1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   THOMAS T. AOKI, M.D., et al.,              Case No.  2:11-cv-02797-MCE-CKD

12                    Plaintiffs,

13        v.                                    **MEMORANDUM AND ORDER**

14   GREGORY FORD GILBERT, et al.,

15                    Defendants.

16

17        Through this action, Plaintiffs Thomas Aoki, M.D. ("Aoki"), and Aoki Diabetes

18   Research Institute ("ADRI") (collectively "Plaintiffs") allege a variety of causes of action

19   arising from the development, patenting and licensing of therapies intended for the

20   treatment of diabetes.  Pending before the Court is a Motion to Compel Arbitration and

21   Stay Proceedings Pending Arbitration by Defendants Gary J. Mugg, Shuyuan "Sherry"

22   Tang, Health Innovations, LP, ACSRC, LLC, and Cheng Shao (collectively "the Hayward

23   Clinic Defendants").[1]  (ECF No. 91.)

24   _____

25        [1] The Hayward Clinic Defendants filed a Motion to Compel Arbitration and Stay Proceedings on
     February 16, 2012.  (ECF No. 54.)  Because Plaintiffs' Motion to Disqualify Counsel (ECF No. 41) was
     also pending before the Court, the Court ordered the Motion to Compel Arbitration (ECF No. 54) removed
26   from the Court's calendar.  (ECF No. 59.)  The Court's Order provided that the Motion to Compel
     Arbitration could later be reset at Defendants' request.  (Id.)  Rather than request that the Motion to
27   Compel Arbitration (ECF No. 54) be reset, the Hayward Clinic Defendants noticed a new Motion to
     Compel Arbitration and Stay Proceedings on August 16, 2012 (ECF No. 91).  Because the February 16
     motion and the August 16 motion are substantively identical, this Order applies to both.  However, for
28   simplicity's sake, the Order refers to only the August 16 motion (ECF No. 91).

1  Defendants Gregory Ford Gilbert ("Gilbert"), Bionica, Inc., Bionica International, LLC,

2  Trina Health, LLC, and Trina Health of Newport Beach, LLC, submitted a statement of

3  non-opposition to Defendants' Motion.  (ECF No. 100.)  Plaintiffs filed a timely opposition

4  to the Motion to Compel Arbitration (ECF No. 101) as well as objections to the statement

5  of non-opposition.  (ECF No. 102.)

6       For the following reasons, Defendants' Motion to Compel Arbitration is DENIED.[2]

8                          **BACKGROUND**[3]

10  **A.  Plaintiffs' Version of the Facts**[4]

12       Aoki, a physician licensed to practice in California, founded ADRI in 1986 to

13  further his research efforts into the areas of diabetes and metabolism.  ADRI also

14  provides some clinical care using an intravenous insulin therapy called metabolic

15  activation therapy or MAT® treatment.  Aoki is the sole inventor and developer of, and

16  has received a patent for, that treatment.  During development of that therapy and

17  thereafter, Aoki and ADRI developed trade secret know-how related to the use and

18  application of the technology.  Aoki also developed additional treatment-related methods

19  and systems for which he obtained further patents, including U.S. Patent No. 4,826,810

20  ("the '810 patent") (collectively, all above patents are referred to as "the Patents").

21       According to Aoki, at some point he retained Gilbert, a California attorney, to act

22  as his personal counsel.

23  ///

---

[2] Because oral argument will not be of material assistance, the Court ordered this matter submitted on the briefs.  E.D. Cal. Local R. 78-230(g).

[3] The underlying dispute arises from a business relationship between Aoki and Gilbert that dates back to the mid-1980s.  Given the long history of the parties' relationship, and the lack of clarity as to exactly what has evolved over the years, the Court recites only the bare minimum facts here.

[4] Unless otherwise stated, these facts are taken, sometimes verbatim, from Plaintiffs' Complaint.

