1  FRANK F. SOMMERS, SBN 109012
   SOMMERS & SCHWARTZ LLP
2  One Embarcadero Ctr, Ste. 800
   San Francisco, CA 94111
3  Telephone: (415) 955-0925
   ffs@SommersSchwartz.com
4
   DUYEN T. NGUYEN, SBN 225368
5  DTN LAW GROUP
   355 1st St., Unit S2006
6  San Francisco, California 94105
   Telephone: (415) 310-6979
7  Facsimile: (415) 707-2171
   duyen@dtnlawgroup.com
8
   Attorneys for Plaintiffs
9  THOMAS T. AOKI, M.D., and
   AOKI DIABETES RESEARCH INSTITUTE
10

11                    UNITED STATES DISTRICT COURT

12                   EASTERN DISTRICT OF CALIFORNIA

13
   THOMAS T. AOKI, M.D., an individual, and      Case No.: 2:11-cv-02797-TLN-CKD
14 AOKI DIABETES RESEARCH INSTIUTE,
   a California Non-Profit Corporation,           PLAINTIFFS' [PROPOSED] STATEMENT OF
15                                                FACTS AND CONCLUSIONS OF LAW
              Plaintiffs
16                                                *Trial Date: 03/25/2019*
              vs.
17                                                Courtroom:  2, 15th Floor
   GREGORY FORD GILBERT, an individual;
18 et al.                                         Before United States District Judge Troy L. Nunley

19            Defendants

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

<u>Page</u>

I.   **SUMMARY OF THE CASE**……………………………………………………1

II.  **FINDING OF FACTS**…………………………………………………………2

   A.  Mr. Gilbert's Credibility……………………………………...…………………2

     1.  Day 1- Refusal To Produce Financial Data……………………..…………..2

     2.  Denial of His Connections With Clinics…………………………………..3

       a.   The Trina Health Prospectus…………………..…………..………3

       b.   Trina Health West Los Angeles…………………..…………………4

       c.   Www.diabetes.net.................................................................4

     3.  Mr. Gilbert's Relationship With Dr. Aoki / ADRI…………………………5

       a.   Mr. Gilbert's Testimony Re Confidentiality Agreement ………………5

       b.   Mr. Gilbert's Role As Dr. Aoki / ADRI's Attorney………..…………..5

     4.  License-Related Mis-statements ……………………………………6

     5.  Mr. Gilbert Testified He Had No Role In Dr. Aoki's RQ Patent Applications But He Previously Testified He Worked On Every One Of Aoki's Patents………..……...7

     6.  Mr. Gilbert's Testimony That The APT Treatment Doesn't Return To Baseline Is Contradicted By His Own Patent Application Declaration..……………..…………7

     7.  Mr. Gilbert's Claim Of No Rest Period For APT Is Contradicted By The Evidence……………………………………………………...8

     8.  Mr. Gilbert Deliberately Failed To Disclose The Existence Of The CI-Bionica License……………...……………………………..……………....8

     9.  APT Trademark..……………..……………………..……………………8

    10. Artificial Pancreas "System" Vs. "Treatment"..…………..……………………9

    11. Mr. Gilbert Is Not A Medical Doctor And Only Has A "Ph.D." From An Online Website..……………..………………………..…………..…….....9

    12. Mr. Gilbert Has Pled Guilty To A Crime Of Moral Turpitude……………………10

B. Aoki Diabetes Education, Training And Research Prior To '810 And RQ Patents........10

C. Dr. Aoki Goes To UC Davis……………………..……………….…..……………...13

D. Confidentiality Agreement, Mr. Gilbert's Work as Dr. Aoki / ADRI's Attorney………14

   1. AMSys / Advanced Metabolic Systems, Inc. / Connecticut Innovations…………..14

   2. AMTech – Diabetex……………………..………………………………….....15

   3. Pulse Activation Therapies ("PAT") – Metabolic Industries ("MI")……………..16

E. The Pump – Gilbert's Use of Company Funds to Buy Bionica Australia – Gilbert's
Termination From MI…………..……..……………..…..………………………17

F. The 2003 Nevada Litigation……………..……..…..……..………..……………18

G. CI – Bionica License……..…………….……………..…..….…………..……………20

   1. AMSys License and Modification License…………………..………………20

   2. AMSys – CI Development Agreement……………………..………………20

   3. CI – Bionica Development Agreement……………………..………..……20

   4. Aoki Termination Letter to CI……..…………………..…..……………21

   5. The CI – Bionica License Did Not Grant Defendants A License……………..21

H. The RQ Patent Claims And Infringing Evidence……………….…………………22

   1. Arizona Manual And Florida Protocol…………….…..………………22

   2. Witness Testimonies – Infringing Evidence……………….…………………23

      a. Rebecca Shaffer…………..……..…………………..………………23

      b. Michael Arcangeli…………….…..……..…………..………………24

      c. Gregory Gilbert…………….…..……..…..……………..…………25

   3. The License Agreements Reference Dr. Aoki's Technology Under the CI-Bionica
License And Call Out Use Of A Metabolic Measurement Cart………..………..25

   4. The License Agreements Explicitly Cite Dr. Aoki's RQ Patents…………………26

   5. Other Evidence Of Infringement And/Or Use Of RQ……………..………26

      a. Cellular Activation Therapy Presentation…………….……………26

      b. The Trina Health Prospectus……………..……..……..……………27

      c. Diabetes.Net Printout…………….……..……..……..………………27

         d.   APT Slides Use Dr. Aoki's MAT® Research………..……….……..……………..27

         e.   APT Article By Mr. Gilbert……………..…….……………………..…….....28

I.    Direct Admissions of Infringement……………..………….………………………..29

    1.   2013 Gilbert Supplemental MSJ Declaration…………..………………..………29

    2.   2017 Gilbert Email……………..………….……..…………………………....29

    3.   Hayward Clinic Stipulation, Consent Judgment, Permanent Inj, and Order………..30

J.    Mr. Gilbert's Claim That He Invented A "Different" Treatment Is Not Credible And

    Contradicted By His Own Statements In This Case And In The Nevada Case………..31

K.  Use Of Slides – Copyright Infringement……………..……….……..……………..32

L.   False Or Misleading Misrepresentations……………..……….……..……………..32

    1.   Defendants Falsely Attribute To APT Statements And Research That Belong To

    MAT®………..……..………….……..………….……..………….……………..32

    2.   Defendants Falsely Claim That APT Is Covered By Medicare…………………..35

    3.   Defendants Falsely Claim That There Has Never Been Adverse Reactions To

    APT………….……..………….……..………….……..………….………………..37

M. Thirty-Three Clinics And Calculation Of Damages……………………………..38

N.  Involvement Of The Other Defendants………………..……….……………..……..39

    1.   The Remaining Defendants……………………….……..………………....39

    2.   Default Is Entered Against These Defendants………………………………..40

III.    **CONCLUSIONS OF LAW**……………………………………………..40

A. Judicial Admissions………………….……..………….……..………….…..40

    1.   Legal Standard……………………………………………………………..40

    2.   Defendants Have Admitted In Briefs Filed With The Court That Their APT

    Treatment Is The Same As Dr. Aoki's MAT® Treatment……………….…...…...41

    3.   Defendants Admit Under Oath That They Are Using Dr. Aoki's MAT®

    Treatment………….……..………….……..………….……..…………......42

B.  Res Judicata………..………….……..………….……..………….…….....42

    1.   Legal Standard……………………..………….……..……………..……..42

2. Relevant Factual Events…..……………………………………….............43

3. Analysis..……………………………………………………………..44

C. Patent Infringement…………..…………………..…..……………………...45

   1. Generally……………….………………………………………………..45

   2. Direct Infringement…………….……………………………………….45

      a. Legal Standard………………………………………………..………45

      b. Analysis..……………………………………………………..………46

         1) Mr. Gilbert And Defendants Admit To Infringement…………………46

         2) Claim-By-Claim Analysis……………………………………....46

   3. Doctrine of Equivalence……………………………………………......48

      a. Legal Standard…………………………………………………………48

      b. Analysis………………………………………………………………49

   4. Indirect Infringement:  Inducement of Infringement……………………………50

      a. Legal Standard…………………………………………………………50

      b. Analysis……………………………………………………..………50

         1) Mr. Gilbert And His Entities Had Knowledge Of The Patents…………50

         2) Mr. Gilbert And His Entities Acted With Specific Intent To Encourage
Infringement Of The Patents…………………………………………50

   5. Remedies (Patent Infringement) ……………………………………..……51

      a. Reasonable Royalty..…………………………………………..……51

      b. Willfulness And Enhanced
Damages..………..………………………..……….52

      c. Fees………………………………………………………………53

      d. Injunctive Relief……………………………………………..………53

D. Copyright Infringement…………………………………..……………………55

   1. Legal Standard (Copyright Infringement)…………..……………..……………55

   2. Remedies (Copyright Infringement)….……………….…………..………55

      a. Statutory Damages…………..…………………..…………………55

-iv-

b.   Injunctive Relief ...……….……..…………..……...……….……....56

c.   Attorneys' Fees ...……………..…….…….…..…………….……...56

E.   False And Misleading Advertising (15 U.S.C. §1125(a)(1), Lanham Act)…..,………..56

1.   Legal Standard (Lanham Act – False and Misleading Advertising) ...…………..56

2.   Remedies (Lanham Act – False and Misleading Advertising) ...……..………..57

a.   Defendants' Profits And Any Damages Sustained By Plaintiff....…………..…57

b.   Trebling.…………………………………………….……….……....57

c.   Costs Of The Action.………………………………………………58

d.   Injunctive Relief.……………………….……...…………………58

e.   Attorneys' Fees.………………………………………………58

3.   Analysis (Lanham Act – False and Misleading Advertising) ...………..………..58

F.   False And Misleading Advertising (Cal. Bus. & Prof. Code §17500).……………….60

1.   Legal Standard (B&P §17500 – False And Misleading Advertising).…………..60

2.   Remedies (B&P §17500 – False And Misleading Advertising).…………..……..60

a.   Restitution.……………………………………………….…....60

b.   Injunctive Relief.……………………………………………....61

3.   Analysis (B&P §17500 – False and Misleading Advertising).……..……..……..61

G.   Breach of Fiduciary Duty – Against Defendant Gilbert Only.…………………….....62

1.   Legal Standard (Breach of Fiduciary Duty) ………..……………………62

2.   Remedies (Breach of Fiduciary Duty) ...……………………………..………62

a.   Unjust Enrichment.…………………………………………62

b.   Punitive Damages.………………………………………....63

3.   Analysis (Breach of Fiduciary Duty) ...……………………………….63

H.   Breach Of Confidential Relationship – Against Defendant Gilbert Only.……………65

1.   Legal Standard (Breach of Confidential Relationship).………………..……….65

2.   Remedies (Breach of Confidential Relationship) ...……………..…………….66

a.   Compensatory And Punitive Damages.………………………66

b.   Attorneys' Fees.……………………………………...…….66

3.  Analysis (Breach of Confidential Relationship) …………..……………..…..66

I.  Unfair Competition (15 U.S.C. §1125(a), Lanham Act)………………………...…66

1.  Legal Standard (Lanham Act – Unfair Competition)………………..…….…..66

2.  Remedies (Lanham Act – Unfair Competition) …………..……………..……67

3.  Analysis (Lanham Act – Unfair Competition..……………..…………………67

J.  Unfair Competition (Cal.Bus.&Prof. Code §17200)……………………………...67

1.  Legal Standard (Cal.Bus.&Prof. Code §17200)………………………………67

2.  Remedies (Cal.Bus.&Prof. Code §17200)……………………………………67

a.  Restitution…………………..……………………………………..…..67

b.  Injunctive Relief…………………………………………………......68

c.  Attorneys' Fees And Costs……………………………………………68

3.  Analysis (Cal.Bus.&Prof. Code §17200)……………………………………68

K.  Patent Invalidity…………………………………………………………….......69

1.  Legal Standard…………………………………………………………………69

2.  Prior Public Use / On Sale Bar……………………………………………..…69

3.  Defendants Failed To Establish Patent Invalidity Based On Anticipation………...71

4.  Defendants Failed To Establish Patent Invalidity Based On Obviousness…………72

L.  Defendants' Affirmative Defenses……………..………………..…………….…73

1.  Defendants Failed To Establish Prior Commercial Use Under §273(b)………...…73

2.  The Statute Of Limitations Does Not Bar Plaintiffs' Claims……………..………74

3.  The Physicians' Immunity Doctrine Does Not Apply………..……………...…..75

IV.  **CONCLUSION**………………………………..................................………77

V.  **APPENDICES**……………………………………..……………..………77

A.  Appendix A (Chart Of Infringing Evidence)……………………………...…..76

B.  Appendix B (Chart Of Copyrighted Slides That Were Copied)…… ………….............85

C.  Appendix C (License Agreements) …………………………………………….....87

D.  Appendix D1 (Claim-By-Claim Analysis Of '191 Patent (System- Eye And Nerve Disease))……………………………………………………………………...91

1

E.   Appendix D2 (Claim-By-Claim Analysis of '531 Patent (Method - Heart and

Cardiovascular Disease))……………………………………………………………..93

F.   Appendix E (Chart Of Defendants' Admitted Prior Art Exhibits)……………………...97

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' [PROPOSED] STATEMENT  OF FACTS AND CONCLUSIONS OF LAW
Case No.:  2:11-cv-02797-TLN-CKD

# TABLE OF AUTHORITIES

<u>**State**</u>

## California Supreme Court Cases

*Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal.4th 1185 (2013)……………………………………..74

*In re Tobacco II Cases*, 46 Cal.4th 298 (2009)……………………………………………………..59

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Company,* 20 Cal.4th 163 (1999)..66

*Davies v. Krasna*, 14 Cal.3d 502 (1975) ………………………………………………………….64

*Estate of Sanders*, 40 Cal.3d 607 (1985)…………………………………………………………..64

*Fletcher v. Security Pacific National Bank*, 23 Cal.3d 442 (1979)…………………………………..59

*Kasky v. Nike, Inc.*, 27 Cal.4th 939 (2002) ……………………………………………………….59

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134 (2003)…………………………60, 67

*Kwikset Corp. v. Superior Court*, 51 Cal.4th 310 (2011) …………………………………………..59, 66

*Oasis West Realty, LLC v. Goldman*, 51 Cal.4th 811 (2011) ………………………………………61

*People v. Superior Court* (Jayhill), 9 Cal.3d 283 (1973)……………………………………………67

## State Cases

*American Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal.App.4th 1451 (2014)…………...………61

*Chapman v. Skype, Inc.*, 220 Cal.App.4th 217 (2013)………………………………………………..59

*Clemente v. State of Cal.,* 40 Cal.3d 202 (1985)……………………………………………………67

*Colgan v. Leatherman Tool Group, Inc.*, 135 Cal.App.4th 663 (2006)…………………………59, 60, 67

*Five Star Capital Corporation v. Michael W. Ruby*, 124 Nev. 1048 (2008)……………………………42

*Michelson v. Hamada*, 29 Cal.App.4th 1566 (1994)……………………………………………….61, 62

*People v. Toomey*, 157 Cal.App.3d 1 (1984)………………………………………………………60

*Richelle L. v. Roman Catholic Archbishop*, 106 Cal.App.4th 271 (2003)………………………………65

*South Bay Chevrolet v. General Motors Acceptance Corp.,* 72 Cal.App.4th 861 (1999)…….…………66

*Uzyel v. Kadisha*, 188 Cal.App.4th 866 (2010)……………………………………………………62

## State Statutes

California Business and Professions Code §17200………………………………..…………………65, 66, 67

California Business and Professions Code §17203…………………………………………………..66, 67

California Business and Professions Code §17500…………………………..………………..59, 66

California Civil Code §3294(a)……………………………………………………………………62

California Civil Code §3333……………………………………………………………………….61

California Code of Civil Procedure §1021.5………………………………………………………67

**Federal**

**United States Supreme Court Cases**

*Arizona v. California,* 530 U.S. 392 (2000)…………………………………………………….42

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)……………………………..………54, 56

*Graham v. John Deere Co. of Kan. City*, 383 U.S. 1 (1966)……………………………………72

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605 (1950)……………………………48

*Halo Electronics, Inc. v. Pulse Electronics, Inc.* 136 S.Ct. 1923 (2016) ………………………………52

*Migra v. Warren City School Dist. Bd. Of Ed.*, 465 U.S. 75 (1984)……………………………………42

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014)…………………………53

*Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 661 (2014)…………………………………………74

*Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55 (1998)……………………………………………....69

*Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17 (1997)…………………………........49

**Federal District And Circuit Court Cases**

*A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001)…………..………………………55

*Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.,* 944 F.2d 1446 (9th Cir. 1991) …………………………………………………………………………………66

*Adobe Systems Incorporated v. Alghazzy*, No. 15-cv-01443-BLF, 2015 WL 9478230, at *2 (N.D.Cal. Dec. 29, 2015)……………………………………………………………………….….61

*Amazon.com, Inc. v. BarnesandNoble.com, Inc.*, 239 F.3d 1343 (Fed. Cir. 2001)…………..…………45

*American Title Ins. Co. v. Lacelaw Corp.* 861 F.2d 224 (9th Cir. 1988)…………………………………40

*Amgen Inc. v. Sanofi*, 872 F.3d 1367 (Fed. Cir. 2017)………………………………………………..54

*Apple Inc. v. Samsung Electronics Co., Ltd.*, 809 F.3d 633 (Fed. Cir. 2015)………………………54

*AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042 (Fed. Cir. 2010)……………………………………71

*Aventis Pharma Deutchsland GmbH v. Lupin Ltd.*, 499 F.3d 1293 (Fed. Cir. 2007)………..………....72

-ix-

*Barnes v. Owens-Corning Fierglas Corp.,* 201 F.3d 815 (6th Cir. 2000)………………………………41

*Barry v. Medtronic, Inc.*, 914 F.3d 1310 (Fed. Cir. 2019)………….………………………………69

*Bowmar Instrument Corp. v. Continental Microsystems, Inc.*, 497 Supp. 947 (S.D.N.Y. 1980)………..58

*Brooktree Corp. v. Advanced Micro Devices, Inc.* 977 F.2d 1555 (Fed. Cir. 1992)………..…………68

*Cadence Design Systems, Inc. v. Avant! Corp.*, 125 F.3d 824 (9th Cir. 1997)…………………………56

*Clark v. Bunker*, 453 F.2d 1006 (9th Cir. 1972)…………………………………………………......66

*Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317 (Fed. Cir. 2009)…………………………………69

*Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*, 880 F.3d 1356 (Fed. Cir. 2018)……………..69

*Crown Packaging Technology, Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308 (Fed. Cir. 2009)…...48

*Duncan Parking Technologies, Inc. v. IPS Group, Inc.*, 914 F.3d 1347 (Fed. Cir. 2019)………………45

*Ferguson v. Neighborhood Housing Services of Cleveland, Inc.,* 780 F.2d 549 (6th Cir. 1986)……….41

*Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059 (9th Cir. 2015)……………………58

*Forest Laboratories, Inc. v. Abbott Laboratories*, 239 F.3d 1305 (Fed. Cir. 2001)……………………45

*Georgia-Pacific Corp. v. United States Plywood Corp.,* 318 F.Supp. 1116 (S.D.N.Y. 1970)………….51

*Glover v. BIC Corp.,* 6 F.3d 1318 (9th Cir.1993)………………………………………………………..59

*Gospel Missions of America v. City of Los Angeles,* 328 F.3d 548 (9th Cir. 2003)………………………41

*Harper House, Inc. v. Thomas Nelson, Inc.,* 889 F.2d 197 (9th Cir. 1989)……………………………57

*Helsinn Healthcare S.A. v. Teva Pharmaceuticals USA, Inc.*, 855 F.3d 1356 (Fed. Cir. 2017)…………69

*Holcombe v. Hosmer*, 477 F.3d 1094 (9th Cir. 2007)…………………………………………………42

*Holman v. Kemna*, 212 F.3d 413 (8th Cir. 2000)…………………………………………………………41

*i4i Ltd. v. Microsoft Corp.*, 598 F.3d 831 (Fed. Cir. 2010)……………………………………………..45, 50

*In re Barboza*, 545 F.3d 702 (9th Cir. 2008)……………………………………………………………55

*In re Century 21 RE/MAX Advert. Claims Litig.,* 882 F. Supp. 915 (C.D. Cal. 1994)…………………57

*Innovation Ventures, LLC v. Pittsburg Wholesale Grocers, Inc.*, Case No. C12-05523 WHA, 2013 WL 1007666, at *8…………………………………………………………………………………………60

*Intendis GMBH v. Glenmark Pharmaceuticals Inc., USA*, 822 F.3d 1355 (Fed. Cir. 2016)………..........48

*Interconnect Planning Corp. v. Feil*, 774 F.2d 1132 (Fed. Cir. 1985)…………………………………69

*Internet Specialties West, Inc. v. Milon–DiGiorgio Enterprises, Inc.*, 559 F.3d 985 (9th Cir. 2009)…….56

-x-

*KSR International Co. v. Teleflex*, 550 U.S. 398 (2001)………………………………………72

*Liquid Dynamics Corp. v. Vaughan Company, Inc.*, 449 F.3d 1209 (Fed. Cir. 2006)……………………45

*Lucent Tech., Inc. v. Gateway, Inc.,* 580 F.3d 1301 (Fed. Cir. 2009)…………………………………51

*Medicines Company v. Hospira, Inc.*, 827 F.3d 1363 (Fed. Cir. 2016)……………..………………..69

*Minks v. Polaris Industries, Inc.,* 546 F.3d 1364 (Fed. Cir. 2008)………………………51, 52

*Mobilemedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159 (Fed. Cir. 2015)…………………………………..72

*Nichia Corp. v. Everlight Americas, Inc.*, 855 F.3d 1329 (Fed. Cir. 2017)……………………………54

*Norian Corp. v. Stryker Corp.*, 363 F.3d 1321 (Fed. Cir. 2004) …………………………………68

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.* 806 F.2d 1565 (Fed. Cir. 1986)………………………72

*Peer Intern. Corp. v. Pausa Records, Inc.*, 909 F.2d 1332 (9th Cir. 1990)……………………………55

*PepsiCo. v. Triunfo-Mex, Inc.,* 189 F.R.D. 431 (C.D. Cal. 1999)………………………………………57

*Polara Engineering Inc. v. Campbell Co.*, 894 F.3d 1339 (Fed. Cir. 2018)……………………………69

*Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979 (9th Cir. 2015)…….…………………………61

*Radiator Specialty Company v. Micek*, 327 F.2d 554 (9th Cir. 1964)…………………………………66

*Rojas v. Roman Catholic Diocese of Rochester,*  660 F.3d 98 (per curiam) (2nd Cir. 2011)………….41

*Silicon Graphics, Inc. v. ATI Technologies*, 607 F.3d 784 (Fed. Cir. 2010)………………………………71

*Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134 (9th Cir. 1997)………………………………57, 58

*SRI International, Inc. v. Cisco Sys., Inc.*, 918 F3d 1368 (Fed. Cir. 2019)……………..………………52

*Sun Microsystems v. Microsoft Corp.,* 188 F.3d 1115 (9th Cir. 1999)…………………………………..61

*Tinnus Enterprises, LLC v. Telebrands Corp.*, 846 F.3d 1190 (Fed. Cir. 2017)…………………..……45

*Toro Co. V. Deere & Co.,* 355 F.3d 1313 (Fed. Cir. 2004)…………………………………………45

*UCB, Inc. V. Watson Laboratories Inc.*, Case Nos. 2018-1397 & 2018-1453, 2019 WL 2571401, at *5 (Fed. Cir. June 24, 2019)……………………………48

*U-Haul Intern., Inc. v. Jartran, Inc.*, 601 F.Supp. 1140 (D.Az. 1984)……………………………57, 59

*Uniloc USA, INC. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011)…………..71

*Voda v. Cordis Corp.*, 536 F.3d 1311 (Fed. Cir. 2008)…………………..……………………...48, 49

*William H. Morris Co. v. Group W, Inc.*, 66 F.3d 255 (9th Cir. 1995)…………………………………57

*Yamauchi v. Cotterman*, 84 F.Supp.3d 993 (N.D. 2015)……………………………………………75

-xi-

1

**Federal Statutes**

2   15 U.S.C. §1116(a)……… ...............................................................................66

3   15 U.S.C. §1117(a)….. ........................................................................57, 58, 66

4   15 U.S.C. §1125(a) …..................................................................56, 66, 74

5   17 U.S.C. §106(1)-(3) ...........................................................................55

6   17 U.S.C. §504(c)(1), (2) ......................................................................55

7   17 U.S.C. §505…..................................................................................55

8   35 U.S.C. §102(a)(1), (b)…...........................................................69, 70, 73

9   35 U.S.C. §103 ....................................................................................72

10  35 U.S.C. §271(a), (b)…........................................................................45, 50

11  35 U.S.C. §273 ...............................................................................73

12  35 U.S.C. §282…...........................................................................68, 69, 72

13  35 U.S.C. §284…................................................................................51, 52

14  35 U.S.C. §285…................................................................................53

15  35 U.S.C. §287 (c)(1)…........................................................................75

16

**Other**

17  Fed. Civ. Trials and Evid., §8:980, The Rutter Group, 2019…………………………...40

18  Fed. R. Civ. P. 37 Advisory Committee Notes (1993)….………………………………59

19  Journal of the Patent and Trademark Office Society, Volume 78 (1996), p. 789, Appendix B………….75

20  Restatement, 2d Judgments §27 (1982)…………………………………………………42

21

22

23

24

25

26

27

28

Plaintiffs hereby submit their proposed Statement of Facts and Conclusions of Law:

## I.   **SUMMARY OF THE CASE**

Plaintiffs sue Gregory Gilbert, the companies he controls (Trina Health, LLC, Trina Health of Newport Beach, and Bionica, Inc.) and the remaining defendants comprising various clinics allegedly licensed by Mr. Gilbert and the individual investors/owners/directors of such clinics.  Plaintiffs assert against all defendants claims for patent and copyright infringement, false advertising and unfair business practices. Plaintiffs are also suing Mr. Gilbert for breach of fiduciary duty and breach of a confidential relationship based on claims he was both attorney for them and an officer, director or board member of various entities owned by Dr. Aoki, in which capacity he used confidential information received while in those positions to take positions adverse to his former clients or in violation of his duties to the entities that he purported to serve.

Plaintiffs claim patent infringement based on Mr. Gilbert and his agents having stolen Dr. Aoki's "pulsed insulin"[1] diabetes treatment methods and having used them to set up over thirty clinics in the US alone, not including international clinics, each of which employs Dr. Aoki's patented diabetes treatment. Plaintiffs also claim that Mr. Gilbert and the associated defendants have infringed on Dr. Aoki's copyrighted slides describing the treatment as part of their marketing efforts. Finally, Gilbert is alleged to have lied to the diabetic public by claiming that he was either the inventor of the treatment he was offering, or a licensee of Dr. Aoki's, and moreover by claiming that Medicare would pay for the treatment despite a 2009 Medicare ruling that it would not pay for the treatment.

Mr. Gilbert offers the following as defenses: 1) he has license rights to the patented treatments; 2) the patents are invalid; 3) he was in fact the inventor of the treatments; 4) the treatments that he and his entities are licensing to third parties are different than those patented by Dr. Aoki; and 5) the clinic defendants have unilaterally chosen the treatment methodologies being employed, and that any

---

[1] The record is replete with different names applied to the treatment. The Court has determined to use "pulsed insulin" as a generic descriptor for the treatment, unless the therapy name is legally significant for purposes of this decision. Similarly, the Court has determined to adopt the following two versions to distinguish between Dr. Aoki's treatment and that espoused by Mr. Gilbert and his related clinics, again unless the names being used in a precise time period are relevant to the decision herein. So Dr. Aoki's treatment will be referred to as "MAT®" and Mr. Gilbert's claimed variation will be "APT."

infringement found as against them cannot be attributed to Mr. Gilbert and his entities.

## II.    FINDINGS OF FACTS

### A.    Mr. Gilbert's Credibility

Conclusions about the underlying facts here often require the Court to choose between directly opposing statements-either between Dr. Aoki and Mr. Gilbert, or between Mr. Gilbert and other witnesses. The Court therefore opens its discussion of its finding of fact with its conclusion that, based on his testimony and his representations and statements in his role as counsel, that Mr. Gilbert is not credible in either capacity. Mr. Gilbert's credibility is undermined by repeated statements he made during trial that were contradicted by his own subsequent statements, his own prior statements (often within a few minutes or hours of the statements that he is contradicting) or by witness testimony and other factors that the Court finds more worthy of belief than Mr. Gilbert's contradictory evidence. The Court has therefore chosen to disregard Mr. Gilbert's statements in favor of the contradictory testimony of either Dr. Aoki or other witnesses as noted below.  The Court provides the following partial list of the instances in which it has concluded that Mr. Gilbert has failed to be honest in his representations with either this Court, or in his testimony in prior actions.

### 1.    Day 1- Refusal To Produce Financial Data

Plaintiffs' MIL#3 sought to preclude Mr., Gilbert from introducing financial data due to his refusal to produce it in discovery. He stated he didn't produce financial documents because of concerns about confidentiality and lack of a protective order.  (Defs' Reply to Plts' MIL #3, ECF #365, ¶8.)  He stated to the Court that he had asked for a protective order and that it wasn't granted.  (P.34:4-6 [Gilbert, Vol.1].)  During the hearing, the Court reviewed the docket, and determined that in fact, a stipulated protective order was in the Court's records. (ECF #266 [Pr. Order]; ECF #261 [Min. Order].)

Mindful of the legal standard that "innocent mis-recollection is common," the Court did not immediately decide the issue of Mr. Gilbert's credibility, but cites it here as only the first of a long string of evidence supporting the Court's ultimate conclusion that Mr. Gilbert was neither a credible witness or a counsel observant of the strictures of Rule 11.

The issue of Mr. Gilbert's failure to produce financial data continued to surface as the trial continued. Mr. Gilbert continued to be evasive about financial data.  He was questioned about report of

a $250K franchise fee paid by a licensed Trina Health clinic, the North Sunflower Medical Hospital in Mississippi.  While he acknowledged that Trina Health "got money to help open this clinic" he claimed not to know how much.  (P.2189:10-25; P.2190:1-15 [Gilbert, Vol.13].  Mr. Gilbert also claimed that no more than $5,000 in royalties total were ever received, presumably for all the 33 or so clinics that he ever opened, which the Court does not find credible. (P.2203:1-24 [Gilbert, Vol.13].)  Mr. Gilbert also claimed not to know the aggregate amount of chair fees that Trina Health ever received from licensing the 33 or more clinics that he admitted to having licensed. (P.2204:16-19 [Gilbert, Vol.13].)

He also refused to produce the bookkeeping records that would reflect such payments.  His reasons vacillated from "I don't have them," to refusing to check for such records, to "I'm not willing to produce them at this late date" to "they're not relevant."  (P. 2201:15-25; P. 2202:1-13 [Gilbert, Vol.13].)

The Court also notes the $10,355 discovery sanctions order issued against Mr. Gilbert where the Magistrate Judge hearing discovery disputes found Mr. Gilbert's failure to produce documents and comply with discovery orders to be "unacceptable, and the court finds his excuses disingenuous."  (ECF #271, lns. 5-6.)  The order also states Mr. Gilbert's excuses regarding an email relating to discovery issues to be a "false representation to the court."  (ECF # 271, lns. 15-20.)

### 2. <u>Denial Of His Connection With Clinics</u>

#### a. <u>The Trina Health Prospectus</u>

The Court also finds that Mr. Gilbert's testimony regarding who drafted the Trina Health prospectus document not to be credible.  Mr. Gilbert represented "we don't have anything to do with investors."  (P.690:12-14 [Gilbert, Vol.5].)  However, Mr. Matt Kalifeh, an investor, testified that Mr. Gilbert informed him he was the one who wrote the investor prospectus for investment in a Trina Health clinic in Alabama.  (P.791:7-9; P.841:15-23 [Kalifeh, Vol.5]; P.Exh.112 [Trina Prospectus, P4592-4633].)  There were in fact investors since Mr. Kalifeh invested $343,420.00 in a Trina Health clinic. (P.Exh.112 [Kalifeh Affidavit], Bates P4490]; P.776:15-25; P.777:1-16 [Kalifeh, Vol.5].)

Mr. Gilbert represented he is "not listed as a manager in the Trina Health Partners, LLC, operating agreement" and that "no entity that [he] know[s] of or associated with [him] has any ownership in the Alabama clinics or any of their companies."  (P.1617:5-7, 14-17 [Gilbert, Vol.9].)  However, the very investor prospectus that he drafted states "[b]ecause Trina Health, LLC will remain a minor partner of

the company, G. Ford Gilbert, the manager of Trina Health Care Partners, LLC will advise the manager(s)." (P.Exh.112 [Trina Prospectus, Bates P4622].)  Additionally, Mr. Gilbert subsequently testified that he would approach investors or vice versa.  (P.2046:14-18 [Gilbert, Vol. 12].)

### b.   Trina Health West Los Angeles

Mr. Gilbert claimed Trina Health West Los Angeles "is not part of Trina," that it is an "independent company" and that websites pertaining to Trina Health West Los Angeles was "absolutely irrelevant" to the case.  (P.1482:22-25 [Gilbert, Vol.9].)  Later, Mr. Gilbert acknowledged Trina Health West LA was a licensed Trina clinic. (P.1876:16-25; P. 1877:1-6; P.1921:18-24 [Gilbert, Vol.11].)

