GREGORY FORD GILBERT, SBN 65920
5112 Bailey Loop
McClellan, CA 95652
Telephone: (916) 643-2222
Facsimile: (916) 643-2080
ggilbert@gmail.com

Pro Se Attorney for Defendant GILBERT

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS T. AOKI, M.D., an individual, and AOKI DIABETES RESEARCH INSTITUTE, a California Non-Profit Corporation, <br><br>vs.<br><br>GREGORY FORD GILBERT, an individual; BIONICA, INC., a Nevada corporation; BIONICA INT'L, LLC, a California limited liability company; TRINA HEALTH, LLC, a California limited liability company, et al.,<br><br>    Defendants. | Case No.: 2:11-cv-02797-TLN-CKD<br><br>**DEFENDANT GILBERT'S PROPOSED FINDINGS OF FACTS AND CONCLUSIONS LAW**<br><br>*Trial Completed*<br><br>Hon. Judge Troy Nunley |

DEFENDANT GILBERT'S PROPOSEDFINDINGS OF FACT AND CONCLUSIONS OF LAW:

1. **Bionica International** (a partnership) replaced Bionica International LLC, and was added as the Defendant by Stipulation due to the change in status.
    a. There are no distinctions made between Bionica International LLC and Bionica International (partnership) as the only activity was to change its form [RT 66:23-25]
    b. Bionica International is a partnership [RT 73:6-12]
    c. Exhibit PX 235 sets forth the Aoki international patents [RT 43:23-25; 432:1-3]

    d. Bionica International is not doing anything oversees with the Aoki patents [RT 70:25; 71:1; RT428:25; 429:1-5]

    e. There is no evidence of Bionica International performing any actions of any kind related to the causes of action in the Amended Complaint. [no citations].

    f. Bionica International

**2. Plaintiff Dr. Aoki testified as to History and Licenese**

    a. Dr. Aoki is an expert with years of work in diabetes [RT 79:1 through 106:25]

    b. Dr. Aoki obtained a Biostator, "Artificial Pancreas" in 1978 [RT 107:1-19]

    c. The purpose of the Biostator was to develop the treatment to "re-awaken the liver, essentially do what what it normally does for a person who's not diabetic"…Dr. Aoki: "Right."   [RT 109:21-25; 111:1-9]

    d. AMSys was formed in 1987. [RG 147: 19-20]

    e. At the first meeting in 1985, Aoki and Gilbert discussed forming a non-profit which Gilbert set up at no cost, named the Aoki Diabetes Research Institute, which was formed in January 1986  [RT 147:7 through 149:10]

    f. In 1987 AMSys received a license from Dr. Aoki PX 24, [RT 183:6-8]

    g. In 1992 AMSys entered into a Development Agreement with Connecticut Innovations Inc. (State of Connecticut). PX 30. [RT 184:14-185:2]

    h. The AMSys license agreement of 1987 was modified to allow for the Connecticut Innovation Inc. license PX 29. [RT 202:18-25]

    i. As a result of that License Agreement, Connecticut Innovations Inc. received a non-exclusive royalty free license to all technology past, present and future, related to the Aoki technology.  PX 30.

    j. In order to attempt to commercialize the treatment, the license rights (subject to the Connecticut Innovations Inc. license) were transferred from AMSys to AMTech, and from AMTech, to Diabetex. [RT 208:22 through 209:11]  PX 35.

    k. Plaintiff Aoki agreed to the transfer of the license rights from AMSys to AMTech to Diabetex. [RT213:11-14].

l. From 1993 to 1999 AMSys had opened clinics, and there were two clinics still open, which were opened by AMSys. (Aoki testimony) [RT 187:20-25].

m. On July 1, 2001 Plaintiff Aoki licensed "the Subject Technology" to Pulse Activation Therapies (later to be re-named Metabolic Industries) because Diabetex ran out of money. PX 39. [RT 214:9 through 215:3].