1   At the same time, Gilbert became engaged in business transactions with Aoki and set up

2   legal entities, including ADRI, to exploit Aoki's technology.  Gilbert acted as counsel for

3   those legal entities as well.  In fact, Gilbert purportedly drafted nearly every legal

4   document for both the entities and for Aoki and provided legal advice to Plaintiffs over

5   the course of many years, until their relationship dissolved in late 2002 or early 2003.

6          After Plaintiffs' relationship with Gilbert ended, Gilbert allegedly proceeded to

7   falsely assert that he, or entities with which he is affiliated, holds all right, title and

8   interest in the MAT® treatment.  More specifically, Gilbert purportedly acted in concert

9   with the remaining Defendants to set up clinics where the MAT® treatment is now

10  offered.  Gilbert also allegedly made false and misleading statements to patients or

11  would-be patients regarding the status and efficacy of the MAT® treatment as well as

12  regarding available payment options.

13

14      **B.  Gilbert's Version of the Facts[5]**

15

16         According to Gilbert, he has been involved in the development of diabetes

17  technologies for more than twenty-five years, ever since his daughter was diagnosed

18  with Type 1 diabetes at age two.  At that time, Gilbert was a practicing lawyer and the

19  Chief Executive Officer ("CEO") of an international innovative pump manufacturing

20  company.  After his daughter's diagnosis, Gilbert began work on designing an insulin

21  pump for use in the treatment of diabetes.  Due to his increasing diabetes-related work,

22  Gilbert eventually met Aoki, and the two thereafter partnered together to develop and

23  commercialize a new approach to the treatment of diabetes using Aoki's technology and

24  Gilbert's pumps.

25         Gilbert formed ADRI in approximately 1986 or 1987 and thereafter served as its

26  Executive Director.

27  _____

28         [5] Unless otherwise stated, these facts are derived, at times verbatim, from the Declaration of
    Gregory Ford Gilbert.  (ECF No. 13.)

1    After realizing that fund-raising presented an issue for a non-profit entity, Gilbert formed

2    a "for profit" company, AMSys, to raise additional funds.  According to Gilbert, at AMSys'

3    formation, Aoki licensed his technology to that new entity pursuant to a Licensing

4    Agreement ("Agreement"), signed by Aoki and AMSys in November 1987.  In the

5    meantime, Gilbert continued working on pumps through his own affiliated entities,

6    namely, some of the Bionica Defendants.  Subsequently, Gilbert became the CEO of

7    AMSys and he and Aoki reverse merged AMSys into a new company.  Eventually, after

8    the new company experienced difficulties, Gilbert purchased the license from that

9    company via one of his other entities.  All disputes between the parties were purportedly

10   resolved in 2002 by execution of a Settlement Agreement and Release, which Gilbert

11   argues operated to assign him the license rights in the pertinent technology.

12

13   **C.  The Licensing Agreement[6]**

14

15        AMSys and Aoki entered the Agreement in November 1987.  Pursuant to the

16   Agreement, Aoki transferred to AMSys "an exclusive worldwide license to utilize the

17   Subject Technology and Patent Rights as they exist from time to time, and to

18   manufacture, use, have manufactured and sell the Licensed Products manufactured by it

19   or pursuant to its request in the Territory."  (ECF No. 91-1 at 13.)  The Agreement

20   defines "Subject Technology" as "the ideas, methods, inventions, improvements, and

21   techniques heretofore or hereafter developed by or for [Aoki] or [ADRI] during the

22   lifetime of this agreement as they shall relate, inter alia, to restoring and maintaining

23   normal metabolic fuel processing in a patient by means of a method or algorithm for

24   delivering insulin which may be combined with the administration of carbohydrates

25   and/or other drugs."  (Id. at 10-11.)

26   ///

27   _____

28        [6] A copy of the Licensing Agreement was submitted by the Hayward Clinic Defendants.  (ECF No. 91-1.)