### c.   Www.diabetes.net

There was extensive testimony about www.Diabetes.net, a web site on which many of the clinics licensed by Trina posted their site's text.   At trial, Mr. Gilbert repeatedly tried to claim that he was not the owner or registrant for www.diabetes.net.  (P.1455:8-10 [Gilbert, Vol.9]; P.1918:11-12; P.1925:17-18 [Gilbert, Vol.11].)  However, Mr. Gilbert previously told Dr. Aoki that he owned www.diabetes.net and that he even told Dr. Aoki that he paid about $10K or $15K for the website.  (P.1455:18-19; P.1575:24-25; P.1576:1-4 [Aoki, Vol.9].) Mr. Arcangeli also testified that Mr. Gilbert informed him he registered www.diabetes.net and that he paid money to register it.  (P.1656:18-21; P.1657:1-6; P.1668:24-25; P.1669:1-3 [Arcangeli, Vol.10].)

When reminded about his answers during his deposition, Mr. Gilbert quickly stated he "registered it" but didn't "register it for myself" and that he "registered for Biophile."  (P.1918:13-16 [Gilbert, Vol.11].)  When confronted with his deposition answers given on October 30, 2017 in response to the question as to whether he owned www.diabetes.net, he acknowledged he had previously testified he was the registrant for diabetes.net, without making the above referenced distinction, that www.diabetes.net was his website, that he is the original registrant and has been the original registrant since its inception.  (P.1920: 4-16; P.1927:20-25; P.1928:1-25; P.1929:1-5 [Gilbert, Vol.11].)

He also acknowledged he has had the right for a long time now to control what goes on www.diabetes.net.  (P.1920:17-20 [Gilbert, Vol.11].)  Additionally, in the 2015 Trina Prospectus which Mr. Gilbert wrote, it states that "[e]ach clinic will have its own web site, and will also rely upon diabetes.net for much of the marketing of APT.  The website, www.Diabetes.net will help educate the

-4-

public, including medical professionals and prospective patients, on the benefits of APT." (P.791:7-9; P.841:15-23 [Kalifeh, Vol.5]; P.Exh.112 [Trina Prospectus, Bates P4611].)  Mr. Gilbert acknowledged he allowed people to put content on diabetes.net and knew about it.  (P.1929:18-21 [Gilbert, Vol. 11].)

The Court finds Mr. Gilbert's testimony about www.diabetes.net disingenuous at best, and directly dishonest at worst.  This is particularly true given the fact that Mr. Gilbert, in his then-role as counsel for Defendants, participated in several arguments about whether various clinic websites taken from www.diabetes.net should be received in evidence as showing the overall advertising and control scheme described above. In this context, the Court concludes that Mr. Gilbert was not being honest with the Court as to the provenance or purpose of the various clinic sites appearing on www.diabetes.net.

### 3.    Mr. Gilbert's Relationship With Dr. Aoki / ADRI

#### a.    Mr. Gilbert's Testimony Re Confidentiality Agreement

Mr. Gilbert denied that he had entered into a confidentiality agreement when he started with Dr. Aoki, stating that none of Dr. Aoki's:

> "[T]reatments were accompanied by confidentiality agreements, that Dr. Aoki and the ADRI and I were all relying on the '810 patents during the pre-RQ patent period to cover what we were doing.  So there was never a concern about following-on patents during the time from the '810 patent until the RQ patents because we thought we were covered by the '810 patent.  So at that time there were no confidentiality agreements.  And when the publications that we're going to be talking about here came out, they were publications without confidentiality claims.  So there was no claim that these patent activities that were being done before the RQ patents were somehow confidential."  (P.2337:11-22 [Gilbert, Vol.14].)

Yet, when confronted with exh. 245, he had to admit that he himself had drafted and signed a confidential agreement acknowledging any inventions, improvements, et. al. relating to research, development or other activities of Dr. Aoki made or conceived by him while working with Dr. Aoki belonged to Dr. Aoki.  (P.Exh.245 [Confid. Agreement]; P.2726:1-22; P.2727:1-6 [Aoki/Gilbert Vol.17].)

#### b.    Mr. Gilbert's Role As Dr. Aoki / ADRI's Attorney

While Mr. Gilbert acknowledges he was lawyer for ADRI, Mr. Gilbert testified he was never Dr. Aoki's counsel.  (P.1784:16-18 [Gilbert, Vol.10]; ECF 192 [Answer, p. 6, para 44].)  He testified "I did not believe I ever – in my life I did never believe that I was his lawyer . . . I was always the lawyer for

either the ADRI or the company."  (P.2074:14-17 [Gilbert, Vol.12].)  Yet the documentary evidence reflects otherwise.  In fact, in 2003, Mr. Gilbert wrote an email acknowledging that Dr. Aoki "has personally been my client for many, many years." (P.Exh.61 [Gilbert Email].)  Mr. Gilbert has written on "Law Offices of Gregory F. Gilbert" letterhead that he has acted as counsel for "Aoki in connection with the transactions contemplated by the [AMSys] Agreement."  (P.Exh.25 [Gilbert Letter To Purchasers].)  In the AMSys Corporation Closing Memorandum, Mr. Gilbert represented himself to be Dr. Aoki's attorney.  (P.Exh.26 [AMSys First and Second Closing Memo].)

### 4.   License Related Mis-Statements

Mr. Gilbert makes several claims on behalf himself and Defendants w/regards to license rights arising from the Nevada litigation which are belied by the evidence.  Those contradictions and the relevant factual chronology are further developed below but summarized here:  (i) Mr. Gilbert's claim that the Diabetex settlement resulted in technology rights being transferred to him even though he testified otherwise in the Nevada action; (ii) claiming he paid the $150K monies in satisfaction of the Diabetex settlement even though he previously acknowledged it came entirely from an investor, Phil Gurian; (iii) claiming he was not a party at the time of the Nevada rulings which found Dr. Aoki was the owner of the technology and gave no license rights to Bionica; and (iv) claiming the appeal of the Nevada preliminary injunction was dismissed due to inaction when in reality it was dismissed by the appeals court for a lack of standing.  (See *infra* II.D.2 [Discussing Diabetex settlement]; P.1634:21-25: P.1635:1-2 [Gilbert, Vol.9] [Stating he paid some of the settlement monies]; P.Exh.63 [Nevada Transcript, P.39-41, P.115-116]; P.Exh.46 [Gilbert email] [testifying / stating that monies came from Gurian]; see also P.223:17-20 [Aoki, Vol.2]; P.1799:13-25; P.1800:1-15 [Gilbert, Vol.10] [Adopting that Gurian paid the settlement monies]; P.2211:12-14; P.2233:19-25; P.2235:3-11; P.2238:5-11 [Gilbert, Vol.13] [Claiming Gilbert and Bionica not parties]; see *infra* II.F. and III.B. [Res Judicata]; P.2101:24-25; P.2102:1-6 [Gilbert, Vol.12]; P.2164:1-10; P.2244 [Gilbert, Vol.13] [Claiming Nevada court preliminary injunction ruling was dismissed due to "nonaction by us" or that it encompassed the Cross-Complaint and Nevada Court's OSC Order]; P.Exh.238 [8-26-05 Nev. Supreme Ct. Order Dismissing Appeal]; P.2164-2167 [Vol.13].)

### 5. Mr. Gilbert Testified He Had No Role In Dr. Aoki's RQ Patent Applications But He Previously Testified He Worked On Every One Of Aoki's Patents

Mr. Gilbert disclaimed any role in the filing of Dr. Aoki's patent applications. Specifically, he testified he never saw any of the initial filed patent applications. (P.1732:20-25; P.1733:6-8 [Gilbert, Vol.10].) Mr. Gilbert also testified "he really wasn't involved in the actual patenting process [of Dr. Aoki's RQ patents]." (P. 2457:14-16; P.2458:10-14 [Gilbert, Vol.14].) However, in 2004, Mr. Gilbert testified <u>under oath</u> in the Nevada case that he allegedly provided the legal work to help Dr. Aoki write these very same patent applications. (P.Exh.63 [Nevada Transcript, p.52:17-22; p.106:11-12].) In fact, Mr. Gilbert testified that he "worked on every patent [Dr. Aoki has] ever had," even suggesting that he had done patent litigation on behalf of Dr. Aoki and written some of those patents completely by himself. (*Id.* at p.13:22-14:1; p.52:17-22.) At yet another point during his 2004 testimony, Mr. Gilbert very clearly claimed to have done "all the patent work" as the attorney for Dr. Aoki and ADRI. (*Id.* at p.106:11-12.)

### 6. Mr. Gilbert's Testimony That The APT Treatment Doesn't Return to Baseline Is Contradicted By His Own Patent Application Declaration

Mr. Gilbert testified APT does *not* involve waiting for the patient's insulin level to drop back to the baseline where it was before the treatment started. (P.2063:18-23 [Gilbert, Vol.12]; P.3060:19-20 [Gilbert, Vol.18].) Yet Mr. Gilbert's statements made under oath in his February 1, 2019 patent application distinguishing his APT treatment from Dr. Aoki's patented methods suggest he does allow insulin to return to baseline (thereby contravening medical science, as discussed below):

- ¶20: "It is my opinion that this '453 application hormone stimulation boluses sized and timed to allow blood hormone levels **to more or less return to baseline blood levels is significantly different than the Aoki hormone stimulation bolus sequence sized and timed to establish hormone levels of a gradually increasing baseline** during some sequence of bolus injections.

- ¶25: "To the best of my knowledge, a therapeutic goal of a rising insulin baseline is not widely accepted as desirable by knowledgeable practitioners, and in fact raises a risk of a reasonable chance of hypoglycemia in the patient."

(P.Exh.239 [Gilbert Patent App, see also ¶¶21 and 23]; P.2224:15-19; P.2225:15-18 [Gilbert, Vol.13].) In other words, Mr. Gilbert does claim that with APT, in contrast to MAT®, interpeak free insulin concentration or insulin concentration *returns to baseline* between pulses or bursts.(P.1440:19-21; P.1445:7-11; P.1446:24-25; P.1447:1-2 [Aoki, Vol.9]; P.Exh.239 [Gilbert Patent Decl., ¶20-22, 25].) But if insulin pulses are given between 5 or more milliunits per kg body wt, it is physiologically imposs. for

-7-

the insulin levels to return to baseline within 6 minutes. (P.1444:13-21; P.1518:17-20 [Aoki, Vol.9].)  It is physiologically impossible due to insulin's half-life, *i.e.* insulin can only fall to its half-life within that interval of time instead of returning to baseline. (P.3028:3-25; P.3029:1-7; P.3030:5-15 [Aoki, Vol.18].)

### 7.   Mr. Gilbert's Claim Of No Rest Period For APT Is Contradicted By The Evidence

Mr. Gilbert testified "[w]e don't teach that they have to do a rest period."  (P.2342:25; P.2343:1 [Gilbert, Vol. 14].)  While as Mr. Gilbert acknowledged, not all the RQ patents require a rest period (i.e. see P.Exh.7 ['191 Patent–Eye and Nerve System]), his contention that "APT" treatment doesn't include a rest period is contradicted by multiple evidence, including the Arizona manual, the Florida protocol and witness testimonies (*i.e.* Natalie Pereyra, Rebecca Shaffer), all of whom or which, testified to or discusses the existence of a rest period.  (P.Exh.203 [Arizona Manual, Bates P3313]; P.992:1-14 [Pereyra, Vol.6]; P.Exh.228 [Florida Protocol, Bates P5-5771]; P.2542:2-4; P.2562:1-3 [Shaffer, Vol.16.].)

Even the APT article authored by Mr. Gilbert states that during the treatment, patients stay in the treatment area and "continues to read, watch TV, type, compute, telephone or engaged in any other passive activity," thereby suggesting the existence of a rest period.  (P.Exh.103 [APT Article, Bates P1105].)  Similarly, the prospectus Mr. Gilbert authored confirms the existence of a rest period for APT: "[T]the patient sits in a recliner chair for 3 one-hour infusions and 15 to 45 minutes of rest period between them of approximately 20minutes [sic]. . ." (P.Exh.112 [Trina Prospectus, Bates P4597].)

### 8.   Mr. Gilbert Deliberately Failed To Disclose The Existence Of The CI-Bionica License

As discussed below, *infra* III.B (Res Judicata), Mr. Gilbert was specifically asked in a deposition approximately four months after he entered into the CI-Bionica license as to whether he or Bionica were involved in any other business activities related to the delivery of diabetes treatment and he disavowed any and omitted mentioning at all the existence of the CI-Bionica license, which at the time was unknown to Dr. Aoki. (P.2215:15-24;P.2216:1-6; P.2219:18-24[Gilbert, Vol.13.]; P.Exh.72 [Aoki Dinucci Letter].)

### 9.   APT Trademark

During trial, Mr. Gilbert perpetually attempted to disclaim any connection with various website documents, even where the documents contained the APT logo with the "man" symbol that he trademarked.  Mr. Gilbert testified that the APT description had to be accompanied by the "little man"

-8-

logo.  (P.1947:1-4 [Gilbert, Vol.11].)  Later, when he was questioned regarding other documents containing the APT sign with the "man logo," he testified that well, it also had to have a "zero R" on it. As the Court acknowledged, "[T]he bar kind of keeps on moving.  Earlier you never said that." (P.1950:22-25; P.1951:1-17 [Court, Vol.11].)

### 10.   Artificial Pancreas "System" Vs. "Treatment"

In connection with his testimony regarding the website for Health Innovations, Inc.[2], Mr. Gilbert claims "we can prove this isn't us because it says 'artificial pancreas system' instead of 'treatment.'" (P.1952: 22-24 [Gilbert, Vol.11].)  And yet, in the APT article Mr. Gilbert wrote, he states the terms are synonymous: "Artificial Pancreas System® and Artificial Pancreas Treatment® are based on many clinical trials and human treatments, using several names including **PIVIT, Metabolic Treatment, CIIIT**, etc."  (P.Exh.103 [APT Article, Bates P1104].)  In the video interview of Mr. Gilbert by Defendant Glenn Wilson, Mr. Gilbert is referred to as the founder of the "Artificial Pancreas **System**," which Mr. Gilbert adopts.  (P.Exh.192 [Glenn Wilson Video, 0:20 time].)  Ms. Pereyra, the nurse who worked at the Trina Health of Miami clinic also testified Mr. Gilbert's treatment is referred to as either Artificial Pancreas "System" or "Treatment."  (P.1005:22-25 [Pereyra, Vol.6].)

### 11.   Mr. Gilbert Is Not A Medical Doctor And Only Has a "Ph.D." From An Online Website

In advertisements, Mr. Gilbert presents himself as a "doctor" and yet he has no medical degree. As Mr. Gilbert acknowledged, he has a "Ph.D." from an "online university" which he obtained by "giv[ing] them my background, and I gave them a book that I wrote, and I did some writing and they awarded me a Ph.D. in health sciences in 2014" and that "it's not like a Ph.D. that you go in and you go to classes all the time for."  (P.2672:6-25; P.2673:1-3 [Gilbert, Vol.16]; P.Exh.201 "Video, 'Dr. G. Ford Gilbert on Diabetes.'")  In sum, Mr. Gilbert's "Ph.D." doesn't emanate from attendance at a rigorous multi-year university program with dissertation defense as generally understood by the public but from an online outfit.  Additionally, when confronted about his LinkedIn profile listing his purported credentials, Mr. Gilbert claimed he "never used LinkedIn." (P.2111:24 [Gilbert, Vol.12].).

---

[2] Health Innovations was the name for the Hayward clinic and is a dismissed defendant in this case.

**12.    Mr. Gilbert Has Pled Guilty To A Crime Of Moral Turpitude**

Finally, Mr. Gilbert has admitted guilty to a crime of moral turpitude, *i.e.* felony offense of conspiracy to bribe members of the Alabama legislature. (P.2000:11-15 [Gilbert, Vol.12].)  While the Court and the parties have carefully not inquired as to the facts involved in that plea, the Court was very careful to inquire of Mr. Gilbert at every resumption of the trial whether that matter had affected his license to practice law. The Court's conclusion was that  Mr. Gilbert "hasn't been very forthcoming with this Court." (P.7:24-25 [Court, Vol.1].)

**B.    Aoki Diabetes Education, Training And Research Prior To '810 And RQ Patents**

Dr. Aoki attended U.C. Berkeley and was granted early admission to Yale Medical School, where he received his medical degree.  Thereafter, he did post-graduate training at Yale New Haven Hospital. He took two years off from 1966 to 1968 to go to Japan to study the residual effects of the atomic bomb explosion in Hiroshima and Nagasaki, which prompted his interest in endocrinology, and specifically diabetes. (P.Ex.9 [Aoki resume]; P.81:6-23 [Aoki, Vol.1].)  He developed an insulin assay to measure the insulin production of the Japanese diabetic, thinking that perhaps they would be similar to the diabetics in New Haven. (P.82:18-21 [Aoki, Vol.1].)  However, he noticed that the insulin produced by the pancreas of the Japanese diabetic patient did not rise after a meal to a peak within one hour and fall off.  Instead, the insulin level gradually rose and peaked at two hours and sometimes even later.  As a result, he began to associate the fact that this fast rise within one hour was key to controlling the blood glucose level.  (P.84:24-25; P.85:1-5 [Aoki, Vol.1].)  Then as now, glucose control, as fostered by the NIH and American Diabetes Association, is thought to be a preeminent factor in determining whether or not a diabetic will live a long and healthy life with or without complications.  (P.83:7-14 [Aoki, Vol.1].)

In 1969, Dr. Aoki was invited to join the world-famous Joslin Diabetes Center by George Cahill, Harvard Professor of Medicine and Joslin's Director, where he studied starvation metabolism and researched body tissues (*i.e.* liver, pancreas, kidneys, et al.) to understand what happens when a person is starving. (P.85:10-14; P.87:16-25; P.88:6-7, 22-25; P.89:1-3 [Aoki, Vol.1].).  As a result, he discovered that the liver was the key to the process of metabolism.  (P.89:3-4 [Aoki, Vol.1].)  Around this time, Dr. Aoki started to question why at a world-famous place like the Joslin, diabetic patients with glucose control (*i.e.* tight control) still experienced complications.   (P.90:21-25; P.91:1-11 [Aoki, Vol.1].)  So around

-10-

1975 when Dr. Aoki was starting to look into diabetes, he started with the glucose tolerance test in which glucose levels are measured after one, two, and three hours after the ingestion of glucose for non-diabetics vs. diabetics.  (P.92:19-25; P.93:9-15; P. 94:1-7 [Aoki, Vol.1].)  He discovered that 60 to 80 % of the insulin production from the pancreas during a glucose tolerance test ends up sticking to the liver.  (P.98:3-5 [Aoki, Vol.1].)  That suggested to him that the liver was the target organ of both the GI tract (from drinking of glucose) and the insulin being produced by the pancreas.  This was something nobody had ever suggested to him and he began looking at old papers to figure out what the normal liver was doing when all that glucose was coming in.  (P.98:6-12 [Aoki, Vol.1].)  So, Dr. Aoki came to realize that the high concentrations of insulin and glucose together provided a unique signal to the liver, specifically liver cells called hepatocytes. (P.98:14-21 [Aoki, Vol.1].)

At that time, the state-of-the-art treatment was and still is, subcutaneous insulin injections.  People were afraid of giving intravenous insulin because of the danger of hypoglycemia.  (P.104:18-25 [Aoki, Vol.1].).  However, in 1978, Dr. Aoki got an artificial pancreas machine, the Biostator, which could safely give insulin intravenously by constantly monitoring the glucose level and could automatically stop giving insulin and start giving glucose to avoid hypoglycemia.   (P.107:1-3, 24-25; P.108:2-12 [Aoki, Vol.1]; P.2872:17-21 [Aoki, Vol.18].)  In 1978, Dr. Aoki spoke with the inventor of the machine, Tom Clemens and explained his novel and unique concept of giving large amounts of insulin intravenously for days with the primary purpose not of controlling the blood glucose level but to biochemically turn on the liver cells.  (P.108:20-25; P.109:1-13 [Aoki, Vol.1].)

In 1982, Dr. Aoki published the Foss paper in Diabetes, a four-day study on using an (unmodified) Biostator to give *square* waves of insulin (as opposed to pulses of insulin) in response to any rise in glucose levels.  This paper documented for the first time that you could turn the liver back on.  The question was whether there was a faster and more efficient way of doing this.  The Biostator, which could only give square waves of insulin, took four days to turn on the liver. (P.116:15-17; P.130:8-10 [Aoki, Vol.1]; P.2936:13-16, P.2940:10-13 [Aoki, Vol.18]; P.2923:21-23; P.2924:21-25; P.2934:3-23; P.2936:11-22; P.2937:5-6: [Aoki, Vol.18].) This gave birth to the '810 patent.  At the time, he had no data that his idea would work, that it could be done more quickly.  The whole goal was to improve glucose control.  At this point, Dr. Aoki was still focusing on glucose control.  (P.117:24-25; P.118:1-6 [Aoki,

-11-

Vol.1]; P.2938:13-25; P.2939:1-7 [Aoki, Vol.18].)  After all, studies have shown in Type 1 and 2 diabetics that good glucose control slows the progression of retinopathy, neuropathy, et al . . as compared to no control.  (P.118:6-10 [Aoki, Vol.1]; P.3052:6-25; P.3053:1-5 [Aoki, Vol.18].)

To further test his hypothesis regarding the liver, Dr. Aoki submitted proposals for NIH funding grants but was told his idea was so off the wall that nobody on the study section had any experience to guide them as to fund his proposal or not.  (P.105:12-15; P.106:12-15 [Aoki, Vol.1].)  Unsuccessful in getting NIH funding, he turned to a company called American Hospital Supply ("AHS") that was then looking for potential commercial deals at Joslin and AHS became interested in his idea. (P.120:5-22 [Aoki, Vol.1].) However, AHS suggested he first get a patent.  So on Joslin's dime, he was referred to patent attorneys at Fish & Richardson.  They started writing the '810 patent in 1982, it was filed in 1983 and then issued in 1989. (P.121:8-16 [Aoki, Vol.1].)  At the time he approached Fish & Richardson, Dr. Aoki had not settled on a fixed method of awakening the liver and was still experimenting. (P.121:17-21 [Aoki, Vol.1].)  In fact, one of his next experiments was using a modified Biostator which AHS created that allowed him to experiment for the first time with giving actual pulses of insulin and to measure resulting blood insulin.  (P.2939:1-19; P.2940:1-2; P.2943:7-10 [Aoki, Vol.18].)  This was to show it was possible to give pulses of insulin in people.  (P.2941:5-20; P.2953:22-25 [Aoki, Vol.18].)

Over the next ten+ years until the RQ patents were provisionally applied for beginning in 2000, Dr. Aoki focused his research on turning the liver back on (*i.e.* cause the liver cells to make the necessary enzymes so that the diabetic patient's liver could correctly process incoming dietary glucose). But he needed a simple, safe and noninvasive way (*not* liver biopsies) to document that the liver had indeed been beneficially affected and could now oxidize (or "burn") carbohydrate.  (P.152:1-22 [Aoki, Vol.1].) A basic biochemical fact is that when the liver cell burns glucose, it will release carbon dioxide and utilize oxygen.  (P.153:10-12 [Aoki, Vol.1]).   As a result, he conceived of the idea of measuring the production of $CO_2$ to $O_2$ consumed before and after exposing diabetic patients to his procedure.  An increase in the ratio of $CO_2$ produced to $O_2$ consumed (i.e. "RQ") would indicate that the diabetic patients' liver cells were 1) taking up the ingested glucose and 2) "burning" or oxidizing it.  (P.153:13-24 [Aoki, Vol.1].)

As of the 1990s, Dr. Aoki was still experimenting with use of the RQ and had not reduced it to an actual treatment methodology as his focus was on improving glucose control and documenting liver

-12-

1   function.  He had not settled on the final adjustments for how often he was going to measure things like

2   RQ and how to modify the treatment if he was looking for other physiological results outside of glucose

3   control.  (P.158:9-19 [Aoki, Vol.1].)  However, toward the late 1990s, he noticed glucose control

4   worsened in some of his treated patients and yet some of their complications, *i.e.* eyes and kidney, did

5   not.  (P.157:5-13 [Aoki, Vol.1].) As part of his continuing efforts to investigate this quizzical issue and

6   specifically after 1999, Dr. Aoki decided to do a baseline RQ and then aggressively and rapidly increase,

7   by increasing the size of the insulin pulses, the RQ response so that within an hour the RQ had exceeded

8   .9 and remained elevated at one, two and three hours of the procedure to insure that the metabolic milieus

9   of the new target tissues (*i.e.* eye, kidney) were also biochemically enhanced like that of the liver. He also

10   increased the frequency of treatment days from once a week to 2–3 times/week as appropriate.  (P.165-

11   166 [Aoki, Vol.1].)   And he began looking specifically to see if the complications were responding to

12   these changes, *i.e.* was the kidney more stable than before in response to this more aggressive

13   implementation of a different protocol, and they were.  (P.166:20-25 [Aoki, Vol.1].)  Unlike the original

14   '810 patent, the higher insulin and glucose doses reflected in the RQ patents recognize these higher doses

15   are needed to treat diabetic complications, *i.e.* retinopathy, et al. (P.3004:13-23 [Aoki, Vol.18].)

16   **C.    Dr. Aoki Goes To UC Davis**

17   In 1983 Dr. Aoki was recruited to UC Davis by UC Davis' Chief of Medicine, Dr. Joseph Silva.

18   (P.127:16-25; P.128:1-4 [Aoki, Vol.1].)  In 1984, Dr. Aoki moved to Sacramento to become Chief of the

19   Division of Endocrinology and Professor of Medicine at UC Davis.  (P.128:11-12 [Aoki, Vol.1].)

20   On or around 1999, a grievance action commenced over the university requiring Dr. Aoki to do

21   more clinical work than research.  (P.712:9-14; P.746:11-14; P. 751:11-12 [Aoki, Vol.5].)  In connection

22   with this grievance action, on around June 1999, Dr. Aoki received a letter from Fred Meyers, chair of

23   the Department of Internal Medicine confirming that when he worked at ADRI, he was doing so as a

24   volunteer and not as an employee of the UC.  (P.713:13-16 [Aoki, Vol.5]; P.1607:15-19; P.1608:1-2

25   [Aoki, Vol.9].)  As such, when Dr. Aoki received the letter, he realized that whatever he did at ADRI was

26   off-limits vis a vis the university.  (P. 714:24-25; P.715:1-5 [Aoki, Vol.5].)

27   At that time, Dr. Aoki had not filed for the RQ patents, which happened in 2000.  (P.1608:4-7

28   [Aoki, Vol.9].)  Dr. Aoki is not aware that UC Davis ever took the position that they somehow had any

-13-

rights to his RQ patents because he had concealed or failed to inform them about them pursuant to any existing agreement. (P.1608:8-14 [Aoki, Vol.9].)  In 2002, Dr. Aoki entered into a settlement agreement with UC Davis.  The agreement provides, in pertinent part that, "Aoki is entitled to conduct his research at the Aoki Diabetes Research Institute (ADRI) and UCDHS without interference from the University so long as such research is conducted consistent with applicable University policies, including those addressing outside professional activity, conflict of commitment issues and/or compensation plan contributions."  It further states it "is understood and agreed that **any research conducted by Aoki at ADRI is being done as a volunteer and such research is not affiliated with UC or UC Davis, or done under Aoki's official status as a University employee**."  (P.Exh.58, ¶4 [Davis Settlement].)

### D.      Confidentiality Agreement And Mr. Gilbert's Work As Dr. Aoki /ADRI's Attorney

As part of Dr. Aoki's recruitment package to UC Davis, he was allowed to form the equivalent of a "Joslin West," *i.e.* a nonprofit to be set up by Dr. Aoki and presumably affiliated with the university where he could continue his research.  (P.147:9-14 [Aoki, Vol.1].)  Dr. Aoki was referred to Mr. Gilbert who had a diabetic daughter, to help him set up this Joslin West.  (P.147:17-24 [Aoki, Vol.1].)  Subsequently, Dr. Aoki met with Mr. Gilbert and he ultimately agreed to set up the non-profit, Aoki Diabetes Research Institute ("ADRI") with the hope that Dr. Aoki's treatment would benefit his daughter. (P.148:1-25 [Aoki, Vol.1].)  Thus, on January 1, 1986, ADRI was incorporated in California.  (P.149:5-7 [Aoki, Vol.1].)  As part of his work with Dr. Aoki, Mr. Gilbert drafted and voluntarily executed on February 3, 1986, a confidentiality agreement agreeing to assign any inventions/improvements, et al. to Dr. Aoki made or conceived by him during the time that he worked with Dr. Aoki. (P.Exh.245 [Confidentiality Agreement, ¶¶1 and 2]; P.2726:1-22; P.2727:1-6 [Aoki/Gilbert Vol.17].)

### 1.      AMSys / Advanced Metabolic Systems, Inc. / Connecticut Innovations

On or around 1987, AMSys was formed and invested $1 million in ADRI to continue research. (P.Exh.21 [AMSys Art.]; P.177:16-22 [Aoki, Vol.1].)  In return, Dr. Aoki licensed his technology to AMSys, which at the time consisted of just the '810 patent.  (P.Exh.24 [AMSys-Aoki License]; P.183:8-9, 21-23 [Aoki, Vol.1].)  By 1993, AMSys was running out of money but AMSys CEO Dick Sandberg reported that there was an opportunity to receive $1 million to continue the research through Connecticut Innovations ("CI"), a state agency that provides companies with start-up funds.  (P.184:5-24 [Aoki,

-14-

Vol.1].)  As such, AMSys and CI entered into an agreement whereby AMSys received $1 million dollars from CI, and if AMSys defaulted on the repayment, CI would receive a nonexclusive license and right to *sublicense* the therapy, provided it had Dr. Aoki's written consent.[3]  (P.Exh.30 [AMSys-CI License]; P.185:18-22; P.186:7-9 [Aoki, Vol.1].)

Mr. Gilbert was the lawyer Dr. Aoki worked with in connection with the AMSys-Aoki and AMSys-CI licenses, and who reviewed and/or created these licenses.  (P.202:1-25 [Aoki, Vol.2].)  Dr. Aoki understood Mr. Gilbert was working as an attorney for both Dr. Aoki and AMSys in connection with the AMSys-Aoki and AMSys-CI transactions.  (P.202:10-25 [Aoki, Vol.2].)  Although Baker-McKenzie prepared the AMSys-Aoki license, Mr. Gilbert reviewed the entirety of this license with Dr. Aoki and then AMSys CEO, Joe Marin.  (P.202:6-9; P.203:1-4 [Aoki, Vol.2].)  Mr. Gilbert himself prepared the AMSys-CI license.  (P. 201:19-25; P. 202:1-5 [Aoki, Vol.2].)

In a 1987 letter to potential AMSys investors, Mr. Gilbert also represented on "Law Offices of Gregory Gilbert" letterhead that he has "acted as counsel for AMSys, ADRI and Aoki in connection with the transactions contemplated by the Agreement" and reviewed and relied upon various relevant legal documents in connection therewith. (P.Exh.25 [Gilbert Letter, Bates P105-106].)  In documents titled "Closing Memorandum," Mr. Gilbert also represented he was the lawyer for AMSys and Dr. Aoki. (P.Exh.26 [AMSys Corp Closing Memo].)

### 2.   AMTech – Diabetex

Subsequently, Mr. Gilbert identified another group of individuals who owned a corporation called Diabetex interested in purchasing Dr. Aoki's technology to commercialize it by setting up clinics and collecting reimbursement from health insurance companies.  Mr. Gilbert advised on the mechanism for the sale of assets from AMSys to Diabetex via another created entity, AMTech.  (P.207:1-25; P.208:4-12; P. 209:1-11 [Aoki, Vol.2]; P.Exh.36 [Diabetex Agreement and Plan of Reorg].)

Diabetex then ran out of money to commercialize the therapy, had stopped providing the promised funds for patents and research and thus was in breach of the agreement.  (P.215:1-13; P.217:18-21 [Aoki,

---

[3] In 1992, the 1987 AMSys-Aoki license was *clarified* to separate out Asia from the license and *modified* to allow AMSys to offer a potential license to other entities, *i.e.* CI in the event of a default.  (P.Exh.28 [Clarification License]; P. 200:12-25 [Aoki, Vol.2]; P.Exh.29 [Modification License]; P.201:12-22 [Aoki, Vol.2].)

Vol.2].)  Mr. Gilbert led the process of terminating Diabetex's agreement.  (P.218:2-4 [Aoki, Vol.2]; P.Exhs.40 [7-16-01 mtg mins]; 41 [8-08-01 mtg mins]; 43 [9-17-01 mtg mins].)  Ultimately Diabetex agreed to relinquish Dr. Aoki's technology in exchange for return of Dr. Aoki's and others' shares of Diabetex and $150K. (P.223:17-20 [Aoki, Vol.2].)  **Phil Gurian (*not Gregory Gilbert*) ultimately paid the $150,000 that went to Diabetex to accomplish the settlement**. (P.Exh.46 [Gilbert email]; P.Exh.63 [Nevada Evid. Hearing Transcript, p. 39-41; p. 115-116]; P.1368:20-24 [Aoki, Vol.8].)