n. Defendant Gilbert was authorized to negotiate for a replacement of Diabetex, but there was no agreement to terminate the Diabetex license PX 40 [RT 218:2-4]

o. Plaintiff Aoki knew of the settlement agreement with Diabetex and that Gilbert had obtained the license as the end game [RT 225:17-23]

p. Plaintiff Aoki was not part of the board for the meeting, and claimed that he had no discussion about Defendant Gilbert receiving the license as part of the settlement with Diabetex. [RT 227:1-17]. PX 41. However, Plaintiff Aoki acknowledged that he signed an approved Plaintiffs' Exhibit 42.

q. Plaintiff then acknowledged the transfer to Gilbert of the rights "because he was my surrogate, in terms of getting ahold of the license." "basically, this was to negate the license that Diabetex had and allowing me to license – with the elimination of the Diabetex license then it would be – I would then be free to license Pulse Activation Therapies. [RT 229:3-11]. However, the document Exhibit 42, was executed August 28, 2001, three years before the first lawsuit by Aoki against Gilbert which was dismissed. The case at bar was not filed until October 2011, ten years 2 months later.

r. Plaintiff Aoki admitted that he knew about the claim of ownership by Gilbert in 2003 which is 7 years prior to the case at bar. [RT 229:18-25]

s. The license of the subject technology contain two rights, one of the royalty interest which was to go to Plaintiff Aoki and the ADRI, and one which is the commercialization rights, which are to fund and operate a company to generate those royalties. [RT 271:14-17] by Gilbert

t. There are no documents which terminate the license purchase by Diabetex to

Gilbert. [no citations]

    u. Plaintiff Aoki claimed to understand for the first time in 2005 that Bionica Inc. had purchased the Connecticut Innovations License. [RT 286:14-22]. This date is 6 years prior to the filing of the case at bar, and was part of the "Nevada Case" [RT 286:20-23]. There is no evidence that the CII license was ever terminated, and CII was never part of the case at bar.

    v. In the Nevada lawsuit, the order was a Preliminary Order PX 65 which was effective only until the final judgment. It was issued September 20, 2004.

    w. That lawsuit was Amended by Plaintiff to Cross Complain March 16, 2005 PX 67 to include Bionica and Gilbert. PX 67. This is 6 months after the Order of the court, which proceeded without the participation of Gilbert and Bionica as witnesses were excluded.

    x. An Order to Show Cause was issued on June 20, 2005 which did not order Bionica or Gilbert to do anything or reply, it merely recited that failure to show cause would result in cancellation of the "franchise agreement" and that MTC should modify its website (not related to Bionica or Gilbert). PX 69

    y. On October 4, 2004, an appeal was filed of the Temporary Order. Def B-5.

    z. On September 20, 2005, the appeal was denied and the case remittited to District Court. Def C-5.

    aa. By the time of the final judgement all Gilbert related parties had an interlocutory appeal and then had been dismissed. On June 7, 2006 the Nevada case was dismissed as to Bionica and Gilbert. [DX F-2]

3. **The Trina Arizona Manuel**. PX 203.

    a. Plaintiffs'' Exhibit 203 was obtained from the Arizona Clinic which is not a party to the case at bar.

    b. Plaintiff Aoki had no personal knowledge of the authorship of the Manual.

    c. Plaintiff Aoki claimed that "all repertory quotient patents utilize the respiratory quotient to of .9 or higher as an index of efficacy to some extent". [RT 306:14-25]

4

    d. The RQ Patents are specific as to the time of taking the measurement, the means of obtaining a baseline (two readings) and use of the RQ a total of 4 times, each session [RT 306:1-15which included the adjusting of insulin and other factors. These are "very important".

    e. Plaintiff Aoki testifies: "The oral glucose is administered to raise the concentration of glucose in the portal vein so that the liver cell will receive a high glucose level together with a high insulin level simultaneously.  Q. And do the RQ patents specify either an exact amount or a range of oral glucose that's being administered?  A. It specifies a range of glucose that's determined on an individual basis and not on a basis of body mass index measurements." [RT310:1-10]

    f. This is a stark distinction from Exhibit 203 which does not provide any of the above and uses the Body Mass Index as a factor in the amount of glucose given PX 203

    g. The steps for the RQ patents have the same steps in treatment. [RT 313:15-18]

    h. Plaintiff Aoki was asked to review Plaintiffs' Exhibit 203 for "descriptions that match the treatment steps listed in the RQ patents. [RT 314:13-17]. The following were testified by Plaintiff Aoki.