4

1   The Agreement defines "Patent Rights" as "all patents or patent applications . . . ,

2   including inventions claimed by such patents or patent applications, relating to the

3   subject technology, owned or filed by [Aoki]."  (ECF No. 91-1 at 12.)  At the time the

4   Agreement was executed, Aoki had several patents.  Finally, the Agreement provides

5   that "any disagreement arising under the provisions of this agreement shall be decided

6   by arbitration in Chicago in accordance with the rules then obtaining of the American

7   Arbitration Association."  (ECF No. 91-1 at 38.)

8

9                                    **STANDARD**

10

11         "The [Federal Arbitration Act ("FAA")] was enacted in 1925 in response to

12   widespread judicial hostility to arbitration agreements."  AT&T Mobility LLC v.

13   Concepcion, 131 S. Ct. 1740, 1745 (2011).  Under the FAA, arbitration agreements

14   "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or

15   in equity for the revocation of any contract."  9 U.S.C. § 2.  Section 2 of the FAA

16   "reflect[s] . . . a 'liberal federal policy favoring arbitration."  Id. at 1745 (quoting Moses H.

17   Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)).  At the same time,

18   however, § 2 reflects the 'fundamental principle that arbitration is a matter of contract.'"

19   Id. (quoting Rent-A-Center, W., Inc. v. Jackson, 130 S. Ct. 2772, 2776 (2010)).

20   "[Section] 3 requires courts to stay litigation of arbitral claims pending arbitration of those

21   claims in accordance with the terms of the agreement; and § 4 requires courts to compel

22   arbitration 'in accordance with the terms of the agreement' upon the motion of either

23   party to the agreement . . . ."  Concepcion, 131 S. Ct. at 1748.

24         Thus, "[b]y its terms, the [FAA] leaves no place for the exercise of discretion by a

25   district court, but instead mandates that district courts shall direct the parties to proceed

26   to arbitration on issues as to which an arbitration agreement has been signed."  Dean

27   Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985) (citing 9 U.S.C. §§ 3, 4)

28   (emphasis in original).

                                        5

1  "The standard for demonstrating arbitrability is not a high one; in fact, a district court has

2  little discretion to deny an arbitration motion, since the [FAA] is phrased in mandatory

3  terms." Republic of Nicaragua v. Standard Fruit Co., 937 F.2d 469, 475 (9th Cir. 1991).

4  "Moreover, the scope of an arbitration clause must be interpreted liberally and 'as a

5  matter of federal law, any doubts concerning the scope of arbitrable disputes should be

6  resolved in favor of arbitration.'" Concat LP v. Unilever, PLC, 350 F. Supp. 2d 796, 804

7  (N.D. Cal. 2004) (quoting Moses H. Cone, 460 U.S. at 24; Three Valleys Mun. Water

8  Dist. v. E.F. Hutton & Co., 925 F.2d 1136, 1144 (9th Cir. 1991); French v. Merrill Lynch,

9  784 F.2d 902, 908 (9th Cir. 1986)).  Thus, "[a]n order to arbitrate . . . should not be

10  denied unless it may be said with positive assurance that the arbitration clause is not

11  susceptible of an interpretation that covers the asserted dispute.  Doubts should be

12  resolved in favor of coverage." United Steelworkers v. Warrior & Gulf Navigation Co.,

13  363 U.S. 574, 582-83 (1960).

14        In determining whether to compel arbitration, the Court may not review the merits

15  of the dispute.  Instead, the Court must limit its inquiry to three steps: (1) whether the

16  contract containing the arbitration agreement evidences a transaction involving interstate

17  commerce; (2) whether there exists a valid agreement to arbitrate; and (3) whether the

18  dispute(s) fall within the scope of the agreement to arbitrate. Standard Fruit, 937 F.2d at

19  476-78.