On August 28, 2001, the return of Dr. Aoki's technology was accomplished.  (P.Exh.42 [Diabetex Settlement].)  Although the settlement agreement provides for the return of Dr. Aoki's technology to Mr. Gilbert, Dr. Aoki was informed by Mr. Gilbert, who was acting as his personal lawyer, that he was simply acting as the agent for PAT, see *infra* discussion of PAT.  (P. 228:17-25; P.229:1-2 [Aoki, Vol.2].)

On June 7, 2004, Mr. Gilbert testified in the Nevada action that after the Diabetex rights were terminated, they came back to Dr. Aoki and that Dr. Aoki had "everything, not only the licenses rights, he [also] had the control." (P.2096:13-24; P.2097:13-25; P.2098-2100 [Gilbert, Vol.12]; P.Exh.63 [Nevada Transcript, p.39:1-10; p.76:13-24; p.77:1-15].)

The Court finds that Mr. Gilbert's attempt to justify the ostensible transfer of the patent rights to him as part of the Diabetex settlement not credible or legally defensible.

### 3.   Pulse Activation Therapies ("PAT") – Metabolic Industries ("MI")

Meanwhile, on or around July 1, 2001, Pulse Activation Therapies ("PAT") was also formed and Dr. Aoki licensed his technology, which was in the process of being relinquished from Diabetex, to PAT. (P.Exh.39 [Aoki-PAT license].)  PAT's name was later changed to Metabolic Industries ("MI"). (P.Exh.48 [10-01-01 mtg mins].)  On September 22, 2001, consistent with the return of the rights back to Dr. Aoki under the Diabetex settlement agreement, he licensed the technology to MI (f/k/a PAT). (P.Exh.47 [Aoki-MI license].)  This agreement is signed by Dr. Aoki individually and Mr. Gilbert as president of MI, indicating that Mr. Gilbert acknowledged that the rights to the technology went back to Dr. Aoki following the Diabetex settlement, which Dr. Aoki then directly licensed to MI.  (*Id.*)

On March 29, 2002, MI (not Gilbert) entered into a management services agreement with a Florida entity, Advanced Diabetes Treatment Centers of Florida ("ADTC") for purposes of starting clinics and developing locations for providing Dr. Aoki's metabolic activation therapy.  The agreement is signed by

-16-

Mr. Gilbert *on behalf of* MI.  (P.Exh.55 [MI-ADTC Agreement].)  This again is another recognition by Mr. Gilbert that he had no rights to Dr. Aoki's technology after the Diabetex settlement.

On July 17, 2002, ADTC, Dr. Aoki and Hamilton-May (aka Bionica, Inc.) entered into an agreement assuring ADTC that in the event MI couldn't perform under its management service agreement with ADTC, Dr. Aoki would continue to license his technology to ADTC.  This agreement recites that Dr. Aoki designed, developed and tested MAT® and that Dr. Aoki is the owner of all patent rights that pertain to MAT®.  (P.Exh.57 [ADTC-Aoki Agreement, Recitals ¶A and ¶B].)  This agreement is signed by Mr. Gilbert on behalf of Hamilton-May[4].

On January 24, 2002, the Resolution of Advanced Metabolic Technologies, Inc. Debt Agreement was executed by Mr. Gilbert as CEO of MI acknowledging MI is the "new licensee from Thomas T. Aoki, M.D. of those patents and technology related to the procedure known as 'Hepatic Activation,' 'Chronic Intermittent Intravenous Insulin Therapy,' and 'Pulsatile Intravenous Insulin'. . ."  (P.Exh.52 [AMTech Resolution].)  Thus, again, after the Diabetex settlement, Mr. Gilbert acknowledged Dr. Aoki as the licensor/owner of the technology.

Up to the execution of the Diabetex settlement agreement, Dr. Aoki never discussed with Mr. Gilbert nor did he have any discussions with any members of the board of directors of the then existing entity, PAT, of Mr. Gilbert personally receiving any part of the intellectual property that Diabetex was releasing.  (P.226:5-17 [Aoki, Vol.2].)  During the subsequent Nevada litigation (see discussion below), Mr. Gilbert testified under oath that the rights to the technology following the Diabetex settlement went back to Dr. Aoki and then to PAT (aka MI) thereafter.  (P.Exh.63 [6-7-04 Nevada Transcript, p.39:1-6].)

**E.     The Pump – Gilbert's Use of Company Funds To Buy Bionica Australia – Gilbert's Termination From MI**

Originally, Dr. Aoki gave insulin pulses using a reverse-engineered Biostator, then he used the much simpler AccuPro pump combined with Epson computer, and thereafter the Bionica pump. (P.140:24-25; P.141:1-7 [Aoki, Vol.1].)  The Bionica pump was discovered when Dr. Aoki sent Mr. Gilbert to a trade show in southern California and he met Vladimir Feingold, the then president and owner

---

[4] Mr. Gilbert is the CEO of Hamilton-May. (P.280:5-25 [Aoki, Vol.2].)  Hamilton-May later became Bionica, Inc.

PLAINTIFFS' [PROPOSED] CONCLUSIONS OF FACT AND LAW
Case No.:  2:11-cv-02797-TLN-CKD

of an Australian company called Bionica, who had invented an analgesia pump which intravenously infuses painkilling meds. (P.142:1-10; P.143:10-11 [Aoki, Vol.1]; P.1651:14-16, 22-23 [Arcangeli, Vol.10].)  The pump was approved for analgesia use, but that certification was insufficient for infusing insulin.  (P.142:22-25; P.143:1-3; P.144:1-4 [Aoki, Vol.1].).  Dr. Aoki then met with Feingold at UC Davis and told him what he needed, which was to use the same programming as the AccuPro and Epson computer device. (P.144:5-14 [Aoki, Vol.1].) Dr. Aoki along with Mr. Arcangeli gave Mr. Feingold detailed information as to the specifications for the programming of the Bionica pump.  Dr. Aoki understood that the Australian Bionica pump could be reprogrammed as to both pulse, frequency and dosage for his use.  (P.145:8-16 [Aoki, Vol.1]; P.1652:3-9, 19-25; P.1653:1-4 [Arcangeli, Vol.10].)

Around 2001 or 2002, Dr. Aoki learned from Mr. Gilbert himself that he had used $100K of MI's money to buy Bionica Australia. (P.145:22-25 [Aoki, Vol.1]; P.198:20-22; P.237:5-14 [Aoki, Vol.2]; P.Exh.219 [$25K check].)  Mr. Gilbert's use of MI funds to buy Bionica, concerns about MI's financial condition esp. given Mr. Gilbert's lack of forthcoming regarding MI's financial information, along with Mr. Gilbert's grant of a sweetheart license to his friend, Kunz, were factors that led Dr. Aoki to request that Mr. Gilbert resign from MI. (P.232:3-13; P.235:9-20; P.239:10-20; P.263:11-20 [Aoki, Vol.2].) On 10-28-02, Mr. Gilbert resigned from MI.  (P.235:11-13 [Aoki, Vol.1]; P.893:20-21 [Aoki, Vol.5].)

### F.    The 2003 Nevada Litigation

On August 4, 2003, Metabolic Treatment Centers ("MTC") sued among others, Mr. Gilbert, Dr. Aoki, and MI in Nevada state court alleging breach of a term sheet.  (P.Exh.62 [MTC Complaint].)  The term sheet summarizes the terms for an investment in MI by MTC.  (P.Exh.60 [Term Sheet].)  On March 16, 2004, MTC dismissed Mr. Gilbert and Bionica, Inc. from their lawsuit.  On December 17, 2003, Dr. Aoki and MI answered, countered and cross-claimed, and sought a preliminary injunction. (P.Exh.65 [Order Granting PI, p. 2:19-24].)

On December 30, 2003, in connection with the Nevada litigation, Mr. Gilbert stated in a declaration[5] that: "The clinics are all using the protocols which were first instituted by Dr. Aoki, and

---

[5] This declaration was filed in support of MTC's Opposition to Aoki/MI's Motion for Preliminary Injunction.  See docket numbers 280 and 278, Second Judicial District Court, Washoe County, State of Nevada, Case No. CV03-04790.

have been used at the ADRI for many years.  These protocols have been unchanged, and to a greater or lesser extent followed at most other clinics.  I know of no reason to change these long standing protocols, and indeed they are being used by MTC."  Mr. Gilbert testified that this statement is still true to this day.  (P. 2153:10-17 [Gilbert, Vol.13].)

On June 07, 2004, Mr. Gilbert testified in support of MTC's opposition to the Aoki/MI preliminary injunction motion, at an evidentiary hearing.  In his testimony, Mr. Gilbert admitted:

- Rights to technology went back to Aoki (and then PAT) after Diabetex (p. 39)
- That in 2001 Aoki gave the rights to the technology to PAT (or MI) (p. 46)
- That Aoki was the licensor of the license that went to MI (p. 77)
- And that the $150K that went to resolve the Diabetex dispute came from an investor named Phil Gurian (p. 40, 116)

(All page references above correspond to P.Exh.63 [Nevada Transcript].)

On September 20, 2004, the Nevada Court granted Dr. Aoki's and MI's motion for preliminary injunction and held the term sheet was not an enforceable contract and that:  "Any agreements entered into by Dr. Aoki and/or MI prior to the May 11, 2003, Term Sheet (Exhibit 1) **did not alienate Dr. Aoki's control over the use and marketing of MAT, which he developed throughout his entire career**."  (P.Exh.65 [Order Granting PI, p. 7:2-5 (bold emphasis added)].)

On March 16, 2005, Dr. Aoki and MI filed a second-amended cross-complaint against Gilbert and Bionica, Inc. (f/k/a Hamilton-May).  (P.Exh.67 [Cross-Complaint].)  Both Bionica, Inc. and Mr. Gilbert were subsequently personally served.  (P.Exhs.249-252.)[6]

On February 7, 2005, Dr. Aoki and MI filed an Application for OSC.[7]  On June 22, 2005, the Court granted the Application and held: (1) "Aoki developed Metabolic Activation Therapy ('MAT'); (2) **Under no circumstances can anybody have a right to MAT other than Dr. Aoki, Metabolic Industries ('MI') or Metabolic Treatment Centers ('MTC')[8]**; and (3)This Court has previously

---

[6] On March 18, 2005, Bionica, Inc. was personally served with the cross-complaint.  (P.Exh.252.)  On May 10, 2005, the Nevada court ordered service by publication on Mr. Gilbert due to his "eluding service" and the process server "unable to serve [him] . . . after seventeen (17) attempts" at his residence in Orangevale, California.  (P.Exh.251.)  On May 18, 2005, Mr. Gilbert was personally sub-served with the second amended cross-complaint.  (P.Exh.250.)  On June 17, 2005, Mr. Gilbert was also personally served with the second amended cross-complaint.  (P.Exh.249.)

[7] Presumably the OSC was necessitated by defendants' failure to abide by the preliminary injunction order.

[8] Although not relevant to this dispute, it is surmised the Court allowed some MTC clinics to continue to operate

PLAINTIFFS' [PROPOSED] CONCLUSIONS OF FACT AND LAW
Case No.:  2:11-cv-02797-TLN-CKD

determined that Bionica does not have any rights to MAT." (P.Exh.69 [Order Granting OSC, P.2-3].)

On June 7, 2006, MI dismissed Mr. Gilbert and Hamilton-May Corporation (aka Bionica, Inc.) from its cross-complaint.  Dr. Aoki *did not* dismiss Mr. Gilbert or Hamilton-May.  (D.Exh.F2 (Tab 32).)  On August 4, 2009, the Nevada court issued a Judgment and Order adopting the findings of fact and conclusions of law contained in its Order Granting Preliminary Injunction and incorporated it into the Judgment.  (P.Exh.76 [Nevada Judgment, ¶1].)

### G.   CI - Bionica License

#### 1.   AMSys License And Modification License

On November 20, 1987, Dr. Aoki licensed his technology to AMSys.  (P.Exh.24 [AMSys-Aoki License].)   On January 22, 1992, Dr. Aoki and AMSys entered into a "Clarification of License Agreement."  The license clarified Asia was excluded from the definition of territory.  (P.Exh.28 [Clarification License, p. 2, ¶4].)   On January 22, 1992, Dr. Aoki and AMSys entered into a "Modification of License Agreement" to allow AMSys to enter into a development agreement with Connecticut Innovations, Inc. ("CI").  (P.Exh.29 [Modification License, p. 1, third whereas recital].)

#### 2.   AMSys-CI Development Agreement

On March 3, 1992, AMSys and CI entered into a "Development Agreement."  (P.Exh.30 [CI Dev. Agreement].)  The CI Development Agreement provided AMSys with what was essentially a $1 million loan secured by a royalty-free, non-exclusive worldwide license (excluding Asia) only in the "Event of Default" under the agreement.  (P.Exh.30 [CI Dev. Agreement, p. 8, Sec. 11].)

#### 3.   CI-Bionica Development Agreement

On February 23, 2005, CI and Bionica entered into a Development Purchase Agreement.  (P.Exh.66 [CI-Bionica License].)  Dr. Aoki never received written notice from CI that they considered AMSys to be in default of the AMSys-CI license nor did he ever receive notice that CI intended to issue a license to Bionica.  (P. 286:7-13 [Aoki, Vol.2].)   On June 17, 2005, Mr. Gilbert was deposed in connection with a lawsuit he filed against MI in Sac.  Despite questioning regarding his or Bionica's activities in the "marketing, selling or soliciting the sales of diabetic treatment" he failed to disclose the

---

pending entry of a permanent injunction.

existence of the CI-Bionica Development Agreement which he and Bionica had entered into just four months earlier in February 2005.  (P.2215:15-24; P.2216:1-6; P.2219:18-24 [Gilbert, Vol. 13.])

### 4.     Aoki Termination Letter To CI

After learning for the first time of the CI-Bionica license, on 1-31-07, Dr. Aoki wrote to CI about the invalidity of that agreement and his lack of consent to the transaction. (P.Exh.72 [Aoki Dinucci Letter].)  He expressed Mr. Gilbert had used confidential information acquired in his capacity as an attorney and fiduciary to himself and ADRI in order to approach CI and enter into the agreement. Dr. Aoki explained CI's agreement with Gilbert was not a mere "sublicense" but a complete sale of any rights, title and interest CI may have in the AMSys-CI Development Agreement and thus subject to the limitations of the licensing rights set forth in the Modification and AMSys License.  (P.Exh.24 [AMSys-Aoki License]; P.Exh.29 [Modification License];  P.Exh.72 [Aoki Dinucci Letter].)  In CI's response, it did not challenge the veracity of these statements, and agreed the AMSys-CI license had been terminated, and any further issues were between Gilbert and Dr. Aoki regarding the viability of any license rights it had with respect to the AMSys transaction.  (P.287:1-2; P.289:16-21; P.286-289 [Aoki, Vol.2].)

### 5.     The CI-Bionica License Did Not Grant Defendants A License

Under the terms of the Modification License, Dr. Aoki was required to be promptly notified "of any default under the [CI] Development Agreement."  (P.Exh.29 [Modification License, P. 2, ¶2].) This was to allow Dr. Aoki an opportunity to work with AMSys to ensure that any default was cured. No such notice was ever provided to Aoki.   (P. 286:7-10 [Aoki, Vol.2].)

Even if there had been a properly noticed and uncured default resulting in CI acquiring a license to Dr. Aoki's technology, CI could never have transferred that license to Mr. Gilbert without Dr. Aoki's advance written consent, which consent Dr. Aoki never gave and never would have given.  (P.Exh.24 [AMSys-Aoki License, ¶11.1]; P.Exh.72 [Aoki Dinucci Letter].)

Additionally, CI's wholesale assignment of Dr. Aoki's technology to Gilbert was prohibited by the terms of the agreement.  Neither the Modification License nor the CI Development Agreement allow for the assignment of rights.  (P.Exh.29 [Modification License]; P.Exh.30 [AMSys-CI License].) The AMSys License specifically prohibits any assignment without Dr. Aoki's written consent.

(P.Exh.24 [AMSys-Aoki License, ¶11.1].)  Finally, the rights provided, thereunder, while allowing for a transfer of license rights to CI in the event of default, only did so to the minimum extent necessary to effectuate the purposes of the CI Development Agreement and could not grant rights any greater than those set forth in the underlying AMSys License. (P.Exh.29 [Modification License, ¶4].)  The only patent then licensed under the AMSys License was the '810 patent, which expired March 2007. (P.Exh. 24 [AMSys-Aoki License, ¶1.4].)  Since the only rights necessary to effectuate the "purpose" of the CI Development Agreement are the technology rights found under the '810 patent, **any license rights to the subsequent RQ patents would not have transferred to CI upon a default by AMSys**.   In other words, once AMSys defaulted on the $1 million loan, at best AMSys only lost its license to the '810.

This analysis is further supported by the use of the defined term "Patent Rights" in the CI Development Agreement.  That phrase is defined to mean "all now existing or hereafter created patents …relating to the treatment of diabetes mellitus and licensed to or owned by [AMSys] covering" products, processes and services associated with the **treatment of diabetes mellitus** using pumps for the administration of insulin.  (P.Exh.30, p. 3 [AMSys-CI License (emphasis added)].)  The patent rights expressed in the CI Development Agreement are, therefore, limited in scope to the '810 patent. Paragraph 14(b) goes further to state that *CII shall not receive any proprietary rights under the agreement except for those rights expressly granted to it*.  (P.Exh.30 [AMSys-CI License, p. 17 14(b).) It is hard to imagine that this clause was drafted and included in the agreement for any reason other than to ensure AMSys' preservation of rights to later acquired technology such as the RQ Patents.

**H.    The RQ Patent Claims And Infringing Evidence**

The RQ patents were provisionally filed beginning in 2000.  (See P.Exhs.2-7 [RQ Patents].) These patents were ultimately issued from between 2003 to 2005.  (*Id*.)  The RQ patents all follow the same steps with the emphasis on looking at the RQs and trying to increase glucose utilization at the affected or targeted tissue site.  (P.312:22-24 [Aoki, Vol.2].)  Each patent treats a different issue or problem.  (P.313:3-6 [Aoki, Vol.2].)  Specifically, they treat the (i) heart ('531 patent), (ii) wounds ('716 patent), (iii) kidney ('342 and '527), and (iv) eye and nerve ('736 and '191).  (P.Exhs.2-7 [RQ Patents].)

**1.    Arizona Manual And Florida Protocol**

A summary of the claims for the RQ patents as testified to by Dr. Aoki and the infringing evidence

-22-

found in both the Arizona manual and Florida protocol, with supporting citations to testimony is attached hereto as **Appendix A**. (This chart is also referenced in the claim by claim analysis at *supra*, III.C.2.b.)

The Arizona manual (P.Exh.203) was used in administering APT in the Arizona clinic. (P.1136:16-23; P.1140:11-18 [Elliott, Vol.7].) It sets forth the basic protocol of the treatment. (P.1143:7-8 [Elliott, Vol.7].) It was a collaborative work from other Trina Health clinics and included contributions from the Trina Health of Arizona clinic. (P.1154:11-18 [Elliott, Vol.7].) Trina Health of Arizona was a licensed Trina Health clinic. (P.1863:17-23 [Gilbert, Vol.11].) Trina corporate held the copyright for the manual. (P.1157:22-24 [Elliott, Vol.7].) Mr. Gilbert also wrote portions of the manual. (P.2376:4-17 [Gilbert, Vol.14].)

The 2017 Florida protocol (P.Exh.228) was prepared by Natalie Pereyra, a nurse who worked for the Trina Health of Miami clinic, a clinic licensed by Trina Health, LLC. (P.992:1-14 [Pereyra, Vol.6]; P. 1877:20-25; P.1878:1-5 [Gilbert, Vol.11].) The protocol is much lengthier, but this was a basic standing order between herself and the physician for purposes of administering the treatment, called Artificial Pancreas Treatment or Artificial Pancreas System, that was submitted to the Florida State Board of Nursing. (P.992:16-20; P.1000:6-8; P.1005:22-25 [Pereyra, Vol.6].) There was a training manual in the very beginning that was left for them during the training. (P.1011:8-10 [Pereyra, Vol.6].) The training manual was brought by administrators from Trina Health of Sacramento to the Miami location to set up the clinic. (P.1011:8-25; P.1012:1-5 [Pereyra, Vol.6].) Ms. Pereyra first met Mr. Gilbert in June 2014 during her job interview for the Trina Health of Miami clinic. (P.1005:15-21 [Pereyra, Vol.6].)

## 2.    Witness Testimonies -  Infringing Evidence

### a.    Rebecca Shaffer

Ms. Shaffer was a patient at both the St. Louis (aka Chesterfield), Missouri and Scottsdale, Arizona Trina Health clinics. (P.2538:19-25; P.2539:4-8 [Shaffer, Vol.16].) Not only was she a patient, she also became employed as a sales representative at the Missouri clinic. (P.2541:17-25; P.2583:1-15 [Shaffer, Vol.16].) She also had a background working in the fitness industry and understood the efficacy and uses for measuring VCO2 alone versus production of VCO2 as a ratio to consumption of VO2, also known as RQ. (P.2554:17-20; P.2602:17-25: P.2603:1-3 [Shaffer, Vol.16].)

On or around November 2017, Ms. Shaffer attended a presentation in Missouri where Mr. Gilbert

gave a presentation about the APT treatment.  She attended partly because she was being groomed to be hired to work at the Missouri clinic.  (P.2598:19-25; P.2599:1-9 [Shaffer, Vol.16].)  At the presentation, Mr. Gilbert explained the APT treatment and the use of RQ in connection with the treatment, and how there's only way one to really show that you are metabolizing carbohydrate, which is to use the VacuMed machine to measure a person's CO2 and O2, with the result being an respiratory quotient.  (P.2599:14-24; P.2601:1-15 [Shaffer, Vol.16].)  Mr. Gilbert described the resultant RQ from the VacuMed machine as a way of determining proper carbohydrate metabolism.  (P.2602:6-12 [Shaffer, Vol.16].)  Ms. Shaffer also testified that given the importance of RQ, *the patients at the clinic even held a competition amongst themselves to see who could get to the RQ goal of over .90, i.e. to "100 or 1."* (P.2609:23-25; P.2610:1-2 [Shaffer, Vol.16].)

She testified that it was pointless to measure VCO2 alone for purposes of determining carbohydrate metabolism.  (P.2610:7-11 [Shaffer, Vol.16].)  It would be difficult to have an accurate measurement of carbohydrate metabolism without taking into account oxygen consumption.  (P.2613:2-10 [Shaffer, Vol.16].) In the fitness industry, which she's familiar with, she's not aware of measuring anybody's VCO2 while they're sitting in a chair consuming dextrose.  (P.2615:20-23 [Shaffer, Vol.16].) In fact, she's had her VCO2 measured while resting as part of her work in the fitness industry but she wasn't consuming anything and that situation is different from the present context.  (P.2615:23-25 [Shaffer, Vol.16].)  What is most relevant for purposes of the treatment is not a person's maximum VCO2 – after, this isn't a case of measuring an athlete's fitness, it's about testing diabetics, whom we already know aren't fit– we're trying to see if they are in fact metabolizing carbohydrate relative to the treatment. (P.2602:20-25; P.2603:1-3 [Shaffer, Vol.16].)

It was her understanding that the clinics were using the respiratory quotient as a way of determining that a patient was responding to the treatment.  (P.2556:4-25 [Shaffer, Vol.16].)  Her own patient records reflect that the Trina Health clinics were using respiratory quotient and in fact recorded her RQ. (See P.Exh.244A, Bates P5856 – reflecting a VO2 reading of 214 and VCO2 reading to be 149. The ratio of 149 (VCO2) / 214 (VO2) =.70 is the RQ, which number is recorded on her chart.) The rising RQ values reflected her body's response to the treatment.  (P.2582:16-23[Shaffer, Vol.16].)

### b.    Michael Arcangeli

-24-

Michael Arcangeli, who was involved early on with the MAT® treatment, working with Dr. Aoki while at Joslin, UC Davis and then for AMSYs and MI, testified that on numerous of Mr. Gilbert's websites as well as Mr. Gilbert's diabetes.net website that specified the APT protocol, it stated exactly how they treat a patient when they come into the clinic including giving them "10 pulses of insulin over an hour, checking their blood sugar every 30 minutes or whatever, and measuring their RQs." (P.1649:7-25; P.1650:1-14; P.1656:20-25; P.1657:1-16; P.1668:11-25; P.1669:1-3 [Arcangeli, Vol.10].]

### c.   Gregory Gilbert

Mr. Gilbert himself testified that a lot of the clinics he licensed had a VacuMed machine that could measure the RQ, which would be an indicator of the type of metabolism, *i.e.* fats, lipids, carbs. (P.2036:8-13; P.2037:1-9 [Gilbert, Vol.12].)   He also testified that Trina Health didn't bill for multiple RQ "except if the doctor required it"– suggesting the clinics did use RQ at least in some instances. (P.2362:1-4 [Gilbert, Vol.14].)

### 3.   The License Agreements Reference Dr. Aoki's Technology Under The CI-Bionica License And Call Out Use Of A Metabolic Measurement Cart

The license agreements specifically refer to the patented technology that Defendants claim under the "Development Agreement between Bionica and Connecticut Innovations, Inc.," which can only mean the rights to Dr. Aoki's patented technology.  (See definitions of Subject Technology, Patents, et al. in license agreements at **P.Exh.94** [2013 Texas License, p.1, Recitals, p. 5, ¶1(x)]; **P.Exh.95** [2013 Arizona License, p.1, Recitals, p. 2, 1(a)]; **P.Exh.98** [2014 Smart Medical License, p.1, Recitals, p. 5 ¶1(v)]; **P.Exh.99** [2014 CP Homes License, p. 1, Recitals, p. 2, ¶1(a) & (u)[9]]; **P.Exh.104** [2014 Trina Health Kansas License, p.5-6, ¶1(v) & (w)]; **P.Exh.105** [2016 Animo Health License, p.5-6, ¶1(u) & (w)]; **P.Exh.108** [2016 Healthy Foods License, p. 5-6¶1(u) & (v)]; **P.Exh.109** [2016 New Albany License, p. 5-6, ¶1(u) & (v)]; **P.Exh.229** [2012 Life Pulse Health, LLC License, p.1, Recitals, p.2 ¶1(a), p.5 ¶ (u)].) (In some instances, the license agreements refer specifically to Dr. Aoki and the Aoki Diabetes Research Institute, see *e.g.* P.Exh.104 [Trina Health Kansas License, ¶1(c)].)

The license agreements refer to or call out a definition of Metabolic Measurement Cart as the

---

[9] See also p. 11, ¶12(a) referencing royalty stream payable to "Connecticut Innovations (State of Connecticut) pursuant to the Development Agreement" of P.Exh.99 [CP Homes License].

PLAINTIFFS' [PROPOSED] CONCLUSIONS OF FACT AND LAW
Case No.:  2:11-cv-02797-TLN-CKD

"measurement cart necessary for the proper utilization of the Artificial Pancreas Treatment" or similar language. (**P.Exh.94** [2013 Texas License, p.4, ¶1(q)]; **P.Exh.98** [2014 Smart Medical License, p.4, ¶1(q)]; **P.Exh.99** [2014 CP Homes License, ¶1(r)]; **P.Exh.104** [2014 Trina Health Kansas License, p.4, ¶1(r)]; **P.Exh.105** [2016 Animo Health License, p.4, ¶1(q)]; **P.Exh.108** [2016 Healthy Foods License, ¶1(q)]; **P.Exh.109** [2016 New Albany License, p. 4, ¶1(q)]; **P.Exh.229** [2012 Life Pulse Health, LLC License, p.2, Recitals, p.3, ¶1(g), p.4, ¶1(r), p.5, ¶1(v)].)  The metabolic measurement is determined using a VacuMed or similar machine, which automatically prints out respiratory quotient readings.  (P.154:9-14 [Aoki, Vol.1]; P.314:20-24 [Aoki, Vol.2].)  Measuring the "volume of carbon dioxide produced by the patient before and after each treatment does not tell you if the therapy is working.  It only tells you that the CO2 production has or has not increased or has stayed the same."  It is not a scientifically acceptable measurement. (P.1493:1-4 [Aoki, Vol.9]; see also P.2811:3-9; P.2812:2-25 [Aoki, Vol.17].)  Nurse Pereyra who worked at the Trina Health of Miami clinic testified that they used a VacuMed machine to determine ratio of "inhaled oxygen" to "exhaled carbon dioxide" to determine "if the patient was processing carbs or if they were processing other forms of energy."  (P.1004:6-24 [Pereyra, Vol.6].)  Ms. Shaffer, a patient of the Trina Health clinics in Arizona and Missouri testified that both clinics measured her RQ for purposes of determining carbohydrate metabolism. (P.2552:1-25; P.2553:22-25; P.2556:22-25;  P.2557:6-8;  P.2579:17-25  [Shaffer,  Vol.15];  P.Exh.244A  (Trina  Health  Treatment Records – shows recording of RQ of .70 as result of 149 (VCO2) divided by 214 (VO2).)  Mr. Gilbert also acknowledged that sometimes the Trina Health clinics billed for RQ.  (P.2362:1-4 [Gilbert, Vol.14].)

### 4.    The License Agreements Explicitly Cite Dr. Aoki's RQ Patents

The license agreement entered into between Defendant Life Pulse Health, LLC, Mr. Gilbert, Trina Health, LLC and Bionica, Inc. *explicitly* references Dr. Aoki's RQ patents as the basis of the subject technology that would be licensed as part of administering APT. (P.Exh.229 [Life Pulse Health License, p.5 ¶u, p.20-Patent List.)  It mentions that this technology was pursuant to the Development Purchase Agreement entered into between Bionica and CI.  (*Id.* at p.1, Recitals, p.2 ¶(1)a, p.5 (1)¶u.)

### 5.    Other Evidence Of Infringement And/Or Use Of RQ

#### a.    Cellular Activation Therapy Presentation

Cellular Activation Therapy ("CAT") is the first name that Mr. Gilbert used to "clone" MAT®.

-26-

(P.366:6-23 [Aoki, Vol. 2]; P.Exh.11 [CAT presentation].)  Mr. Gilbert himself set up Cellular Activation Therapy Clinics and later changed its name to Trina Health.  Both are essentially the same company. (P.2043:7-25; P.2044:5-14 [Gilbert, Vol.12].)  In the CAT presentation, under "Equipment Overview," it mentions the treatment uses the "Metabolic Measurement (RQ) machine to monitor metabolism" and goes on to list the steps of the treatment, which steps not only mirror MAT® but also explicitly include use of RQ to assess metabolism:

> (1) "Measure weight and blood pressure
> (2) Check blood sugar level
> (3) Medical information reviewed and dosage determined for programming Bionica pump
> (4) Small IV inserted in arm or hand
> (5) Breathe into RQ machine to measure resting metabolism
> (6) Start 1 hour treatment session
> (7) Blood sugar level checked and Glucola given as needed
> (8) Breathe into RQ machine to measure metabolism levels
> (9) Steps 5 – 8 repeated two more times equals 6 hour"

(P.Exh.11, Bates P1026-1027 [CAT Presentation].)

### b.      The Trina Health Prospectus

The April 1, 2015 Trina Health prospectus given to Alabama clinic investors states, "Metabolic Measurement Carts (**made by others are used to determine the metabolic changes (respiratory measurements)** of patients under therapy.  These Carts are also acquired through Bionica, and are used in the clinic."   (P.Exh.112 [Trina Prospectus, Bates P4615].)

### c.      Diabetes.Net Printout

The April 11, 2013 printout from www.diabetes.net[10] references an "Artificial Pancreas Treatment Device," stating:  "The FDA approved devices include the Bionica pump and the VacuMed Metabolic Measurement System." (P.Exh.126, Bates P1439 [diabetes.net printout].)  (This statement is also a misrepresentation as the Bionica pump is FDA cleared as opposed to FDA approved.  (P.2388:8-10 [Gilbert, Vol.14]; P.578:9-10 [Aoki, Vol.3]; P.2688:24-25; P.2689:1-4 [Gilbert, Vol.16].)

### d.      APT Slides Use Dr. Aoki's MAT® Research

---

[10] See *infra* II.M.4 regarding discussion of Mr. Gilbert's status as registrant of and control of diabetes.net.

The 2017 or 2018 APT presentation which Dr. Aoki downloaded from www.trinahealth.com includes Dr. Aoki's copyrighted slides from his MAT® presentation.  (P.1471-73 [Aoki, Vol.9]; P.Exh.10(A) [MAT Presentation, Bates P6-5840].)  In particular, it uses Dr. Aoki's rising insulin chart of MAT® insulin pulses and attributes it to the APT treatment.  (P.1473:17-24 [Aoki, Vol.9].)  In fact, the caption for APT is inserted below Dr. Aoki's slide and reads "[a]s shown, the APS [Artificial Pancreas System] pump delivers extremely precise bursts of insulin at pressure.  This special delivery stimulates the liver and reawakens dormant metabolism." (P.Exh.12 [APT Presentation, Bates P2683].)  This same MAT® chart (as well as other copyrighted slides) is used in numerous other places to demonstrate APT.  (See 2017 CMS Presentation (D.Exh.T4-Tab 98, Bates D4448); 2015 Trina Health Presentation (P.Exh.112, Bates P4525); 2017 Dr. G. Ford Gilbert South Bronx Video (P.Exh.201, Video Link).)