        i. P. 75 Necessary equipment a 10 ml syringe. [RT 315:8

        ii. Metabolic measurement cart by Vacumed "Is used to determine the volume of carbon dioxide, the VCO2, produced by the patient to verify improvement, and the volume of oxygen consumed, VO2 each minute.  If you measure those two items, you have measured the RQ. [RT 315:20-24]. This is not as set forth in the patent, and is consistent with measurement for diagnostic purposes described in Ex 203

        iii. The needle size is discussed.  22-23-24 gage [RT 316- 317].  This is set forth in the patents.

        iv. Well, the next paragraph says, below the "Metabolic Measurement System," it says, "After a treatment, this value provides information on

how well the patient's overcoming metabolic diseases." The RQ does provide that information. Measurement of CO2 alone will not. [RT 318:5-9]. This is not set forth in the patent claims.

 v. Plaintiff Aoki testified: Well, every time the – in the next paragraph "the purpose of taking metabolic measurements is, "and it talks about the treatment is working each day.. [RT319:10-12]. This is not contained in the patent claims and is consistent only with APT treatment.

 vi. Plaintiff Aoki testified that the VCO2 does not tell you if the treatment is working. [RT 320:7,8]. This acknowledges and is an admission that the VCO2 approach used by the Arizona clinic is not following the Aoki patents.

 vii. Plaintiff Aoki testified that Exhibit 203 states that the VCfO2 is used "To determine the maximum length of time between treatment which still maintains the desired metabolic improvements (change in VCO2 before and after second treatment). [RTs321:112-15]. This shows that the RQ patents are not being followed because the VCO2 is used for the maximum length of time between treatments, not to adjust insulin and for the purpose of treating. The time between treatments is the number of days between treatments, and as shown, this is not within any RQ patent discussion.

 viii. Plaintiff Aoki testified that the Pretreatment metabolic measurement baselines calls for measurement of the VCO2 if the patient has not been treated or has been absent for 6 plus weeks. [RT 323:20 – 324:2] This also shows that the measurement is for other than treatment since "if the patient has not been treated for 6 plus weeks belies the idea that the measurement is given every treatment. The Arizona clinic clearly does not use the RQ and does not even use the VCO2 in the manner of the patents or for the purposes set forth in the RQ patents.

 ix. These are all the "indications" of infringement found in the Arizona

manual testified by Plaintiff Aoki, and none of these written words are used in the RQ patents, except for the size of the needle being used for an IV. In order to find infringement indication within Exhibit 203, the reader must say. "this does not mean what it says" which is totally speculative because Plaintiff Aoki testified that he had no personal knowledge of how the treatment is being given. To claim that Ex 203 does not mean what it says, requires Dr. Elliott (supra) to not be telling the truth in his testimony when he said the Arizona clinic uses VCO2 and not for the treatment but as a diagnostic tool to follow the treatment.

x. Placement in a chair for 20 to 30 minutes is claimed by Plaintiff Aoki to indicate something about the RQ.  [RT 327:17-25].  This is misleading as the instruction manual for Vacumed requires this for any reading Ex 203].  This also has nothing to do with the rest cycles of 30-60 minutes between insulin as stated in the patents.

xi. "The pretreatment baseline number will be the lowest levels of VO2 and VCO2.  [RT 328:13-14].  This does not mean RQ, without recharacterizing the statement into words that are not found in the statement.

xii. "Glucose Rise is used for both diagnosis and metabolic dysfunction and for a baseline assessment of their metabolic levels"  [RT 329:16-18]. This is not contained in the RQ patents.

xiii. When patients come into the clinic for treatment, the blood sugar should be between 150 to 200 mg/dl. [RT 331:7-9].  This is not found in the RQ patents or claims.

xiv. "Avoiding complications" is claimed to be indication of the RQ patents [RT 331:22 through 322:5].  The Arizona Clinic is not making specific claims in this section.

xv. "Interpretation that the Treatments Are Progressing" uses a precise amount of glucose and that is in our RQ patent [RT 336:12-15].  The manual states