20

21                                    **ANALYSIS**

22

23       **A.  Applicable Law**

24

25        "Congress vested the Federal Circuit with exclusive jurisdiction over 'an appeal

26  from a final decision of a district court of the United States . . . if the jurisdiction of that

27  court was based, in whole or in part, on 28 U.S.C. § 1338.'"

28  ///

1    Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc., 535 U.S. 826, 829 (2002)

2    (quoting 28 U.S.C. § 1295(a)(1)).  "Section 1338(a), in turn, provides in relevant part that

3    'the district courts shall have original jurisdiction of any civil action arising under any Act

4    of Congress relating to patents.'"  Id.  Accordingly, the Federal Circuit has jurisdiction

5    when "[t]he plaintiff's well-pleaded complaint . . . establish[es] either that federal patent

6    law creates the cause of action or that the plaintiff's right to relief necessarily depends on

7    resolution of a substantial question of federal patent law."  Id. (quoting Christianson v.

8    Colt Indus. Operating Corp., 486 U.S. 800, 809 (1988)).  Thus, if patent law is a

9    necessary element of one of the well-pleaded claims, the Federal Circuit has jurisdiction.

10    Id.

11        Here, Plaintiff's first claim is for patent infringement.  (ECF No. 1 at 24.)  Plaintiffs

12    specifically state that the Court has original and exclusive subject matter jurisdiction over

13    the action pursuant to 28 U.S.C. § 1338(a).  (ECF No. 1 at 2.)  Thus, Plaintiff's complaint

14    establishes that federal patent law creates the cause of action.  Accordingly, the Federal

15    Circuit has jurisdiction over the case.  The Federal Circuit applies "the law of the regional

16    circuit to which the district court appeal normally lies unless 'the issue pertains to or is

17    unique to patent law,' in which case [the Federal Circuit] appl[ies] [its] own law to both

18    substantive and procedural issues 'intimately involved in the substance of enforcement

19    of the patent right.'"  Flex-Foot, Inc. v. CRP, Inc., 238 F.3d 1362 (Fed. Cir. 2001)

20    (quoting Amana Refrigeration, Inc. v. Quadlux, Inc., 172 F.3d 852, 855-56 (Fed. Cir.

21    1999)).  Thus, the Federal Circuit is "obligated to follow regional circuit law on questions

22    of arbitrability that are not 'intimately involved in the substance of enforcement of a

23    patent right.'"  Promega Corp. v. Life Techs. Corp., 674 F.3d 1352, 1356 (Fed. Cir.

24    2012).  In this case, the issue of arbitrability is not intimately involved in the substance of

25    the enforcement of a patent right, and thus Ninth Circuit law applies.  See id.

26    ///

27    ///

28    ///

1    **B.  Motion to Compel Arbitration**

2

3         As set forth above, when determining whether to compel arbitration, the Court

4    must limit its inquiry to: (1) whether the contract containing the arbitration agreement

5    evidences a transaction involving interstate commerce; (2) whether there exists a valid

6    agreement to arbitrate; and (3) whether the dispute(s) fall within the scope of the

7    agreement to arbitrate.  Standard Fruit, 937 F.2d at 476-78.

8

9              **1.  Transaction Involving Interstate Commerce**

10

11        The FAA provides that "[a] written provision in any . . . contract evidencing a

12   transaction involving commerce to settle by arbitration a controversy thereafter arising

13   out of such contract or transaction . . . shall be valid, irrevocable, and enforceable . . . ."

14   9 U.S.C. § 2.  Section 1 defines "commerce" to mean, among other things, "commerce

15   among the several States or with foreign nations . . . ."  Id. § 1.  "The 'interstate

16   commerce' provision has been interpreted broadly, embracing any agreement that in its

17   operation directly or indirectly affects commerce between states in any fashion."

18   Affholter v. Franklin Cnty. Water Dist., 1:07-CV-0388-OWW-DLB, 2008 WL 5385810, at

19   *2 (E.D. Cal. Dec. 23, 2008) (citing Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S.