### e.  APT Article By Mr. Gilbert

The 2015 Trina Health "Introduction to Artificial Pancreas Treatment" of which Mr. Gilbert wrote "every word" also evidences infringement (as well as misrepresentations).  (P.2124:1-24; P.2125:1-3 [Gilbert, Vol. 12]; P.Exh.103 [APT Article].)  It states:

> "APT is the only US FDA cleared safe and effective way to stop the progression of diabetes and in most ways reverse the chronic complications of diabetes . . . APT is the only treatment which address this core problem [of improper metabolism], and does so by mimicking the natural way that a pancreas signals a liver to cause proper metabolism."

(P.Exh.103 [APT Article, Bates P1103].)  This statement suggests that APT is MAT® as it unequivocally states it is the only diabetic treatment that treats improper metabolism.  Additionally, it states that the treatment is "FDA cleared" although the evidence demonstrates only the pump is FDA cleared as opposed to the treatment.  (P.2388:8-10 [Gilbert, Vol.14]; P.578:9-10 [Aoki, Vol.3].)

The article also states: "Artificial Pancreas System® and Artificial Pancreas Treatment® are based on many clinical trials and human treatments, using several names including **PIVIT, Metabolic Treatment, CIIIT**, etc."  (P.Exh.103 [APT Article, Bates P1104 (emphasis added)]; see also P.Exh.16 [Diab Innov Printout, Bates P2388[11]].)  Yet Mr. Gilbert testified that MAT® is also PIVIT, suggesting

---

[11] States "**CAT has been known by a number of names during its clinical trials and early development, such as PIVIT, Metabolic Treatment, and Hepatic Treatment etc.**  They are all the same treatment, developed and owned by CATC and Bionic Inc. . . . ." (P.Exh.176 [CAT Presentation, Bates P2388 (bold emphasis added)].)

PLAINTIFFS' [PROPOSED] CONCLUSIONS OF FACT AND LAW
Case No.:  2:11-cv-02797-TLN-CKD

he is equating APT with MAT®.  (P.2531:4-5 [Gilbert, Vol.15].)

The article also states that "APT was developed and then tested in a number of university and centers of excellence including Harvard (Joselin) [sic], University of California Davis, University of Arizona, Scripps, Temple University, and the May Clinic just to name a few." (P.Exh.103 [APT Article, Bates P1105].)  This statement references clinical studies done using Dr. Aoki's MAT® protocol at Joslin, UC Davis, Florida, et al.  (P.2048:9-25; P.2049:1-11 [Gilbert, Vol.12]; (see also above discussion of Aoki credentials).)  Moreover, Mr. Gilbert suggests in his testimony he has never done an IRB clinical trial post-Aoki.  (P.2047:2-4; P.2048:3-13 [Gilbert, Vol. 12].)  As such, the APT developed in the studies referenced above cannot be APT and are clearly MAT®.

The article also describes the treatment as follows:  "Patients treat for 4-5 hours in the clinic once a week for a few weeks, then a [sic] most treat once every two to even three weeks. . . During a treatment day, three infusions are given with the patient sitting in a recliner chair but still able to walk around etc. During the treatments, carbohydrates and intravenous insulin are administered using the Bionica programmed infusion device.  The patient stays in the treatment area, and continues to . . . engage in any other passive activity." (P.Exh.103 [APT Article, Bates P1105].)  The treatment steps mirror the MAT® protocol suggesting at least three treatment sessions at least once a week with IV insulin infusion using a pump and rest periods where the patient can engage in passive activity.  (See claims, *supra,* at II.I.1.)

## I.    Direct Admissions Of Infringement

### 1.    2013 Gilbert Supplemental MSJ Declaration

On July 03, 2013, Mr. Gilbert admitted in a declaration filed in connection with Defendants' Motion for Summary Judgment in this case that he and the Defendants in this case have been using Dr. Aoki's technology with no modifications since at least 2005:

"¶a. **Both Bionica Inc. and I (Gregory Ford Gilbert) have continued, without interruption, to market and open clinics using the Subject Technology for much longer than from just 2003 or 2005**, the period of the prior lawsuit and its dismissal.

¶d. All of the clinics we have continued to open are under the same umbrella of sublicense of the Subject Technology from both Bionica and myself (Gilbert), and are thus defended by Bionica, Gilbert and Trina Health. Therefore, they have no independent actions or uses of the technology or the Bionica pump, and are not independently operating, they are operating under the Bionica and Gilbert Licenses. If they were operating without a sublicense by Bionica and Gilbert, that could be different, but they are not, they are

-29-

all operating under such licenses.

¶e. **While there has not been any, changes to the pump or even the treatment would be irrelevant to this case since all modifications and improvements are included in the License.** The Licenses from Bionica and Gilbert to all of the clinics specifically cover their actions as they are indeed operating and treating in the way by which we have developed the Subject Technology for more than 20 years.

¶f. It is illogical to claim that there is some new change, as people are being treated with the exactly same equipment for over 20 years. This has been personally known by Plaintiffs since my daughter, Trina was in the home treatment program of Plaintiffs until 2011 after they filed the above entitled action and realized that their own claims were ludicrous in light of her treatment. Such treatment was also unchanged for her for over 12 years. If this treatment were dangerous or changed, why was Trina being treated under the Plaintiff's home treatment protocol in the same way for over 12 years? The claims of change, and the claims of the treatment being dangerous are totally false and outrageous as they are purported made under penalty of perjury. But even were there any changes, they would be included in the definition of the subject licensed technology."

(P.Exh.93 [Gilbert Supplemental Declaration (emphasis added)].)

## 2. <u>2017 Gilbert Email</u>

On July 22, 2017, Mr. Gilbert further admitted in an email to counsel that "we have a rough road with Medicare, and **now one place is clearly infringing on the patents** which legally can only be enforce against others." (P.Exh.111 [Gilbert email (emphasis added)].) Mr. Gilbert claimed the email concerned "settlement negotiations" (P.1808:8-9 [Gilbert, Vol.10]) but a simple cursory review of the email chain reveals no settlement negotiations whatsoever, just deposition scheduling. Subsequently, Mr. Gilbert claimed it's "not one of our clinics" (P.1809:6-9 [Gilbert, Vol.10]) yet prior to that, Mr. Gilbert testified that the only people who used the name Trina "in the medical sense or medical area would be people that we had some contractual relationship with." (P.1718:19-21 [Gilbert, Vol.10].) In fact, Mr. Gilbert later suggests he was referencing a clinic licensed by Trina Health, the Texas, West Houston clinic. (P.1895-1896 [Gilbert, Vol.11]; *see also* P.Exh.127 [2014 Diabetes.net Printout, stating "The Trina Health West Houston clinic is already at capacity on some days. . ." Bates P2512].)

## 3. <u>Hayward Clinic Stipulation, Consent Judgment, Permanent Inj, and Order</u>

The Hayward clinic defendants comprised of defendants (i) Health Innovations, LP (ii) ACSRC, LLC, (iii) Shuyuan "Sherry" Tang and (iv) Cheng Shao admitted as follows:

@ ¶3: "The Hayward Clinic Defendants admit that Plaintiff Dr. Aoki is the owner of all right, title and interest in and to the 531 patent, the 716 patent, the 342 patent, the 736 patent, the 527 patent, the 191 patent, and the 351 patent."

**@ ¶5:** **"During the operation of their Hayward Clinic, the Hayward Clinic Defendants admit that they made, used, sold, or offered for sale the MAT® Treatment technology described in the 531 patent, the 716 patent, the 342 patent, the 736 patent, the 527 patent, the 191 patent, and the 351 patent."** (P.Exh.100 [Hayward Clinic Stipulation (emphasis added)]; ECF 187.)

Mr. Kevin Buckman who was the medical director of the Trina Health Hayward, Roseville and Sacramento clinics, testified that all three clinics used the same treatment methodology and the source of that treatment methodology were training manuals from Trina Health, such as the Arizona manual. (P.950:24-25; P.951:1-13; P.952:22-25; P.953:1; P.960:8-17; P.961:22-25; P.962:1-9 [Buckman, Vol.6]; P.Exh.203 [Arizona manual].)  He also testified that an RQ value was derived and recorded for the patients.  (P.949:6-8 [Buckman, Vol.6].)

## J. Mr. Gilbert's Claim That He Invented A "Different" Treatment Is Not Credible And Contradicted By His Own Statements In This Case And In the Nevada Case

Mr. Gilbert testified that his invention of "APT" originated from an "epiphany" he had following a lecture and that the MTC[12] clinics subsequently came to perform his APT method.  (P.2085:15-25; P.2086:1-25; P.2087:1-5 [Gilbert, Vol.12].).   Mr. Gilbert testified that MTC clinics were essentially performing the APT method as far back as 2003 or 2004 when MTC was setting up clinics based on its belief that it had a contract with MI.  (P.2144:19-25; P.2145:1-3 [Gilbert, Vol.13].)  In fact, in his 2017 declaration submitted in support of Defendants' MSJ in this case, Mr. Gilbert stated:

"Prior to the [2003] dispute [with Dr. Aoki], I was giving a lecture about diabetes in Utah on the AOKI Patent, and the way that the MAT@ TREATMENT was being given to my daughter among others. I came to the realization that the AOKI approach, i.e., the MAT® TREATMENT, was not what was being delivered by the Bionica Microdose, and even more importantly, that the MAT@ TREATMENT in its basic design was not physiologically correct. . . I then, in **early 2002 1created a new protocol which is distinct and different from the MAT@ TREATMENT in that it does not use Respiratory Quotient (RQ) to determine insulin amount, does not use an ever increasing baseline of insulin, does not have a 100 mg/dl rise and 50 mg/dl fall, and does not adjust insulin on an ad hoc basis, nor does it use a set amount of glucose rather than an ad lib response to blood glucose.**"

(P.Exh.118 [Gilbert Decl., ¶10 (emphasis added)]; ECF 175-2.)

Yet, Mr. Gilbert's statements above are contradicted both by his 2013 declaration in this case where he states that he and the Defendants have been using Dr. Aoki's technology since 2005 pursuant to a license and that the technology has been unchanged. This repeats his post-termination 2003

---

[12] See *supra*, II.E. regarding 2003 Nevada litigation as a point of reference regarding MTC clinics.

-31-

declaration that he filed in support of MTC's Opposition to Motion for Preliminary Injunction, which

he testified in this action to be "all true to this day still" (P.2153:10-17 [Gilbert, Vol.13])

that as 2003, the MTC clinics were using Dr. Aoki's technology:

"**From and after May 11th, 2003,** MTC began and has continued the process of commencing the commercial rollout of the Metabolic Activation Therapy . . . This process is working well, and new people are being treated every day as a result of the work of MTC. **The clinics are all using the protocols which were first instituted by Dr. Aoki and have been used at the ADRI for many years.** These protocols have been unchanged, and to a greater or lesser extent followed at most other sites. I know of no reason to change these longstanding protocols and, indeed, they are being used by MTC." (P.2153:21-25; P.2154:1-17 [Gilbert, Vol.13]; P.Exh.93 [Gilbert 2013 Suppl Decl., ¶3 (emphasis added)].)

The Court therefore finds that Mr. Gilbert's current testimony is directly contradicted by his earlier sworn declarations, and thus not believable.  On the one hand, as of 2017 and during trial, Mr. Gilbert claims he invented APT back in **2002**, which invention was used in the MTC chartered clinics. On the other hand, in 2013 and in 2003, Mr. Gilbert declared under penalty of perjury that at all times he and Defendants have been using MAT® and that the MTC clinics used MAT®.

### K.    Use of Slides – Copyright Infringement

On 8-23-11, Dr. Aoki obtained copyright registration of his MAT presentation. (P.Exh.81 [Copyright Catalog]; P.Exh.10A [MAT Presentation].)  Around 2002, this presentation was given to Mr. Gilbert for the sole purpose of Mr. Gilbert's education, with instructions not to distribute and Mr. Gilbert agreed to those conditions.  (P.360:2-25; P.361:1-25; P.362:1 [Aoki, Vol.2].)  Mr. Gilbert acknowledged receiving these slides although he disputes the purpose for which received them.  (P.2647:5-7 [Gilbert, Vol.16].)  This presentation contains slides of material created by Dr. Aoki from his MAT® research, *i.e.* photos of patients Dr. Aoki treated (P.400:15-23; P.401:13-25; P.402:1-6,13-22; P.507:10-15 [Aoki, Vol.3]), pictorial/graphic representations of the results of his MAT® research, and material obtained from other publications used as part of a presentation.  (P. Exh.10A, P.359:16-21 [Aoki, Vol.2].)  The MAT® slides used by Defendants subsequent to Dr. Aoki obtaining copyright registration in 2011 are referenced at **Appendix B**.  Mr. Gilbert also admits that many of the slides used in the video clips were slides from Dr. Aoki's slide deck.  (P.2131:12-25; P.2132:1-11 [Gilbert, Vol.12].)

### L.    False Or Misleading Misrepresentations

####    1.    Defendants Falsely Attribute To APT Statements And Research That Belong To MAT®

-32-

A plethora of evidence demonstrate that Mr. Gilbert's statements about APT (or its precursor name, CAT) are entirely about or derived from MAT®.  They fall into these categories:

Using research conducted on MAT® to support claims about APT (see below).  The evidence demonstrates that the clinical trials referenced below conducted at Joslin, UC, et al. . . were conducted on MAT® (not APT). (P. 2048:9-25; P.2049:1-11 [Gilbert, Vol. 12].) The CalPERS decision referenced below was entirely about Dr. Aoki's MAT® procedure and had nothing to do with APT.  (See P.Exh.50 [CalPERS decision]; P.2966:15-21 [Aoki, Vol.18].)

- "APT has been tested with Clinical Trials in a number of university and centers of excellent including **Harvard (Joslin), University of California, University of Arizona, Scripps, Temple University, and the Mayo Clinic**, just to name a few . . . Following years of clinical studies . . . judges have ruled that the treatment is no longer experimental, is not investigational, and is medically necessary for the patients treated.  **A landmark lawsuit against CalPERS achieved the same result.**  (P.Exh.112 [2015 Trina Prospectus, Bates P4597 (bold emphasis added)].)

Using Dr. Aoki's MAT® slides and attributing them to APT, including the rising insulin chart (see P.Exh.10A, Bates P6-5840) and various other copyrighted slides.  (See P.Exh.**11** [CAT Presentation, *see* Bates P1028 (Rising Insulin Baseline Chart); P1040 (Fuel Oxidation – Oral 100G Glucose Test Slide); P1041 (Fuel Oxidation – Lunch Test Meal Study Slide); P1043 (Fuel Oxidation – Exercise Slide); P1045 (Normal Man Slide); P1046 (Type 1 Diabetes Mellitus Slide); P1049 (Results – Glycemic Control Slide); P1051 (Creatinine Clearance Chart)];  P.Exh.**112** [2015 Trina Presentation, *see* Bates P4525 (Using Dr. Aoki's Rising Insulin Chart)].)  All of these are Dr. Aoki's copyrighted slides. (See P.Exh.10A.)

Using photos of Dr. Aoki's patients who were treated with his MAT® therapy and which photos he took (P.400:15-23; P.401:13-25; P.402:1-6, 13-22; P.507:10-15 [Aoki, Vol.3]) for the false claim that the patient was treated with APT.  (See these exhibits which reflect using Dr. Aoki's slides of his patients' foot wounds:  P.Exh.**11** [CAT Presentation, see Bates P1053-1054; P.Exh.12 [2017 APT Presentation, see Bates P2707-2710; P.Exh.**112** [2015 Trina Presentation, P4551-4554].)

Claim that Mr. Gilbert's daughter, Trina was initially and for over 20 years treated with APT when she actually was treated by Dr. Aoki with MAT® initially at UC Davis J-Lab and continuing until at least 2011 at ADRI.  (P.2264:5-8; P.2269:24-25; P.2270:1-17 [Lambertson, Vol.13].)  (See P.Exh.**12** [2017 APT Presentation, Bates P2700; P.Exh.**112** [2015 Trina Presentation, Bates P4544 [stating Trina

-33-

has "been on the treatment for 24 years"]; P.Exh.**126** [2013 Diabetes.Net Printout, Bates P1449] [stating Trina "was 2 when diagnosed. . . The youngest patient when she stared [sic], she has been on CAT for over 20 years."].)

Claim that APT is the ONLY existing treatment of pulsatile insulin and thereby falsely suggesting that MAT® is subsumed within APT:

- "Cellular Activation Therapy. The **ONLY** treatment proven to stop, retard, and/or reverse the chronic complications of diabetes." (P.Exh.11 [CAT Presentation, Bates P1013 (emphasis in original)].)

- "Cellular Activation Therapy provides the only proven way to impede, stop or reverse the chronic complications of diabetes." (P.Exh.11 [CAT Presentation, Bates P1017].)

- "Prior to Cellular Activation Therapy, there was never any treatment better than tight control." (P.Exh.11 [CAT Presentation, Bates P1032].)

- "The Artificial Pancreas Treatment® uniquely restores proper resting metabolism, the <u>only treatment that ever has</u>." (P.Exh.112 [2015 Trina Presentation, Bates P4531 [underline emphasis in original].)

- "The Artificial Pancreas Treatment® . . . is the <u>only</u> clinically proven safe and effective way to treat all of the complications of diabetes." (P.Exh.112 [2015 Trina Prospectus, Bates P4596].)

- "There is no other treatment which mimics normal stimulation of the liver and produces the necessary enzymes to cause all the cells of the body to become more metabolically normal. (P.Exh.112 [2015 Trina Health Prospectus, Bates P4606].)

- "There is no other diabetic treatment, procedure, drug or personal regimen that has been able to demonstrate the slowing, stopping and reversing of diabetic complications found in patients on APT." (P.Exh.112 [2015 Trina Health Prospectus, Bates P4609].)

Claim that the APT treatment has been around for over 20 years although in 2013 Mr. Gilbert admits in his declaration filed in this case (P.Exh.93 [Gilbert Suppl. Decl.]) that Defendants have been using Dr. Aoki's MAT® since before 2005 up to that time; to the extent Mr. Gilbert changed his story in 2017 to claim that he invented the APT treatment in 2002 (see P.Exh.118 [Gilbert MSJ Decl.]), this is not only contradicted by other statements, i.e. P.Exh.93, but even then, APT could not have been in existence for over 20 years at the time the below statements were made, such that the treatment Mr. Gilbert is actually referring to is MAT® and not APT. (*See* exhibits stating (**<u>a</u>**) "The Artificial Pancreas System is FDA approved, totally unique and has been in continuous use for almost 22 years." P.Exh.**126**

-34-

[2013 Diabetes.Net Printout, Bates P1436]; (**b**) "It has taken over 20 years to finally bring this technology to market.  And it is still the 'best kept secret' in the treatment of diabetes." P.Exh.**126** [2013 Diabetes.Net Printout, Bates P1465]; see also P.Exh.**127** [2014 Diabetes.Net Printout, Bates P2525]; (**c**)  "For the last 20 years the Artificial Pancreas Treatment and Artificial Pancreas System have been in development, but the problem has always been that the cost of delivering the treatment is too high for the average diabetic patient."  P.Exh.**127** [2014 Diabetes.Net Printout, Bates P2505].)

### 2.   Defendants Falsely Claim That APT Is Covered By Medicare

In 2009, Medicare issued a national coverage determination that outpatient intravenous insulin treatment ("OIVIT") would not be covered by Medicare.  (P.Exh.77 [Medicare Decision].)  The decision states that OIVIT consists of an outpatient regimen of "pulsatile or continuous intravenous infusion of insulin via any means, guided by the results of: (i) measurement of respiratory quotient . . . and/or (iii) measurement of arterial, venous or capillary glucose; . . performed in scheduled recurring intermittent episodes."  (*Id.*, Bates P218.)  The decision noted that this regimen is also "sometimes termed **Cellular Activation Therapy (CAT), Chronic Intermittent Intravenous Insulin Therapy (CIIIT) . .** Metabolic Activation Therapy (MAT®), Pulsatile Intravenous Insulin Treatment (PIVIT), Pulse Insulin Therapy (PIT) and Pulsatile Therapy (PT)." (P.Exh.77 [Medicare Decision, Bates P218 (emphasis added)].)

"Cellular Activation Therapy" was the first name Mr. Gilbert used to "clone" MAT®.  (P.366:6-23 [Aoki, Vol. 2]; P.Exh.11 [CAT presentation].)  (Mr. Gilbert has also referred to CIIIT as the precursor to APT.  (See P.Exh.126 [2013 Diabetes.Net Printout, Bates P1450 - Photo of Mr. Gilbert with "CIIT" sign underneath APT description on his website, www.diabetes.net].)  Mr. Gilbert has also claimed that CAT is the same as PIVIT, which Mr. Gilbert acknowledged is the prior name for MAT®.  (P.2531:4-5 [Gilbert, Vol.15]; P.Exh.103 [APT Article, Bates P1104]; P.Exh.176 [CAT Presentation, Bates P2388].)  Mr. Gilbert set up Cellular Activation Therapy Clinics and later changed its name to Trina Health.  Both are essentially the same company.  (P.2043:7-25; P.2044:5-14 [Gilbert, Vol.12].)

Pursuant to the 2009 Medicare decision, entities using any form of outpatient intravenous insulin treatment are required to bill using a specific Medicare assigned G code to enable Medicare to detect and reject payment.  (P.1063:2-3 [Aoki, Vol.6]; P.1381:12-19; P.1382:1-25; P.1383:1-5 [Aoki, Vol.8]; P.1659:3-7 [Arcangeli, Vol.10].)  Despite the decision, Mr. Gilbert continued to tout to the public that

APT is covered by Medicare.  This is reflected in the 2015 Trina Health Prospectus which Mr. Gilbert wrote to entice others to invest in a Trina Health clinic in Alabama. (P.791;7-9; P.841:15-23 [Kalifeh, Vol.5].)   The prospectus states at various places that (1) Medicare is currently reimbursing for the treatment under its existing codes; (2) Trina Health is currently receiving payment from Medicare as well as other insurance companies and in the past has received reimbursements; (3) Medicare has paid at a rate of $650 and private insurance up to $800; and (4) that a Medicare provider number is required to bill Medicare.  (P.Exh.112 [Trina Prospectus, at Bates P4597, P4619, P4620, P4588, and P4621].[13])

Despite the 2009 Decision, Trina Health investors were not made aware of Medicare reimbursement issues. (P.794:9-11 [Kalifeh, Vol.5].  Mr. Kalifeh testified Mr. Gilbert stated Medicare was paying for it at the time.  (P.794:12-14 [Kalifeh, Vol.5].)  Mr. Elliott, owner of the Trina Health of Arizona clinic, testified it was represented to him that they would bill Medicare for the treatment. (P.1144:1-2 [Elliott, Vol.7].)  Ms. Shaffer, a patient/employee of the Trina clinics in MI and AZ testified "[t]he biggest problem was that the clinics opened with the understanding that there was Medicare coverage for patients" although there was no such coverage.  (P.2623:7-12 [Shaffer, Vol.16].)

Rather, Trina Health offered services where the clinics would send their bills to Trina Health and they would then bill it through to Medicare.  (P.1708:24-25; P.1709:1-5 [Miller, Vol.10]; P.1144:16-18 [Elliott, Vol.7].)   In other instances, the clinics would bill Medicare directly.  (P. 2192:12-15 [Gilbert, Vol. 13].)   Instead of using the required G code, Trina Health was billing individual steps.  (P.1659:3-11,19-25; P.1660:1-21 [Arcangeli, Vol.10.]; P.1145:18-24 [Elliott, Vol.7].)  Eventually, Medicare caught on and stopped paying.  (P.1145:25; P.1146:1-3 [Elliott, Vol.7]; P.1710:7-14, [Miller, Vol.10]; P.Exh.111 [Gilbert Email To Duyen];  P.1158:16-25; P.1159:1-12 [Elliott, Vol.7]).  As a result, many of the clinics closed because of the lack of Medicare reimbursement.  (*See e.g.*, P.1145:25; P.1146:1-8 [Elliott, Vol.11]; P.1866:1-8; P.1877:1-6; P.1878:1-8; P.1885:16-20; P.1886:1-14  [Gilbert, Vol.11].)

Thus, Mr. Gilbert falsely misrepresented to the public that his method of pulsatile insulin therapy was covered by Medicare.  First, Mr. Gilbert changed the name of Dr. Aoki's MAT® treatment from

---

[13] In his 2016 letter to the AL Ins. Commissioner, Mr. Gilbert also stated, "The Artificial Pancreas Treatment® is FDA cleared, Safe and Effective, paid for by Medicare and other insurance companies, other than Alabama's BCBSAL." (P.Exh.112 [Gilbert Letter, P4697].)

"Cellular Activation Therapy" to "Artificial Pancreas treatment," presumably to circumvent the language of the 2009 Medicare Noncoverage Decision.  It is also clear that under the decision's language, whether termed "CAT" or "APT," no coverage is afforded for any type of outpatient intravenous insulin therapy guided by the results of the use of respiratory quotient or glucose measurements.  (P.Exh.77 [Medicare Decision].)  APT administers pulses of insulin using RQ.  (*See supra,* II.H.)  Even if Defendants claim they don't use RQ, at minimum their treatment is guided by the results of glucose measurements. (P.2183:6 [Gilbert, Vol.13]; *see also e.g.,* P.Exh.203 [Arizona Manual, Bates P3403].)

### 3.    <u>Defendants Falsely Claim That There Has Never Been Adverse Reactions To APT</u>

In various forms of advertisements, including print and videos, Defendants claim there has never been any adverse reaction to APT.  (Exh.126 [2013 Diabetes.Net Printout, Bates P1453]; *see also* P.Exh.192 [2012 Glenn Wilson Interview, "No single incident of an adverse reaction" @6:09]; P.Exh.112 [2015 Trina Presentation: "there has never been an adverse reaction."  Bates P4538.)

Plaintiffs contend that Defendants directly infringe on Dr. Aoki's patents by performing MAT® under the guise of "APT" or under the most recent incarnation, Microburst Insulin Infusion or "MII." (P.2555:2-5 [Shaffer, Vol.16].)  To the extent Defendants attempt to circumvent Dr. Aoki's patents by altering one or two steps of the procedure, these variances result in patients experiencing adverse reactions.  Ms. Shaffer, a patient at the Trina Health clinics in Missouri and Arizona, testified that the change from the typical three-hour treatment sessions to a two-hour treatment session at the Arizona clinic led to fatigue, vision changes, and less than optimal laboratory tests results (i.e. kidney readings). (P.2572:20-25; P.2573:1-12 [Shaffer, Vol.16].)  These are adverse reactions which should have been reported to the FDA.  (P.2632:19-24 [Shaffer, Vol.16].)

When she subsequently became an employee at the Missouri clinic tasked with revamping their marketing materials, she re-wrote the clinic's brochures to eliminate statements claiming "no adverse effects to the treatment" which statements she believed to be false given her experience.  (P.2631:21-25; P.2632-1-6 [Shaffer, Vol.16].)  Ms. Shaffer's experience echo and validate Dr. Aoki's concerns about patient health when clinics are allowed to run awry.  Indeed, prior to this lawsuit and in connection with sending out cease and desist letters to unauthorized clinics who were using his

1  treatment, Dr. Aoki invariably learned of problems with patients.  (P.1587:12-24 [Aoki, Vol.9].)

2  **M.    Thirty-Three Clinics And Calculation Of Damages**

3       Mr. Gilbert confirmed the existence of at least 33 clinics.   (P.1856-1899 [Gilbert, Vol.11];

4  P.2197:12-14 [Gilbert, Vol.13]; P.2378:8-9 [Gilbert, Vol.14].)[14]  He also testified that the number of

5  chairs in these clinics ranged as high as 15 to as low as 2. (P.2196:22-25; P.2208:21-24 [Gilbert, Vol.13].)

6  The Trina Offering Memorandum which Mr. Gilbert wrote, stated that "[c]linics start with a minimum of

7  **8 to 12 chairs and can expand to 18** or more depending upon the available space."  (P.Exh.112 [Trina

8  Prospectus, Bates P4598 (emphasis added)]; P.791:7-9; P.841:15-23 [Kalifeh, Vol.5].)

9       The license agreements reflect these clinics paid at minimum a **(i)** $20K per chair license fee

10  (going as high as $22,500 – see P.Exh.105 [Animo Health License] in chart – and in at least one instance,

11  a $100K per clinic fee – see P.Exh.108 [Newco License]), **(ii)** a one-time $10K training fee, **(iii)** a one-

12  time $500 oversight fee, and **(iv)** a royalty fee / cooperation fee ranging from 5 to 13% of gross revenue.

13  A chart of these license agreements and their relevant license provisions is attached at **Appendix C**.

14       Defendants failed to produce their financials. (See, *infra,* at section II.M.1; P.34:4-6 [Gilbert,

15  Vol.1]).  But using an average of 10 chairs per clinic, the Court can reasonably deduce the following as

16  a basis for damages:

     33 clinics x 10 chairs x $20,000 = $6,600,000
17     33 clinics x $10K training fee = $330,000
     <u>33 clinics x $500 oversight fee = $16,500</u>
18

19  **Total: $6,946,500**.  Additionally, the license agreements required that clinic licensees purchase a Bionica

20  pump to administer the patented treatment, defining each clinic to be one pump per chair.  (See *infra,*

21  **Appendix C.**)  Based on an average of 10 chairs per clinic, the Court estimates each clinic purchased on

22  average 5 pumps at a unit price of $8,750 (P.1150:12-13 [Elliott, Vol.7]; P.1904:12-15 [Gilbert, Vol.11];

23  P.2026:18-22 [Gilbert, Vol.12]) to administer the patented treatment, totaling $1,443,750 for 33 clinics.[15]

24  _____

25       [14] These clinics are located in:  Alabama (Birmingham, Foley, and Fairhope), Arizona (Scottsdale), California
   (Hayward, Newport Beach, Roseville, Sacramento, San Diego, Santa Barbara, West Los Angeles), Florida (Miami,
26  Kendall), Kansas (Wichita), Louisiana (Shreveport), Louisiana (Trina Health of Lake Charles), Mississippi (North
   Sunflower Medical Hospital, Boonville, and New Albany), Missouri (Chesterfield), Montana, Nevada (Las Vegas), New
27  Jersey, North Carolina, New York (Bronx), Oklahoma (Oklahoma City), Tennessee (Memphis), Texas (Dallas, Fort Worth
   aka North Texas, West Houston and Tyler), Virginia (Pounding Mill) and Virginia (Grundy).  (*Id.*)

28       [15] The Court notes the Trina presentation as well as Trina prospectus which Mr. Gilbert wrote states in various
   places the approximate payments from insurance companies, including that payments range from "$800" to

PLAINTIFFS' [PROPOSED] CONCLUSIONS OF FACT AND LAW
Case No.:  2:11-cv-02797-TLN-CKD

N.      **Involvement Of The Other Defendants**

1.      **The Remaining Defendants**

Mr. Buckman was the medical director of the Trina Health clinics in Hayward, Roseville, and Sacramento and oversaw the administration of the APT treatment at these clinics.  (P.952:22-25; P.953:1; P.960:8-17; P.961:22-25; P.962:1-9 [Buckman, Vol.6].)

Melanie Kunz is a nurse practitioner and was involved with training the clinics on the treatment. Ms. Kunz is the president and CEO of Mededco, LLC.  Mededco was the medical training and oversight company for Trina clinics, including Diabetic Innovations, LLC.  (P.1959:21-25; P.1960:1 [Gilbert, Vol.11]; P.Exh.175 [Diab Innov Printout, Bates P2385-2386].)  Ms. Kunz was a nurse practitioner in the Trina Health of Arizona clinic.  (P.1128:11-13 [Elliott, Vol.7].)  Ms. Kunz *through Trina Health* taught the treatment to the Arizona clinic.  (P.1971:19-22 [Gilbert, Vol.11].)

Diabetic Innovations, LLC[16] was a Texas entity formed to set up clinics to provide APT (formerly Cellular Activation Therapy). Its management team comprised of Ms. Kunz *and Gilbert*. (P.Exh.172 [Tx Sec. of State]; P.Exh.175 [Diab Innov Printout, Bates P2385]; P.Exh.176 [CAT Prsn].)

Marc R. Rose[17] and Michael McCarthy were among the first ones who did business as a licensed Trina Health clinic (Costa Mesa). (P. 1714:1-12 [Gilbert, Vol.10].)  They treated patients using Dr. Aoki's patented technology.  (P.2968:24-25, P.2969:1-4 [Aoki, Vol.18].)

Faising Chui was the manager and organizer of Diabetic Life Pulse of Louisiana, LLC, a Trina Health licensed clinic in Shreveport, Louisiana that operated for three to four years.  Limi Management, Inc. along with Faising Chui are managers and/or members of this Trina Health clinic.  (P.Exh.162 [Articles of Org, Bates P1324, 1329]; P.1880:16-25; P.1881:1-17 [Gilbert, Vol.11].)

John Mullen, Richard Girard and Glenn Wilson are principals of a Santa Barbara entity called

---

"$1,000/treatment day." See *e.g.,* P.Exh.112 [2015 Trina Presentation, Bates P4588; Prospectus, Bates P4598].  However, the Court finds license fees and pump sales are a more reliable and appropriate basis for determining damages.