7
DEFENDANT GILBERT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

           that the precise amount of glucose is based upon the body mass of the patient, not as found in the RQ patents.

    xvi. "Treatment must be shortened to 10 or even 7 days" [RT 336: 7-8]. This is not indicative of the RQ Patents and shows that the RQ patents are not being used.

    xvii. "10 to 70 milliunits per kilogram" shows it relates to Bionica pump. [RT 337: 17]. This too is not part of the RQ patents.

    xviii. "Interval of six minutes" [RT 338:7-7]. This period is used on all treatments, starting with the '810 patent because this is the normal interval of a normal pancreas.

    xix. "Number of Bursts set to 10 which is the default and normal number of bursts (pulses)". [RT 338: 17-19]. This number is not always used as it is the default and normal, distinguishing the setting from the RQ patents.

    xx. The stop feature air play was discussed. [RT 340: 6-20] The stop feature was part of the original pump design, and by definition pre-dates the RQ patents. There is nothing in the RQ patents which relate to this pump feature.

    xxi. Maintenance Phase "2 to 300 grams of glucose per treatment day [RT 17-22]. This is not mentioned in the RQ patents.

    xxii. "Let the patent rest for 15 to 60 minutes." [RT 3437-7]. This is outside the range of the RQ patents.

    xxiii. "The goal "The goal during all treatments is to maintain blood glucose in the 130 to 250 milligram treatment range and ingest a total glucose for each one-hour treatment, optimally between 70 and 100 grams (equaling 200 grams to 300 grams for all treatment hours," [RT 344 6-10]. This is not in the RQ patents which state no such goal. This is the "backwards" reference (supa).

    xxiv. The RQ tells the provider how much insulin to give to the patient with

Plaintiff's MAT. [RT 713:11-17].

  xxv. The APT Arizona protocol provides that insulin is given off of Blood Glucose Chart, not RQ. [PX 203]

The foregoing is the testimony of Plaintiff Aoki of all indication of infringement by Arizona Clinic. The statements made were objected to as without foundation of knowledge. Plaintiff reading Exhibit 203 tried to make a correlation with his patents. But the claims made by Plaintiff reviewing the Arizona Manual do not show infringement by Arizona, or any clinic, and in several cases above actually prove that the Arizona Protocol does not infringe.

4. **Use of Slides** Plaintiffs' Exhibit 10 (as amended) were used in Florida to physicians at the AACE meeting and a dinner meeting with physicians, and no copyright was claimed. The first claim of copyright was at the time of the filing of the complaint [RT 434:15 through 435:7]

The slides were part of a powerpoint that occurred prior to the first claim of copyright, but the powerpoint notes were not downloaded. [RT 518:1-8].

The slides are dated by the fact that the slides refer to Cellular Activation Therapy which was used prior to the claim of Copyright [RT 518:6]

The slides do not refer to RQ in the pointed part of the powerpoint, and in fact the arrows placed over the original slide on oxidation, show that it was the Carbohydrate Oxidation (VCO2) which was important and which is used by ATP. [RT 519: 18-20] This is inconsistent with Plaintiff Aoki's testimony that the only metabolic measurement of importance is the RQ. And this was his own slide that set forth the carbohydrate oxidation (as opposed to RQ). PX 11, page 29, 31.

Other writing on the powerpoint show that the few powerpoint slides containing images from the later-copyrighted work were for discussion and training, which constitutes fair use. [RT 522: 16-24]

5. **Programming**. Plaintiff Aoki claimed that Gilbert did not do the programming on the pump, but admitted that he had spent no minutes involved in the programming [RT

9

502:10-13]

6. **Clinical Trials Require an IRB**: The use of the treatment or the Bionica pump for experimental purposes on human subjects would require an IRB approval [RT 511:14=17]. Plaintiffs did not have an IRB for patients being treated, they were being treated for diabetes [RT 512: 5-12]. In 1996 this was not a clinical trial it just the practice of medicine [RT 512:20-22]. This is an admission of the fact that patients were being treated, not for research, but for a commercial sale.