20   265, 277-282 (1995)).

21        In this case, the parties do not dispute that the Agreement evidences a

22   transaction involving interstate commerce.  The Agreement grants "an exclusive

23   worldwide license to utilize the Subject Technology and the Patent Rights as they may

24   exist from time to time, and to manufacture, use, have manufactured and sell the

25   Licensed Products manufactured by it or pursuant to its request in the Territory."  (ECF

26   No. 91-1 at 13.)  The Agreement defines the "Territory" as "worldwide."  (Id.)

27   ///

28   ///

8

1   Thus, the Agreement clearly evidences a transaction that directly or indirectly affects

2   commerce between the states, as the Agreement gives AMSys the right to manufacture

3   and sell products throughout the United States and the world.  The first prong of the

4   Court's inquiry is therefore satisfied.

5

6                  **2.       Existence of a Valid Agreement to Arbitrate**

7

8          The Court's second task is to determine whether there exists a valid agreement to

9   arbitrate.  Standard Fruit, 937 F.2d at 477-78; see also Sanford v. MemberWorks, Inc.,

10  483 F.3d 956, 962 (9th Cir. 2007).  While the FAA expresses a strong public policy in

11  favor of enforcing arbitration agreements, the Court must first establish that there is an

12  agreement to be enforced.  Baker v. Osborne Dev. Corp., 159 Cal. App. 4th 884, 892

13  (2008).  "[T]he question of whether a party is bound by an agreement containing an

14  arbitration provision is a threshold question for the court to decide."  Microchip Tech.

15  Inc. v. U.S. Philips Corp., 367 F.3d 1350, 1357 (Fed. Cir. 2004) (citing John Wiley &

16  Sons, Inc. v. Livingston, 376 F.3d 543 (1964)) (applying Ninth Circuit law).  In

17  determining whether an agreement to arbitrate exists, the district court "appl[ies] general

18  state-law principles of contract interpretation, while giving due regard to the federal

19  policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in

20  favor of arbitration."  Wagner v. Stratton Oakmont, Inc., 83 F.3d 1046, 1049 (9th Cir.

21  1996); see also Pokorny v. Quixtar, Inc., 601 F.3d 987, 994 (9th Cir. 2010).

22         Because the existence of an arbitration agreement is a statutory prerequisite to

23  granting a petition to compel arbitration, the party seeking to enforce the agreement

24  bears the burden of proving the agreement exists by a preponderance of the evidence.

25  Rosenthal v. Great W. Fin. Secs. Corp., 14 Cal. 4th 394, 413 (1996).  "When considering

26  a motion to compel arbitration, a court applies a standard similar to the summary

27  judgment standard of Federal Rule of Civil Procedure 56."

28  ///

1    Concat LP, 350 F. Supp. 2d at 804 (quoting McCarthy v. Providential Corp., 1994 WL

2    387852, at *2 (N.D. Cal. July 19, 1994)).  "Only when there is no genuine issue of

3    material fact concerning the formation of an agreement should a court decide as a

4    matter of law that the parties did or did not enter into such an agreement."  Id. (citing

5    Three Valleys Mun. Water Dist., 925 F.2d at 1141).

6          The agreement at issue contains a choice-of-law provision in which the parties

7    agreed to apply the law of the State of California to the Agreement.  (ECF No. 91-1 at

8    31.)  Under California law, "the right to arbitration depends on the existence of an

9    agreement to arbitrate."  Frederick v. First Union Secs., Inc., 100 Cal. App. 4th 694, 697

10   (2002); see also Cal. Civ. Proc. Code § 1281.2.  Thus, the Court must determine

11   whether, under California law, there is a viable contract agreeing to resolve disputes by

12   arbitration.  California contract law provides that the elements for a viable contract are:

13   "(1) parties capable of contracting; (2) their consent; (3) a lawful object; and (4) sufficient

14   cause or consideration."  United States ex rel. Oliver v. Parsons Co., 195 F.3d 457, 462

15   (9th Cir. 1999) (citing Cal. Civ. Code § 1550; Marshall & Co. v. Weisel, 242 Cal. App. 2d

16   191, 196 (1966)).  Under California law, an arbitration agreement may only be

17   invalidated for the same reasons as other contracts.  Cal. Code Civ. Proc. § 1281.