[16] Defendant Diabetic Innovations, LLC is a Texas entity and distinct from the Trina Health of Arizona clinic, also called Diabetic Innovations, LLC, which had a license agreement with Trina Health / Bionica (see P.Exh.95 [Diabetic Innovations, LLC license].).  Only the former is a defendant in this case.  During trial, lead counsel confused the two.

[17] Mr. Rose was an ophthalmologist who surrendered his license in 2016.  This info is available via the CA Medical Board https://search.dca.ca.gov/details/8002/C/37054/57c0d216cb2951468ed4a75abf50afd0

Life Pulse Health, LLC.   Life Pulse Health, LLC is also a defendant, albeit has a suspended corporate status.  (See *infra*, II.N.2.)  Life Pulse Health, LLC entered into a license agreement with Trina Health to provide APT.  (P.Exh.229 [Life Pulse Health License, Bates P3-5882].)  The agreement was signed by John Mullen on behalf of Life Pulse Health and Mr. Gilbert on behalf of Trina Health, LLC and Bionica, Inc.  (*Id.* at Bates P3-5881].)  ***This license agreement specifically references as an exhibit and incorporates all of Dr. Aoki's patents.***  (*Id.* at Bates P3-5867 ¶(1)u, P3-5882.)

Timothy Tight was another licensee of MAT® through Mr. Gilbert and his entities and was attempting to start clinics using MAT®.  Around the time Mr. Gilbert changed his company from Cellular Activation Therapy to Trina Health[18], Mr. Tight became the manager of a Trina Health clinic, i.e. Trina Health of West LA.  (P.1494:17-25; P.1495:1-4; P.1496:20-25; P.1497:1-22 [Aoki, Vol.9].)

### 2.    Default Is Entered Against These Defendants

At the start of trial, the following corporate defendants had a suspended and/or forfeited status with the California Secretary of State: (1) **Life Pulse Health, LLC**; (2) **Bionica International, Inc.**[19]; and (3) **Diabetic Life Pulse, Inc.**  Additionally, the following out-of-state entity, **Diabetic Life Pulse of Louisiana, LLC**, has a revoked corporate status Louisiana.[20]

## III.    CONCLUSIONS OF LAW

### A.    Judicial Admissions

#### 1.    Legal Standard

Admissions *made in the course of litigation* are generally treated as "judicial admissions," *i.e.*, they are more than mere evidence of the facts admitted—they *conclusively establish* the matter. Several forms of "judicial admission" are recognized under federal law, including statements in briefs filed with the court.  Fed. Civ. Trials and Evid., §8:980, The Rutter Group, 2019.  Judicial admissions

---

[18] With respect to the transition from CAT to APT, see P.366:6-23 [Aoki, Vol. 2]; P.Exh.11 [CAT presentation]; P.2043:7-25; P.2044:5-14 [Gilbert, Vol.12].

[19] During trial, Mr. Gilbert claimed that Bionica International, Inc. converted to a general partnership. (P.63:8-13, [Gilbert, Vol.1].)  No supporting evidence was proffered.  In any event, as reflected on the CA Secretary of State's website, Bionica International, Inc. has a suspended corporate status.  See https://businesssearch.sos.ca.gov/CBS/Detail

[20] The first page of the document shows an "inactive" status but the reason for the "inactive" state is referenced on the second page, which shows a **revoked corporate status** as of August 15, 2018.

PLAINTIFFS' [PROPOSED] CONCLUSIONS OF FACT AND LAW
Case No.:  2:11-cv-02797-TLN-CKD

are more than evidentiary admissions.  They have the effect of removing the admitted fact from issue and *wholly dispensing with the necessity for proof* of the fact.  *Id.* at §8:982, citing *American Title Ins. Co. v. Lacelaw Corp.* 861 F.2d 224, 226  (9th Cir. 1988); *Barnes v. Owens-Corning Fierglas Corp.,* 201 F.3d 815, 829 (6th Cir. 2000).  Judicial admissions are binding on the parties for purposes of the case in which the admissions are made, including appeals.  *Id.* at §8:984, citing *Ferguson v. Neighborhood Housing Services of Cleveland, Inc.,* 780 F.2d 549, 551 (6th Cir. 1986); see *Rojas v. Roman Catholic Diocese of Rochester,*  660 F.3d 98, 106 (per curiam) (2nd Cir. 2011).   A court has discretion to treat factual statements by counsel in briefs filed as binding judicial admissions.  See *Gospel Missions of America v. City of Los Angeles,* 328 F.3d 548, 556-557 (9th Cir. 2003) –trial and appellate briefs; *Holman v. Kemna,* 212 F.3d 413, 417-48 (8th Cir. 2000).

### 2. Defendants Have Admitted In Briefs Filed With The Court That Their APT Treatment Is The Same As Dr. Aoki's MAT® Treatment.

On December 6, 2011, Defendants filed a Motion To Dismiss / MSJ on the basis that they have been using Dr. Aoki's MAT® treatment under the moniker, APT through a purported *exclusive* license that they claim they received from Dr. Aoki for over a decade now.  (ECF 11.)  These facts were re-asserted when Defendants filed a similar motion nearly 1.5 years later on April 17, 2013.  (ECF 139.)  Nowhere in either of these motions do Defendants claim in the alternative that the "APT" treatment as they've called it, which is subject to this purported license received from Dr. Aoki is somehow different from Dr. Aoki's MAT® treatment.  In fact, Defendants have admitted otherwise:

- "Moving Defendants variously provide treatment to diabetes patients using Defendant Bionic, Inc.'s medical infusion pump.  The pump is the only device cleared ("approved") by the U.S. Federal and Drug Administration ("FDA") to deliver the pulsatile intravenous insulin therapy at issue in the First Amended Complaint (the "FAC").  **This therapy is referred to in the FAC as metabolic activation therapy (the "technology").**  Thousands of patients have been successfully treated through out-patient facilities operated by Moving Defendants under licenses from Defendant(s) Gilbert and/or Bionica."  (MPA ISO Motion to Dismiss, ECF 11, p. 1:7-13.; MPA ISO Motion to Dismiss, ECF 139, p. 1:6-13.)  (Bold emphasis added.)

- "As a matter of written record, Gilbert and Bionica **hold exclusive grants from Plaintiff Aoki of the right to use the technology, with Plaintiffs retaining a royalty on Defendants' efforts** and certain research and development rights."  (MPA ISO Motion to Dismiss, ECF 139, p. 1:14-2:4; see also MPA ISO Motion to Dismiss, ECF 11, p. 1:14-19.) (Bold emphasis added.)

PLAINTIFFS' [PROPOSED] CONCLUSIONS OF FACT AND LAW
Case No.:  2:11-cv-02797-TLN-CKD

- "For more than eight years before this action was filed, Defendant Gilbert has operated and sublicensed to others. . . . . **This technology is licensed to Gilbert and Bionica . . .**"  (MPA ISO Motion to Dismiss, ECF 139, p. 2: 8-14.) (Bold emphasis added.)

- "The gravamen of the FAC, and a necessary element of each of the claims for relief, is that Moving Defendants do not have the right to use the technology.  This contention is **barred as a matter of law by the 2001 Settlement Agreement License and the 2005 License purchased from CII, both of which independently give Moving Defendants the right to use the technology**. Sep. Statement ¶¶ 1, 2, respectively.  **As set forth therein, the Licenses grant Defendants Gilbert and Bionica the exclusive rights to the technology.  In turn the remaining Defendants operate under sublicenses from Gilbert and Bionica**. . . (MPA ISO Motion for Motion to Dismiss, ECF 139, p. 7:20-8:12.) (Bold emphasis added.)

### 3.   Defendants Admit Under Oath That They Are Using Dr. Aoki's MAT® Treatment.

In Mr. Gilbert's declaration submitted in support of motions to dismiss, Mr. Gilbert who was then a lawyer representing himself and all the Defendants in this action unequivocally admitted that he and Defendants have been using Dr. Aoki's technology pursuant to a purported license and have been doing so since at least "2003 or 2005." (P.Exh.93 [Gilbert Supplemental Decl., ¶¶a-f]; ECF 165.[21])  He further declares there has been no changes to the treatment and that even if there were, it would be "irrelevant" because such modifications / improvements are captured by the purported license from Dr. Aoki.  (*Id.*)  The Court finds that such admissions are binding on Mr. Gilbert and Defendants.

### B.   Res Judicata

#### 1.   Legal Standard

*Factual* or *legal* issues necessarily and finally adjudicated in an earlier action or proceeding may be entitled to preclusive effect in a later lawsuit on a *different* claim.  The effect may be to bar relitigation of *those* issues, if not the entire claim.  *Arizona v. California,* 530 U.S. 392, 414 (2000); Rest.2d Judgments §27 (1982).  If the former judgment is a state court judgment, federal courts must apply the res judicata and collateral estoppel rules of the state that rendered the underlying judgment. *Migra v. Warren City School Dist. Bd. Of Ed.*, 465 U.S. 75, 81 (1984); *Holcombe v. Hosmer,* 477 F.3d 1094, 1097 (9th Cir. 2007).  The Nevada Supreme Court  has held that the "following factors are necessary for application of issue preclusion:  '(1) the issue decided in the prior litigation must be

---

[21] See also full text at *supra,* II.H.1.

identical to the issue presented in the current action; (2) the initial ruling must have been on the merits and have become final; (3) the party against whom the judgment is asserted must have been a party or in privity with a party to the prior litigation'; and (4) the issue was actually and necessarily litigated." *Five Star Capital Corporation v. Michael W. Ruby*, 124 Nev. 1048, 1055 (2008).

## 2. **Relevant Factual Events**

On August 28, 2001, the Diabetex Settlement Agreement was inked, transferring Dr. Aoki's rights back to him, not Mr. Gilbert.  (P.Exh.42 [Diabetex Settlement]; see *supra,* II.D.2.)

On August 4, 2003, MTC filed a complaint in Nevada court against Dr. Aoki, MI, Mr. Gilbert, and Hamilton-May (aka Bionica, Inc.), claiming breach of the Term Sheet that Mr. Gilbert had attempted to negotiate as part of a deal to license Dr. Aoki's technology to MTC.  (P.Exh.62 [Complaint]; P.Exh.60 [Term Sheet].)

On March 16, 2004, MTC dismissed Mr. Gilbert and Bionica, Inc. from their lawsuit.

On June 7, 2004, Mr. Gilbert testified in the Nevada action that the technology rights went back to Dr. Aoki from Diabetex. (See *supra,* II.D.2.)  Mr. Gilbert does not claim on behalf of himself or Bionica, the rights to Dr. Aoki's technology at all.

On September 20, 2004, the Nevada court granted Dr. Aoki and MI's motion for preliminary injunction, finding "[a]ny agreements entered into by Dr. Aoki and/or MI prior to the May 11, 2003, Term Sheet (Exhibit 1) did not alienate Dr. Aoki's control over the use and marketing of **MAT, which he developed throughout his entire career**."  (P.Exh.65 [Prel. Inj., Bates P3737, ¶1].)

On February 23, 2005, unbeknownst to Dr. Aoki, Mr. Gilbert and Bionica enter into the CI-Bionica license which would purport to transfer Dr. Aoki's technology to Bionica.  (P.Exh.66 [CI-Bionica License]; P.Exh.72 [Aoki Dinucci Letter].)

On March 16, 2005, Dr. Aoki and MI filed a Second Amended Cross-Complaint against Bionica (f/k/a Hamilton-May) and Mr. Gilbert.  (P.Exh.67 [Cross-Complaint].)

On June 17, 2005, Mr. Gilbert is deposed in Sacramento in a separate lawsuit and questioned regarding Bionica's business activities related to the sale or marketing of diabetes treatment and he fails to disclose the existence of the CI-Bionica license, entered into just four short months ago. (P.2215:15-24; P.2216:1-6; P.2219:18-24 [Gilbert, Vol.13].)

On June 22, 2005, the Nevada court granted Dr. Aoki and MI's Application for an Order to Show Cause, finding that (i) Dr. Aoki developed MAT®; (ii) Under no circumstances can anybody have a right to MAT® other than Dr. Aoki, MI or MTC[22]; and (iii) The Court previously determined that Bionica does not have any rights to MAT®.  (P.Exh.69[23] [OSC, ¶¶1, 3, and 4].)  *As of the date the OSC was granted, both Mr. Gilbert and Bionica were cross-defendants in the case.* (See *supra*, II.F.)

On June 7, 2006, MI dismissed Mr. Gilbert and Bionica (f/k/a Hamilton-May) from the lawsuit. (D.Exh.F2-Tab 32.)  However, Dr. Aoki did *not* dismiss either of them. (*Id.*)

On August 4, 2009, the Nevada Court issued a permanent injunction adopting the findings of fact of the September 20, 2004 preliminary injunction.  (P.Exh.76 [Nevada Judgment and Order].)

### 3.   <u>Analysis</u>

The Court finds that the Nevada Court has previously determined that no one has rights to the MAT® technology but Dr. Aoki.  (P.Exh.65 [Prel. Inj.]; P.Exh.69 [OSC Order].)  This is the same issue litigated in this action.  These rulings were on the merits and became final as a result of the final 2009 Judgment and Order.  (P.Exh.76].)  The parties in the Nevada case were either the same parties or in privity with the parties in this action.  At the time the preliminary injunction was issued, although MTC had dismissed Mr. Gilbert and Bionica as defendants, their interests were certainly in privity with MTC with respect to the license rights to Dr. Aoki's technology.  And yet, at the preliminary injunction evidentiary hearing, Mr. Gilbert testified that the technology rights transferred back to Dr. Aoki after the Diabetex settlement.  (P.2096:13-24; P.2097:13-25; P.2098-2100 [Gilbert, Vol.12]; P.Exh.63 [Nevada Transcript, p.39:1-10; p.76:13-24; p.77:1-15].)

Subsequently and during the Nevada action, Mr. Gilbert/Bionica, Inc. entered into the license with CI which Defendants now claim gave them a license to Dr. Aoki's technology.  (P.Exh.66 [CI-Bionica License]; ECF 11 and 139 [Defendants' MSJs].)  A few weeks after entering into this license, both Mr. Gilbert and Bionica became cross-defendants in the Nevada action.  (P.Exh.67 [Second Cross-Complaint].)  Yet at no time thereafter did Mr. Gilbert or Bionica ever assert rights to Dr. Aoki's

---

[22] MTC was allowed to operate clinics until final resolution of the preliminary injunction.

[23] The Application For Order To Show Cause is attached as Exhibit B to the Nevada Court's June 22, 2005 ruling.

PLAINTIFFS' [PROPOSED] CONCLUSIONS OF FACT AND LAW
Case No.:  2:11-cv-02797-TLN-CKD

technology under the CI-Bionica license.  In fact, at Mr. Gilbert's deposition (in a separate but related case) just a few months after being brought back as a cross-defendant in the Nevada action and after entering into the CI-Bionica license, Mr. Gilbert was asked about and failed to disclose the existence of this license.  (See s*upra*, II.G.3; P.2215:15-24; P.2216:1-6; P.2219:18-24 [Gilbert, Vol.13.].)  Five days after the deposition, the Court issued the 2005 OSC Order (P.Exh.69), affirming that nobody but Dr. Aoki had rights to MAT®.  At the time of the issuance of this 2005 OSC Order, *both Mr. Gilbert and Bionica were cross-defendants in the case and had every opportunity to raise the issue as to their rights under the CI-Bionica license but did not.*

**C.   Patent Infringement**

**1.   Generally**

Patent infringement is a question of fact.  *See, e.g., i4i Ltd. v. Microsoft Corp.*, 598 F.3d 831, 849 (Fed. Cir. 2010).  Infringement must be proven by a preponderance of the evidence.  *Duncan Parking Technologies, Inc. v. IPS Group, Inc.,* 914 F.3d 1347, 1360 (Fed. Cir. 2019).

**2.   Direct Infringement**

**a.   Legal Standard**

"[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. §271(a).  "[I]nfringement and validity analyses must be performed on a claim-by-claim basis." *Amazon.com, Inc. v. BarnesandNoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).  "An infringement analysis involves the two-step process of 'construing the claims and comparing the properly construed claims to the accused product.'" *Tinnus Enterprises, LLC v. Telebrands Corp.*, 846 F.3d 1190, 1203 (Fed. Cir. 2017).   A patent owner "can employ any method of analysis that is probative of the fact of infringement." *Forest Laboratories, Inc. v. Abbott Laboratories*, 239 F.3d 1305, 1312 (Fed. Cir. 2001).  A patent owner may rely on appropriate inferences, circumstantial evidence, and admissions. *Liquid Dynamics Corp. v. Vaughan Company,*

*Inc.*, 449 F.3d 1209, 1219 (Fed. Cir. 2006).   An accused infringer may, expressly or implicitly, admit infringement.  *E.g., Toro Co. v. Deere & Co.*, 355 F.3d 1313, 1322 (Fed. Cir. 2004)[24].

### b.     Analysis

The evidence supporting direct patent infringement are set forth above.  (See *e.g. supra,* II.H. and I.)  They include reference to the (i) Arizona clinic manual, (ii) the Florida protocol, (iii) witness testimonies, (iv) the numerous Trina Health license agreements, including specifically the Life Pulse Health, LLC license which explicitly references Dr. Aoki's RQ patents as the basis of the subject technology to be performed for administering APT; (v) the various APT/CAT presentations or slides, prospectus, websites, and APT article written by Mr. Gilbert; and (vi) video clips.

### (1)     Mr. Gilbert And Defendants Admit To Infringement

Mr. Gilbert admitted on behalf of himself and all Defendants whom he was then representing that he and they have been using Dr. Aoki's MAT® technology pursuant to a purported license.  (See *supra,* II.I.1)  Mr. Gilbert also admitted in an email to counsel that at least one of his clinics was infringing on the patents.  (See, *supra,* II.I.2.)  The Defendants who were licensees of the Hayward clinic admitted that they were using Dr. Aoki's patented technology at their clinic and Mr. Buckman, the medical director for the Trina Hayward, Roseville and Sacramento clinics testified that he oversaw the same procedure at each of these clinics and that the source of that procedure was from Trina Health, including the manual referenced herein as the Arizona manual.  (P.950:24-25; P.951:1-13; P.952:22-25; P.953:1; P.960:8-17; P.961:22-25; P.962:1-9 [Buckman, Vol.6]; P.Exh.203 [Arizona manual].)

### (2)     Claim By Claim Analysis

An exemplar claim by claim analysis of an at-issue patent, the '736 patent, a system and method patent for treating eye and nerve disease is set forth below.  Additional exemplar claims chart analysis are attached hereto at **Appendices D1 and D2**.

| Claim | Infringing Evidence |
| --- | --- |
| (1) A method for treating eye and | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing |

---

[24] A district court's grant of summary judgment of literal infringement of a patent claim was proper even though a district court erred by not construing the claim:  "Where [an accused infringer's] employees, [its] counsel, and the designer of the [accused device] all acknowledged infringement, and where [the accused infringer] does not dispute that the accused device is in all material respects a [patent] embodiment, the district court properly determined that [the accused infringer] infringed [the patent] claim . . . as a matter of law."

-46-

| nerve disease associated with a diminution in glucose oxidation in patients through an intravenous site administering a pulse of insulin to a patient comprising the steps of: | various tissues and complications (last row after step 9).<br><br>See also *supra* II.L.1 citing P.Exh.112 [2015 Trina Prospectus, Bates P4596]  which states APT "is the only clinically proven safe and effective way to treat all of the complications of diabetes;" see also P.Exh.112 at Bates 4609;  P.Exh.11 [CAT Presentation, Bates P1013, 1017]). |
|---|---|
| a) determining a respiratory quotient of the patient, | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing use of RQ at step 1.<br><br>See also *supra* II.H.2, 3, 4 and 5 discussing evidence of use of RQ. |
| b) having the patient consume a liquid or food containing glucose, | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing administration of oral glucose at step 5. |
| c) administering intravenously the pulse of insulin at a regular interval of time until the respiratory quotient is 0.90 or greater, | Ms. Shaffer testified that patients at the Trina clinics held a competition to see who could get to an RQ goal of over .90, i.e. 100 or 1. (P.2609:23-25; P2610:1-2 [Shaffer, Vol.16].) |
| d) providing the patient a rest period, and | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing rest period at step 7. |
| e) repeating the steps a-d three times, | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing three cycles of treatment at step 8. |
| (2) The method of claim 1, wherein the intravenous site further comprises a needle or catheter located in the patient's body, hand or forearm. | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing IV access and pump/syringe at steps 2 and 3. |
| (3) The method of claim 1, wherein the liquid or food contains 60 to 100 grams of glucose. | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing administration of oral glucose at step 5.  Specifically, page 79 of the manual mentions giving the patient 75 grams of glucose (dextrose). |
| (4) The method of claim 1, wherein the pulse of insulin is administered by an intravenous infusion device. | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing use of pump or syringe at step 3. |
| (5) The method of claim 1, wherein the interval of time is about 6 mins. | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing insulin pulses at 6 minute intervals at step 4. |
| (6) The method of claim 1, wherein the pulse of insulin is tailored to achieve increased retinal and glucose oxidation by enhanced pyruvate dehydrogenase complex activity. | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing various tissues and complications including retinopathy (last row after step 9).<br><br>See also *supra* II.L.1 citing P.Exh.112 [2015 Trina Prospectus, Bates P4596]  which states APT "is the only clinically proven safe and effective way to treat all of the complications of diabetes;" see also P.Exh.112 at Bates 4609;  P.Exh.11 [CAT Presentation, Bates P1013, 1017]).<br><br>See *supra* II.L.1 citing P.Exh.112 [2015 Trina Prospectus, Bates P4606] stating APT "mimics normal stimulation of the liver and produces the necessary enzymes to cause all the cells of the body to become more metabolically normal;" see also P.Exh.112, Bates P4531.<br><br>See also *supra* II.K. citing MAT® slides used in APT presentations pertaining to fuel oxidation, *i.e.* P.Exh.112 [2015 Trina Presentations, Bates 4533], P.Exh.195 [Trina Health Transforming Metabolism2 Video], P.Exh.12 [2017 APT Presentation, Bates 2683; P.1457:16-20 [Aoki, Vol.9].) |

-47-

| | |
|---|---|
| (7) The method of claim 1, wherein the intravenous site is converted to a heparin or a saline lock during the rest period. | See *supra* II.H.1, chart of infringing evidence discussing IV access at step 2, use of a pump or syringe at step 3 and rest period at step 7.<br><br>See also *supra* II.A.7 (citing P.Exh.103 [APT Article, Bates P1105], P.Exh.112 [Trina Prospectus, Bates P4597]*)*, discussing activities patients can do during rest period.  This leads to the inference that during rest periods, patients are disconnected from the pump and the IV "stoppered" (essentially converted to a saline lock) or else blood would come out of the catheter. |
| (8) The method of claim 1, wherein the rest period is one hour. | See *supra* II.H.1, chart of infringing evidence discussing rest period of up to one hour at step 7. |
| (9) The method of claim 1, wherein said steps a-e are repeated at least once a week. | See *supra* II.H.1, chart of infringing evidence discussing administration of treatment once a week or more than once a week at step 9. |
| (10) The method of claim 9, wherein said steps a-e are repeated three or more times a week. | See *supra* II.H.1, chart of infringing evidence discussing administration of treatment once a week or more than once a week at step 9.<br><br>See also P. 84 of Arizona Manual (P.Exh.203) ("There will be some interpretation required as a single session showing a continued ability to maintain good metabolism may not be enough, and no fewer than 3 consecutive days of Metabolic ability are needed to then transition into a 10 day or 2 week schedule.") |

### 3.   Doctrine of Equivalence

#### a.   Legal Standard

"Even when an accused product does not meet each and every claim element literally, it may nevertheless be found to infringe the claim 'if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention.'"  *Intendis GMBH v. Glenmark Pharmaceuticals Inc., USA*, 822 F.3d 1355, 1360 (Fed. Cir. 2016) (quoting *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 21 (1997)).  "Infringement under the doctrine of equivalents is a question of fact that [the Federal Circuit] review[s] for clear error after a bench trial." *Intendis GMBH*, *supra,* 822 F.3d at 1360 (Fed. Cir. 2016).

"A finding of infringement under the doctrine of equivalents requires a showing that the difference between the claimed invention and the accused product was insubstantial. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 608 (1950).  One way of doing so is by showing on a limitation by limitation basis that the accused product performs substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patented product." *Crown Packaging Technology, Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir. 2009) (citing *Warner-Jenkinson v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39-40 (1997)).    This is

-48-

1  known as the "function-way-result" test.  *See Id.*  "Each prong of the function-way-test is a factual

2  determination."  *Intendis GMBH v. Glenmark Pharmaceuticals Inc., USA*, 822 F.3d 1355, 1361 (Fed.

3  Cir. 2016).  A second way of showing insubstantial difference between the claimed invention and the

4  accused process is the "insubstantial differences" test.  *UCB, Inc. V. Watson Laboratories Inc.*, Case

5  Nos. 2018-1397 & 2018-1453, 2019 WL 2571401, at *5 (Fed. Cir. June 24, 2019); *Voda v. Cordis*

6  *Corp.*, 536 F.3d 1311, 1326 (Fed. Cir. 2008).  "Under the insubstantial differences test, '[a]n element in

7  the accused device is equivalent to a claim limitation if the only differences between the two are

8  insubstantial." *Voda*, 536 F.3d at 1326.

9          **b.**     **<u>Analysis</u>**

10        Plaintiffs have proven direct infringement on a claim by claim analysis whether via direct,

11  circumstantial or inferential evidence.  (See *supra* III.C.2.)  To the extent Defendants can credibly claim

12  differences between the treatments, the Court finds these differences are without distinction.  Under

13  either the "function-way-result" or "insubstantial differences" test, APT infringes upon all the claims of

14  the MAT® treatment.  APT performs substantially the same function (activation of liver to improve

15  metabolic processing) using substantially the same way (high pulses of insulin concomitant with

16  glucose meal) to achieve substantially the same result (improved diabetic complications, *i.e.* eye,

17  wounds, kidney, heart, et al.).  (See *supra,* II.H., I, K, L and appendices[25].)

18        Given the analysis above, the Court finds it unnecessary to engage in a similar claim by claim

19  analysis under the doctrine of equivalence.  However, by way of illustration, with reference to claim

20  1(b) of the '736 patent, to the extent Defendants claim they use dextrose instead of glucose (P.1842:19-

21  22 [Gilbert, Vol.10]), both dextrose and glucose are the same.  (P.1417:3-6, [Aoki, Vol.8]; P.2911:17-

22  25, [Aoki, Vol.18].)  In fact, Mr. Gilbert used the two interchangeably during his testimony.

23  (P.2060:19-25 [Gilbert, Vol.12]; P.2790:13-14 [Gilbert, Vol.17]; see also P.2912:5-6 [Gilbert, Vol.18].)

24  With reference to claim 10 of the '736 patent regarding repetition of the treatment three times a week or

25

26        [25] References to factual sections also include the accompanying Appendices as well.  For example, reference to

27  II.G. (RQ Patent Claims And Infringing Evidence) includes reference to **Appendix A** (Chart Of Infringing Evidence),
reference to II.J (Use Of Slides – Copyright Infringement) includes reference to **Appendix B** (Chart Of Copyrighted Slides

28  That Were Copied), reference to II.L (Damages) includes reference to **Appendix C** (License Agreements), et al.

-49-

1   more, the Court finds that insubstantial from repetition of the treatment from one to two times a week or

2   more.  (See *supra,* II.H.1 and Appendix A, at step 9.)  The function-way-result would be the same.

3       To the extent Defendants claim they varied the treatment, the Court finds those claims not to be

4   credible.  (See *e.g.* (i) Mr. Gilbert's claims about no rest periods that is contradicted by the evidence at

5   *supra,* II.A.7 or evidence reflecting use of RQ at *supra,* II.H, I and Appendix A), (ii) Ms. Shaffer's

6   testimony regarding reduction from three hour to two hour session treatments at *supra,* II.L.3 or (iii)

7   Mr. Gilbert's statement under oath that APT allows insulin to go back to baseline in-between pulse

8   intervals despite this being physiologically impossible due to the half-life of insulin, at *supra,* II.A.6.).

9                **4.      Indirect Infringement:  Inducement of Infringement**

10      Plaintiffs allege Mr. Gilbert and the entities he controlled, *i.e.* Bionica, Inc., Trina Health, LLC

11  and Trina Health of Newport Beach induced defendants Kevin Buckman, Melanie Kunz, Mededco,

12  LLC, Diabetic Innovations, LLC, Marc Rose, Michael McCarthy, Faising Chui, Limi Management,

13  Inc., John Mullen, Richard Girard, Glenn Wilson and Timothy Tight to infringe upon the patents.

14                        **a.      Legal Standard**

15      "Whoever actively induces infringement of a patent shall be liable as an infringer."  35 U.S.C.

16  §271(b).  "To prove inducement, the patentee must show direct infringement, and that the alleged

17  infringer 'knowingly induced infringement and possessed specific intent to encourage another's

18  infringement.'"  *i4i Ltd. v. Microsoft Corp.*, 598 F.3d 831, 851 (Fed. Cir. 2010).

19                        **b.      Analysis**

20                **(1)      Mr. Gilbert And His Entities Had Knowledge Of The Patents**

21      Given the decades-long relationship between Mr. Gilbert and Dr. Aoki (see, *supra* II.D) and Mr.

22  Gilbert's involvement with Dr. Aoki's patent applications (see, *supra* II.A.5), Mr. Gilbert and therefore

23  his companies knew of Dr. Aoki's patents, but proceeded with the specific intent to induce infringement

24  by the downstream licensees.  (See *supra,* II.N.)

25                **(2)      Mr. Gilbert And His Entities Acted With Specific Intent To**
                       **Encourage Infringement Of The Patents**

26      Direct infringement is demonstrated as discussed above. (See also, *supra,* II.H., I and Appendix

27  A.)  Extensive evidence demonstrates that Mr. Gilbert and his entities acted with specific intent to

28

induce infringement of the patents.  Mr. Gilbert and his entities initially claimed that they had a license

to use MAT®. As the effect of the Nevada court's rulings became clear, they shifted their ground and

tried to claim that they were doing something different - "APT," even though the treatments are clearly

the same.  (See ECFs 11 and 139 [Defs' MSJ]; *supra*, II.I.1. and II.B. [Res Judicata discussion].)

Mr. Gilbert's current claims that he in fact invented a new treatment around 2002 is not

credible.  (See *supra*, II.J.).  Mr. Gilbert is also a not medical doctor and does not have a medical

background.  (See *supra* A.11.) The license agreements that were entered into specifically reference Dr.

Aoki's patent as the subject technology to be used while failing to disclose Dr. Aoki as the actual owner

of these patents.  (See *supra,* II.H.3).  Mr. Gilbert attempted to solicit investors and patients for the APT

treatment using Dr. Aoki's work on MAT® and his MAT® slides and falsely attributing it to APT.

(See, *supra,* II.K., L. and A.2.c.)

## 5.  Remedies (Patent Infringement)

Upon a finding of patent infringement, "the court shall award the claimant damages adequate to

compensate for the infringement, but in no event less than a reasonable royalty for the use made of the

invention by the infringer, together with interest and costs as fixed by the court."  35 U.S.C. §284.

### a.  Reasonable Royalty

Plaintiffs are entitled to a reasonable royalty to compensate for Defendants' infringement.  35

U.S.C. §284.  A "reasonable royalty may 'be based upon an established royalty, if there is one, or if not,

upon the supposed result of hypothetical negotiations between the plaintiff and defendant.'" *Minks v.

Polaris Industries, Inc.,* 546 F.3d 1364, 1372 (Fed. Cir. 2008).  This approach typically includes

consideration of the "*Georgia-Pacific* factors," a set of factors set forth in *Georgia-Pacific Corp. v.

U.S. Plywood Corp.*, 318 F. Supp. 116, 1120 (S.D.N.Y. 1970) and numerous subsequent patent cases.

*See, e.g., Lucent Technologies v. Gateway, 580 F.3d 1301,* 609 F.3d 1301,1324 (Fed. Cir. 2009); *Rite

Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 n.13 (Fed. Cir. 1995).  It must be understood that "any

reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty.'"

*Lucent*, 609 F.3d at 1325.

There is evidence of license agreements that actually specify the royalties received by Mr.

Gilbert and his entities comprising chair license fees, oversight fees, and training fees which were

-51-

collected.  (*See supra,* II.M. and Appendix C [licenses chart].)  APT is simply the patented invention disguised under another name.  (*See supra,* II.H.I.J.K.L and appendices.)  These royalty payments to defendants for the purported right to practice the claimed invention are the best evidence of an appropriate royalty.  *See Whitserve, LLC v. Computer Packages, Inc.* 694 F.3d 10, 27, n.11 (Fed. Cir 2012) (listing factors (1) and (2) that consider other royalty rates paid); *Minks, 546 F.3d at* 1372 (holding that a reasonable royalty "may be based on an established royalty").