7. **The Results of MAT were inconsistent**: Of the people who were treated "some got better, some did not." [RT 514:16-20]. This is in contrast to the published article on APT where over 93% improved (supra).

8. **Before Filing RQ Patents**, Plaintiff Aoki was already treating patients for kidney disease. [RT 534: 6-8].
   <u>In all the years prior to 2000 filing patent in 2001, the RQ baseline was being measured</u>. [RT 738 :6-10].
   Prior to 1999, Plaintiff Aoki was using the RQ to determine insulin, determining a steady baseline of RQ, Obtained an RQ every 30 minutes on some patients, Consumed 60 to 100 grams of glucose, giving pulses of insulin of 20 to 35 milliunits of insulin, for type 2 giving doses of 70 to 200 milliunits, looking for an improvement in baseline RQ, allowing a rest between treatments, and repeating steps 3 times [RT 764 11 through 768: 15].

9. **Number of patients treated from 1984 to 2019**: Plaintiff has treated only approximately <u>200 patients</u>. [RT 543: 7-24]. That equates to 5.7 patients per year over 35 years. Plaintiffs elected not to treat patients with MAT.

10. **Admission of no personal knowledge or formal reports:** When asked how many patients have been treated with APT, Plaintiff Aoki testified "I have no idea. Ok that's because you've never seen anybody treated with APT, correct? No, I have not seen any formal report." [RT: 542:21- 543:1]. This is an admission of no personal knowledge and the fact that he has never seen any formal reports. This includes the internet which he discounts.

10

DEFENDANT GILBERT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

11. **American Hospital Supply** decided to stop funding Dr. Aoki in 1986. That left him with no commercialization company and no support for his work. [RT 553: 9-14]

12. **Royalty Rates**: The royalty rate Plaintiff agreed to with American Hospital Supply was 1-3% [Defendant's J-1]. This was an acceptable rate. The royalty rate for the license to AMSys was 5%. [PX 24 p.13]. There is no royalty due under the CII license. [PX-30]

13. **Matthew Kalifeh** testified: Mr. Gilbert was the science side with the technical presentation. [RT 178:19-25]. He did not remember where the money that was invested went. [RT 803: 16-17]. He did not discuss the license with Gilbert [RT 818: 12-14]. Every patient on APT in Birmingham (Hoover) received a benefit [RT 833: 20-23]. And he would not say that the therapy was just all smoke and mirrors. [RT 834: 1-4]. There was no discussion about Gilbert using websites to publicize his clinic. [RT 842: 2-4].

14. **Physicians Package**. Defendant's O-1 1991 shows the various claims of improvements in the complications of diabetes. This predates the application for the RQ patents and shows that AMSys was selling the treatment for all complications of diabetes.

15. Defendants' N-2 and O-2 of 1993 shows the effect of treatment on eye disease. This was prior to any application for patent.

16. Defendants' P-2 shows the stabilization of eye disease as of 1990, ten years prior to filing any RQ patent.

17. Defendants' R-2 shows the exact protocol of the RQ patents was being used on multiple occasions in1995. This is proof of commercial use and prior sale.

18. Defendants' Z-2 is a report on the successful appeal of commercial patients for the treatment for all 11 Medicare appeal patients spanning a time of years prior to 2001.  This shows commercial use and prior sale.

19. Defendants' Y-3-1 shows commercial sales in Florida prior to the application for patents where the "Indications of cardiovascular, eye, gut, neuropathy, retinopathy, and ulcers (wounds).

20. Defendants' E-4 sets forth the MAT protocol used by AMSys (the commercial company) with RQ checked hourly, and on page 2 claims of retinopathy, nephropathy, neuropathy,

and cardiovascular hypertension. This is well before any RQ patent filing, using the name Hepatic Activation. The "Typical Treatment Day mirrors the RQ patents as the commercial treatment to a licensed clinical provider.

21. Defendants' F-4, the AMSys Business plan of 1990, ten years before the RQ patent applications show the complications being treated as a commercial entity.

22. Defendants' K-4, the AMSys Effects of PIVIT on Diabetic Complications shows patients who suffered from the complications of diabetes and were treated, including wounds, retinopathy, hypoglycemic excursions, and heart diseases (cardiomyopathy).