18         Here, there is no question that the parties to the Agreement—AMSys and Aoki—

19   were capable of contracting and consented to arbitration of disputes arising under the

20   Agreement.  Furthermore, the parties do not dispute that the Agreement was supported

21   by sufficient consideration.  See Circuit City Stores, Inc. v. Najd, 294 F.3d 1104, 1108

22   (9th Cir. 2002) (a promise to be bound by the arbitration process itself serves as

23   adequate consideration).  Finally, the "paramount consideration" in determining the

24   validity of the arbitration agreement is "the parties' objective intention at the time of

25   contracting."  Kingsburg Apple Packers, Inc. v. Ballantine Produce Co., Inc.,

26   1:09-cv-00901 AWI JLT, 2012 WL 718853, at *3 (E.D. Cal. Mar. 5, 2012) (quoting

27   Porreco v. Red Top RV Center, 216 Cal. App. 3d 113, 119 (Cal. Ct. App. 1989)).  In this

28   case, no evidence before the Court suggests that at the making of the Agreement, the

1    parties did not intend that disputes would be resolved through arbitration.  The evidence

2    suggests only that Aoki and AMSys intended that disputes "arising under" the

3    Agreement would be subject to arbitration.  In light of these considerations, the Court

4    finds the agreement to arbitrate valid under California law.

5         The Court must next consider whether Defendants, as non-signatories to the

6    Agreement, may properly compel arbitration.  See Microchip Tech. Inc., 367 F.3d at

7    1357.  "The strong public policy in favor of arbitration does not extend to those who are

8    not parties to an arbitration agreement, and a party cannot be compelled to arbitrate a

9    dispute that he has not agreed to resolve by arbitration."  Lee v. S. Cal. Univ. for Prof'l

10   Studies, 148 Cal. App. 4th 782, 786 (2007).  In this case, the evidence provided by

11   Gilbert makes clear that the Hayward Clinic Defendants are not signatories to the

12   Agreement.  In 1987, Aoki and AMSys entered the Agreement at issue.  Pursuant to the

13   Agreement, Aoki licensed patent rights and the subject technology to AMSys.  (ECF

14   Nos. 91-1; 13 at 71.)  The subject technology includes the '810 patent.  (ECF No. 124.)

15        There are several circumstances in which non-signatories may be bound to the

16   agreement and may compel a signatory to arbitrate.  To compel arbitration, a

17   non-signatory must be either (1) a third party beneficiary to the contract, (2) a successor

18   in interest to the contract, or (3) an agent intended to benefit from the arbitration clause.

19   Britton v. Co-op Banking Grp., 4 F.3d 742, 744 (9th Cir. 1993).  Successors in interest

20   are entitled to the benefits of a contract, including an arbitration clause contained in an

21   agreement, under the ordinary principles of contract and agency and the doctrine of

22   equitable estoppel.  See Comer v. Micor, Inc., 426 F.3d 1098, 1101 (9th Cir. 2006).

23        Although not perfectly clear, the Hayward Clinic Defendants appear to contend

24   that they are successors in interest to the Agreement as the result of a series of

25   agreements and assignments that took place between 1992 and 2005.  Gilbert provided

26   a declaration, with multiple exhibits, outlining these transactions for the Court.