The evidence establishes that licensees pay at minimum a $20K chair license fee, a $500 oversight fee and a $10K training fee for the right to set up APT clinics.  (See *supra,* II.M*.)*  As such, the minimum applicable royalty rate comprised of a royalty base of chair license fee, oversight fee, and training fee is $30,500 for each license.  Mr. Gilbert confirmed the existence of at least 33 clinic licensees, none of which predate the filing of this lawsuit by later than two years.  As such, a $30,500 license fee for each of the 33 clinics infringing the patents-in-suit result in damages of $6,946,500.

### b. <u>Willfulness And Enhanced Damages</u>

"[T]he court may increase the damages up to three times the amount found or assessed."  35 U.S.C. §284.  "The sort of conduct warranting enhanced damages has been variously described . . . as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate."  *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 136 S. Ct. 1923, 1932 (2016).   The Supreme Court has rejected any "rigid formula for awarding enhanced damages under §284, leaving the determination to the discretion of the district court.  *Id.* at 1934.  "A patentee need only show by a preponderance of the evidence that the facts support a finding of willful infringement."  *SRI International, Inc. v. Cisco Sys., Inc.*, 918 F3d 1368, 1380 (Fed. Cir. 2019).

The evidence demonstrates that Defendants acted willfully in infringing Dr. Aoki's patents.  Defendants initially claimed entitlement to Dr. Aoki's patents pursuant to a license, based on the CI-Bionica and Diabetex transactions.  (ECFs 11 and 139 [MSJs]; P.Exh.66 [CI-Bionica License]; P.Exh.42 [Diabetex Settlement].)  Mr. Gilbert withheld the existence of the CI-Bionica license from Dr. Aoki.  (See *supra,* II.A.8.)  The CI-Bionica license did not transfer any rights to the RQ patents.  (See *supra,* II.G.5.)  Mr. Gilbert previously testified that the Diabetex Settlement reverted the technology back to Dr. Aoki (not to himself).  (See *supra,* II.D.2.)  Mr. Gilbert also signed documents

acknowledging Dr. Aoki's ownership of his technology subsequent to the Diabetex settlement.  (See *supra,* II.D.3. citing Exh.47 [Aoki-MI License]; P.Exh.55 [MI-ADTC Agreement]; P.Exh.57 [ADTC-Aoki Agreement, Recitals ¶A and ¶B]; Exh.52 [AMTech Resolution].)  Later, when Mr. Gilbert/Bionica/Trina Health proceeded to license Dr. Aoki's technology to others, these downstream licenses reference Dr. Aoki's technology and patents. (See *supra,* II.H.4., II.M and Appendix C.)  The advertisements, investor prospectus, et al . . . reference Dr. Aoki's work and research and even falsely claim that patients that were actually treated with MAT® to have been treated with APT.  (See *supra*, II.H.5 and L; *see also* P.400:15-23; P.401:13-25; P.402:1-6, 13-22; P.507:10-15 [Aoki, Vol.3].)

### c.    <u>Fees</u>

"The court in exceptional cases may award reasonable attorney fees to the prevailing party."  35 U.S.C. §285.  An exceptional case is one that "stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014).   This is an exceptional case meriting an award of attorney fees.  Defendants admitted to infringing Dr. Aoki's patents early on in this case.  (See, *e.g., supra,* II.I.)  The subsequent downstream licenses even explicitly reference Dr. Aoki's patents and Dr. Aoki's technology as the source of the APT technology.  (See, *e.g. supra*, II.H.4.) The evidence demonstrates that advertisements, video clips, and investor prospectus used to promote APT are entirely about or derived from MAT®. (*See e.g., supra* II.H. and L.).  Defendants' subsequent reversal of position that APT is not MAT® is not credible given the conflicting explanations, contravention to medical science, patient testimonial of the ineffectiveness of any purported changes, not to mention Mr. Gilbert's lack of medical credentials in claiming invention of a new treatment, *i.e.* APT.  (*See supra*, II.H.2.a., II.J and A.6, 7, and 12.)  Defendants' refusal to produce any financial documents also support a finding of exceptional circumstances. (See *supra*, II.A.1.)

### d.    <u>Injunctive Relief</u>

Courts may grant injunctions in patent cases under 35 U.S.C. §283.  The Supreme Court has set forth a four-factor test for determining when an injunction is proper in a patent case:

1   According to well-established principles of equity, a plaintiff seeking a permanent
2   injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff
    must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies
3   available at law, such as monetary damages, are inadequate to compensate for that
    injury; (3) that, considering the balance of hardships between the plaintiff and defendant,
4   a remedy in equity is warranted; and (4) that the public interest would not be disserved
    by a permanent injunction.

5   *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "The decision to award or deny

6   permanent injunctive relief lies within the equitable discretion of the district court…." *Apple Inc. v.*

7   *Samsung Electronics Co., Ltd.*, 809 F.3d 633, 639 (Fed. Cir. 2015). "Historically, 'courts have granted

8   injunctive relief upon a finding of infringement in the vast majority of cases.'" *Nichia Corp. v.*

9   *Everlight Americas, Inc.*, 855 F.3d 1329, 1341 (Fed. Cir. 2017). Reduction in options for medical

10  treatments is not sufficient to show that the public interested would suffer a disservice. *See Amgen Inc.*

11  *v. Sanofi*, 872 F.3d 1367, 1381 (Fed. Cir. 2017) (ruling that "eliminating a choice of drugs is not, by

12  itself, sufficient to disservice the public interest").

13      The Court finds that injunctive relief is warranted. Defendants' use of Dr. Aoki's MAT®

14  treatment under the guise of a different name has caused irreparable injury to Dr. Aoki and that monetary

15  damages are insufficient. Dr. Aoki is the inventor of the MAT® treatment, for which he spent his entire

16  career developing. (See *supra,* II.F and III.B, discussing Nevada rulings.) There is no distinction between

17  APT and MAT® or if there are, the distinctions are insubstantial.(See *supra* III.C.3) Patients and investors

18  were lulled into falsely believing that APT was invented by Mr. Gilbert and paid for by Medicare. (See

19  *e.g. supra*, II.H. and L.) A lack of proper oversight led to clinics to modify the treatment, creating a "wild

20  west of medicine" atmosphere resulting in adverse consequences to patients. (See *supra,* II.L.3;

21  P.2625:15-21 [Shaffer, Vol.16].) Despite the Medicare decision, Trina Health or the clinics themselves

22  would bill Medicare for the treatment in distinct steps as opposed to the required uniform G code. (See

23  *supra* II.L.2) Clinics would shut down after paying upfront license fees once the Medicare issue was

24  unveiled. (See *e.g.,* P.1145:25; P.1146:1-8 [Elliott, Vol.11]; P.1866:1-8; P.1877:1-6; P.1878:1-8;

25  P.1885:16-20; P.1886:1-14 [Gilbert, Vol.11]; P.2660:2-5 [Gilbert, Vol.16]; see also *supra,* II.L.2.) Mr.

26  Gilbert's implication in a criminal scheme to bribe the Alabama state legislature to pass a law requiring

27  Blue Cross of Alabama to cover the treatment and other false representations made in this case (see *supra,*

28  II.L) and during trial (see *supra* II.A) also suggests questionable ethics which would cause harm to the

-54-

public if he were allowed to continue to operate and/or license clinics.  Under these circumstances, public interest would be served with injunctive relief.  Moreover, injunctive relief would not result in eliminating a treatment choice as Dr. Aoki and ADRI continue to offer the treatment to patients.

### D.   Copyright Infringement

#### 1.   Legal Standard (Copyright Infringement)

The Copyright Act grants the copyright owner the exclusive right to reproduce a copyrighted work, to distribute copies of the work, and to authorize reproduction or distribution.  See 17 U.S.C. §106(1)-(3).  Plaintiff must prove: (1) ownership of a valid copyright and (2) that the defendant violated at least one exclusive right granted to plaintiff under 17 U.S.C. §106.  *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).  Dr. Aoki is the owner of a valid copyright in the MAT® slides.  This copyright is registered with the Copyright Office, number TXu0017772019, dated August 23, 2011, and is titled "Metabolic Activation Therapy – History and Current Protocol."  (P.Exh.10A [MAT Presentation]; P.Exh.81 [Copyright Printout].)  Defendants have copied and distributed a significant amount of these MAT® slides without authorization.  Defendants continued to use these slides even after this lawsuit was filed in 2011 and therefore knew of the allegations of copyright infringement.  (See *supra*, at II.K. and copyright chart, citing exhibits that used Dr. Aoki's slides.)

#### 2.   Remedies (Copyright Infringement)

##### a.   Statutory Damages

The Copyright Act authorizes statutory damages of up to $30,000 per infringed work.  17 U.S.C. §504(c)(1).  Where the copyright owner proves infringement was willful, the Act authorizes enhanced statutory damages of up to $150,000 per infringed work.  *Id.* §504(c)(2).  Willfulness may be found where the defendant's infringing actions are undertaken either with knowledge that the conduct constitutes infringement or with reckless disregard for the copyright owner's rights.  *See In re Barboza*, 545 F.3d 702, 707-08 (9th Cir. 2008).  The court has broad discretion to determine the amount of statutory damages.  *Peer Intern. Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1336 (9th Cir. 1990).

The evidence demonstrates that this is not a situation of isolated, innocent instances of infringement, but multiple instances of willful unauthorized uses.  Even after this lawsuit was filed in 2011, Defendants continued to use Dr. Aoki's copyrighted slides in promoting APT.  They used numerous

of Dr. Aoki's slides in their 2017 presentation to CMS (D.Exh.T4-Tab 98), in their 2015 presentation to investors in the Alabama clinic (P.Exh.112), and in multiple videos on youtube promoting APT (P.Exhs.194, 195, and 201).  (See *supra*, at section II.K.)  Most glaringly, they used the foot wound photos of Dr. Aoki's patient whom he treated with MAT® and which photos he copyrighted, to claim that the patient was treated with APT rather than MAT®.  (*Id.*)  These facts demonstrate Defendants knew their conduct was unlawful or at minimum engaged in reckless conduct sufficient to support a finding of willfulness. As such, the maximum statutory damages for willful infringement is appropriate.

### b. <u>Injunctive Relief</u>

The Copyright Act authorizes a permanent injunction to prevent future infringement where plaintiff has demonstrated: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Each of these four factors here support granting a permanent injunction. With regard to the first two factors, copyright infringement is generally presumed to give rise to irreparable harm for which there is no adequate remedy at law. *Cadence Design Systems, Inc. v. Avant! Corp.*, 125 F.3d 824, 826–27 (9th Cir. 1997).  As to the third factor, while Dr. Aoki will be harmed by continued infringement, there is no potential harm to Defendants as an injunction would simply require them to comply with the Copyright Act. As to the fourth factor, a permanent injunction would likely serve the public interest by reducing consumer confusion, see *Internet Specialties West, Inc. v. Milon–DiGiorgio Enterprises, Inc.*, 559 F.3d 985, 993 (9th Cir. 2009), and by "upholding" the rights that "Congress has elected to grant ... to the owner of a copyright in a protected work."

### c. <u>Attorneys' Fees</u>

The Copyright Act permits a court to award full costs and reasonable attorneys' fees to a prevailing party.  17 U.S.C. §505.  As Defendants have not only infringed Dr. Aoki's copyright, but also done so willfully, an award of costs and reasonable attorney's fees is appropriate.

### E. <u>False And Misleading Advertising (15 USC §1125(a)(1), Lanham Act)</u>

#### 1. <u>Legal Standard (Lanham Act – False and Misleading Advertising)</u>

-56-

The elements are: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the consumer's purchasing decision; (4) the defendant causes its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by a direct derivation of sales from itself to defendant or by a lessening of the good will associated with its products. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).  The Act distinguishes between advertisements that are literally false and those that are literally true, but misleading.  When the advertising is literally false, a court may grant relief without reference to the advertisements' impact on the buying public.  *In re Century 21 RE/MAX Advert. Claims Litig.*, 882 F.Supp.915, 922 (C.D. Cal. 1994).  Where a statement is not literally false, but is only misleading in context, proof that the advertising actually conveyed the implied message and thereby deceived a significant portion of the consuming public is required.  *William H. Morris Co. v. Group W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995).  The only exception to this proof requirement arises when the plaintiff intentionally deceives consumers.  *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 209 (9th Cir. 1989).

### 2.    Remedies (Lanham Act – False and Misleading Advertising)

#### a.    Defendants' Profits And Any Damages Sustained By Plaintiff

A plaintiff who establishes a violation of Section 43(a) of the Lanham Act is entitled to recover, " (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. . . **In assessing profits, the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed**." 15 U.S.C. §1117(a) (emphasis added).

#### b.    Trebling

"In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount.  If the court shall find that the amount of the recovery based on the profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case."  15 U.S.C. §1117(a).  The only limit on this award is that the award "shall constitute compensation and not a penalty."  *Id.*  Treble damages are appropriate in the event that

compensatory damages are inadequate to deter future infringing conduct. *PepsiCo. v. Triunfo-Mex, Inc.,* 189 F.R.D. 431, 431 (C.D. Cal. 1999). Where damages have been increased, it is usually premised on some sort of willful or knowing infringement. In *U-Haul Intern., Inc. v. Jartran, Inc.*, 601 F.Supp. 1140 (D.Az. 1984), aff'd in part, rev'd in part, modified in part, the court doubled a $20 million damage award where the court found that the defendant had engaged in willful and malicious false advertising.

### c.   Costs of the Action

Unlike an award of attorneys' fees, the Lanham Act does not limit taxable costs to "exceptional cases," but makes costs "one of the routine elements of a prevailing plaintiff's recovery." *Bowmar Instrument Corp. v. Continental Microsystems, Inc.*, 497 Supp. 947, 961 (S.D.N.Y. 1980).

### d.   Injunctive Relief

A plaintiff does not need to prove the element of injury when seeking injunctive relief. *Southland Sod Farms*, *supra,* 108 F.3d at 1145 (9th Cir. 1997). Rather, injunctive relief is available under the Lanham Act provided the plaintiff can demonstrate that the advertisement has mislead, confused or deceived the consuming public. *Id*. at 1140.

### e.   Attorneys' Fees

"The court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. §1117(a). "A case is considered exceptional 'when the infringement is malicious, fraudulent, deliberate or willful.' Egregious conduct is not required. Nor is bad faith." *Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1078 (9th Cir. 2015) (citations omitted) (Affirming district court's grant of attorneys' fees in case involving false endorsement based on finding that despite uncertainty of law, defendants nevertheless acted willfully). Additionally, a party need not succeed in all of its claims to be the prevailing party. *Fifty-Six Hope Road Music, supra,* 778 F.3d at 1708 (9th Cir. 2015).

### 3.   Analysis (Lanham Act – False and Misleading Advertising)

The evidence demonstrates that Defendants made the following false statements: (i) APT is covered by Medicare when it is not. In fact, when Medicare caught on that Trina and its clinics were billing for outpatient pulsatile insulin therapy in individual steps as opposed to the required unified G code, it stopped paying and the clinics closed; (ii) APT is an FDA-approved treatment when it is not. Only the Bionica pump (not the treatment itself) is FDA *cleared* (as opposed to approved); (iii)

Attributing clinical research conducted regarding MAT® to APT; (iv) claiming that the CalPERS decision deeming MAT® to be medically necessary as opposed to experimental concerned APT when it had nothing to do with APT and was entirely about MAT®; (v) claiming that research slides developed by Dr. Aoki in support of MAT® were about APT; (vi) using patient outcomes from MAT® to claim that the patient was treated with APT; (vii) claiming that Trina Gilbert was initially treated with APT when she was actually treated by Dr. Aoki with MAT® and under his guise for at least 25 years from 1986 to 2011; (viii) claiming APT is the *only* extant pulsatile insulin treatment and that Mr. Gilbert was the inventor of the treatment when APT is simply a moniker for APT and Dr. Aoki is the real inventor; (ix) claiming APT has no adverse reactions when in fact, there are adverse reactions, especially when the treatment was varied from the MAT® steps.  These statements are both facially false and/or misleading. They had the effect of deceiving patients in seeking treatment or inducing members of the public to invest in opening clinics.  (*See supra,* II.L.; *see e.g.*, P.2572:20-25; P.2573:1-12; P.2623:7-12; P.2631:21-25; P.2632-1-6 [Shaffer, Vol.16]; P.Exh.112 [Kalifeh Affidavit, Bates P4490]; P.776:15-25; P.777:1-16; P.791:7-9; P.841:15-23; [Kalifeh, Vol.5].)

Mr. Gilbert and his cohorts made these statements knowing they were untrue and did so with the intent of deceiving the unsuspecting public, including patients and investors.  As such, an award of treble damages is appropriate for Defendants' intentional conduct and to deter future conduct.  Such willful conduct also warrants attorneys' fees.  Although Defendants refused to produce their financial information (*supra,* II.A.1), Plaintiffs have demonstrated a reasonable basis of claiming Defendants profited at least $6,946,500 in chair license fees, training fees, and oversight fees and $1,443,750 in pump sales stemming from their false advertising.[26] (See *supra*, section II.M.) These amounts shall be trebled for a total of ***$25,170,500*** along with attorneys' fees and costs and injunctive relief.  *Glover v. BIC Corp.,* 6 F.3d 1318, 1329 (9th Cir.1993) (A factfinder may "drawn an adverse inference from the destruction or spoliation" of evidence against the party responsible for that behavior.).  Spoliation

---

[26] Defendants claim they made no profit (despite failing to produce any financial data). Nevertheless, it is irrelevant if Defendants as a whole failed to turn a profit during the period of the advertising as the amount to be awarded is the financial benefit defendant received because of the advertising.  *U-Haul Intern., Inc. v. Jartran, Inc., supra,* 793 F.2d at 1034 (D.Az. 1984) (affirming award of profits even though defendant's overall operations were unprofitable).

1  includes nonproduction of relevant evidence.  *See* Fed. R. Civ. P. 37 Advisory Committee Notes (1993)

2  (treating nonproduction like spoliation).

3        **F.**    **False And Misleading Advertising (Cal. Bus. & Prof. Code §17500)**

4            **1.**    **Legal Standard (B&P §17500 – False And Misleading Advertising)**

5        California's False Advertising Law ("FAL") prohibits the dissemination of false or misleading

6  statements in connection with advertising. Cal. Bus. & Prof. §17500.  "Section 17500 has been broadly

7  construed to proscribe 'not only advertising which is false, but also advertising which [,] although true,

8  is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the

9  public.'" *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal.App.4th at 679 (quoting *Kasky v. Nike*, Inc.,

10  27 Cal.4th 939, 951 (2002)) (internal quotation marks omitted). Thus, to state a claim under either the

11  UCL or the false advertising law, based on false advertising or promotional practices, "'it is necessary

12  only to show that 'members of the public are likely to be deceived.'" *Ibid.* (citation omitted).) A violation

13  of the FAL also constitutes a violation of the UCL.  *Kasky*, *supra*, 27 Cal.4th at 949–50.

14        "Actual reliance, or causation, is inferred from the misrepresentation of a material fact."

15  *Chapman v. Skype, Inc.*, 220 Cal.App.4th 217, 229 (citing *In re Tobacco II Cases*, 46 Cal.4th 298, 327

16  (2009) (2013).  "A misrepresentation is judged to be 'material' if 'a reasonable man would attach

17  importance to its existence or nonexistence in determining his choice of action in the transaction in

18  question' . . . In the alternative, it may also be material if 'the maker of the representation knows or has

19  reason to know that its recipient regards or is likely to regard the matter as important in determining his

20  choice of action, although a reasonable man would not so regard it.'" *Kwikset Corp.*, *supra*, 51 Cal.4th at

21  332-333 (citations omitted).

22            **2.**    **Remedies (B&P §17500 – False And Misleading Advertising)**

23        A court may award injunctive relief and restitution for false advertising that violates §17500.  See

24  Ca. Bus. and Prof. Code §17535; *Fletcher v. Security Pacific National Bank*, 23 Cal.3d 442, 452 (1979).

25            **a.**    **Restitution**

26        Restitution is not "limited only to the return of money or property that was once in the possession

27  of that person" but is "broad enough to allow a plaintiff to recover money or property which he or she

28  has a vested interest." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1149 (2003).

-60-

"Typically, profits earned from unfair business practices do not constitute money taken directly from the plaintiff, nor money in which a plaintiff has a vested interest." *Innovation Ventures, LLC v. Pittsburg Wholesale Grocers, Inc.*, Case No. C12-05523 WHA, 2013 WL 1007666, at *8. However, in Innovation Ventures, LLC, "each challenged sale involved a product allegedly embodying plaintiffs' intellectual property" and using the framework of *Korea Supply* and *Cortez*, the Court there held that:

> "the 'work' done by the trademark is identifying the origin and quality of a product in the eyes of a consumer. In that sense, a counterfeiter profits from the 'work' performed by the trademark owner's property. The sale of a counterfeit is also analogous to the sale of a res. By selling the counterfeits, an alleged infringer is both selling the trademark owners' property, and damaging the owner's property interest in its accumulated goodwill by putting inferior products in the stream of commerce. Just as a copyright owner acquires an equitable interest in an infringing work as soon as it is made, and which attaches to any profits from its exploitation, cf. *Los Angeles News. Serv. v. Reuters Television. Int'l, Ltd.*, 149 F.3d 987, 991 (9th Cir.1998), so too does a trademark owner acquire an equitable interest in a counterfeit product."

See also *Adobe Systems Incorporated v. Alghazzy*, No. 15-cv-01443-BLF, 2015 WL 9478230, at *2 (N.D.Cal. Dec. 29, 2015) (Plaintiff's factual allegations support its request for restitution and injunctive relief insofar as Plaintiff's claim for restitution is based on recovery of Defendant's ill-gotten gains related to Defendant's alleged sale of products that infringe Plaintiff's trademark rights.); *Colgan v. Leatherman Tool Group, Inc.*, *supra,* 135 Cal.App.4th at 699 (2006) (a plaintiff can seek money or property as restitution where such "money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession"). In calculating restitution damages, exact proof is not necessary. California law "requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d, 979, 989 (9th Cir. 2015).

### b.   <u>Injunctive Relief</u>

Plaintiff cannot receive an injunction for past conduct unless he shows that the conduct will probably recur. *Sun Microsystems v. Microsoft Corp.*, 188 F.3d 1115, 1123 (9th Cir. 1999) (citing *People v. Toomey*, 157 Cal.App.3d 1, 20 (1984).

### 3.   <u>Analysis (B&P §17500 – False And Misleading Advertising)</u>

See *supra,* at section III.E. regarding false advertising under the Lanham Act which also applies here to the equivalent state cause of action. The false statements discussed above are those that a

PLAINTIFFS' [PROPOSED] CONCLUSIONS OF FACT AND LAW
Case No.:  2:11-cv-02797-TLN-CKD

reasonable person would attach importance to in determining whether to proceed with the treatment or invest in Trina clinics and did indeed mislead, deceive or confuse the public.  (See *supra,* III.E. and II.L.)  Plaintiffs have a vested interest in Defendants' profits which were ill-gotten using Dr. Aoki's MAT® technology (*supra,* II.H.), which they simply rebranded as "APT," calculated to be approximately $6,946,500 from license chair fees, oversight fees, and training fees alone and $1,443,750 for pump sales totaling $8,101,500.  (See *supra,* II.M. and Appendix C.)

### G.   Breach Of Fiduciary Duty – Against Defendant Gilbert Only

#### 1.   Legal Standard (Breach of Fiduciary Duty)

The elements of a claim for breach of fiduciary duty are the existence of a fiduciary relationship, breach of fiduciary duty, and damages.  *Oasis West Realty, LLC v. Goldman*, 51 Cal.4th 811, 820 (2011). Among those fiduciary obligations are the duties of loyalty and confidentiality, which **continue in force even after the representation ends**.  *Id.*[27]

#### 2.   Remedies (Breach of Fiduciary Duty)

##### a.   Unjust Enrichment

Recovery for damages based upon breach of fiduciary duty is controlled by Civil Code §3333, the traditional tort recovery.  *Michelson v. Hamada*, 29 Cal.App.4th 1566, 1582 (1994); Civil Code §3333. In cases of breach of fiduciary duty, disgorgement based on unjust enrichment is the appropriate remedy regardless of whether the principal suffers any damage.  *American Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal.App.4th 1451, 1483 (2014).   There are two types of disgorgement: restitutionary disgorgement, which focuses on the plaintiff's loss, and nonrestitutionary disgorgement, which focuses on the defendant's unjust enrichment.[28]  A claimant "'has the burden of producing evidence from which

---

[27] As the California Supreme Court has explained, "'[A]n attorney is forbidden to do either of two things after severing [the] relationship with a former client. [The attorney] may not do anything which will injuriously affect [the] former client in any matter in which [the attorney] formerly represented [the client] nor may [the attorney] at any time use against [the] former client knowledge or information acquired by virtue of the previous relationship."  *Id.* at 821 (citations omitted).

[28] "Typically, the defendant's benefit and the plaintiff's loss are the same, and restitution requires the defendant to restore the plaintiff to his or her original position. However, many instances of liability based on unjust enrichment ... do not involve the restoration of anything the claimant previously possessed ... including cases involving the disgorgement of profits ... wrongfully obtained....' The public policy of this state does not permit one to "take advantage of his own wrong" regardless of whether the other party suffers actual damage. Where 'a benefit has been received by the defendant but the plaintiff has not suffered a corresponding loss or, in some cases, any loss, but nevertheless the enrichment of the defendant

the court may make at least a reasonable approximation of the defendant's unjust enrichment,' and 'the defendant is then free (there is no need to speak of "'burden shifting'") to introduce evidence tending to show that the true extent of unjust enrichment is something less.' Thus, '[a]s a general rule, the defendant is entitled to a deduction for all marginal costs incurred in producing the revenues that are subject to disgorgement.'"  *Id.* at 1487-1488, citing *Uzyel v. Kadisha*, 188 Cal.App.4th 866, 894 (2010).

### b.   Punitive Damages

Punitive damages are appropriate for a breach of fiduciary duty.  *Michelson v. Hamada*, *supra*, 29 Cal.App.4th at 1582 (1994).  Under California Civil Code section 3294, punitive damages may be recovered where "oppression, fraud, or malice" is proven by clear and convincing evidence.  §3294(a).

### 3.   Analysis (Breach of Fiduciary Duty)

From around 1986 to 2002, Mr. Gilbert worked closely with Dr. Aoki and ADRI both as an attorney and in a business capacity.  In anticipation of the fact that Mr. Gilbert would acquire confidential information about his treatment as a result of working together, Mr. Gilbert drafted and signed a confidentiality agreement assigning to Dr. Aoki any inventions he conceived during their time together that related to Dr. Aoki's work. (P.Exh.245 [1986 Confid. Agreement]; P.2726:1-22; P.2727:1-6 [Aoki/Gilbert Vol.17].)  Mr. Gilbert claims he was at ADRI frequently, while treatments were given, and thereby gained in-depth knowledge regarding Dr. Aoki's technology.  (P.2803:8-14 [Gilbert, Vol.17].)  Mr. Gilbert advised on the formation of a number of business entities to commercialize Dr. Aoki's technology and drafted and reviewed documents in connection with that enterprise, spanning multiple business entities. (See *supra*, II.D, II.A.3.b and A.5.)  In the course of Mr. Gilbert's marketing of MAT®, Dr. Aoki lent to Mr. Gilbert a copy of his MAT® slides to further educate him on the treatment, with strict instructions not to disseminate.  (P.361:4-14 [Aoki, Vol.2].)

Around 2002, things changed.  At the time, the existing entity was Metabolic Industries ("MI"), which had been formed with money from investor Phil Gurian, some of it which was used to pay off Diabetex for the return of Dr. Aoki's technology back to him which he then licensed to MI.  (See *supra*,

---

would be unjust ... the defendant may be under a duty to give to the plaintiff the amount by which [the defendant] has been enriched.'"  *Id.* at 1482 (internal citations and quote marks omitted).

II.D.2 and 3.)  Around this time, Dr. Aoki learned of unsavory conduct and Mr. Gilbert was asked to resign and did resign from MI.  (See *supra*, II.E.)  Meanwhile, Mr. Gilbert had been negotiating with two other investors, John Duffell and Max McCombs who had set up MTC with the anticipation of a licensing deal from MI of Dr. Aoki's technology. The MI board conducted due diligence into these potential investors. They learned Duffell had a felony background and McCombs didn't have the purported $10 million.  Therefore, the MTC negotiations ceased.   (P.888:14-16; P.889:22-25; P.890:1-7 [Aoki, Vol.5]; P.Exh.60 [MTC Term Sheet].)  This spawned the 2003 MTC Nevada lawsuit and multiple other litigation. (P.Exh.62 [MTC Complaint]; P.Exh.67 [Cross-Complaint].)

In 2005, *unbeknownst to Dr. Aoki*, Mr. Gilbert entered into the Bionica-CI licensing deal. (P.Exh.66 [2005 Bionica-CI license].)   That license attempted to transfer to Bionica/Gilbert the technology rights which Dr. Aoki had licensed to AMSys which he allowed to be licensed to CI.  Mr. Gilbert had intimate knowledge of the terms of the underlying AMSys-CI deal because he had previously helped engineer it and thereby was in a position to get CI to surreptitiously transfer those rights to him. (P.Exh.72 [Aoki Dinucci Letter].) Mr. Gilbert must have known Dr. Aoki would not have allowed the rights to his technology to go to his former counsel, especially given the events leading up to 2002, and indeed took steps to conceal it.  In 2005, when questioned at his deposition about his or Bionica's business activities relating to diabetes, Mr. Gilbert failed to disclose the existence of that deal.  (See *supra*, II.A.8.) Thereafter, he began opening clinics using Dr. Aoki's technology, first under the name "Cellular Activation Therapy" and later, "Artificial Pancreas Therapy."  (See *supra*, II.H.5.)

Early on in this case in 2013, Mr. Gilbert attested that at all times he and the Defendants have been using Dr. Aoki's technology, unchanged since at least 2005 pursuant to the CI-Bionica license. (P.Exh.93 [Gilbert Suppl. Decl., ¶3].)  At trial and in his 2017 MSJ declaration, Mr. Gilbert claims that in 2002 he had an "epiphany" leading to the invention of APT and that the MTC clinics subsequently came to perform his APT method. (P.Exh.118 [MSJ Declaration, ¶10]; P.2085:15-25; P.2086:1-25; P2087:1-5 [Gilbert, Vol.12].) But Mr. Gilbert doesn't have a medical degree and presented no evidence regarding his medical background.  (See, *supra,* II.A.11.)  (In fact, some of his medical claims are suspect, see *infra*.).  In contrast, there was extensive testimony of Dr. Aoki's 30+ year research efforts, beginning with his work as a physician working with diabetic patients in Hiroshima and Nagasaki to studies on

-64-

starvation and diabetes metabolism at the world renowned Joslin Diabetes Center to his recruitment as head of the endocrinology department at UC Davis.  (See *supra*, II.B and C.)

Even Mr. Gilbert's explanation of his "APT" treatment is suspect.  He claims APT doesn't use RQ as a measurement of the treatment's efficacy, but the evidence demonstrates otherwise.  Patient and personnel testimony from his clinics state they were either trained by him or attended lectures by him where he explicitly discussed the use of RQ for the APT treatment or had their RQ measurements taken when treated with APT at his clinics.  (See *supra,* II.H.)  Mr. Gilbert claims the clinics use the VacuMed machine just to measure carbon dioxide volume.  But Ms. Shaffer, a patient of his clinics with a background in fitness, testified to the irrelevance of such measurement alone for purposes of assessing treatment efficacy.  (See *supra,* II.H.2.a.)  Dr. Aoki also testified that measuring the volume of carbon dioxide produced by the patient before and after each treatment does not tell you if the therapy is working. (P.1492:23-25; P.1493, 1-4 [Aoki, Vol.9].)  In an attempt to distinguish APT from MAT®, Mr. Gilbert declared under oath that his treatment allows insulin levels to fall back to baseline in-between pulse intervals.  (See *supra,* II.A.6.)  And yet, he testified emphatically that "no one does this." Dr. Aoki concurred that this is physiologically impossible.  (*Id.*)

As discussed above, a comparison of the APT and MAT® treatment shows an exact match of the treatment.  (See *supra,* II.H.)  In fact, Mr. Gilbert used slides, research, patient outcomes, case decision, et al. pertaining to MAT® to make claims about APT.  (See *supra,* II.L.)  In sum, Mr. Gilbert used information and knowledge gained from his decades-long relationship with ADRI and Aoki to his former clients' detriment.  As such, the Court finds that the ill-gotten gains of approximately $8,390,250 comprising license fees and pump sales should be disgorged and that punitive damages are appropriate. (See *supra,* II.M. and Appendix C.)

### H.   Breach Of Confidential Relationship – Against Defendant Gilbert Only

#### 1.   Legal Standard (Breach of Confidential Relationship)

A confidential relation exists between two persons "when one has gained the confidence of the other and purports to act or advise with the other's interest in mind" and "may exist although there is no fiduciary relation" and "is particularly likely to exist where there is a family relationship or one of friendship . . ."  *Davies v. Krasna*, 14 Cal.3d 502, 510 (1975). A "confidential relationship exists when

-65-

trust and confidence are reposed by one person in the integrity and fidelity of another." *Estate of Sanders*, 40 Cal.3d 607 (1985) (citations omitted). It is not necessary that "there be an extended period of business or accommodation transactions or dealings between persons in order for a confidential relationship to be established between them." *Id.* (citations omitted); *see also Richelle L. v. Roman Catholic Archbishop*, 106 Cal.App.4th 257, 271 (2003) (citations omitted) ("Technically, a fiduciary relationship is a recognized legal relationship such as . . . attorney and client, whereas a confidential relationship may be founded on a moral, social, domestic, or merely personal relationship as well as on a legal relationship.")