23. Defendants' Q-4 of April 1996, in Plaintiff Aoki's own words "New treatment lessens diabetic complications. He states "controlling glucose is not enough" which is in opposite to his testimony that until 2001 he was trying only to treat blood glucose. This shows his claims of invention circa 2000 to be incorrect.

24. Defendants' S-4 is the 2017 article showing uniform outcomes for 1,524 patients in 14 centers with APT. This shows the difference between MAT which has a much lesser success rate.

25. Defendants' T-4 shows the amazing outcomes where amputations would be automatic, but with APT the patients would even grow back much of a foot (last slides 17 weeks).

26. Defendants' K-5 shows the patent being used by Defendants McCarthy and Rose. This patent does not use the RQ to determine insulin infusion, and like APT looks to the rise in blood sugar to determine the amount of insulin.

27. Defendants' L-5 consists of eleven (11) patients with the secondary complications of diabetes claimed in the RQ patent, who were treated as commercial patients for all of the complications of diabetes. This exhibit alone invalidates the RQ patents.

28. Defendants' M-5 is the Vacumed Manual which requires a rest period of 20 to 30 minutes for all different measurements other than active metabolism (p.28). This manual shows that Plaintiff Aoki was incorrect when he claimed that the result of the machine was an RQ. This manual shows a multitude of different tests, and actually prints out the VCO2 before an RQ (display patter page 11). It tells the patient the number of calories (kCal)

DEFENDANT GILBERT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

and is a tool for weight management.

29. Defendants' R-5, is the Trina Home Activation Instructions which shows that RQ is not needed for insulin dosing (for over 24 years straight). Trina testified that on the very few occasions she treated (picture N-5- 7 yr old and P-5 12 yr old) her RQ was taken confirming that the RQ patent protocol was in use for years prior to the patent application.

30. Dr. Elliott testified that Mr. Gilbert had not used the Exhibit 203 to train Arizona [RT 1133:8-11].

31. Dr. Elliott testified that many of the clinics and his clinic made contributions to Exhibit 203. [RT 1134: 1-8

32. Dr. Elliott testified that the RQ was not used in treating patients, neither was RER. [RT 1138:21 through 1139:1

33. Dr. Elliott testified that the VCO2 was used to determine how frequently the patient needed to come back for the next treatment. [RT 1139: 9-15]

34. Dr. Elliott testified that the basic difference in the MAT and APT treatment was that there was opposite approach to glucose, where standard glucose was given an a pulse of insulin in response to the blood glucose, which is different from the former treatment where insulin was given in response to the RQ. They were exactly opposite treatments [RT 1141:24 – 1142:8]

35. Medicare designated the old pulsatile insulin, the OIVIT a G code it did not pay. [RT 1145: 7-17]

36. Dr. Elliott has treated 3,000 to 4,000 patients with APT and was more than happy with the results of APT [RT 1148: 25- 1149: 11]

37. Dr. Elliott testified that every single patient treated was benefited greatly, and he had never seen a treatment in medicine like that. [RT 11:49: 14-18]

38. Dr. Elliott changed the treatment protocol to shorten the time between treatments to 15 minutes. [RT 1152: 19-1153:1]. This is different from all of the RQ patents.

39. Dr. Elliott did not use the RQ because it is a ratio, and VCO2 is not a ratio. [RT 1154:8-9]

40. Defendant Buckman testified that the treatments were not the same and that the RQ was

not used, the reading comes out as the VCO2. The RQ was not used to determine the dose of insulin. [RT 949: 6-23]

41. Dr. Buckman testified that sometimes the RQ would be repeated, but often not, or not at all. It was part of the collection of data. [RT 968; 3-5].

42. The vacuumed machine was also used as a weight management tool and that's why we get a resting VCO2. [RT 988: 6-10].

43. The RQ was never used to determine how much glucose or insulin to give. [RT 1014: 6-11]

This memo is supplemental to the Findings of Fact of all other Defendants.

DATED: August 5, 2019

_____
Gregory Ford Gilbert

[Notice and proof of service by filing, no special written paper requests having been made.]