27   ///

28   ///

1   According to Gilbert, the first of these transactions took place on January 31, 1992,

2   when AMSys purportedly entered into a Development Agreement with Connecticut

3   Innovations Incorporated ("CII"), pursuant to which CII provided development funding by

4   loan to AMSys and AMSys gave CII a non-exclusive license to use the '810 patent as a

5   security.  (ECF No. 13 at 48.)  This Development Agreement approved as to form by the

6   Attorney General on March 3, 1992.  (Id. at 64.)  Gilbert asserts that at this point, AMSys

7   owned the license to use the '810 patent and the subject technology and CII had a

8   non-exclusive royalty-free license to use the '810 patent.

9          According to Gilbert, AMSys subsequently transferred its rights and obligations

10   under the Agreement to AMTech.  (ECF No. 71 at 120.)  Thus, at this point, AMTech

11   owned the License to the '810 patent, and CII had a non-exclusive license to use the

12   '810 patent.  Gilbert next asserts that on June 30, 1999, pursuant to an "Agreement and

13   Plan of Reorganization," Diabetex International Corporation ("Diabetex") became the

14   sole shareholder of AMTech.  (ECF No. 13 at 67.)  Diabetex thus owned AMTech, which

15   in turn owned the license to the '810 patent and CII had a non-exclusive license to use

16   the '810 patent.

17          As an exhibit to his declaration, Gilbert submitted a document entitled "Settlement

18   Agreement and Release," dated January 24, 2002.  (ECF No. 13 at 71-76).  According to

19   that document, Diabetex, its wholly owned subsidiary AMTech, ADRI, Aoki, the

20   Hamilton-May Corporation, and Gilbert entered a settlement agreement, pursuant to

21   which Diabetex and AMTech transferred to Gilbert "all of their respective rights and

22   interests in all Technologies including the License Agreements."  (ECF No. 13 at 78.)

23   The Settlement Agreement and Release states that "in order to avoid further uncertainty,

24   inconvenience and expense of future litigation, the Parties now desire to compromise

25   and settle all claims, causes of action, and issues in dispute between them arising out of

26   or relating to the License Agreement."  (ECF No. 13 at 71.)

27   ///

28   ///

1   Pursuant to the Settlement Agreement, Aoki "agree[d] to deliver to Diabetex an

2   aggregate of [152,405] shares of common stock received by him from Diabetex" and

3   Gilbert agreed "to pay Diabetex $150,000 in cash . . . ." (ECF No. 13 at 71.)

4   Additionally, Diabetex and AMTech "agree[d] to transfer to Gilbert all of their respective

5   rights and interests in the License Agreement" upon receipt of Gilbert's $150,000. (Id. at

6   72.) Importantly, Aoki signed this Settlement Agreement, as did ADRI. Gilbert asserts

7   that as a result of this settlement, he became the Licensee under the Agreement and

8   that ADRI and Aoki knew and consented to this transfer. At this point, according to

9   Gilbert, CII still owned a non-exclusive license to use the '810 patent.

10         Gilbert next asserts, and offers evidence purporting to show, that on February 23,

11   2005, Defendant Bionica, Inc. ("Bionica") purchased the non-exclusive license from CII

12   pursuant to a Development Purchase Agreement. (ECF No. 13 at 80.) The

13   Development Purchase Agreement between Bionica and CII states that AMSys had

14   agreed to pay CII certain royalties pursuant to the 1992 Development Agreement but

15   had failed to do so. (ECF No. 13 at 80.) CII assigned to Bionica all rights in the 1992

16   Development Agreement, including the intellectual property rights. (ECF No. 13 at 80.)

17   Thus, Gilbert contends that the evidence before the Court establishes that Gilbert and

18   Bionica are parties to the Agreement as successors in interest.

19         Even assuming that the Court accepts Gilbert's assertion that he is a party to the

20   settlement agreement,[7] the question remains whether the Hayward Clinic Defendants—

21   the moving parties—are parties to the Agreement with standing to compel arbitration.