### 2. Remedies (Breach of Confidential Relationship)

#### a. Compensatory And Punitive Damages

Compensatory and punitive damages exist for breach of a confidential relationship. See *Clark v. Bunker*, 453 F.2d 1006, 1011-1012 (9th Cir. 1972) (In a breach of confidential relationship matter, holding that the plaintiff/appellee "should not be restricted to defendant's actual profits from his improper uses of the secret," but that the plaintiff is "entitled to the profit he would have made had his secret not been unlawfully used, but not less than the monetary gain which the defendant reaped from his improper acts" and that the Court is also empowered to award punitive damages.).

#### b. Attorneys' Fees

Attorneys' fees are also permissible for breach of a confidential relationship. *Radiator Specialty Company v. Micek*, 327 F.2d 554 (9th Cir. 1964) (Awarding reasonable attorneys' fees to patentee whose valid patent was infringed and was damaged by breach of confidential relationship.).

### 3. Analysis (Breach of Confidential Relationship)

See discussion, *supra* at section III.G. regarding breach of fiduciary duty which equally applies here, entitling Plaintiffs to compensatory, punitive damages, and attorneys' fees for Mr. Gilbert's breach.

### I. Unfair Competition (15 USC §1125(a), Lanham Act)

#### 1. Legal Standard (Lanham Act – Unfair Competition)

The Ninth Circuit has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code 17200 are "substantially congruent" to claims made under the Lanham Act. See *Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir. 1991).

**2.**   **Remedies (Lanham Act – Unfair Competition)**

Under the Lanham Act, the remedies for acts of unfair competition are the same as for false and misleading advertising.  (See *supra,* section III.E – Lanham Act – False and Misleading Advertising; 15 U.S.C. §1117(a) [defendants' profits, any damages sustained by plaintiffs, and costs of the action and reasonable attorney fees in exceptional cases to the prevailing party] and §1116(a) [injunctive relief]).)

**3.**   **Analysis (Lanham Act – Unfair Competition)**

See discussion, *infra,* at section III.J. for analysis regarding acts of unfair competition under California state law which applies equally to the federal law.

**J.**   **Unfair Competition (Cal. Bus. & Prof. Code §17200)**

**1.**   **Legal Standard (Cal. Bus. & Prof. Code §17200)**

§17200 defines "unfair competition" to include "any unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising" and any act that violates California's false advertising law, Business and Profs Code §17500 et seq.  Thus, §17200 enumerates five theories of liability: (1) unlawful business acts or practices; (2) unfair business acts or practices; (3) fraudulent business acts or practices; (4) unfair, deceptive, untrue or misleading advertising; and (5) false advertising and related practices covered by §17500.  *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 180 (1999).  §17200 is a strict-liability statute and proof of intent is not required.  *South Bay Chevrolet v. General Motors Acceptance Corp.*, 72 Cal.App.4th 861, 877 (1999).  Private plaintiffs must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) show that that economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 322 (2011).

**2.**   **Remedies (Cal. Bus. & Prof. Code §17200)**

**a.**   **Restitution**

Courts may "make such orders or judgment . . . as may be necessary to restore any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."  Cal. Bus. & Prof. Code §17203.  The California Supreme Court has defined an order for such restitution as an order "'compelling a UCL defendant to return money obtained through an unfair

-67-

business practice to those persons in interest from whom the property was taken.'"  An aggrieved plaintiff may recover profits unfairly obtained to the extent those profits represent monies given to a defendant or benefits in which a plaintiff as an ownership interest. *Korea Supply*, 29 Cal. 4th at 1150.  See also *Cortez v. Purolator Air Filtration Products Co.*, 23 Cal.4th 163, 178 (2000) (Plaintiffs could recover earned overtime wages as restitution because they had a "vested interest" in their earned wages, and "equity regards that which ought have been don as done, and thus recognizes equitable conversion.")

### b.   Injunctive Relief

Under §17203, courts have broad discretion to exercise all powers inherent in a court of equity. *People v. Superior Court of Los Angeles County*, 9 Cal.3d 283, 286-87 n. 1 (1973).   Injunctive relief is appropriate where the acts of unfair competition are likely to be repeated in the future. *Colgan v. Leatherman Toll Group, Inc.*, *supra*, 135 Cal.App.4th at 702 (2006).

### c.   Attorneys' Fees And Costs

While the UCL does not expressly provide for recovery of attorneys' fees and costs in private action, if a UCL action is successful and results in the enforcement of an important right affecting the public interest, a private plaintiff may able to recover attorneys' fees pursuant to CA C.C.P. §1021.5.

### 3.   Analysis (Cal. Bus. & Prof. Code §17200)

The acts enumerated above (*see supra, e.g.,* II.H., K., L. and N.) including patent infringement, copyright infringement, false and misleading advertising constitute acts prohibited by §17200. Defendants used Dr. Aoki's MAT® technology, rebranded as "APT" to induce clinic owners to enter into licensing agreements and pay up-front fees for the rights to the technology.  (*Id.)* As a result of Defendants' prohibited conduct, Plaintiffs were deprived of the profits they would have been entitled to but for Defendants' inequitable conduct.  Plaintiffs have a vested interest in the profits that were ill-gotten as a result of Defendants use of Dr. Aoki's technology, research work, slides, et al . . . in promoting and selling APT.  Plaintiffs have established those profits totaled at least $8,390,250.  (*See supra,* II.M.)  Defendants failed to produce any financial documents (see *supra,* II.A.1.) and have produced no evidence of off-setting expenses. *Clemente v. State of Cal.,* 40 Cal.3d 202, 219 (1985) ("If plaintiff's inability to prove his damages with certainty is due to defendant's actions, the law does not generally require such proof.)

-68-

**K.**      **Patent Invalidity**

      **1.**      **Legal Standard**

 "A patent is presumed valid, 35 U.S.C. §282, and this presumption is based in part on the expertise of patent examiners presumed to have done their job." *Brooktree Corp. v. Advanced Micro Devices, Inc.* 977 F.2d 1555, 1574 (Fed. Cir. 1992); *see also Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1329 (Fed. Cir. 2004) (noting that the presumption renders inquiry into the examiner's understanding, competence or gullibility inappropriate).   Moreover, the Federal Circuit has observed that the "statutory presumption [of validity in §282] derives in part from the recognition of the technological expertise of the patent examiners." *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1139 (Fed. Cir. 1985).  In light of the presumption of validity, a party must show invalidity by "clear and convincing evidence." *Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*, 880 F.3d 1356, 1364 (Fed. Cir. 2018).  As discussed below, Defendants have failed to meet their burden of proof.

      **2.**      **Prior Public Use / On Sale Bar**

 A person is not entitled to a patent if "the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention." 35 U.S.C. §102(a)(1).   Under Section 102(b) the invention may be sold up to one year before the filing of the patent application; if "on sale" more than one year before the filing of an application for a patent on the governing claims, any issued patent is invalid." *Medicines Company v. Hospira, Inc.*, 827 F.3d 1363, 1365 (Fed. Cir. 2016).

 For determining whether the on-sale bar applies, the Supreme Court had adopted a two-prong test.  *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 67-68 (1998).   First, the claimed invention must be the subject of a commercial offer for sale and, second, the claimed invention was ready for patenting. *Helsinn Healthcare S.A. v. Teva Pharmaceuticals USA, Inc.*, 855 F.3d 1356, 1363 Fed. Cir. 2017); *Medicines Company v. Hospira, Inc.*, 827 F.3d 1363, 1368 (Fed. Cir. 2016).  "[E]xperimental use negates applicability of the on-sale bar…." *Barry v. Medtronic, Inc.*, 914 F.3d 1310, 1321 (Fed. Cir. 2019); *see also id.*, at 1337 (dissenting opinion noting that "Even if a patent challenger makes out a *prima facie* case of the on-sale bar, a patentee may negate the bar's application with evidence that the sale was primarily for experimental purposes.").   "A use may be experimental if its purpose is: '(1) [to]

-69-

1   test claimed features of the invention or (2) to determine whether an invention will work for its intended

2   purpose—itself a requirement of patentability.' *Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317,

3   1327 (Fed. Cir. 2009)." *Polara Engineering Inc. v. Campbell Co.*, 894 F.3d 1339, 1349 (Fed. Cir.

4   2018). "Whether the on-sale bar applies is a question of law based on underlying factual findings."

5   *Medicines Company v. Hospira, Inc.*, 827 F.3d 1363, 1365 (Fed. Cir. 2016).

6       Defendants have failed to establish by clear and convincing evidence patent invalidity under 35

7   U.S.C. §102(a). At trial, Defendants designated approximately 30 documents which they contend

8   establish their defense of "prior art" for purposes of invalidating Dr. Aoki's patents. Prior art however

9   is a broad term that encompasses prior public use, anticipation and obviousness. Of the 30 documents,

10  11 were admitted. They comprise these defense exhibits: (See Appendix E for chart). Defendants

11  claim Dr. Aoki's RQ patents have been in commercial use or "on sale" more than a year prior to filing

12  of the patents. Defendants attempted to establish that Dr. Aoki's therapy was used for the commercial

13  treatment of the various diabetic complications for which the patents were ultimately issued and that

14  use of RQ, one of the distinguishing features of the subsequent patents from the '810, was already in

15  use. The documents referenced above, and testimony however do not support these conclusions.

16      As discussed above (see *supra*, II.B.), Dr. Aoki testified that as of the 1990s, he was indeed

17  using the RQ, but on an experimental basis. He had not yet reduced it to an actual treatment

18  methodology as his focus was on improving glucose control. He had not settled on the final

19  adjustments for how often he was going to measure RQ and how to address the treatment if he was

20  looking for other physiological results outside of glucose control. (P.158:9-19 [Aoki, Vol.1].) It was

21  only later during the late 1990s did he noticed that despite glucose control getting worse, some of the

22  complications he was studying, *i.e.* eyes and kidneys, stayed stabilize, that he started to investigate this

23  quizzical issue further. (P.157:5-13 [Aoki, Vol.1].) Dr. Aoki testified that specifically after 1999, he

24  decided to do a baseline RQ followed by after one, two and three hours for a total of four RQs to ferret

25  out the metabolic milieus surrounding the tissues in question as well as increased the amount of pulsed

26  insulin and frequency of treatment days. (P.165:7-24 [Aoki, Vol.1].) He began looking to see if the

27  complications were responding to these, *i.e.* was the kidney more stable than before in response to this

28  more aggressive implementation of a different protocol and they were. (P.167:7-24 [Aoki, Vol.1].)

Prior to 1999, his focus was on improving glucose control.  (P.3046:25; P.3047:1-7; P.3048:1-9 [Aoki, Vol.18].)  Prior to applying for the RQ patents, Dr. Aoki also did not charge for the treatment of diabetic complications.  He only charged for out-of-control diabetes.   (P.2751:3-10 [Aoki, Vol.17]; P.3045:20-24 [Aoki, Vol.18].)

Indeed, even the "prior art" documents that Defendants rely upon support Dr. Aoki's testimony. The 1990 letter from Dr. Bell to Dr. Aoki referencing a patient who had been on an "experimental program with [Dr. Aoki] involving insulin and glucose control" noted improvement in the patient's retinopathy.  In the letter, Dr. Bell noted that "it is well known that of course, that improvement in background diabetic retinopathy may occur under certain conditions, especially improvement in *diabetic glucose control*."  (D.Exh.P2 (Tab 42) [Bell Letter, Bates D1204 (emphasis added)].)  The AMSys Hepatic Activation Program document notes that "studies are in progress to assess using Hepatic Activation therapy to treat a number of complications of diabetes including:  1) retinopathy; 2) hypertension; 3) nephropathy; 4) autonomic neuropathy."  (D.Exh.E4 (Tab 83), [AMSys Program, 2nd page].)  The document additionally notes use of RQ and that "measurements are made for two 3-minute intervals."  This is consistent with Dr. Aoki's testimony that as of that time, he was experimenting with use of RQ and had not reduced it to the formulation that was ultimately patented and was still investigating the impact of his treatment on diabetic complications outside of glucose control.

In sum, none of the "prior art" documents relied upon negate Aoki's testimony that prior to1999 when he first applied for the RQ patents, he was performing his treatment using RQ to treat diabetic complications on an experimental basis and had not yet reduced to practice the steps and for the complications that were ultimately patented.  He also wasn't charging for treatment of complications.

### 3.    Defendants Failed To Establish Patent Invalidity Based On Anticipation

"To show that a patent claim is invalid as anticipated, the accused infringer must show by clear and convincing evidence that a single prior art reference discloses each and every element of a claimed invention. *Silicon Graphics, Inc. v. ATI Technologies*, 607 F.3d 784, 796 (Fed. Cir. 2010).  A prior art reference does not invalidate a patent if it merely "suggests" the claimed subject matter.  *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1056 (Fed. Cir. 2010).  To prove anticipation, the alleged infringer must show that one skilled in the art would reasonably understand or infer that every claim element is

-71-

1   disclosed in the prior art reference.  *Id.*  Anticipation must be shown by clear and convincing evidence.

2   *Uniloc USA, INC. v. Microsoft Corp.*, 632 F.3d 1292, 1321 (Fed. Cir. 2011).  The Federal Circuit has

3   expressly ruled that because of the presumption of a patent's validity, a patent holder need not provide

4   *any* evidence of validity, the burden is wholly upon the challenger to prove invalidity:

5       a jury or a court may reach a conclusion that a patent remains valid *solely* on the failure
    of the patent challenger's evidence to convincingly establish the contrary. A patent being

6       presumed valid at birth, §282, a patentee need submit *no* evidence in support of a
    conclusion of validity by a court or a jury.

7   *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.* 806 F.2d 1565, 1570 (Fed. Cir. 1986) (emphasis in

8   original).  The Court finds that Defendants provided no evidence, let alone clear and convincing

9   evidence that would invalidate the patents based on anticipation.

10  **4.   Defendants Failed To Establish Patent Invalidity Based On Obviousness**

11      "A patent for a claimed invention may not be obtained . . . if the differences between the

12  claimed invention and the prior art are such that the claimed invention as a whole would have been

13  obvious before the effective filing date of the claimed invention to a person having ordinary skill in the

14  art to which the claimed invention pertains."  35 U.S.C. §103.  "Obviousness is a question of law based

15  on underlying facts, as set forth in *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17 (1966).  The

16  *Graham* factors are (i) the scope and content of the prior art, (ii) the differences between the prior art

17  and the claimed invention, (iii) the level of ordinary skill in the field of the invention, and (iv) any

18  relevant objective considerations of nonobviousness. See *id*. at 17–18."  *Mobilemedia Ideas LLC v.*

19  *Apple Inc.*, 780 F.3d 1159, 1167 (Fed. Cir. 2015).  Obviousness is assessed at the time of the invention

20  and should be evaluated on a claim-by-claim basis.  *KSR International Co. v. Teleflex*, 550 U.S. 398,

21  421 (2001) (assessed at time of invention); *Aventis Pharma Deutchsland GmbH v. Lupin Ltd.*, 499 F.3d

22  1293, 1303 (Fed. Cir. 2007) (claim-by-claim basis).  The ultimate determination of obviousness is a

23  question of law.  *Mobilemedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1167 (Fed. Cir. 2015).  The

24  Fed. Cir. has expressly ruled that given the validity presumption under 35 U.S.C. §282, a patent holder

25  need not provide *any* evidence of validity, the burden is wholly upon the challenger to prove invalidity:

26      a jury or a court may reach a conclusion that a patent remains valid *solely* on the failure
    of the patent challenger's evidence to convincingly establish the contrary. A patent being

27      presumed valid at birth, §282, a patentee need submit *no* evidence in support of a
    conclusion of validity by a court or a jury.

28  *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.* 806 F.2d 1565, 1570 (Fed. Cir. 1986) (emphasis in

PLAINTIFFS' [PROPOSED] CONCLUSIONS OF FACT AND LAW
Case No.:  2:11-cv-02797-TLN-CKD

1   original).  The Court finds that Defendants provided no evidence, let alone clear and convincing

2   evidence, that would invalidate the patents based on obviousness.  Moreover, Dr. Aoki testified that

3   early on his concept was so off-the-wall that NIH wouldn't approve funding and he had to look

4   elsewhere to private entities like AHS.  (P.105:12-15; P.106:12-15; P.120:5-22 [Aoki, Vol.1].)

### L.    Defendants' Affirmative Defenses

#### 1.    Defendants Failed To Establish Prior Commercial Use Under §273( b)

7       A person is entitled to a defense to patent infringement where the person would otherwise be

8   infringing if (1) the person commercially used the subject matter in the United States (2) at least one

9   year before the earlier of (A) the effective filing date of the claimed invention or (B) the date on which

10  the claimed invention was disclosed to the public in a manner that qualified for the exception from prior

11  art under §102(b).  35 U.S.C. §273(a).  "A person asserting a defense under this section shall have the

12  burden of establishing the defense by clear and convincing evidence."  35 U.S.C. §273(b).  A person

13  may not assert a defense under this section if the subject matter on which the defense is based was

14  derived from the patentee or persons in privity with the patentee.  U.S.C. §273(e)(2).   A patent is not

15  rendered invalid because a defense is established under §273.  35 U.S.C. §273(g).

16      Defendants have failed to establish prior commercial use as a defense under 35 U.S.C. §273(a).

17  From 1986 to 2002, well before the first RQ patent was filed in 2000 (see P.Exh.5  ['736 patent]), Mr.

18  Gilbert worked in tandem with Dr. Aoki as both his lawyer and business partner.  (See *supra,* II.D and

19  G.)  Mr. Gilbert did not part ways with Dr. Aoki until 2002 when he resigned from MI following the

20  fallout that led to the Nevada litigation.  (See *supra,* II.E. and F.)  Moreover, the confidentiality agreement

21  Mr. Gilbert drafted and voluntarily signed provided that "all inventions, improvements, modifications,

22  discoveries and developments which relate to the research, development or other activities of Dr. Aoki"

23  during the time Mr. Gilbert worked with Dr. Aoki would be assigned to Dr. Aoki.  (P.Exh.245 [Confid.

24  Agreement].)  To the extent Mr. Gilbert claimed he and those within his control were using MAT®, APT

25  or any similar method of pulsatile insulin prior to when the first RQ was provisionally applied for in

26  2000, such subject matter necessarily derives from Dr. Aoki's work and therefore the defense does not

27  apply.  In fact, Mr. Gilbert admitted he had been using Dr. Aoki's technology since at least before 2003

28  or 2005.  (P.Exh.93 [Gilbert Supplemental Decl.].)

"If the defense under this section is pleaded by a person who is found to infringe the patent and who subsequently fails to demonstrate a reasonable basis for asserting the defense, the court shall find the case exceptional for the purpose of awarding attorney fees under section 285." 35 U.S.C. §273(f). Defendants' assertion of this defense is unreasonable given Mr. Gilbert's long assoc. with Dr. Aoki as a lawyer and business partner until 2002 and admissions by Mr. Gilbert that he had been using Dr. Aoki's MAT® therapy since before 2003 or 2005. (See *supra*, II.I.1.) Any commercial use by Mr. Gilbert of the therapy necessarily derived from or is MAT®. In fact, Mr. Gilbert now claims that it was only in 2002 (after the filing of the RQ patents) that he invented APT (see *supra*, II.J.), which is not credible given his earlier admissions, but which certainly negate Mr. Gilbert's prior commercial use defense.

## 2.   **The Statute of Limitations Does Not Bar Plaintiffs' Claims**

The Court has previously addressed the applicable statute of limitations period with respect to Plaintiffs' causes of action: (1) breach of fiduciary duty/confidential relationship–one year or three year depending on the gravamen of the complaint; (2) copyright infringement–three years; (3) false and misleading advertising and unfair competition in violation of the Lanham Act, 15 U.S.C. §1125(a)-three years; (4) false and misleading advertising under California B&P Code §17500–three or four-years; and (5) unfair competition under California B&P Code §17220–four years. (ECF 175, pp. 14-18.)

The acts that give rise to the claims in this dispute, largely the opening of CAT / APT clinics and the course of conduct that necessarily stems from that endeavor, *i.e.* false representations, unfair business practices, *et al .* . were not discovered until 2009, two years prior to the filing of this lawsuit and therefore well within all the applicable statute of limitations. Dr. Aoki testified that he learned of the first wave of Cellular Activation Therapy clinics (the precursor to APT) in 2009. All the other previous clinics had ceased to east. (P.1512:6-15 [Aoki, Vol.9].) The acts of copyright infringement continued thereafter, even after this lawsuit was filed as Mr. Gilbert and his entities continued to open more clinics. There is evidence for example that Dr. Aoki's slides were used in the 2015 Trina Health Presentation that was presented to the Alabama investors (P.Exh.112), the 2017 APT presentation (P.Exh.12), the 2017 video promoting APT at the New York clinic (P.Exh.201), as well as in connection with Mr. Gilbert's 2017 Presentation to CMS (D.Exh.T4-Tab 98, Bates D4448). (See *supra,* II.K. and Appendix B, copyright infringement chart with reference to Bates numbers.) Each infringing act starts a new limitations period

1  under the separate accrual doctrine applicable to copyright causes of action.  *Petrella v. Metro-Goldwyn-*

2  *Mayer, Inc.*, 572 U.S. 661, 671 (2014) (citations omitted).

3       With respect to breach of fiduciary duty / confidential relationship, a theory of continuous

4  accrual applies under California law.  Separate, recurring breaches of fiduciary duty provide a basis for

5  the application of the theory of continuous accrual, where each violation triggers its own statute of

6  limitations.  *Yamauchi v. Cotterman*, 84 F.Supp.3d 993, 1014 (N.D. 2015) (citing *Aryeh v. Canon Bus.*

7  *Solutions, Inc.*, 55 Cal.4th 1185, 1198, 1199 (2013)).  Whether the Court applies a one-year or longer

8  statute of limitations period, the evidence establishes that Mr. Gilbert's continuing course of conduct

9  using Dr Aoki's MAT® therapy and claiming it as his own, soliciting investors to open clinics with Dr.

10  Aoki's therapy among other misconduct, continued well after this case was filed such that each new

11  breach re-sets the SOL under the continuous accrual doctrine. (See *supra,* II.H., I., K., L., M., N.)

### 3.    The Physicians' Immunity Doctrine Does Not Apply

13       Defendants have failed to establish that the physicians' immunity doctrine under 35 U.S.C.

14  §287(c)(1), which precludes a patent from interfering with a doctor or clinician providing "medical

15  activity" applies.  Dr. Aoki's patented methods for treating diabetes and diabetes-related complications

16  do not constitute medical activity as defined by the physicians' immunity defense and is specifically

17  described in the legislative history as exempt from assertion of the defense.  *See* Journal of the Patent

18  and Trademark Office Society, Vol. 78 (1996), p.789-801, Appendix B (emphasis added).  The

19  legislative history is directly on point because it specifically exempts from the definition of "medical

20  activity" Dr. Aoki's treatment which involves the novel use of a drug (*i.e.* insulin) in treating diabetes

21  by administering insulin at a specified dose over a specified period of time. [29]

## IV.    CONCLUSION

23       Plaintiffs have proved entitlement to damages amounting to at least **$25,170,500** under the

24  claims discussed above (including for trebled damages).  (See *supra,* IV.B, E., F., G., H., I., J.)

25  Plaintiffs have also demonstrated entitlement to statutory copyright damages of $30K and $150K for

26  willful violation, totaling **$180K**.  Plaintiffs are entitled to attorneys' fees, costs and injunctive relief.

---

[29] See Plaintiffs' trial brief at ECF 359, p.13-15 for a more extensive discussion of the Physicians' Immunity.

1    Respectfully submitted,

2    Dated:  August 5, 2019                **DTN LAW GROUP**
                                           By /s/ Duyen T. Nguyen_____
3                                          Duyen T. Nguyen, Esq.

4                                          **SOMMERS & SCHWARTZ LLP**
                                           By: s/Frank F Sommers
5
                                           Attorneys for Plaintiffs THOMAS T. AOKI and AOKI
6                                          DIABETES RESEARCH INSTITUTE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' [PROPOSED] CONCLUSIONS OF FACT AND LAW
Case No.:  2:11-cv-02797-TLN-CKD

## APPENDIX A – Chart Of Infringing Evidence

| RQ Patent Claims | Infringing Evidence Found In Arizona Manual (P.Exh.203) | Infringing Evidence Found In Florida Protocol (P.Exh.228) |
|---|---|---|
| **Step 1. Determining Respiratory Quotient and Measuring It at Intervals**<br>All of the patents at issue use RQ for purposes of determining biological functioning other than glucose stability. (P. 305:1-5 [Aoki, Vol.2].)<br><br>All of the RQ patents reference measuring a baseline RQ at one hour, two hour, three hour, and as often as needed after each treatment. (P. 306, 1-7 [Aoki, Vol.2].) | **Page 75 of Manual:**<br>"Necessary Equipment- VacuMed Metabolic Measurement Cart." (P.Exh.203, Bates P3384.)<br><br>Use of the VacuMed metabolic measurement cart which specifically measures both $CO_2$ production and $O_2$ consumption calculates the respiratory quotient ("RQ") on a breath-by-breath basis. (P. 299:7-24; P.304:12-25 [Aoki, Vol.2].)<br><br>The report that is generated by the VacuMed metabolic measurement device only outputs the $CO_2$ production and $O_2$ consumption and outputs it as the "RER" which is essentially RQ. (P. 305, 11-18 [Aoki, Vol.2].)<br><br>**Page 76 of Manual:**<br>"The Metabolic Measurement Cart is provided by VacuMed, and is used to determine the volume of Carbon Dioxide ($VCO_2$, produced by the patient to verify improvement, and the volume of the Oxygen consumed ($VO_2$) each minute." (P.Exh.203, Bates P3385.)<br><br>If you measure those two items, you have measured RQ and the VacuMed machine automatically prints out RQ. (P. 314:20-24 [Aoki, Vol.2].)<br><br>The VacuMed cart cannot be set to measure only $CO_2$ volumes. | "Metabolic measurement: at beginning and end of treatment session for a total of 2 measurements." (P.Exh.228, Bates P5-5771.)<br><br>In connection with administering the APT or APS protocol at the Trina Health of Miami clinic, Ms. Pereyra used a VacuMed machine. A patient would breathe into the mouthpiece. The machine gave readings of inhaled oxygen to exhaled carbon dioxide to give a specific number to demonstrate if the patient was processing carbs or processing other forms of energy. (P.1004:6-24; P.1005:24-25 [Nurse Pereyra, Vol.6].) During the metabolic measurement, the respiratory quotient would be given. (P.1005:3-7 [Nurse Pereyra, Vol.6].) |

(P.319:22-4 [Aoki, Vol.2].)

**Page 76 of Manual:**
"After a treatment, this value [RQ] provides information on how well the patient is overcoming metabolic diseases." (P.Exh.203, Bates P3385.)

Measuring respiratory quotient does provide such information; measurement of CO2 alone will not. (P.317:5-9 [Aoki, Vol.2].)

The statement regarding use of the RQ in determining how well the patient is "overcoming metabolic diseases" applies both to diabetes and other complications such as eye disease, kidney disease, wound healing, et al . . (P.317:10-17; P.318:1-6 [Aoki, Vol.2].)

VCO2 is just the volume of carbon dioxide produced.  It does not tell you if the treatment is working.  (P. 319:7-8 [Aoki, Vol.2].)

**Page 77 of Manual:**
"Before the initial treatment, (or when a patient has been absent for 6+ weeks) the patient's resting metabolism before and in some cases, after a glucose load, should be obtained in the strictest manner possible." (P.Exh.203, Bates P3386.)

This refers to talking about the ability of a patient's body, presumably the liver, to take that glucose and oxidize it or burn it like gasoline in a car engine, which is akin to RQ measurement. (P.324:5-19 [Aoki, Vol.2].)  To assess carbohydrate metabolism in the way that is attempted here, RQ must be measured. (P.325:23-25;

| | | |
|---|---|---|
| | P.326:1 [Aoki, Vol.2].) | |
| | **Page 78 of Manual:**<br>"The Pre-Treatment Baseline number will be the lowest levels of $VO2$ and $VCO2$ during the first or in some cases second treatment days." (P.Exh.203, Bates P3387.)<br><br>CO2 and VO2 are elements of RQ. (P.327:23-25 [Aoki, Vol.2].)<br><br>**Page 84 of Manual:**<br>"In order to determine the length of time that the treatment is causing the patient to continue metabolizing carbohydrates at a rate which will avoid complications and allow tissues to heal, the Metabolic Measurement (MM) is performed just prior or during the first minutes of treatment, then after the first hour of treatment, then after all treatments (usually 3 treatments total)." (P.Exh.203, Bates P3393.)<br><br>The clinic is performing MM (or RQ) after the first hour, two hours, and then three hours after treatment. Similarly, Aoki's treatment measure at baseline, one hour, two hours, and then three hours. (P.332:8-20 [Aoki, Vol.2].) | |
| **Step 2. IV access**<br>IV access means putting a needle or catheter into a hand, forearm vein. (P.306:23-25 [Aoki, Vol.2].) | **Page 112 of Manual:**<br><br>Discusses use of IV access. (P.Exh.203, Bates P3421.) | "Access: Obtain 24 gauge peripheral IV with good blood return." (P.Exh.228, Bates P5-5771.)<br><br>The protocol discusses IV access. (P.353:7-8 [Aoki, Vol.2].)<br><br>"A pediatric sized IV would be started into a peripheral IV on the patient." (P.1000:14-16 |

| | | [Nurse Pereyra, Vol.6].) |
|---|---|---|
| **Step 3.  Pump or syringe**<br>Insulin is infused using a pump. The Bionica pump is a typical pump but other pumps can be used. (P.307:19-24 [Aoki, Vol.2].) Insulin pulses can also be administered using a syringe. (P.307:25;  P.308:1-3 [Aoki, Vol.2].) | **Page 75 of Manual:** It mentions use of a syringe. (P. 314, 5-8 [Aoki, Vol.2].)<br><br>**P.87 of Manual**: Mentions use of Bionica pump.<br><br>There's a whole section on the use of the Bionica pump in the manual. (P.334:15 [Aoki, Vol.2].) | "Refill and Maintenance of pump: Bionica portable infusion pump inspected for proper function and battery             level." (P.Exh.228,  Bates  P5-5771.)<br><br>The protocol reports using a Bionica infusion pump. (P.353:23 [Aoki, Vol.2].) |
| **Step 4.  Initial infusion of saline and then insulin pulses, typically every 6 minutes**<br>What is infused via the needle or catheter  is  initially  saline. (P.307:15-16 [Aoki, Vol.2].)<br><br>Insulin is infused in pulses every six minutes with a total of ten pulses over a one-hour period. (P.308: 4-12 [Aoki, Vol.2].)<br><br>Several of the RQ patents mentions use of other intervals and other intervals between pulses can be used, but six minutes is the typical interval.      (P.309:17-20 [Aoki, Vol.2].) | **Page 44 of Manual:**<br>"It has been found that most patients should have 6 minute intervals between pulses, with a total of 10 pulses." (P.Exh.203, Bates P3353.)<br><br>**Page 89 of Manual:**<br>"Interval should remain at six minutes."          (P.Exh.203, Bates P3398.)<br><br>These are the intervals that are claimed  on  the  RQ  patents. (P.338:6-13 [Aoki, Vol.2].) | "Prepped  with  patient details  and  primed  with Humalog        100U/mL **insulin** as indicated below. . . Medication:  0.5mL or 1mL   Humalog   U100 insulin mixed with 0.9% sodium      chloride      [i.e. saline] to equal 10mL total volume in BD syringe." (P.Exh.228, P5-5771.)<br><br>"Pump intervals set every 6  minutes  for  a  total number of 10 pulses per cycle."  (P.Exh.228, Bates P5-5771.)<br><br>This is precisely what the RQ patents recommend and outline and claim.  (P. 353:25; P.354:1-2 [Aoki, Vol.2].)<br><br>"There was a mixture of Humalog  insulin  with normal saline that would be mixed into a syringe, which         was        then programmed     into     the pump."  (P.1000:16-18 [Nurse Pereyra, Vol.6].)<br><br>"And once the pump was |