22   Gilbert states in a declaration dated October 10, 2012, that the Hayward Clinic

23   Defendants have sub-license contracts with Gilbert, and thus are allowed to use the

24   Subject Technology under the terms of the Agreement. (ECF No. 104 at 2.) The

25   Agreement allows for the licensed patents to be sublicensed, providing:

26   _____

27         [7] At this time, the Court does not reach the issue of whether the evidence establishes that Gilbert is a party to the Agreement. In light of the Court's conclusion that there is insufficient evidence to establish that the Hayward Clinic Defendants are parties, see infra, such a finding is unnecessary. Accordingly, the Court declines to address Plaintiffs' Objections to Declaration of Gregory Ford Gilbert in Support of Motion

28   to Dismiss (ECF No. 81.)

1

2

3

4

5

6

> It is agreed that neither Licensee nor Licensor shall subcontract, transfer, assign or delegate this agreement, or any of the rights granted herein, in whole or in part, nor shall this Agreement inure to the benefit of a successor, trustee, or any other legal representative of Licensee or Licensor, *without the prior written consent of the other of them*, which consent shall not be unreasonably withheld or delayed, provided however, that Licensee may transfer or assign this Agreement, or any of the rights granted herein, to an Affiliate, and no prior written consent from Licensor shall be required.

7    (ECF No. 91-1 at 31-32 (emphasis added).)  Gilbert's declaration states that "in

8    response to our efforts to provide Licensor with notice regarding sublicenses, Licensor in

9    the past several years repudiated the License."  (ECF No. 104 at 2.)

10          Given Gilbert's sworn statement that Aoki has rejected the Agreement as having

11   any binding force and has refused to give consent to these sublicenses, it is unclear

12   whether the Hayward Clinic Defendants have valid sublicenses under the Agreement.

13   Only when there is no genuine issue of material fact concerning the formation of an

14   agreement should a court decide as a matter of law that the parties in the litigation are

15   also parties to the agreement.  See Concat LP, 350 F. Supp. 2d at 804.  The only

16   evidence before the Court regarding the Hayward Clinic Defendants' status as

17   sublicensees is Gilbert's declaration.  Rather than conclusively establish that the

18   Hayward clinic Defendants are parties to the Agreement by virtue of owning valid

19   sublicenses, Gilbert's declaration makes clear that there are genuine issues of material

20   fact regarding the Agreement and the validity of sublicenses.  While additional evidence

21   may permit the Court to determine whether the Hayward Clinic Defendants hold valid

22   sublicenses, and thus are parties who may enforce the Agreement, at this juncture the

23   Court lacks sufficient evidence to make that determination.

24          Accordingly, the Hayward Clinic Defendants have failed to show that they are

25   successors in interest to the Agreement, and have thus failed to show that they, as

26   non-signatories, may enforce the terms of that Agreement.  The Court therefore cannot,

27   at present, require Plaintiffs to submit to arbitration.

28   ///

1   Accordingly, the Court need not reach the issue of which disputes, if any, fall within the

2   scope of the Agreement.[8]

3

4                                    **CONCLUSION**

5

6          For the reasons set forth above, the Hayward Clinic Defendants' Motion to

7   Compel Arbitration and Stay Proceedings Pending Arbitration is DENIED.  (ECF

8   Nos. 91, 54.)

9          IT IS SO ORDERED.

10  DATED:  March 14, 2013

11

12  _____
    MORRISON C. ENGLAND, JR., CHIEF JUDGE
13  UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26  _____
        [8] Because the Court does not reach the issue of which disputes fall within the scope of the
27  Agreement, the Court declines to rule on Plaintiffs' Request for Judicial Notice in support of the
    Supplemental Brief.  (ECF No. 125.)  For the same reasons, the Court declines to reach Plaintiffs'
28  Objections to Gilbert Defendants' Statement of Non-Opposition to Motion to Compel Arbitration.  (ECF
    No. 102.)

                                          15