PLAINTIFFS' [PROPOSED] CONCLUSIONS OF FACT AND LAW
Case No.: 2:11-cv-02797-TLN-CKD

| | | |
|---|---|---|
| | | started, it would go for 10 pulses each hour, so every 6 minutes they would receive a burst or a dose of the medication as the pump was running." (P.1003:7-9 [Nurse Pereyra, Vol.6].) |
| **Step 5. Administration of glucose or oral carbohydrates**<br><br>Oral glucose is administered to raise the concentration of glucose in the portal vein so that the liver cell will receive a high glucose level together with a high insulin level simultaneously. (P.309:21-25 [Aoki, Vol.2].)<br><br>The RQ patents specifies a range of glucose that's determined on an individual basis ranging from 40 to 100 grams of glucose per treatment. (P.310:6-15 [Aoki, Vol.2]). | **Page 77 of Manual:**<br>"Before the initial treatment, (or when a patient has been absent for 6+ weeks) the patient's resting metabolism before and in some cases, after a glucose load, should be obtained in the strictest manner possible." (P.Exh.203, Bates 3386)<br><br>This refers to the patient eating or swallowing a high carbohydrate glucose containing meal as discussed in the RQ patents. (P.324:20-25; P.325:1 [Aoki, Vol.2].)<br><br>**Page 79 of Manual:**<br>"Try to arrive at clinic with Blood Glucose of 150-200 mg/dl."<br><br>When patients come to the clinic for receiving treatment, their blood sugar should be between 150 to 200 milligrams per deciliter. (P.329:11-13; P. 330:7-9 [Aoki, Vol.2].)<br><br>**Page 79 of Manual:**<br>Mentions giving the patient "75 grams of glucose (dextrose)." (P.Exh.203, Bates P3388.)<br><br>**Page 99 of Manual**:<br>"The goal during all treatments is to maintain blood glucose in the 130 to 250 mg/dl treatment range AND ingest a TOTAL Glucose for each one-hour treatment, optimally between 70 and 100 grams | "Diet: NPO during treatment session with exception of oral dextrose drinks provided by staff." (P.Exh.228, Bates P5-5771.)<br><br>"Because it was an insulin infusion, we would want to keep their blood glucose levels higher than the norm because the insulin infusion will bring down their glucose level. So for safety reasons we had a goal of 150 to 250 milligrams per deciliter for the treatment session." (P.1003:15-19 [Nurse Pereyra, Vol.6].) |

PLAINTIFFS' [PROPOSED] CONCLUSIONS OF FACT AND LAW
Case No.: 2:11-cv-02797-TLN-CKD

| | (equaling 200 grams to 300 grams for all treatment hours)." (P.Exh.203, Bates P3408.)<br><br>This goes to the glucose loads on the patented claims.   (P.344:6-13 [Aoki, Vol.2].) | |
|---|---|---|
| **Step 6.   Amount of insulin per pulse**<br><br>The amount of insulin per pulse ranges usually from a minimum of 10 milliunits per kilogram body weight, mU/kg.   (P.308:13-17 [Aoki, Vol.2].)<br><br>There are different dosages for Type 1 and Type 2 diabetic patients.   Some Type 2s are very insulin sensitive and so they will get 10 milliunits, perhaps even less per kilogram body weight. Some Type 1s are very insulin resistant and may require much higher doses, like 70 milliunits per kilogram body weight. (P.308:18-25 [Aoki, Vol.2].)<br><br>The range of dosage can go as high as 200 milliunits per kilogram body weight.  (P.309:5-7 [Aoki, Vol.2].) | **Page 88 of Manual:**<br>"Doses are for each individual Burst of insulin in range of 10 to 70 mU/kg."      (P.Exh.203, Bates P3397.)<br><br>This relates to dosage of insulin for the pump.   (P.337:12-23 [Aoki, Vol.2].) | "Prepped with patient details and primed with Humalog 100U/mL **insulin** as indicated below. . . Medication:  0.5mL or 1mL Humalog U100 insulin mixed with 0.9% sodium chloride [i.e. saline] to equal 10mL total volume in BD syringe." (P.Exh.228, Bates P5-5771.) |
| **Step. 7.  Rest Period**<br>After each treatment cycle of ten pulses, the high insulin levels engendered by the pulsing sequence is returned to baseline. Waiting 30 minutes or so between treatments will allow the free insulin concentration to approach close to baseline.   (P.311:2-6 [Aoki, Vol.2].) | **Page 4 of Manual:**<br>"How long does the treatment last? Typically in a clinic visit the patient receives three-one hour sessions with a break between sessions. The typical time of the break is 40-60 minutes."   (P.Exh.203, Bates P3313.)<br><br>**Page 97 of Manual:**<br>**Glucose Changes According to Metabolic Measurement, ¶2:** "After the first treatment session, which lasts 60 minutes, evaluate the response by performing a second | "Activity:  Resting in chair with 5-15 minutes of ambulation hourly x3." (P.Exh.228, Bates P5-5771.) |

-82-

| | | |
|---|---|---|
| | Metabolic Measurement. Let the patient rest for **15 to 60 minutes** before continuing the second session, repeating all the previous steps." (P.Exh.203, Bates P3406.)<br><br>This rest period is indicated in the claims. (P.342:13-25; P.343:1-7 [Aoki, Vol.2].) | |
| **Step 8. Three Cycles**<br>A typical treatment day consists of three ten-pulse cycles per day. (P. 312:1-6 [Aoki, Vol.2].) | **Page 4 of Manual:**<br>"How long does the treatment last? Typically in a clinic visit the patient receives **three-one hour sessions** with a break between sessions. The typical time of the break is 40-60 minutes." (P.Exh.203, Bates P3313.)<br><br>**Page 44 of Manual:**<br>"It has been found that most patients should have 6 minute intervals between pulses, with a total of 10 pulses." (P.Exh.203, Bates 3353) | "Pump to run a total of 3 cycles throughout treatment." (P.Exh.228, Bates P5-5771.)<br><br>"We would inspect the pump, itself, to make sure that it had a full battery so that it would run, you know, throughout the entire three-hour sessions and not have any issue." (P.1002:21-24 [Nurse Pereyra, Vol.6].)<br><br>"And once the pump was started, it would go for 10 pulses each hour, so every 6 minutes they would receive a burst or a dose of the medication as the pump was running." (P.1003:7-9 [Nurse Pereyra, Vol.6].) |
| **Step 9. Once a week or more than once a week.**<br>Typically patients get one treatment day per week or it can be more frequently than one treatment day per week, i.e. three times a week or even more. (P.312:11-14 [Aoki, Vol.2].) | **Page 84 of Manual:**<br>"Treatments are initially given for two successive (or nearly successive) days . . . thereafter treatment takes place once a week for at least 8 to 12 weeks." (P.Exh.203, Bates P3393.)<br><br>*"[T]reatment must be shortened to 10 or even 7 days."* (P.Exh.203, Bates P3393.)<br><br>The recommendation for all the RQ | |

| | | |
|---|---|---|
| | treatment is once a week or more frequently as needed.  (P.336:7-14 [Aoki, Vol.2].) | |
| The RQ patents treat various tissues and complications. (P.1450:16-21 [Aoki, Vol.9]; P.Exhs.2-7 [RQ patents].) | **Page 4-5 of Manual:** "What does it do for these complications of diabetes?"  The manual states the treatment addresses neuropathy, wounds, kidney disease, retinopathy, and heart disease.  (P.Exh.203, Bates P3314-3315.) | "The conditions for which the ARNP may initiate treatment include, but are not limited to diabetes." (P.Exh.228, Bates P5-5771.) |
| | **Page 84 of Manual:** "In order to determine the length of time that the treatment is causing the patient to continue metabolizing carbohydrates at a rate which will avoid complications and allow tissues to heal, the Metabolic Measurement (MM) is performed just prior or during the first minutes of treatment, then after the first hour of treatment, then after all treatments (usually 3 treatments total)." (P.Exh.203, Bates P3393.) | During her job interview in 2014, Mr. Gilbert told Natalie Pereyra, the nurse at the Trina Health Miami clinic, a licensed Trina Health clinic, that her job would involve administering a treatment for patients who suffered from diabetes complications.  (P. 1006:2-10 [Pereyra, Vol.6]; P.1877:20-25; P.1878:1-5 [Gilbert, Vol.11].) |
| | The reference to "complications" of diabetes includes the targets of the various RQ patents.  (P.331:20-25 [Aoki, Vol.2].) | |

**APPENDIX B – Chart Of Copyrighted Slides That Were Copied**

| Title of slide found in Aoki MAT® presentation (Exh.10A) | Infringing use identified by exhibit number and internal Bates number |
|---|---|
| Free insulin peak chart (P.Exh.10A, Bates P6-5840) | 2017[30] CMS Presentation (D.Exh.T4-Tab 98, Bates D4448).<br><br>2015 Trina Health Presentation (P.Exh.112, Bates P4525.)<br><br>2017 *Dr. G. Ford Gilbert On Diabetes at the Relief Centers of South Bronx* (P.Exh.201, Video Link)<br><br>2017 APT Presentation (P.Exh.12, Bates P2683; P.1457:16-20 [Aoki, Vol.9].) |
| Slide of Photo of Interior Laboratory (P.Exh.10A, Bates P6-5795.) | 2015 Trina Health Presentation (P.Exh.112, Bates P4530.)<br><br>2017 APT Presentation (P.Exh.12, Bates P2683; P.1457:16-20 [Aoki, Vol.9].) |
| Fuel Oxidation – Oral 100g Glucose Test Chart (P. Exh.10A, Bates P6-5802.) | 2015 Trina Health Presentation (P.Exh.112, Bates P4533.)<br><br>2015 *Trina Health 360 Transforming Metaboism2 Video* (P.Exh.195, Video Link)<br><br>2017 APT Presentation (P.Exh.12, Bates P2683; P.1457:16-20 [Aoki, Vol.9].) |
| Fuel Oxidation – Lunch Test Meal Study (P.Exh.10A, Bates P6-5804.) | 2015 Trina Health Presentation (P.Exh.112, Bates P4534.)<br><br>2015 *Trina Health 360 Transforming Metabolism2* Video (P.Exh.195, Video Link)<br><br>2017 APT Presentation (P.Exh.12, Bates P2683; P.1457:16-20 [Aoki, Vol.9].) |
| Fuel Oxidation – Exercise (P.Exh.10A, Bates P6-5811) | 2015 Trina Health Presentation (P.Exh.112, Bates P4536.)<br><br>2015 *Trina Health 360 Transforming Metabolism2* Video (P.Exh.195, Video Link)<br><br>2017 APT Presentation (P.Exh.12, Bates P2683; P.1457:16-20 |

---

[30] The free insulin chart is the last page of Defendants' Exhibit T4 (Tab 98) and confusingly has both bates numbers 4448 and 4449. This presentation is dated October 1, 2017 per Defendants' exhibit list.

| | |
|---|---|
| | [Aoki, Vol.9].) |
| Photo of Exercise Bike (P.Exh.10A, Bates P6-5808) | 2015 Trina Health Presentation (P.Exh.112, Bates P4535.)<br><br>2015 *Trina Health 360 Transforming Metabolism2* Video (P.Exh.195, Video Link) |
| Results – Glycemic Control 1 (P.Exh.10A, Bates P6-5821.) | 2015 Trina Health Presentation (P.Exh.112, Bates P4580.)<br><br>2017 APT Presentation (P.Exh.12, Bates P2683; P.1457:16-20 [Aoki, Vol.9].) |
| Photos of feet of Dr. Aoki's patient treated with MAT® (P.Exh.10A, Bates P6-5835 to 5838.) | 2015 Trina Health Presentation (P.Exh.112, Bates P4551-4554.)<br><br>2015 *Trina Health 360 Wounds Heale*d (P.Exh.194, Video Link)<br><br>2017 APT Presentation (P.Exh.12, Bates P2683; P.1457:16-20 [Aoki, Vol.9].) |
| Hypertension Graph – Group B control phase and Group B treatment phase.   (P.Exh.10A, Bates 6-5823.) | 2015 Trina Health Presentation (P.Exh.112, Bates P4577.)<br><br>2017 APT Presentation (P.Exh.12, Bates P2683; P.1457:16-20 [Aoki, Vol.9].) |
| Creatinine Clearance Chart ("Start Treatment") (P.Exh.10A, Bates 6-5825.) | 2015 Trina Health Presentation (P.Exh.112, Bates P4575.)<br><br>2017 APT Presentation (P.Exh.12, Bates P2683; P.1457:16-20 [Aoki, Vol.9].) |
| Treatment of Diabetic Nephropathy, Aoki et al. 175 – Table **1** (P.Exh.10A, Bates P6-5827.) | 2015 Trina Health Presentation (P.Exh.112, Bates P4571.)<br><br>2017 APT Presentation (P.Exh.12, Bates P2683; P.1457:16-20 [Aoki, Vol.9].) |
| Treatment of Diabetic Nephropathy, Aoki et al. 175 – Table **2** (P.Exh.10A, Bates P6-5828.) | 2015 Trina Health Presentation (P.Exh.112, Bates P4572.)<br><br>2017 APT Presentation (P.Exh.12, Bates P2683; P.1457:16-20 [Aoki, Vol.9].) |
| Table 1. Main Characteristics of IDDM patients.   (P.Exh.10A, Bates P6-5830.) | 2015 Trina Health Presentation (P.Exh.112, Bates P4573.)<br><br>2017 APT Presentation (P.Exh.12, Bates P2683; P.1457:16-20 [Aoki, Vol.9].) |
| Table with footer tagline, "Adapted from DAILEY G et al. Diabetes 1995.   (P.Exh.10A, Bates P6-5831.) | 2015 Trina Health Presentation (P.Exh.112, Bates P4574.)<br><br>2017 APT Presentation (P.Exh.12, Bates P2683; P.1457:16-20 [Aoki, Vol.9].) |

**APPENDIX C – License Agreements**

| Exh. No. | License Agreement | Financial Terms |
|---|---|---|
| P.Exh.94 (D92-113) | 7-17-13 Dallas Ft. Worth Metroplex Exclusive License Agreement Between Health Assurance of North Texas, Advanced Metabolism Care Associates, and Trina Health, LLC With consent of Bionica, Inc. (Texas) | @ p.6, ¶5(a), Bates D97:  "Founders are obligated to pay herewith a one-time Twenty Thousand Dollars **($20,000) per chair license fee 'Chair Fee' for the first six (6) Chairs of each Clinic** to be opened in the EMA sites as agreed by the parties."<br><br>@ p.7-8, ¶5(h), Bates D98-99: "$500 oversight fee."<br><br>@ p.10, ¶12, Bates D101: "Royalty . . . shall initially be **(7%) of Net Revenue and reduced to (5%)** only after Trina has retired the royalty stream payable to Connecticut Innovations (State of Connecticut) pursuant to the Development Agreement.  That agreement is fully paid after three million dollars is paid thereunder."<br><br>@ p.14, ¶23, Bates D105:  $10K training fee.<br><br>*Terms Requiring Purchase of Bionica Pump*:<br>@ p.2, Whereas clause, discussing concurrent with execution of agreement, the parties shall enter into a Manufacturing and Supply Agreement with Bionica, Inc. whereby licensee shall purchase Bionica pump for administration of APT and APS.<br><br>@ p.3, ¶ 1(e), defining Bionica pump as pump used for APS.<br><br>@p.3, ¶ 1(g), defining clinic to mean a specified number of chairs per clinic and one pump shall be used for each chair. |
| P.Exh.95 (P2943-2961) | 12-31-13 License Agreement between Diabetic Innovations, LLC and Trina Health, LLC<br><br>(Arizona) | @p.6, ¶6.b, Bates P2948:  License fee of $20,000 per chair<br><br>@p.13, ¶20, Bates P2955:  $10K training fee<br><br>@p.10, ¶11, Bates P2952: Royalty Fee of 5% and Cooperation Fee of 13% of Gross Revenues<br><br>*Terms Requiring Purchase of Bionica Pump*:<br>@ p.2, Whereas clause, discussing concurrent with execution of agreement, the parties shall enter into a Manufacturing and Supply Agreement with Bionica, Inc. whereby licensee shall purchase Bionica pump (as well as metabolic measurement equipment and insulin) for administration of APT and APS.<br><br>@ p.3, ¶ 1(g), defining Bionica pump as pump used for APS. |

| | | |
|---|---|---|
| | | @p.3, ¶ 1(h), defining clinic to mean a specified number of chairs per clinic and one pump shall be used for each chair. |
| P.Exh.98 (D180-198) | 4-09-14 License Agreement between Smart Medical, LLC and Trina Health, LLC with consent of Bionica, Inc. | @ p.6, ¶6.b, Bates D185:  "$20K per chair fee for each Clinic . . . "<br><br>@ p. 8, ¶6.j, Bates D187:  $500 oversight fee.<br><br>@ p. 8, ¶6.k, Bates D187:  $10K training fee<br><br>@ p. 11, ¶12, Bates D190:   royalty fee of 5% of gross revenue (as adjusted) and a cooperation fee of 13% of gross revenue (as adjusted)<br><br>*Terms Requiring Purchase of Bionica Pump*:<br>@ p.1, Whereas clause, discussing concurrent with execution of agreement, the parties shall enter into a Manufacturing and Supply Agreement with Bionica, Inc. whereby licensee shall purchase Bionica pump (as well as metabolic measurement equipment and insulin) for administration of APT and APS.<br><br>@ p.2, ¶ 1(e), defining Bionica pump as pump used for APS.<br><br>@p.2, ¶ 1(f), defining clinic to mean a specified number of chairs per clinic and one pump shall be used for each chair. |
| P.Exh.99 (D119-138) | 8-25-14 License Agreement between Pacrim US, LLC dba CP Homes and Trina Health, LLC with the consent of Bionica, Inc. (Fairhope, Alabama) | @ p.6, ¶6.a, Bates D124:  $120K up front per chair fee license fee for a six chair clinic.<br><br>@ p.8, ¶6.k, Bates D126:  $500 oversight fee<br><br>@ p.8, ¶6.l, Bates D126:  $10K training fee<br><br>@ p.11, ¶12, Bates D129: royalty fee of 7% of gross revenue and cooperation fee of 13% of gross revenue.<br><br>*Terms Requiring Purchase of Bionica Pump*:<br>@ p.2, Whereas clause, discussing concurrent with execution of agreement, the parties shall enter into a Manufacturing and Supply Agreement with Bionica, Inc. whereby licensee shall purchase Bionica pump (as well as metabolic measurement equipment and insulin) for administration of APT and APS.<br><br>@ p.3, ¶ 1(f), defining Bionica pump as pump used for APS.<br><br>@ p.3, ¶ 1(g), defining clinic to mean a specified number of chairs per clinic and one pump shall be used for each chair. |

| | | |
|---|---|---|
| P.Exh.104 (D313-322) | 3-04-15 License Agreement between Trina Health of Kansas, LLC and Trina Health, LLC With Consent of Bionica, Inc. (Kansas) | @ p. 7, ¶6.a, Bates D319:  $20K per chair license fee<br><br>@ p. 9, ¶6.q, Bates D321:  $10K training fee<br><br>@ p. 11, ¶12, Bates D323:  royalty fee of 5% of gross revenue and a cooperation fee of 13% of gross revenue.<br><br>*Terms Requiring Purchase of Bionica Pump*:<br>@ p.1, Whereas clause, discussing concurrent with execution of agreement, the parties shall enter into a Manufacturing and Supply Agreement with Bionica, Inc. whereby licensee shall purchase Bionica pump (as well as metabolic measurement equipment and insulin) for administration of APT and APS.<br><br>@ p.2, ¶ 1(f), defining Bionica pump as pump used for APS.<br><br>@ p.2, ¶ 1(g), defining clinic to mean a specified number of chairs per clinic and one pump shall be used for each chair. |
| P.Exh.105 (D72-91) | 2-10-16 License Agreement between Animo Health, Inc. and Trina Health, LLC with consent of Bionica, Inc. | @ p.8, ¶8.c, Bates D79:  $22,500 per chair<br><br>@ p.10, ¶8.m, Bates D81:  $10K training fee<br><br>@ p.18, ¶34.g, Bates D89:  billing services is 5% of amount collected<br><br>*Terms Requiring Purchase of Bionica Pump*:<br>@ p.1, Whereas clause, discussing concurrent with execution of agreement, the parties shall enter into a Manufacturing and Supply Agreement with Bionica, Inc. whereby licensee shall purchase Bionica pump (as well as metabolic measurement equipment and insulin) for administration of APT and APS.<br><br>@ p.2, ¶ 1(e), defining Bionica pump as pump used for APS.<br><br>@ p.2, ¶ 1(f), defining clinic to mean a specified number of chairs per clinic and one pump shall be used for each chair. |
| P.Exh.108 (D264-285) | 7-06-16 License Agreement between Healthy Foods, Inc. ("NEWCO") and Trina Health, LLC with consent of Bionica, Inc. | @ p. 7, ¶6.a, Bates D270:  **$100K per clinic fee for each clinic opened by NEWCO Clinics**.<br><br>@ p. 7, ¶6.b, Bates D270:  $20K per chair license fee.<br><br>@ p.9, ¶6.q, Bates D272:  $10K training fee<br><br>*Terms Requiring Purchase of Bionica Pump*:<br>@ p.1, Whereas clause, discussing concurrent with execution of agreement, the parties shall enter into a Manufacturing and |

PLAINTIFFS' [PROPOSED] CONCLUSIONS OF FACT AND LAW
Case No.:  2:11-cv-02797-TLN-CKD

| | | |
|---|---|---|
| | | Supply Agreement with Bionica, Inc. whereby licensee shall purchase Bionica pump (as well as metabolic measurement equipment and insulin) for administration of APT and APS.<br><br>@ p.2, ¶ 1(e), defining Bionica pump as pump used for APS.<br><br>@ p.2, ¶ 1(f), defining clinic to mean a specified number of chairs per clinic and one pump shall be used for each chair. |

PLAINTIFFS' [PROPOSED] CONCLUSIONS OF FACT AND LAW
Case No.:  2:11-cv-02797-TLN-CKD

# APPENDIX D1

Claim By-Claim Analysis Of 6,967,191 Patent (System- Eye and Nerve Disease)

| Claim | Infringing Evidence |
|---|---|
| (1) A system for treating eye and nerve disease associated with a diminution in glucose oxidation in patients through an intravenous site administering a pulse of insulin to a patient comprising: | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing various tissues and complications (last row after step 9).<br><br>See also *supra* II.L.1 citing P.Exh.112 [2015 Trina Prospectus, Bates P4596] which states APT "is the only clinically proven safe and effective way to treat all of the complications of diabetes;" see also P.Exh.112 at Bates 4609;  P.Exh.11 [CAT Presentation, Bates P1013, 1017]). |
| a) determining a respiratory quotient of the patient | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing use of RQ at step 1.<br><br>See also *supra* II.H.2, 3, 4 and 5 discussing evidence of use of RQ. |
| b) having the patient consume a liquid or food containing glucose | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing administration of oral glucose at step 5. |
| c) administering intravenously the pulse of insulin | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing IV access at step 2, use of pump/syringe at step 3 and insulin pulses at 6 minute intervals at step 4. |
| at a regular interval of time | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing insulin pulses at 6 minute intervals at step 4. |
| until the respiratory quotient is 0.90 or greater | Ms. Shaffer testified that patients at the Trina clinics held a competition to see who could get to an RQ goal of over .90, i.e. 100 or 1. (P.2609:23-25; P2610:1-2 [Shaffer, Vol.16].) |
| (2) the intravenous site further comprises a needle or catheter located in the patient's body, hand or forearm. | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing IV access and pump/syringe at steps 2 and 3. |
| (3) the liquid or food contains 60 to 100 grams of glucose | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing administration of oral glucose at step 5.  Specifically, page 79 of the manual mentions giving the patient 75 grams of glucose (dextrose). |

-91-

| (4) the administered by the pulse of insulin is an intravenous infusion device | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing use of pump at step 3. |
|---|---|
| (5) the interval of time is about six minutes | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing insulin pulses at 6 minute intervals at step 4. |
| (6) the pulse of insulin is tailored to achieve increased retinal and glucose oxidation by enhanced pyruvate dehydrogenase complex activity | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing various tissues and complications including retinopathy (last row after step 9).<br><br>See also *supra* II.L.1 citing P.Exh.112 [2015 Trina Prospectus, Bates P4596]  which states APT "is the only clinically proven safe and effective way to treat all of the complications of diabetes;" see also P.Exh.112 at  Bates 4609;  P.Exh.11 [CAT Presentation, Bates P1013, 1017]).<br><br>See *supra* II.L.1 citing P.Exh.112 [2015 Trina Prospectus, Bates P4606]  stating APT "mimics normal stimulation of the liver and produces the necessary enzymes to cause all the cells of the body to become more metabolically normal;" see also P.Exh.112, Bates P4531.<br><br>See also *supra* II.K. citing MAT® slides used in APT presentations pertaining to fuel oxidation, *i.e.* P.Exh.112 [2015 Trina Presentations, Bates 4533], P.Exh.195 [Trina Health Transforming Metabolism2 Video], P.Exh.12 [2017 APT Presentation, Bates 2683; P.1457:16-20 [Aoki, Vol.9].) |
| (7) the intravenous site is converted to a heparin or saline lock during the rest period | See *supra* II.H.1, chart of infringing evidence discussing IV access at step 2, use of a pump or syringe at step 3 and rest period at step 7.<br><br>See also *supra* II.A.7 (citing P.Exh.103 [APT Article, Bates P1105], P.Exh.112 [Trina Prospectus, Bates P4597]), discussing activities patients can do during rest period.  This leads to the inference that during rest periods, patients are disconnected from the pump and the IV "stoppered" (essentially converted to a saline lock) or else blood would come out of the catheter. |

### APPENDIX D2

Claim By-Claim Analysis Of 6,579,531 Patent (Method - Heart And Cardiovascular Disease)

| Claim | Infringing Evidence |
| --- | --- |
| 1) A method for treating heart disease and cardiovascular disease in diabetic and non-diabetic patients by improving the dietary fuel capabilities and correct an overutilization of free fatty acids comprising the steps of: | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing various tissues and complications (last row after step 9). <br><br> See also *supra* II.L.1 citing P.Exh.112 [2015 Trina Prospectus, Bates P4596]  which states APT "is the only clinically proven safe and effective way to treat all of the complications of diabetes;" see also P.Exh.112 at  Bates 4609;  P.Exh.11 [CAT Presentation, Bates P1013, 1017]). <br><br> See also page 5 of Arizona manual discussing "Heart Disease." (P.Exh.203.) <br><br> See also page 83 of Arizona manual, **Verification of Metabolic Improvement by Treatment; 1st Paragraph** ("...includes the verification of metabolic improvement to achieve the two goals of increased ATP energy (cellular energy) and at the same time increase carbohydrate metabolism which automatically reduces lipid (free fatty acid) and thus metabolic inflammation.") (P.Exh.203.) |
| a) determining a steady baseline respiratory quotient of a patient | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing use of RQ at step 1. |
| and obtaining a subsequent respiratory quotient every 30 minutes | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing use of RQ at step 1. <br><br> See also P.3055:23-25; P.3056:1-4, 14-25, P.3058:23-24; P.3059:1-11 [Aoki, Vol.18, discussing multiple RQs reflected on Shaffer's treatment charts]; P.Exh.244A [Shaffer Treatment Chart ] (reflecting RQs of .70, .94 and .96). <br><br> See also Arcangeli testimony *supra* II.H.2.b, testifying Mr. Gilbert's diabetes.net website reflected checking "blood sugar every thirty minutes . . . and measuring RQs." |
| the steady baseline respiratory quotient being two identical consecutive respiratory quotients less than 0.90 measured five | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing use of RQ at step 1. <br><br> Ms. Shaffer testified that patients at the Trina clinics |

| | |
|---|---|
| minutes apart | held a competition to see who could get to an RQ goal of over .90, i.e. 100 or 1. (P.2609:23-25; P2610:1-2 [Shaffer, Vol.16].) |
| b) have the patient consume a liquid or food containing 60 to 100 grams of glucose | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing administration of oral glucose at step 5. |
| c) administering a pulse of insulin | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing pulses of insulin at step 6. |
| through an intravenous site | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing IV access and pump/syringe at steps 2 and 3.<br><br>See also page 2 of Arizona manual (What is Artificial Pancreas Treatment (APT)? at last paragraph, line 2, "...programmed pump that sends pulses of insulin intravenously..."); page 32 ("You now have a completed mixed insulin syringe and primed pump ready for programming and attachment to patient's IV"); and page 90 (Step 8. Attach IV Set to Syringe**).** (P.Exh.203.) |
| at a six minute interval of time | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing insulin pulses at 6 minute intervals at step 4. |
| until the subsequent respiratory quotient shows an improvement over the steady baseline respiratory quotient | See *supra* II.H.1, chart of infringing evidence and Appendix A discussing use of RQ at step 1.<br><br>Ms. Shaffer testified that patients at the Trina clinics held a competition to see who could get to an RQ goal of over .90, i.e. 100 or 1. (P.2609:23-25; P2610:1-2 [Shaffer, Vol.16].) |
| the pulse of insulin being 20 to 35 milliunits of insulin per kilogram of body weight for a non-diabetic and a Type I diabetic | See page 87 of Arizona manual ("Bionica Pump, Programming and Use; #2, 3rd Paragraph states "Most patients treat at a range of 35 mU/kg or lower"); pages 87-88, ¶3 DOSE, in Bursts of Insulin, (a) ("Doses are for EACH individual burst of insulin in range of 10 to 70 mU/kg"); See also pages 71 to 73 (Types of Diabetes and Patients.  (P.Exh.203.) |
| the pulse of insulin being 70 to 200 milliunits of insulin per kilogram of body weight for a Type II diabetic | See page 72 of Arizona manual, Type 2 DM Patients, second ¶ ("Eventually their burst doses may need to be as high as 70 mU/kg or above".)  (P.Exh.203.) |

PLAINTIFFS' [PROPOSED] CONCLUSIONS OF FACT AND LAW
Case No.:  2:11-cv-02797-TLN-CKD

| | |
|---|---|
| the improvement over the steady baseline respiratory quotient being a respiratory quotient of 0.90 or greater | See *supra* II.H.1, chart of infringing evidence discussing use of RQ at step 1.<br><br>Ms. Shaffer testified that patients at the Trina clinics held a competition to see who could get to an RQ goal of over .90, i.e. 100 or 1. (P.2609:23-25; P2610:1-2 [Shaffer, Vol.16].) |
| the subsequent respiratory quotient improvement over the steady baseline respiratory quotient being a measurement of increased glucose utilization by a diseased myocardium | See *supra* II.H.1, and Appendix A, chart of infringing evidence discussing use of RQ at step 1.<br><br>Ms. Shaffer testified that patients at the Trina clinics held a competition to see who could get to an RQ goal of over .90, i.e. 100 or 1. (P.2609:23-25; P2610:1-2 [Shaffer, Vol.16].)<br><br>See also page 5 of Arizona manual mentioning Heart Disease.  (P.Exh.203.) |
| d) allowing the patient to rest one hour | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing rest period at step 7. |
| e) repeating steps a-d at least three times. | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing three cycles of treatment at step 8. |
| 2) the intravenous site further comprises a needle or catheter located in the patient's body, hand or forearm. | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing IV access and pump/syringe at step 2 and 3. |
| 3) the pulse of insulin is administered by an intravenous infusion device | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing use of pump at step 3. |
| 4) the intravenous site is converted to a heparin or saline lock during step (d) | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing IV access at step 2, use of a pump or syringe at step 3 and rest period at step 7.<br><br>See also *supra* II.A.7 (citing P.Exh.103 [APT Article, Bates P1105], P.Exh.112 [Trina Prospectus, Bates P4597])*,* discussing activities patients can do during rest period.  This leads to the inference that during rest periods, patients are disconnected from the pump and the IV "stoppered" (essentially converted to a saline lock) or else blood would come out of the catheter. |
| 5) said steps a-e are repeated at least once a week | See *supra* II.H.1 and Appendix A, chart of infringing evidence discussing administration of treatment once a |

| | week or more than once a week at step 9. |
|---|---|
| 6) said steps a-e are repeated at least three or more times a week | See *supra* II.G.1 and Appendix A, chart of infringing evidence discussing administration of treatment once a week or more than once a week at step 9.<br><br>See also page 84 of Arizona manual ("There will be some interpretation required as a single session showing a continued ability to maintain good metabolism may not be enough, and no fewer than 3 consecutive days of Metabolic ability are needed to then transition into a 10 day or 2 week schedule.") (P.Exh.203.) |

**APPENDIX E**

**Chart Of Defendants' Admitted "Prior Art" Exhibits**

| D.Exh. No. | Description of Defendants' "Prior Art" Documents |
|---|---|
| B1 (Tab 2) | Insurance procedures checklist |
| O1 (Tab15) | AMSys Hepatic Activation Medical Professional Information from 1991 |
| J2 (Tab 36) | Purchase Order Agreement between American Hospital Supply Corporation and UC Davis Billing |
| N2 (Tab 40) | 1993 Letter from Dr. Salzano to Dr. Aoki regarding improved retinopathy in a patient |
| O2 (Tab 41) | 1993 Letter from Dr. Cole to Dr. Aoki regarding improved retinopathy in a patient |
| P2 (Tab 42) | 1990 Letter from Dr. Bell to Dr. Aoki regarding improved retinopathy in a patient under diabetic glucose control. |
| Y3-1 (Tab 77) | Abstract of Dr. Aoki's article titled, "Chronic Intermittent Intravenous-Insulin Therapy and Type 1 Diabetes Mellitus" |
| E4 (Tab 83) | AMSys Hepatic Activation Program* |
| F4 (Tab 84) | AMSys Business Plan |
| K4 (Tab 89) | Effects Of Pivit On Diabetic Complications (this includes letters referenced above at N2, O2 and P2) |
| Q 4 (Tab 95) | 1996 UC Davis Article titled "New Treatment Lessens Diabetic Complications" |

PLAINTIFFS' [PROPOSED] CONCLUSIONS OF FACT AND LAW
Case No.:  2:11-cv-02797-TLN-CKD