1
2
3
4
5
6
7
8                   UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11   THOMAS T. AOKI, M.D.; AOKI                    No. 2:11-cv-02797-TLN-CKD
     DIABETES RESEARCH INSTITUTE, a
12   California Non-Profit Corporation,

13              Plaintiff,                          **FINDINGS OF FACT AND
                                                   CONCLUSIONS OF LAW**
14        v.

15   GREGORY FORD GILBERT; BIONICA
     INC., a Nevada Corporation; *et al.*,
16
                Defendants.
17

18

19        On October 24, 2011, Plaintiffs Thomas T. Aoki, M.D. ("Dr. Aoki"), and Aoki Diabetes

20   Research Institute ("ADRI") (collectively, "Plaintiffs") initiated the above-captioned action.

21   (ECF No. 1.)  On April 2, 2013, Plaintiffs filed a First Amended Complaint asserting, *inter alia*,

22   causes of action for patent infringement, copyright infringement, false and misleading advertising

23   under federal and California law, and unfair competition under federal and California law against

24   numerous defendants, of which the following remain ("Defendants"): Gregory Ford Gilbert;

25   Bionica Inc. ("Bionica"); Bionica Int'l, LLC[1]; Trina Health, LLC ("Trina" or "Trina Health");

26   _____

     [1]      The FAC names Bionica Int.'l, LLC, a California limited liability company.  (ECF No.
27   135.)  At trial, it was revealed that the LLC converted to a general partnership and the parties
     agreed to substitute Bionica International (a general partnership) in place of the former LLC.  (RT
28   Vol. 1 at 63:8–71:20; 73:6–10.)  The complaint has not been amended to reflect Bionica

                                                  1

1  Trina Health of Newport Beach, LLC; MedEdCo, LLC; Diabetic Innovations, LLC; Melanie J.

2  Kunz; Michael R. McCarthy; Marc R. Rose, M.D.; Kevin J. Buckman, M.D.; Timothy Tight;

3  Faising S. Chui; Diabetic Life Pulse of Louisiana, LLC[2]; Limi Management, Inc.; Diabetic Life

4  Pulse, Inc.[3]; Life Pulse Health, LLC[4]; John D. Mullen; Glenn A. Wilson; and Richard L. Girard.

5  The FAC additionally asserts causes of action for breach of fiduciary duty and breach of

6  confidential relationship against Defendant Gilbert only.  (ECF No. 135.)

7        The Court will not recount the very lengthy procedural history of this case leading up to

8  trial.  The Court conducted a nineteen-day bench trial, beginning March 25, 2019, and concluding

9  June 13, 2019.  Put most succinctly, at trial Plaintiffs contended Defendants infringed Dr. Aoki's

10  patents for his pulsed insulin diabetes treatment method[5]; infringed Dr. Aoki's copyrighted slides;

11  and made false or misleading statements amounting to false advertising and unfair business

12  practices.  Plaintiffs additionally asserted that Mr. Gilbert breached a fiduciary duty to and

13  confidential relationship with Plaintiffs by using confidential information received as both an

14  attorney for Plaintiffs and officer, director, or board member of certain Aoki-owned entities in a

15  manner adverse to those entities.  Defendants defenses consisted of the following: (1) the patents

16  are invalid due to obviousness and public use; (2) Defendants' treatment did not infringe Dr.

---

17
18  International (GP), nor was evidence submitted confirming the change in corporate status.  As
     such, the Court addresses only Bionica Int'l, LLC — which has a suspended corporate status per
19  the California Secretary of State website of which the Court takes judicial notice — herein.

20  [2]      Diabetic Life Pulse of Louisiana, LLC, has a revoked corporate status in Louisiana.  *See*
     https://coraweb.sos.la.gov/commercialsearch/CommercialSearchDetails.aspx?CharterID=985777
21  _CE7614B860.

22  [3]      At the time of trial, Diabetic Life Pulse, Inc. had a suspended or forfeited status.  By way
     of a motion *in limine* Plaintiffs sought a default judgment.  At that time, the Court indicated it
23  would enter such a judgment pursuant to relevant case law if and when judgment was entered in
     this case.  (RT Vol. 1 at 60:7–72:9.)
24
25  [4]      Life Pulse Health, LLC also had a suspended or forfeited status at the time of trial.  (RT
     Vol. 1 at 60:7–72:9.)
26
     [5]      Dr. Aoki's patents at issue in this litigation, as set forth below, are collectively referred to
27  as the "RQ patents."  Along with the '810 patent (also described below), the RQ patents set forth
     a pulsatile insulin treatment protocol that came to be termed MAT.  Mr. Gilbert and his related
28  clinics/entities term their treatment APT.  The Court will use those names herein.

2

1    Aoki's patents; (3) the slides are not copyrightable; (4) Defendants' use of the slides constitutes

2    fair use; (5) Defendants made no false statements and engaged in no false advertising; and (6)

3    Defendants did not engage in unfair business practices.  Additionally, Mr. Gilbert claims he

4    and/or Trina have a license to use Dr. Aoki's treatment protocol.

5           On August 5, 2019, Plaintiffs submitted proposed findings of fact and conclusions of law.

6    (ECF No. 430.)  The Trina Defendants[6] filed the same on August 6, 2019 (ECF No. 431), and Mr.

7    Gilbert filed a supplemental document the same day, indicating he joined in the Trina

8    Defendants' proposed findings of fact and conclusions of law and adding additional proposed

9    findings of fact (ECF No. 432).

10          Having considered the evidence presented at trial and the parties' proposed findings of fact

11   and conclusions of law submitted after trial, the Court sets forth the following findings of fact and

12   conclusions of law, in accordance with Federal Rule of Civil Procedure 52(a).[7]

13   **I.      FINDINGS OF FACT**

14          Mr. Gilbert's Credibility

15          1.     Based on his testimony as a witness as well as representations made in his role as

16   counsel, the Court finds Mr. Gilbert not credible.  Mr. Gilbert's credibility is undermined by

17   repeated statements he made during trial that were contradicted by his own subsequent

18   statements, his own prior statements, or by witness testimony and other evidence the Court finds

19   more credible than Mr. Gilbert's contradictory evidence.  The Court has therefore chosen to

20   disregard many of Mr. Gilbert's statements in favor of the contradictory testimony of either Dr.

21   Aoki or other witnesses.[8]

22   _____

23   [6]      The "Trina Defendants" are all Defendants excluding Mr. Gilbert.

24   [7]      Any finding of fact that may be construed as a conclusion of law is hereby also adopted as

25   a conclusion of law.  Likewise, any conclusion of law that may be construed as a finding of fact is
     hereby also adopted as a finding of fact.  *See, e.g., ProMex, LLC v. Hernandez*, 781 F.Supp.2d

26   1013, 1016, 1019 (C.D. Cal. 2011).

27   [8]      The Court provides examples of Mr. Gilbert's contradictory statements below.  These
     examples are not an exhaustive list.  Indeed, many of the Court's findings of fact may be

28   contradicted by Mr. Gilbert's testimony.  Unless otherwise noted, the Court has disregarded that

1       2.     The Court notes the magistrate judge assigned to the action issued discovery

2 sanctions against Mr. Gilbert in the amount of $10,355, finding Mr. Gilbert's failure to produce

3 documents and comply with discovery orders to be "unacceptable" and "his excuses

4 disingenuous." (ECF No. 271.) The order also found Mr. Gilbert's excuses regarding an email

5 relating to discovery issues to be a "false representation to the court." (*Id.*)

6       3.     Mr. Gilbert represented "we don't have investors . . . [w]e don't have anything to

7 do with investors." (RT Vol. 5 at 690:12–14.) However, Matt Kalifeh, an investor, testified that

8 Mr. Gilbert informed him he was the one who wrote the investor prospectus for investment in a

9 Trina Health clinic in Alabama. (RT Vol. 5 at 791:7–9; 841:15–23; PX 112.) Additionally, Mr.

10 Gilbert later testified that he would approach "finders or fund seekers" or they would approach

11 him. (RT Vol. 12 at 2046:14–18.)

12       4.     Mr. Gilbert objected to admission of an exhibit on grounds that Trina West LA "is

13 not part of Trina. It's an independent company. And there's nothing foundationally that has to

14 do with this case." (RT Vol. 9 at 1182:22–24.) Later, Mr. Gilbert stated that Defendants "will

15 stipulate that Trina Health . . . licensed West LA." (*Id.* at 1490:8–9.)

16       5.     There was extensive testimony about www.diabetes.net, a web site on which many

17 of the clinics licensed by Trina Health posted their site's text. At trial, Mr. Gilbert repeatedly

18 claimed he was not the owner or registrant for www.diabetes.net. (RT Vol. 9 at 1455:8–10; RT

19 Vol. 11 at 1918:11–12; 1925:17–18.) When pressed on the issue, however, Mr. Gilbert stated he

20 "registered it" but didn't "register it for [him]self" and that he "registered for Biophile." (RT Vol.

21 11 at 1918:13–16; *see also id.* at 1919:12–15.) He also acknowledged he has had the right "for a

22 long time" to control what goes on www.diabetes.net (*id.* at 1920:17–20), and that he allowed

23 people to put content on diabetes.net (*id.* at 1929:18–21).

24       6.     Additionally, the 2015 Trina Prospectus states that "[e]ach clinic will have its own

25 web site [*sic*], and will also rely upon diabetes.net for much of the marketing of APT. The

26 website, www.Diabetes.net will help educate the public, including medical professionals and

27

28 testimony because it finds Mr. Gilbert to be not credible.

1   prospective patients, on the benefits of APT." (PX 112 at Bates 4611.)

2   　　　7.　　The Court finds Mr. Gilbert's distinction between registering www.diabetes.net,

3   being the registrant of www.diabetes.net, and owning and/or controlling the content on

4   www.diabetes.net to be disingenuous at best. Indeed, Mr. Gilbert's testimony surrounding the

5   website was generally confusing and misleading. (*See, e.g.*, RT Vol. 11 at 1921:10–24.) This is

6   particularly true given the fact that Mr. Gilbert as counsel participated in several arguments about

7   whether various clinic websites taken from www.diabetes.net should be received in evidence as

8   showing the overall advertising and control scheme of the Trina entities. In this context, the

9   Court concludes that Mr. Gilbert was not being honest with the Court as to the provenance or

10  purpose of the various clinic sites appearing on www.diabetes.net.

11  　　　8.　　Mr. Gilbert acknowledged he was a lawyer for ADRI, but testified he was never

12  Dr. Aoki's counsel. (RT Vol. 10 at 1784:16–18; RT Vol. 11 at 2074:12–2075:7.) The Court

13  finds these representations not credible as the documentary evidence reflects otherwise. (PX 61

14  (stating Dr. Aoki "has personally been my client for many, many years"); PX 25 (letter on "Law

15  Offices of Gregory F. Gilbert" letterhead stating that Mr. Gilbert has acted as counsel for "Aoki

16  in connection with the transactions contemplated by the [AMSys] Agreement"); PX 26 (AMSys

17  Corporation Closing Memorandum in which Mr. Gilbert represented himself as Dr. Aoki's

18  attorney).)

19  　　　9.　　During trial, Mr. Gilbert perpetually attempted to disclaim any connection with

20  various website documents, even where the documents contained the APT logo with the "man"

21  symbol that he trademarked. Mr. Gilbert testified that the APT description had to be

22  accompanied by the "little man" logo. (RT Vol. 11 at 1947:1–4.) Later, when he was questioned

23  regarding other documents containing the APT sign with the "man logo," he testified that the logo

24  also had to have a "zero R" on it. As the Court acknowledged, "[T]he bar kind of keeps on

25  moving. Earlier you never said that." (RT Vol. 11 at 1950:22–1951:17.)

26  　　　Dr. Aoki's Credentials and Credibility; Early Development of Technology

27  　　　10.　　Dr. Aoki testified at length about his background as it pertained to the eventual

28  patents at issue in this litigation. The Court finds Dr. Aoki to be a credible witness and briefly

5

1   summarizes that testimony here.

2       11.     Dr. Aoki received his medical degree from Yale Medical School.  (PX 9.)  From

3   1966 to 1968, he went to Japan to study the residual effects of the atomic bomb explosion in

4   Hiroshima and Nagasaki, which prompted his interest in endocrinology, and specifically diabetes.

5   (RT Vol. 1 at 81:6–23.)  In 1969, Dr. Aoki joined the Joslin Diabetes Center, where he studied

6   starvation metabolism and researched body tissues (*i.e.* liver, pancreas, kidneys) to understand

7   what happens when a person is starving.  As a result, he discovered that the liver was the key to

8   the process of metabolism.  (*Id.* at 85:10–89:4.)

9       12.     In 1978, Dr. Aoki got an artificial pancreas machine, the Biostator, which could

10  safely give insulin intravenously by constantly monitoring the glucose level and could

11  automatically stop giving insulin and start giving glucose to avoid hypoglycemia.  The machine

12  was intended to control the patient's blood glucose level.  Dr. Aoki spoke with the inventor of the

13  machine, Tom Clemens, and explained his idea of giving large amounts of insulin intravenously

14  for days with the primary purpose not of controlling the blood glucose level but to biochemically

15  turn on the liver cells.  (RT Vol. 1 at 107:1–109:13.)

16      13.     In 1982, Dr. Aoki published the Foss paper in the Journal of Diabetes, a study on

17  using an (unmodified) Biostator to give square waves of insulin in response to any rise in glucose

18  levels.  The Foss paper demonstrated that by giving these square waves, the Biostator could "turn

19  the liver on."  Dr. Aoki's desire to do it quicker and more efficiently gave birth to the '810 patent.

20  Dr. Aoki testified that at that time, the goal was to improve glucose control.  He testified that

21  good glucose control was associated with slowing the progression of retinopathy, neuropathy,

22  kidneys, and wound healing.  (RT Vol. 1 at 117:22–118:15.)

23      14.     The '810 patent was filed in 1983, issued in 1989.  (RT Vol. 1 at 121:15; PX 1.)

24      15.     In 1984, Dr. Aoki moved to Sacramento to become Chief of the Division of

25  Endocrinology and Professor of Medicine at UC Davis.  (RT Vol. 1 at 128:11–12.)

26      16.     In the course of conducting research on turning the liver back on, Dr. Aoki

27  conceived of the idea of measuring the production of $CO_2$ to $O_2$ consumed before and after

28  exposing diabetic patients to his procedure.  The respiratory quotient ("RQ") was the measure of

1   $CO_2$ produced to $O_2$ consumed.  Dr. Aoki testified that an increase in the ratio of $CO_2$ produced

2   to $O_2$ consumed (i.e. "RQ") would indicate that the diabetic patient's liver cells were (1) taking

3   up the ingested glucose and (2) "burning" or oxidizing it.  (RT Vol. 1 at 152:3–153:24.)

4        17.    In the late 1990s, Dr. Aoki noticed that in some patients, glucose control worsened

5   but the complications they were studying, like eyes and kidneys, stayed stabilized.  At that time,

6   Dr. Aoki had not settled on final adjustments for measuring RQ, nor had he determined how to

7   modify the treatment if he was looking for other physiological results outside of glucose control.

8   His focus was on glucose control and using the RQ as an indicator of liver function.  (RT Vol. 1

9   at 157:3–160:17.)

10       18.    At some point after 1999, Dr. Aoki decided to do a baseline RQ and then

11  aggressively and rapidly increase, by increasing the size of the insulin pulses, the RQ response so

12  that within an hour the RQ had exceeded .9 and remained elevated at one, two, and three hours of

13  the procedure to insure that the metabolic milieus of the new target tissues (i.e. eye, kidney) were

14  also biochemically enhanced like that of the liver.  He also increased the frequency of treatment

15  days from once a week to 2–3 times per week as appropriate.  And he began looking specifically

16  to see if the complications were responding to these changes, i.e. was the kidney more stable than

17  before in response to this more aggressive implementation of a different protocol, and he found

18  they were.  (RT Vol. 1 at 165:8–167:4.)  Unlike the original '810 patent, the higher insulin and

19  glucose doses reflected in the RQ patents recognize these higher doses are needed to treat diabetic

20  complications.  (*Id.*; RT Vol. 18 at 3004:13–23.)

21       Relevant Transactions

22       19.    As part of Dr. Aoki's recruitment package to UC Davis, he could form the

23  equivalent of a "Joslin West": a nonprofit to be set up by Dr. Aoki and presumably affiliated with

24  the university where he could continue his research.  Dr. Aoki was referred to Mr. Gilbert who

25  had a diabetic daughter, to help him set up this Joslin West.  Subsequently, Dr. Aoki met with Mr.

26  Gilbert and he ultimately agreed to set up the non-profit, Aoki Diabetes Research Institute

27  ("ADRI") free of charge, with the hope that Dr. Aoki's treatment would benefit his daughter.  In

28  January 1986, ADRI was incorporated in California.  (RT Vol. 1 at 147:9 – 149:10.)

7

20.     As part of his work with Dr. Aoki, Mr. Gilbert drafted and voluntarily executed on February 3, 1986, a confidentiality agreement agreeing to assign any inventions/improvements, to Dr. Aoki made or conceived by him during the time that he worked with Dr. Aoki.  (PX 245; RT Vol. 17 at 2726:1–2727:25.)

21.     On or around 1987, AMSys invested $1 million in ADRI to facilitate continuing research.  In return, Dr. Aoki licensed his technology to AMSys, which at the time consisted of just the '810 patent.  (RT Vol. 1 at 177:16– 22; 183:8–23.)

22.     By 1993, AMSys was running out of money.  AMSys and Connecticut Innovations ("CI"[9]) — a state agency that provides companies with start-up funds — entered into a development agreement whereby AMSys received $1 million dollars from CI, and if AMSys defaulted on the repayment, CI would receive a nonexclusive license and right to sublicense the therapy.  Dr. Aoki testified that CI could not sell that "default license" without his written consent.  (PX 30 (AMSys-CI License); RT Vol. 1 at 184:5–186:9.)

23.     Before the development agreement could happen, the 1987 AMSys-Aoki license was clarified to separate out Asia from the license and modified to allow AMSys to offer a potential license or sublicense to CI, in the event of a default.  (PX 28 (Clarification License); RT Vol. 2 at 200:12–25; PX 29 (Modification License); RT Vol. 2 at 201:12–22.)  Pursuant to the Modification of License Agreement between AMSys and Dr. Aoki, AMSys should notify Dr. Aoki of any default of the development agreement.  (PX 29.)

24.     Mr. Gilbert was the lawyer Dr. Aoki worked with in connection with the AMSys-Aoki and AMSys-CI licenses.  Mr. Gilbert reviewed and/or created these licenses.  Dr. Aoki understood Mr. Gilbert was working as an attorney for both Dr. Aoki and AMSys in connection with the AMSys-Aoki and AMSys-CI transactions.  Although Baker-McKenzie largely prepared the AMSys-Aoki license, Mr. Gilbert reviewed the entirety of this license with Dr. Aoki and then-CEO of AMSys, Joe Marin.  Dr. Aoki worked only with Mr. Gilbert in preparing the AMSys-CI

---

[9]     Connecticut Innovations, Incorporated is sometimes referred to in the record as "CII."  For clarification, the Court will refer to simply "CI," understanding this is the same entity.

1  license.  (RT Vol. 2 at 201:19–203:4.)

2         25.     Subsequently, Mr. Gilbert identified another group of individuals who owned a

3  corporation called Diabetex interested in purchasing Dr. Aoki's technology to commercialize it

4  by setting up clinics and collecting reimbursement from health insurance companies.  Mr. Gilbert

5  advised on the mechanism for the sale of assets from AMSys to Diabetex via another created

6  entity, AMTech.  (RT Vol. 2 at 206:25–209:11; PX 36 (Diabetex Agreement and Plan of Reorg).)

7         26.     Diabetex got its license in 1999.  By 2001, Diabetex ran out of money to

8  commercialize the technology, had stopped providing the promised funds for patents and

9  research, and as a result was in breach of the agreement.  Mr. Gilbert led the process of

10  terminating Diabetex's agreement.  Ultimately Diabetex agreed to relinquish Dr. Aoki's

11  technology in exchange for return of Dr. Aoki's and others' shares of Diabetex and $150K.  (RT

12  Vol. 2 at 214:22–218:4; 223:17–20; PX 40 (7-16-01 meeting minutes); PX 41 (8-08-01 meeting

13  minutes); PX 43 (9-17-01 meeting minutes).)

14         27.     Phil Gurian (not Mr. Gilbert) ultimately paid the $150,000 that went to Diabetex to

15  accomplish the settlement. (PX 46; PX 63 (Nevada Evid. Hearing Tr.) at 39-41; 115-116; RT Vol.

16  8 at 1368:20–24.)

17         28.     On August 28, 2001, the return of Dr. Aoki's technology was accomplished.  (PX

18  42.)  Although the settlement agreement provides for the return of Dr. Aoki's technology to Mr.

19  Gilbert, Dr. Aoki was informed by Mr. Gilbert, who was acting as his personal lawyer, that he

20  was simply acting as the agent for PAT.  (RT Vol. 2 at 227:23–229:10.)

21         29.     On June 7, 2004, Mr. Gilbert testified in the Nevada action that after the Diabetex

22  rights were terminated, they came back to Dr. Aoki personally and that Dr. Aoki "had everything,

23  not only the licenses rights, he had the control.  He had everything." (PX 63 at 39:1–10; *see also*

24  RT Vol 12 at 2096:13–2100:25; PX 63 at 76–77.)

25         30.     Also, in 2001 Dr. Aoki licensed the subject technology to Pulse Activation

26  Therapies ("PAT"), which would later become Metabolic Industries ("MI").  (PX 39 (Aoki-PAT

27  License Agreement); PX 47 (Aoki-MAT License Agreement).)

28         31.     The Aoki-MI agreement is signed by Dr. Aoki individually and Mr. Gilbert as

9

1  president of MI, indicating Mr. Gilbert acknowledged that the rights to the technology went back

2  to Dr. Aoki following the Diabetex settlement, which rights Dr. Aoki then licensed to MI.  (PX

3  47.)

4       32.    On March 29, 2002, MI entered into a management services agreement with

5  Advanced Diabetes Treatment Centers of Florida ("ADTC") for purposes of starting clinics and

6  developing locations for providing Dr. Aoki's MAT treatment.  The agreement is signed by Mr.

7  Gilbert on behalf of MI.  (PX 55.)

8       33.    On July 17, 2002, ADTC, Dr. Aoki, and Hamilton-May (d/b/a Bionica, Inc.)

9  entered into an agreement assuring ADTC that in the event MI couldn't perform under its

10  management service agreement with ADTC, Dr. Aoki would continue to license his technology to

11  ADTC.  This agreement recites that Dr. Aoki designed, developed, and tested MAT and that Dr.

12  Aoki is the owner of all patent rights that pertain to MAT.  (PX 57, ¶¶ A, B.)  This agreement is

13  signed by Mr. Gilbert on behalf of Hamilton-May.

14       34.    On January 24, 2002, the Resolution of Advanced Metabolic Technologies, Inc.

15  ("AMTech") Debt Agreement was executed by Mr. Gilbert as CEO of MI acknowledging MI is

16  the "new licensee from Thomas T. Aoki, M.D. of those patents and technology related to the

17  procedure known as 'Hepatic Activation,' 'Chronic Intermittent Intravenous Insulin Therapy,'

18  and 'Pulsatile Intravenous Insulin'. . . ."  (PX 52.)

19       35.    Up to the execution of the Diabetex settlement agreement, Dr. Aoki never

20  discussed with Mr. Gilbert nor did he have any discussions with any members of the board of

21  directors of what was then PAT of Mr. Gilbert personally receiving any part of the intellectual

22  property that Diabetex was releasing.  (RT Vol. 2 at 226:5–17.)

23       36.    The Court finds Mr. Gilbert's present claim that certain patent rights transferred to

24  him via the Diabetex settlement is not credible.[10]

25  Bionica Transactions

26       37.    Originally, Dr. Aoki gave insulin pulses using a reverse-engineered Biostator, then

27

---

28  [10]    This is consistent with what the Court understands to be the outcome of the Nevada
    litigation.

10

he used the much simpler AccuPro pump combined with an Epson computer, and thereafter the Bionica pump.  The Bionica pump was discovered when Dr. Aoki sent Mr. Gilbert to a trade show in southern California and he met Vladimir Feingold, the president and owner of an Australian company called Bionica, who had invented an analgesia pump which intravenously infuses painkilling meds.  The pump was approved for analgesia use, but that certification was insufficient for infusing insulin.  Dr. Aoki then met with Feingold at UC Davis and told him what he needed, which was to use the same programming as the AccuPro and Epson computer device.  Dr. Aoki along with Mr. Arcangeli gave Feingold detailed information as to the specifications for the programming of the Bionica pump.  Dr. Aoki understood that the Australian Bionica pump could be reprogrammed as to both pulse frequency and dosage for his use.  (RT Vol. 1 at 140:2–145:25; RT Vol. 10 at 1651:5–1653:4.)

38.    Around 2001 or 2002, Dr. Aoki learned from Mr. Gilbert himself that he had used $100K of MI's money to buy Bionica Australia.  Mr. Gilbert's use of MI funds to buy Bionica, concerns about MI's financial condition especially given Mr. Gilbert's failure to be forthcoming regarding MI's financial information, along with Mr. Gilbert's grant of what Dr. Aoki perceived to be a sweetheart license to his friend, Melanie Kunz, were factors that led Dr. Aoki to request that Mr. Gilbert resign from MI.  On October 28, 2002, Mr. Gilbert resigned from MI.  (RT Vol 1 at 145:22–25; RT Vol. 2 at 198:16–22; 232:3–239:13; 263:11–20; PX 219 (Check for $25,000).)

39.    On February 23, 2005, CI and Bionica entered into a Development Purchase Agreement, whereby Bionica purchased any rights, title, and interest CI had at that time in and to the AMSys-CI development agreement, purportedly stemming from a default of the development agreement.  (PX 66.)  Dr. Aoki, however, had never received written notice of a default of the AMSys-CI license, as required under the Modification License (PX 29) nor had he ever received notice that CI intended to issue a license to Bionica.  (RT Vol. 2 at 286:7–13.)

40.    Even if there had been a properly noticed and uncured default resulting in CI acquiring a license to Dr. Aoki's technology, CI could not have transferred that license to Mr. Gilbert or Bionica without Dr. Aoki's advance written consent, which consent Dr. Aoki never gave.  (PX 24, ¶ 11.1; PX 72 (letter from Aoki to Frank A. Dinucci, President and Executive

1   Director of CI).)

2        41.    Moreover, the rights provided under the development agreement in the event of

3   default could not exceed the rights set forth in the underlying AMSys license.  The only patent

4   then licensed was the '810 patent.  (PX 24; PX 29.)

5        42.    No Defendant, including Bionica, received legitimate licensing rights via the CI-

6   Bionica license.

7        <u>The Remaining Parties</u>

8        43.    Broadly speaking, unless referring to a specific Trina clinic, witnesses referred to

9   "Trina," "Trina Health," and "Trina Corporate" interchangeably throughout trial.[11]  Based on the

10  record as a whole, the Court finds Trina/Trina Health/Trina Corporate was the de facto parent

11  entity of various Trina clinics and was controlled by Mr. Gilbert.  As discussed in more detail

12  throughout these Findings of Fact and Conclusions of Law, Trina Health provided licenses and

13  start-up services such as training, materials, and equipment to various clinics nationwide.  Those

14  clinics, per their respective license agreements, paid fees to Trina Health.  Mr. Gilbert

15  acknowledged the existence of 33 clinics, as discussed below.

16       44.    Trina Health of Newport Beach was one of the licensed clinics identified by Mr.

17  Gilbert.  Trina Health purchased the clinic from Dr. Rose and Mr. McCarthy.  (RT Vol. 11 at

18  1865:6–25.)

19       45.    MedEdCo was the medical training and oversight company for Diabetic

20  Innovations.  (PX 175.)

21       46.    Diabetic Innovations, LLC was an entity formed in Dallas, Texas in 2008 to

22  market Cellular Activation Therapy ("CAT").  (PX 175.)  Melanie Kunz and Gregory Gilbert

23  were members of the management team of Diabetic Innovations.  (*Id.*)

24       47.    Melanie Kunz was a managing member of MedEdCo.  (PX 137.)  She was also a

25  nurse practitioner at the Trina Arizona clinic (RT Vol. 7 at 1128:9–14) and through Trina Health

26  taught the treatment process to the Arizona clinic.  (RT Vol. 11 at 1971:19–22.)

27

28  [11]    The Court will refer to this entity as "Trina Health" herein.

48.     Michael McCarthy, along with Dr. Marc Rose, was among the first to do business as a licensed Trina clinic, under the entity Trina Health of Costa Mesa, which later became Trina Health of Newport Beach.  (RT Vol. 10 at 1714:1–1715:10; RT Vol. 11 at 1865:10–15.)

49.     Marc Rose, M.D., along with Mr. McCarthy, was among the first to do business as a licensed Trina clinic, under the entity Trina Health of Costa Mesa.  (RT Vol. 10 at 1714:1–1715:10; RT Vol. 11 at 1865:10–15.)

50.     Kevin Buckman, M.D. was the medical director of the Trina Sacramento, Roseville, and Hayward clinics at various relevant times.  (RT Vol. 6 at 947:24–948:9.)  In that position, he oversaw the administration of the APT treatment at those clinics.  (RT Vol. 6 at 948:10–19; 962:2–9.)

51.     Timothy Tight was possibly a manager of Trina Health West L.A., but the record is devoid of additional references to this individual.  (RT Vol. 9 at 1497:3–7.)

52.     Faising S. Chui is listed as a manager and organizer of Diabetic Life Pulse of Louisiana, LLC, filed in 2012 with the Louisiana Secretary of State.  (PX 162.)  Diabetic Life Pulse of Louisiana was a Trina Health licensed clinic operating in Shreveport, Louisiana.  (RT Vol. 11 at 1880:16–1881:17.)

53.     Limi Management is listed as a member and ownership interest of Diabetic Life Pulse of Louisiana, LLC, filed in 2012 with the Louisiana Secretary of State.  (PX 162.)

54.     John Mullen, as CEO and president of Life Pulse Health, LLC, signed a license agreement with Trina Health to open and operate a clinic administering APT.  (PX 229.)

55.     Glenn Wilson, though mentioned as being associated with Mr. Mullen, does not appear in the record or in the exhibits admitted at trial in any meaningful way.

56.     Richard Girard, though mentioned as being associated with Mr. Mullen, does not appear in the record or in the exhibits admitted at trial in any meaningful way.

The RQ Patents and Evidence of Infringement

57.     The six so-called RQ patents were provisionally filed in 2000 and issued between 2003 and 2005.  Each patent treats a different complication of diabetes, and the record sometimes refers to them by the condition they aim to treat: (1) heart ('531 patent); (2) wounds ('716 patent);

1    (3) kidney ('342 and '527); and (4) eye and nerve ('736 and '191).  (*See* PX 2–7.)

2          58.      The patents at issue in this litigation (the "RQ patents") are:

3                   •   U.S. Patent No. 6,579, 531 filed June 15, 2001, issued June 17, 2003 ("Method

4                       for treating heart disease and cardiovascular disease in diabetic and non-

5                       diabetic patients").

6                   •   U.S. Patent No. 6,582,716 filed June 15, 2001, issued June 24, 2003 ("Method

7                       for treating wounds, promoting healing and avoiding amputations in diabetic

8                       and nondiabetic patients").

9                   •   U.S. Patent No. 6,613,342 filed June 15, 2001, issued September 2, 2003

10                      ("System and method for treating kidney diseases in diabetic and non-diabetic

11                      patients").

12                  •   U.S. Patent No. 6,613, 736 filed June 15, 2001, issued September 2, 2003

13                      ("System and method for treating eye and nerve diseases in diabetic and non-

14                      diabetic patients").

15                  •   U.S. Patent No. 6,821,527 filed March 19, 2003, issued November 23, 2004

16                      ("System for treating kidney disease in diabetic and non-diabetic patients").

17                  •   U.S. Patent No. 6,967, 191 filed March 19, 2003, issued November 22, 2005

18                      ("System for treating eye and nerve diseases in diabetic and non-diabetic

19                      patients").

20         59.      As is relevant to this litigation, Dr. Aoki also owns the original '810 patent: U.S.

21   Patent No. 4,826, 810 filed March 19, 1987, issued May 2, 1989 ("System and method for

22   treating animal body tissues to improve the dietary fuel processing capabilities thereof").

23         60.      The RQ patents all follow the same steps with the emphasis on looking at the RQs

24   and trying to increase glucose utilization at the affected or targeted tissue site.  (RT Vol. 2 at

25   312:22–24.)

26         61.      Those steps are as follows: (1) determine the RQ baseline of the patient; (2) place

27   a needle or catheter into a hand or forearm vein; (3) infuse saline followed by pumps of insulin,

28   using a (Bionica) pump; (4) pulses are administered every 6 minutes, giving 10 pulses in an hour;

(5) the amount of insulin per pulse ranges from 10 milliunits to as high as 200 milliunits per kilogram body weight; (6) administer oral glucose, ranging from 40 to 100 grams, determined on an individual basis; (7) after each treatment cycle of ten pulses, the patient is given a rest period ("30 minutes or so") to allow the high insulin levels to return to/come close to baseline; (8) a typical treatment day consists of three ten-pulse cycles per day; (9) patients get one treatment day per week, but up to three treatment days or more.  (RT Vol. 2 at 305:16–312:14.)

62. Dr. Aoki testified that these steps are common to all the RQ patents.  (RT Vol. 2 at 312:15–24.)

63. Much of Plaintiffs' evidence of patent infringement points to two exhibits: the Arizona manual (PX 203) and the 2017 Florida Protocol (PX 228).

64. The Arizona manual was used in administering APT in the Arizona clinic.  Dr. Elliott testified that the manual was an initial training document and that it provided a "general description" and they "followed the recommendations" with a few adjustments.  It sets forth the basic protocol of the treatment.  The manual was a collaborative work from other Trina Health clinics and included contributions from the Trina Health of Arizona clinic.  (RT Vol. 7 at 1136:16–23; 1140:11–18; 1143:7–8; 1154:11–18.)

65. Trina Health of Arizona was a licensed Trina Health clinic.  (RT Vol. 11 at 1863:17–23.)

66. Mr. Gilbert also wrote portions of the manual.  (RT Vol. 14 at 2376:4–17.)

67. The Florida protocol was prepared by Natalie Pereyra, a nurse who worked for the Trina Health of Miami clinic, a clinic licensed by Trina Health.  Ms. Pereyra testified that she used a template from the state website and adjusted it with her supervising doctor.  (RT Vol. 6 at 992:1–14; RT Vol. 11 at 1877:20–1878:5.)

68. Nurse Pereyra testified that the actual protocol is much lengthier, but this document contains the "standing orders" between herself and the physician for purposes of administering the treatment, which treatment was called Artificial Pancreas Treatment or Artificial Pancreas System.  (RT Vol. 6 at 1000:6–8; 1005:22–25.)

69. Additionally, there was a training manual in the very beginning that was left for

15

1  them during the training.  The training manual was brought by administrators from Trina Health

2  of Sacramento to the Miami location to assist in setting up the clinic.  (RT Vol. 6 at 1011:6–1012:

3  5.)

4       70.    The Court finds Rebecca Shaffer to be a credible witness.  Ms. Shaffer was a

5  patient at both the St. Louis (aka Chesterfield), Missouri and Scottsdale, Arizona Trina Health

6  clinics.  She was also employed as a sales representative at the Missouri clinic.  And she had a

7  background working in the fitness industry, which provides her with some background

8  understanding of the purposes for measuring VCO2 alone versus production of VCO2 as a ratio

9  to consumption of VO2, also known as RQ.  (RT Vol. 16 at 2538:19–2539:8; 2541:17–2542:4;

10  2554:17–20; 2602:17–2603:3.)

11       71.    It was her understanding that the clinics were using the respiratory quotient

12  ("RQ") as a way of determining that a patient was responding to the treatment.  (RT Vol. 16 at

13  2556:4–25.)  Ms. Shaffer testified that given the importance of RQ, the patients at the clinic held

14  a competition amongst themselves to see who could get to the RQ goal of over .90, i.e. to "100 or

15  1." (RT Vol. 16 at 2609:23–2610:2.)  The Court finds this testimony highly credible.

16       72.    Ms. Shaffer's testimony is corroborated by her own patient records which reflect

17  that the Trina Health clinics were in fact using and recording her RQ.  (*See* PX 244A (recording a

18  .70 RQ).  The rising RQ values as recorded reflected her body's response to the treatment.  (RT

19  Vol. 16 at 2582:16–23.)

20       73.    The license agreements used to set up numerous Trina clinics specifically refer to

21  the patented technology that Defendants claim under the Development Agreement between

22  Bionica and CI.  This reference can only reasonably point to the rights to Dr. Aoki's patented

23  technology.  (*See* PX 94; 95; 98; 99; 104; 105; 108; 109; 229.)

24       74.    Cellular Activation Therapy Clinics, LLC ("CATC") refers to a company set up by

25  Mr. Gilbert and others to license and consult on the opening of clinics.  CATC changed its name

26  to Trina Health.  (RT Vol. 12 at 2043:7–25.)  Despite Mr. Gilbert's refusal to stipulate that

27  Cellular Activation Therapy ("CAT") is interchangeable with APT (RT Vol. 2 at 365:20–22), the

28  Court finds CAT was the first name Mr. Gilbert used to identify the treatment later known as

1    APT.  (*See* PX 11.)

2        75.    In the CAT presentation, under "Equipment Overview," it mentions the treatment

3    uses the "Metabolic Measurement (RQ) machine to monitor metabolism."  The presentation then

4    lists the steps of the treatment, which steps not only mirror the general steps of MAT but also

5    explicitly include use of RQ to assess metabolism.  There is also a photo of an "RQ Machine"

6    alongside a discussion on measuring metabolism.  (PX 11.)

7        76.    The April 1, 2015 Trina Health prospectus given to Alabama clinic investors

8    states, "Metabolic Measurement Carts (made by others) are used to determine the metabolic

9    changes (respiratory measurements) of patients under therapy.  These Carts are also acquired

10   through Bionica, and are used in the clinic."  (PX 112 at Bates 4615.)

11       77.    The 2015 Trina Health article titled, "Introduction to Artificial Pancreas

12   Treatment," of which Mr. Gilbert wrote "every word" also evidences infringement (as well as

13   misrepresentations).  (RT Vol. 12 at 2124:1–2125:3; PX 103.)

14       78.    The article states: "Artificial Pancreas Treatment . . . is the only US FDA cleared

15   safe and effective way to stop the progression of diabetes and in most ways reverse the chronic

16   complications of diabetes. . . . The Artificial Pancreas Treatment is the only treatment which

17   addresses this core problem [of improper metabolism], and does so by mimicking the natural way

18   that a pancreas signals a liver to cause proper metabolism."  (PX 103 at Bates 1103.)

19       79.    The article also states: "Artificial Pancreas System and Artificial Pancreas

20   Treatment are based on many clinical trials and human treatments, using several names including

21   PIVIT, Metabolic Treatment, CIIIT, etc.  They are all part of the evolution of APT."  (PX 103 at

22   Bates 1104.)  Yet Mr. Gilbert testified that MAT is also PIVIT.  (RT Vol. 15 at 2531:4–5.)

23       80.    The article also states that "APT was developed and then tested in a number of

24   university and centers of excellence including Harvard (Joselin) [sic], University of California

25   Davis, University of Arizona, Scripps, Temple University, and the Mayo Clinic, just to name a

26   few . . . ."  (PX 103 at Bates P1105.)  At least Joslin, UC Davis, and Florida were clinical studies

27   done using Dr. Aoki's MAT protocol.  (RT Vol. 12 at 2048:9–2049:11.)  Further, Mr. Gilbert

28   suggests in his testimony he has never done an IRB clinical trial post-Aoki (RT Vol 12 at 2047:2–

2048:13) and so the studies referenced above must necessarily refer to MAT.

81.     The Court finds these statements misleading at best, and suggestive that APT is MAT.  At a minimum, these statements are admissions that APT is derived from MAT.  The Court finds, however, that any claimed differences between APT and MAT are inconsequential, as discussed below.

82.     Finally, the article describes the treatment as follows: "Patients treat for 4-5 hours in the clinic once a week for a few weeks, then a[t] most treat once every two to even three weeks. . . . During a treatment day, three infusions are given with the patient sitting in a recliner chair but still able to walk around etc.  During the treatments, carbohydrates and intravenous insulin are administered using the Bionica programmed infusion device.  The patient stays in the treatment area, and continues to . . . engage in any other passive activity."  (PX 103 at Bates 1105.)  These treatment steps mirror the MAT protocol suggesting at least three treatment sessions at least once a week with IV insulin infusion using a pump and rest periods where the patient can engage in passive activity.

83.     More specifically, the Court finds the following evidence demonstrates infringement of each of the claims of the '531 patent.

| Claim | Evidence of Infringement |
|---|---|
| (1) A method for treating heart disease and cardiovascular disease in diabetic and non-diabetic patients by improving the dietary fuel capabilities and correct an overutilization of free fatty acids comprising the steps of: | • The Arizona manual states treatment addresses neuropathy, wounds, kidney disease, retinopathy, and heart disease. (PX 203 at Bates 3313–3314.)<br>• Nurse Pereyra credibly testified that Mr. Gilbert told her the job at the Trina Health licensed Miami clinic would involve administering a treatment for patients who suffered from diabetes complications.  (RT Vol. 6 at 1006:2–10; RT Vol. 11 at 1877:20–25.)<br>• 2015 Trina Prospectus claims APT "is the only clinically proven safe and effective way to treat all of the complications of diabetes."  (PX 112 at Bates 4596; *see also* PX 11 at Bates 1013.) |

18

| | |
|---|---|
| (a) determining a steady baseline respiratory quotient of a patient and obtaining a subsequent respiratory quotient every 30 minutes, the steady baseline respiratory quotient being two identical consecutive respiratory quotients less than 0.90 measured five minutes apart, | • The Arizona manual describes the necessary use of the VacuMed metabolic measurement cart, which measures VCO2 and VO2.  The manual explains that "this value" provides information on how well the patient is and how he or she is metabolizing fuel sources.  (PX 203 at Bates 3384–3385.)<br>• "After a treatment, this value provides information on how well the patient is overcoming metabolic diseases."  (PX 203 at Bates 3385.)<br>• Dr. Aoki credibly testified that these two measurements necessarily make up the RQ, that the VacuMed automatically calculates the RER or RQ, and that the RQ is the value that provides information concerning how well a patient is responding, not VCO2 and not VO2 alone.  (RT Vol. 2 at 299:4 – 305:25; 314:17–24; 317:5–319:24.)<br>• The Arizona manual discusses assessing carbohydrate metabolism before treatment, as well as finding a pre-treatment baseline VO2 and VCO2.  (PX 203 at Bates 3386, 3387.)<br>• The manual addresses taking a metabolic measurement, which Dr. Aoki indicated is the RQ, at baseline, one hour, and after all treatments.  (PX 203 at Bates 3393; RT Vol. 2 at 332:8–20.)<br>• The Florida Protocol also provides for metabolic measurement at the beginning and end of treatment.  (PX 228 at Bates 5771.)<br>• Nurse Pereyra testified that RQ would be given during the metabolic measurement.  (RT Vol. 6 at 1005:3–6.)<br>• Per Ms. Shaffer's testimony, the patient goal was to achieve an RQ of over .90.  (RT Vol. 16 at 2609:23–2610:2.) |
| (b) having the patient consume a liquid or food containing 60 to 100 grams of | • The Arizona manual discusses glucose load in multiple areas, and specifically |

| | |
|---|---|
| glucose, | notes the goal of the treatments to maintain blood glucose in a certain range and to ingest glucose during each treatment of 70 to 100 grams.  (PX 203 at Bates 3408, 3410.)<br>• The manual also mentions a total of 200 to 300 grams of glucose administered in a treatment session. (PX 203 at Bates 3393.)<br>• Nurse Pereyra additionally testified to the need to keep patient blood glucose levels higher than the norm because the insulin infusions would bring those levels down.  (RT Vol. 6 at 1003:15–19.) |
| (c) administering a pulse of insulin through an intravenous site at a six minute interval of time until the subsequent respiratory quotient shows an improvement over the steady baseline respiratory quotient, the pulse of insulin being 20 to 35 milliunits of insulin per kilogram of body weight for a non-diabetic and a Type I diabetic, the pulse of insulin being 70 to 200 milliunits of insulin per kilogram of body weight for a Type II diabetic, the improvement over the steady baseline respiratory quotient being a respiratory quotient of 0.90 or greater, the subsequent respiratory quotient improvement over the steady baseline respiratory quotient being a measurement of increased glucose utilization by a diseased myocardium, | • The Arizona manual mentions insulin bursts ranging from 10 to 70 mU/kg per burst.  (PX 203 at Bates 3397.)<br>• The Arizona manual and Florida protocol both discuss IV access and use of the Bionica pump.  (PX 203 at Bates 3421, 3396; PX 228 at Bates 5771.)<br>• The manual additionally describes APT as using a "pump that sends pulses of insulin intravenously as the patient drinks glucose."  (PX 203 at Bates 3311.)<br>• The manual provides for 6-minute intervals for pulses.  (PX 203 at Bates 3353, 3398, 3399.)<br>• The Florida protocol outlines pump intervals set every 6 minutes for a total of 10 per cycle.  (PX 228 at Bates 5771.)<br>• Nurse Pereyra testified to the same time interval of pulses.  (RT Vol. 6 at 1003:7–9.)<br>• The Arizona manual acknowledges different ranges of insulin for Type I and Type II, with Type I generally requiring lower doses of insulin and Type II requiring as high as 70mU/kg or above.  (PX 203 at Bates 3381.)<br>• The manual acknowledges doses in a range of 10 to 70 mU/kg.  (PX 203 at Bates 3397.)<br>• Per Ms. Shaffer's testimony, the patient |

| | |
|---|---|
| | goal was to achieve an RQ of over .90. (RT Vol. 16 at 2609:23–2610:2.) |
| (d) allowing the patient to rest one hour, and | • The Arizona manual references a break rest period between sessions of 40 to 60 minutes and 15 to 60 minutes.  (PX 203 at Bates 3313, 3406.) |
| (e) repeating the steps a-d at least three times. | • The Arizona manual provides that a typical clinic visit consists of three one-hour sessions with a break between sessions. (PX 203 at Bates 3313.)<br>• The Florida protocol references three cycles per treatment.  (PX 228 at Bates 5771.)<br>• Nurse Pereyra testified about three-hour sessions.  (RT Vol. 6 at 1002:21–24.) |
| (2) The method of claim 1, wherein the intravenous site further comprises a needle or catheter located in the patient's body, hand or forearm. | • The Arizona manual and Florida protocol both discuss IV access and use of the Bionica pump.  (PX 203 at Bates 3421, 3396; PX 228 at Bates 5771.) |
| (3) The method of claim 1, wherein the pulse of insulin is administered by an intravenous infusion device. | • The Arizona manual and Florida protocol both discuss IV access and use of the Bionica pump.  (PX 203 at Bates 3421, 3396; PX 228 at Bates 5771.) |
| (4) The method of claim 1, wherein the intravenous site is converted to a heparin or a saline lock during step (d). | • n/a |
| (5) The method of claim 1, wherein said steps a–e are repeated at least once a week. | • The Arizona manual indicates treatments are typically once a week, unless and until the time period can be extended.  (PX 203 at Bates 3393.) |
| (6) The method of claim 5, wherein said steps a–e are repeated three or more times a week. | • n/a |

84.     The Court further finds the claims set forth in the '716, '342, '736, '527, and '191 patents are substantially similar if not identical to the claims set forth in the '531 patent detailed above.  To the extent there are any differences, the '531 patent is more limited (such as, for example, by specifying milliunits of insulin administered and/or specifying a wait time of one hour).  The evidence cited above therefore supports a finding of infringement of each of the RQ patents.

///

Additional Evidence of Infringement

85.     Mr. Gilbert stated in a July 3, 2013 declaration filed with this Court that he and Bionica have been using Dr. Aoki's technology with no modifications since at least 2005.  (PX 93.)  Mr. Gilbert testified that the statements made in his declaration are still true and accurate. (RT Vol. 12 at 2116:8–2120:1.)  Mr. Gilbert and Bionica apparently relied on the Development Agreement between Bionica and CI in issuing sublicenses to clinics, but as the Court has already found and explained above, Mr. Gilbert and Bionica did not have a valid license to the subject technology.

86.     Mr. Gilbert additionally testified before this Court that his 2003 declaration in the Nevada action was "all true to this day still."  (RT Vol. 13 at 2154:17.)  That declaration explained that the MTC clinics were using Dr. Aoki's technology.  As read into the record, the declaration states: "From and after May 11th, 2003, MTC began and has continued the process of commencing the commercial rollout of the Metabolic Activation Therapy, specifically, with the knowledge and consent of MI, ADRI, [and] Dr. Aoki . . . .  The clinics are all using the protocols which were first instituted by Dr. Aoki and have been used at the ADRI for many years. These protocols have been unchanged, and to a greater or lesser extent followed at most other sites.  I know of no reason to change these longstanding protocols and, indeed, they are being used by MTC."  (RT Vol. 13 at 2153:21–2154:15.)

87.     Mr. Gilbert's claim that APT is different from MAT and was his own invention — and specifically to the extent he claims an epiphany in 2002 led to the development of APT and use of APT at MTC clinics (see RT Vol 12 at 2085:15–2087:5) — is therefore contradicted by his own prior sworn declaration and is not credible or believable.

Evidence of Use of Slides/Copyright Infringement

88.     On August 23, 2011, Dr. Aoki obtained copyright registration of his MAT presentation.  The copyright is registered with the Copyright Office, number TXu0017772019, and is titled "Metabolic Activation Therapy – History and Current Protocol."  (PX 81 (Copyright Catalog); PX 10A (MAT Presentation Slides).)

89.     Around 2002, this presentation was given to Mr. Gilbert for the sole purpose of

Mr. Gilbert's education, with instructions not to distribute it.  Mr. Gilbert agreed to those conditions.  (RT Vol. 12 at 360:2–362:1.)

90.    Mr. Gilbert acknowledged receiving these slides but disputes the purpose for which he was given them.  More specifically, Mr. Gilbert testified that he was given the slides for the purpose of recruiting doctors and patients.  He also disputes that the slides were given to him in confidence, with the exception of one particular slide.  (RT Vol. 16 at 2646:19–2648:12.)

91.    The Court finds Dr. Aoki's testimony more credible.

92.    The slide deck contains slides of material created by Dr. Aoki from his MAT research, such as photos of patients Dr. Aoki treated and pictorial/graphic representations of the results of his MAT research.  (*See* PX 10A.)  Dr. Aoki created some of the materials from his research and others were obtained from other publications and used as part of a presentation.  (RT Vol. 2 at 359:16–21.)

93.    Dr. Aoki downloaded PX 11 from diabetes.net, a website under the control of Mr. Gilbert, sometime in 2007 or 2008.  Dr. Aoki testified that some of the slides included could only have come from Mr. Gilbert via Dr. Aoki.  (RT Vol. 9 at 1454:7–1460:6.)

94.    PX 11 is a CAT presentation containing a number of reproduced copies of slides from Dr. Aoki's slide deck.  This presentation is evidence that Dr. Gilbert used Dr. Aoki's slides without his permission prior to Dr. Aoki obtaining a copyright in 2011.

95.    The vast majority of the evidence showing infringement after 2011 is contained in the 2015 Trina Health Presentation (PX 112) and the Trina Health APT Presentation (PX 12).  More specifically, PX 112 and PX 12 contain copies of the slides found in Dr. Aoki's copyrighted slide deck, PX 10A, at Bates 5840, 5795, 5802, 5804, 5811, 5808, 5821, 5835, 5836, 5837, 5838, 5823, 5825, 5827, 5828, 5830, 5831.

96.    Dr. Aoki downloaded and printed PX 12 from trinahealth.com within the last two years, which website the Court finds to be controlled by Mr. Gilbert for Trina Health.  (RT Vol. 9 at 1471:12–25.)  PX 12 is attributable to Mr. Gilbert and his entities, Trina Health and Bionica.

97.    Matthew Kalife testified that Mr. Gilbert used the slide deck contained within PX 112 to get new investors for Trina Health.  (RT Vol. 5 at 783:4–18.)  PX 112 is attributable to Mr.

1   Gilbert and his entities.

2       98.     Mr. Gilbert also admits that many of the slides used in the Trina Health video clips

3   were slides from Dr. Aoki's slide deck.  (RT Vol. 12 at 2132:9–15.)

4       99.     Mr. Gilbert testified that at least one of the slides in question was used to show

5   insulin delivery by the Bionica pump.  (RT Vol. 13 at 2367:19–21.)

6       <u>False or Misleading Statements/Misrepresentations</u>

7       100.    Defendant Gilbert made numerous false or misleading statements in the course of

8   promoting APT/CAT that either conflate APT and MAT, imply APT is MAT, or indicate MAT

9   never existed (only APT).  These statements came from Mr. Gilbert individually and as the

10  president, manager, and/or CEO of both Trina Health and Bionica, in which capacity he signed

11  the Trina clinic license agreements (*see, e.g.*, PX 94, 95).

12      101.    Such statements include: using MAT research to support claims about APT (*see*

13  PX 112); using Dr. Aoki's MAT slides and attributing them to APT (*see* PX 11; PX 112); using

14  photos of Dr. Aoki's MAT patients and indicating they were treated with APT (*see* PX 11; PX

15  12; PX 112); claiming APT is the only treatment of pulsatile insulin (*see* PX 11; PX 112);

16  claiming APT has been used for more than 20 years (*see* PX 126); claiming APT is an FDA-

17  approved treatment when only the Bionica pump is FDA-cleared (not approved) (PX 103 at Bates

18  1103).

19      <u>Evidence of Damages</u>

20      102.    Defendants did not produce their financials at any time in course of this litigation.

21      103.    Mr. Gilbert confirmed the existence of at least 33 Trina licensed clinics.  (RT Vol.

22  11 at 1856:10–1899:1; RT Vol. 14 at 2378:8–9.)

23      104.    Mr. Gilbert testified that the number of chairs in these clinics ranged from as few

24  as 2 to as many as 12 to 15.  (RT Vol. 13 at 2196:22–25; 2208:21–24.)

25      105.    The license agreements reflect these clinics generally paid: (1) a $20K per chair

26  license fee (going as high as $22,500 (*see* PX 105) and in at least one instance, a $100K per clinic

27  fee, aside from the chair fee (*see* PX 108)); (2) a one-time $10K training fee; (3) a one-time $500

28  oversight fee; and (4) a royalty fee/cooperation fee ranging from 5% to 13% of gross revenue.

(*See* PX 94; PX 95; PX 98; PX 99; PX 104; PX 105; PX 108 (various Trina Health license agreements).)[12]

106.    At trial, Mr. Gilbert did not recall the aggregate amount of chair fees Trina collected for licensing the 33 clinics.  He did, however, testify that the aggregate royalties collected — by definition, not including chair fees or other upfront fees — were not more than $5,000 total.  (RT Vol. 13 at 2203:1–2204:23.)

107.    Using an average of 8 chairs per clinic based on Mr. Gilbert's recollection of the number of chairs in various (but not all) clinics, the Court can reasonably deduce that Mr. Gilbert and his entities collected approximately the following from the Trina license agreements:

- 33 clinics x 8 chairs x $20,000 = $5,280,000
- 33 clinics x $10K training fee = $330,000
- 33 clinics x $500 oversight fee = $16,500
    - Total:  $5,626,500.

108.    Additionally, the license agreements required licensees to purchase a Bionica pump to administer the patented treatment, defining each clinic to be one pump per chair.  Based on an average of 8 chairs per clinic, the Court estimates each clinic purchased on average 8 pumps at a unit price of $8,750 (RT Vol. 7 at 1150:12–13; RT Vol. 11 at 1904:12–15; RT Vol. 12 at 2026:18–22) to administer the patented treatment, totaling $2,310,000 for 33 clinics.

109.    Dr. Aoki's royalty rate as set forth in his 1984 license agreement with AHS was between 1% and 6% (PX 20); in his 1987 license agreement with AMSys was 5% (PX 24); in his 2001 license agreement with PAT was 5% (PX 30); and in his 2001 license agreement with MI was 5% (PX 47).

110.    The license agreements also required the licensees to purchase a Bionica pump to administer the treatment.  (*See* PX 94; PX 95; PX 98; PX 99; PX 104; PX 105; PX 108 (various license agreements).)  Mr. Gilbert testified that each pump cost $8,750.  (RT Vol. 12 at 2026:18–22.)

---

[12]    The Court acknowledges that Dr. John Elliott testified to different figures but finds the license agreements to be a more reliable source of these particular data points.

1    **II.    CONCLUSIONS OF LAW**

2         <u>Corporate Defendants with Suspended/Forfeited/Revoked Corporate Status</u>

3         1.    An entity with a suspended or forfeited corporate status cannot defend or prosecute

4    civil actions.  Accordingly, default judgment is hereby entered against the following Defendants:

5    Bionica Int.'l, LLC; Diabetic Life Pulse of Louisiana, LLC; Diabetic Life Pulse, Inc.; and Life

6    Pulse Health, LLC.

7         <u>Patent Infringement</u>

8         2.    Patent infringement is a question of fact.  *i4i Ltd. v. Microsoft Corp.*, 598 F.3d

9    831, 849 (Fed. Cir. 2010).  The patentee has the burden of proving infringement by a

10   preponderance of the evidence.  *Duncan Parking Technologies, Inc. v. IPS Group, Inc.*, 914 F.3d

11   1347, 1360 (Fed. Cir. 2019).

12        3.    "[W]hoever without authority makes, uses, offers to sell, or sells any patented

13   invention, within the United States or imports into the United States any patented invention

14   during the term of the patent therefor, infringes the patent."  35 U.S.C. §271(a).

15        4.    As an initial matter, the Court finds no Defendant had legitimate rights to Dr.

16   Aoki's patented MAT treatment via either the Diabetex or CI line of license agreements.  As

17   such, any use of the patents purportedly stemming therefrom constitutes infringement.

18        5.    "[S]tatements of fact contained in a brief may be considered admissions of the

19   party in the discretion of the district court.  [But] [n]ormally failure to contend that an opposing

20   party's admission barred entry of conflicting evidence is a waiver of the argument that the issue

21   was conclusively settled."  *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir.

22   1988).

23        6.    In the event such admissions cannot be considered conclusive, however, they "still

24   operate as adverse evidentiary admissions properly before the district court in its resolution of the

25   factual issue."  *White v. ARCO/Polymers, Inc.*, 720 F.2d 1391, 1396 (5th Cir. 1983).

26        7.    Mr. Gilbert's statement in his July 3, 2013 declaration that he and Bionica have

27   been using Dr. Aoki's technology with no modifications since at least 2005 is therefore taken as

28   evidence that APT is not distinct from MAT and, because any rights derived from Diabetex/CI

1    are invalid, such use constitutes literal infringement on the RQ patents.

2        8.    Indeed, the development agreements themselves, which reference technology that

3    can only be Dr. Aoki's MAT treatment, are further evidence of literal infringement.  The Court

4    finds this evidence highly persuasive, though not necessarily determinative.

5        9.    Aside from an admission of infringement, determining whether a patent has been

6    infringed is generally a two-step analysis.  The first step is claim construction.

7        10.   Per the parties' agreement, no separate claim construction hearing took place in

8    this action.  The claim terms are given their ordinary meaning as they are understood based on the

9    record before the Court.  Indeed, the parties did not and do not dispute the meaning of any terms

10   set forth in the relevant patent claims, and therefore construction is not necessary.

11       11.   Plaintiffs have met their burden of establishing patent infringement with respect to

12   Defendants Gilbert, Trina Health, and Bionica.

13       12.   "[I]nfringement and validity analyses must be performed on a claim-by-claim

14   basis." *Amazon.com, Inc. v. BarnesandNoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001).

15   "An infringement analysis involves the two-step process of construing the claims and comparing

16   the properly construed claims to the accused product." *Tinnus Enterprises, LLC v. Telebrands*

17   *Corp.*, 846 F.3d 1190, 1203 (Fed. Cir. 2017) (internal citation omitted).  "To prevail, the plaintiff

18   must establish by a preponderance of the evidence that the accused device infringes one or more

19   claims of the patent either literally or under the doctrine of equivalents." *Bayer AG v. Elan*

20   *Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).

21       13.   "To prove literal infringement, the patentee must show that the accused device

22   contains every limitation in the asserted claims. . . .  If even one limitation is missing or not met

23   as claimed, there is no literal infringement." *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d

24   1206, 1211 (Fed.Cir.1998).

25       14.   A patent owner "can employ any method of analysis that is probative of the fact of

26   infringement." *Forest Laboratories, Inc. v. Abbott Laboratories*, 239 F.3d 1305, 1312 (Fed. Cir.

27   2001).  A patent owner may rely on direct or circumstantial evidence in proving infringement.

28   *Liquid Dynamics Corp. v. Vaughan Company, Inc.*, 449 F.3d 1209, 1219 (Fed. Cir. 2006).

27

15.     The Court concludes the APT treatment administered at Trina licensed clinics infringed/infringes Dr. Aoki's MAT treatment as set forth in the RQ patents.  Mr. Gilbert, Trina Health, and Bionica are therefore liable for patent infringement.

16.     More specifically with respect to the '531 patent, the Court finds APT infringed on independent Claim 1 and, at a minimum, dependent claims 3 and 5, as based on the evidence set forth in the chart above.

17.     Because each of the RQ patents protects the identical process as directed to specific complications, the same evidence supports the conclusion that the following patent claims were/are also infringed:

- '716 patent: independent claim 1 and, at a minimum, dependent claims 3 and 5.
- '342 patent: independent claim 1 and, at a minimum, dependent claims 3, 4, 7, and 8.
- '736 patent: independent claim 1 and, at a minimum, dependent claims 3, 4, 5, 8, and 9.
- '527 patent: independent claim 1 and, at a minimum, dependent claim 3.
- '191 patent: independent claim 1 and, at a minimum, dependent claims 3, 4, and 5.

18.     "Even when an accused product does not meet each and every claim element literally, it may nevertheless be found to infringe the claim if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Intendis GMBH v. Glenmark Pharmaceuticals Inc., USA*, 822 F.3d 1355, 1360 (Fed. Cir. 2016) (quoting *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 21 (1997)). Infringement under the doctrine of equivalents is a question of fact.  *Id.*

19.     Equivalency should not be considered in a vacuum, and a finding of infringement under the doctrine of equivalents requires a showing that the difference between the claimed invention and the accused product was insubstantial. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608–09 (1950).

28

20.     One way of doing so is by showing on an element-by-element basis that the accused product performs substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patented product. *Intendis GMBH*, 822 F.3d at 1360.  This is known as the "function-way-result" test. *See id.* "Each prong of the function-way-result test is a factual determination." *Id.* at 1361.

21.     "An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was." *Graver Tank & Mfg. Co.*, 339 U.S. at 609.

22.     A second way of showing insubstantial difference between the claimed invention and the accused process is the "insubstantial differences" test. *UCB, Inc. v. Watson Laboratories Inc.*, 927 F.3d 1272, 1284 (Fed. Cir. June 24, 2019).  "Under the insubstantial differences test, '[a]n element in the accused device is equivalent to a claim limitation if the only differences between the two are insubstantial." *Voda v. Cordis Corp.*, 536 F.3d 1311, 1326 (Fed. Cir. 2008).

23.     To the extent the evidence indicates APT was different in slight ways from MAT, those differences are insubstantial.  As discussed above, the steps of APT mirror those of MAT, indicating overall that APT performs substantially the same function (activation of the liver to improve metabolic processing) using substantially the same way (high pulses of insulin concomitant with a glucose meal) to achieve substantially the same result (improved diabetic complications, i.e. eye, wounds, kidney, heart).

24.     More specifically, and on a claim-by-claim level, the Court concludes the following.

25.     To the extent the evidence does not show APT determined a baseline RQ *by two identical consecutive RQs measured 5 minutes apart*, the Court nevertheless concludes APT infringes this claim under the function-way-result test in that APT identified a pre-treatment baseline RQ, meaning APT performed the same function (obtaining a baseline RQ), in the same way (using an RQ machine or its equivalent), to achieve the same result (a baseline RQ of the patient).

26.     To the extent the RQ patents claim a subsequent RQ is taken every 30 minutes,

1   this is an insubstantial difference from APT's claim of measuring the same at one hour and after

2   treatment.

3       27.     To the extent the RQ patents claim the patient consumes 60 to 100 grams of

4   glucose, this is an insubstantial difference from APT's 70 to 100 grams of glucose and APT's 200

5   to 300 grams of glucose total after 3 sessions because the variation is only slight and the amount

6   consumed necessarily varies between patients, as Dr. Aoki testified.

7       28.     Similarly, some of the RQ patents claim that insulin is administered at 20 to 35

8   milliunits per kilogram of body weight and 70 to 200 milliunits per kilogram of body weight.

9   The function, way, and result of APT in administering insulin is the same, regardless of whether

10  APT publications indicate the exact doses.

11      29.     The RQ patents' rest period of one hour is substantially similar to APT's claimed

12  rest period of 40 to 60 minutes.

13      Indirect Infringement, Inducement

14      30.     "Whoever actively induces infringement of a patent shall be liable as an infringer."

15  35 U.S.C. §271(b).  "To prove inducement, the patentee must show direct infringement, and that

16  the alleged infringer 'knowingly induced infringement and possessed specific intent to encourage

17  another's infringement.'"  *i4i Ltd.*, 598 F.3d at 851.

18      31.     Given the decades-long relationship between Mr. Gilbert and Dr. Aoki, and Mr.

19  Gilbert's involvement with Dr. Aoki's patent applications, Mr. Gilbert — and therefore the

20  entities he controlled (i.e. Bionica and Trina Health) — knew of Dr. Aoki's patents, but

21  proceeded to license the technology and open clinics with the specific intent to induce

22  infringement by the downstream licensees.

23      32.     As for specific intent, Mr. Gilbert and his entities claimed they were operating

24  under a license where one did not exist.  They then shifted to the position that APT is somehow

25  different from MAT, but it is not.  Indeed, the license agreements that were entered into

26  specifically reference Dr. Aoki's patent as the subject technology to be used while failing to

27  disclose Dr. Aoki as the actual owner of these patents.  Nor does Mr. Gilbert, have the credentials

28  to invent a wholly new treatment protocol.  The only reasonable conclusion when considering all

30

1    credible evidence above is that Mr. Gilbert's actions evince a specific intent to encourage others

2    to infringe Dr. Aoki's patents.

3              Infringement by the Trina Defendants

4              33.    What is not clear, however, is whether any Trina Defendant aside from Bionica or

5    Trina Health actually infringed the RQ patents.  Indeed, while the record as it pertains to most

6    (but not all) of the Trina Defendants reflects some involvement with Mr. Gilbert, Trina Health,

7    Bionica, and/or one of many Trina clinics, the record is void of any evidence of their direct or

8    indirect infringement.  Consequently, the Court finds all Defendants other than Mr. Gilbert, Trina

9    Health, and Bionica not liable for patent infringement.

10             Patent Validity

11             34.    "A patent shall be presumed valid.  Each claim of a patent (whether in independent

12   or dependent form) shall be presumed valid independently of the validity of other claims;

13   dependent claims shall be presumed valid even though dependent upon an invalid claim.  The

14   burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting

15   it." 35 U.S.C. § 282.  A challenger is required to prove the invalidity of a patent by clear and

16   convincing evidence.  *i4i Ltd.*, 589 F.3d at 848.

17             35.    At trial and in post-trial filings, Defendants seem to claim Dr. Aoki's RQ patents

18   are invalid due to anticipation, obviousness, and prior public use (all claims of prior art

19   generally).

20             36.    "To show that a patent claim is invalid as anticipated, the accused infringer must

21   show by clear and convincing evidence that a single prior art reference discloses each and every

22   element of a claimed invention." *Silicon Graphics, Inc. v. ATI Technologies*, 607 F.3d 784, 796

23   (Fed. Cir. 2010).  A prior art reference does not invalidate a patent if it merely "suggests" the

24   claimed subject matter.  *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1055 (Fed. Cir. 2010).

25   To prove anticipation, the alleged infringer must show that "one skilled in the art would

26   reasonably understand or infer from a [prior art reference] that every claim element is disclosed in

27   that reference." *Id.* (internal citation omitted).

28             37.    Defendants have not provided clear and convincing evidence of invalidity by prior

1    art and have therefore failed to meet their burden.

2          38.    The assertion that the RQ patents were anticipated by prior art embodied in the

3    '810 patent (or elsewhere) has no support in evidence, nor have Defendants attempted to

4    demonstrate that each claim was disclosed in the '810 patent.

5          39.    "A patent for a claimed invention may not be obtained . . . if the differences

6    between the claimed invention and the prior art are such that the claimed invention as a whole

7    would have been obvious before the effective filing date of the claimed invention to a person

8    having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. §103.

9    Obviousness is a question of law based on underlying facts including: (1) the scope and content

10    of the prior art; (2) the differences between the prior art and the claimed invention; (3) the level of

11    ordinary skill in the field of the invention; and (4) any relevant objective considerations of

12    nonobviousness. *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17–18 (1966); *see also*

13    *Mobilemedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1167 (Fed. Cir. 2015).

14          40.    A person of ordinary skill in the art is a hypothetical person who is presumed to

15    have known the relevant prior art at the time of the invention. Factors that may be considered in

16    determining the level of ordinary skill in the art may include: (1) "type of problems encountered

17    in the art;" (2) "prior art solutions to those problems;" (3) "rapidity with which innovations are

18    made;" (4) "sophistication of the technology;" and (5) "educational level of active workers in the

19    field." *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).

20          41.    "One of the ways in which a patent's subject matter can be proved obvious is by

21    noting that there existed at the time of invention a known problem for which there was an obvious

22    solution encompassed by the patent's claims." *KSR International Co. v. Teleflex*, 550 U.S. 398,

23    420–21 (2001). A court should not use the benefit of hindsight in assessing obviousness. *Id.* at

24    421.

25          42.    Obviousness is assessed on a claim-by-claim basis. *Aventis Pharma Deutchsland*

26    *GmbH v. Lupin Ltd.*, 499 F.3d 1293, 1303 (Fed. Cir. 2007).

27          43.    Defendants have not provided clear and convincing evidence of obviousness and

28    have therefore failed to meet their burden. To the contrary, the record supports a finding that the

1    technology patented by the RQ patents was anything but obvious to a person of ordinary skill in

2    the art at the time Dr. Aoki was developing his methodology and protocol.

3        44.    A person is not entitled to a patent if "the claimed invention was patented,

4    described in a printed publication, or in public use, on sale, or otherwise available to the public

5    before the effective filing date of the claimed invention." 35 U.S.C. §102(a)(1).  Under § 102(b)

6    the invention may be sold up to one year before the filing of the patent application.  If on sale

7    "more than one year before the filing of an application for a patent on the governing claims, any

8    issued patent is invalid . . . ."  *Medicines Company v. Hospira, Inc.*, 827 F.3d 1363, 1365 (Fed.

9    Cir. 2016).

10       45.    For determining whether the public use or on-sale bar applies, the Supreme Court

11   had adopted a two-prong test.  *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 67 (1998).  First, the

12   claimed invention must be the subject of a commercial offer for sale and, second, the claimed

13   invention was ready for patenting.  *Id.*

14       46.    "[E]xperimental use negates invalidity under the public use bar."  *Barry v.*

15   *Medtronic, Inc.*, 914 F.3d 1310, 1321 (Fed. Cir. 2019); *see also id.*, at 1337 (dissenting opinion

16   noting that "Even if a patent challenger makes out a *prima facie* case of the on-sale bar, a patentee

17   may negate the bar's application with evidence that the sale was primarily for experimental

18   purposes.").

19       47.    A use may be experimental only if its purpose is: "(1) [to] test claimed features of

20   the invention or (2) to determine whether an invention will work for its intended purpose — itself

21   a requirement of patentability. . . .  Indeed, the experimental use negation of the § 102(b) bar only

22   exists to allow an inventor to perfect his discovery through testing without losing his right to

23   obtain a patent for his invention."  *Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317, 1327

24   (Fed. Cir. 2009).

25       48.    "A use or sale is experimental for purposes of [§] 102(b) if it represents a bona

26   fide effort to perfect the invention or to ascertain whether it will answer its intended purpose.…

27   If any commercial exploitation does occur, it must be merely incidental to the primary purpose of

28   the experimentation to perfect the invention."  *LaBounty Mfg. v. United States Int'l Trade*

33

1   *Comm'n*, 958 F.2d 1066, 1071 (Fed. Cir. 1992) (citation omitted).

2   49.   Courts have considered a number of factors in determining whether a claimed

3   invention was the subject of a commercial offer for sale primarily for purposes of

4   experimentation.  These factors include: (1) the necessity for public testing; (2) the amount of

5   control over the experiment retained by the inventor; (3) the nature of the invention; (4) the length

6   of the test period; (5) whether payment was made; (6) whether there was a secrecy obligation; (7)

7   whether records of the experiment were kept; (8) who conducted the experiment; (9) the degree of

8   commercial exploitation during testing; (10) whether the invention reasonably requires evaluation

9   under actual conditions of use; (11) whether testing was systematically performed; (12) whether

10  the inventor continually monitored the invention during testing; and (13) the nature of contacts

11  made with potential customers.  *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1353

12  (Fed. Cir. 2002).

13  50.   "Whether the on-sale bar applies is a question of law based on underlying factual

14  findings."  *Medicines Company v. Hospira, Inc.*, 827 F.3d 1363, 1365 (Fed. Cir. 2016).

15  51.   Defendants have not provided clear and convincing evidence of prior public

16  use/applicability of the on-sale bar and have therefore failed to meet their burden.

17  52.   To the contrary, all use of MAT before 1999 was experimental and any payment

18  derived therefrom was "incidental to the primary purpose of the experimentation to perfect the

19  invention."  *LaBounty Mfg.*, 958 F.2d at 1071.

20  53.   On balance, the thirteen factors enumerated above indicate Dr. Aoki's treatment of

21  patients for diabetic complications before 1999 was experimental.  As discussed above, Dr. Aoki

22  testified that as of the 1990s, he was indeed using the RQ, but on an experimental basis.  He had

23  not yet reduced it to an actual treatment methodology as his focus was on improving glucose

24  control.  He had not settled on the final adjustments for how often he was going to measure RQ

25  and how to address the treatment if he was looking for other physiological results outside of

26  glucose control.  In the late 1990s Dr. Aoki noticed that despite glucose control getting worse,

27  some of the complications he was studying were stable.  Dr. Aoki testified that specifically after

28  1999, he decided to do a baseline RQ followed by an RQ after one, two and three hours.  He also

1   increased the amount of pulsed insulin and frequency of treatment days and began looking to see

2   if the complications were responding to these changes, which they did.  Prior to 1999, Dr. Aoki's

3   focus was still on improving glucose control and any use of RQ up to that point was

4   experimental.  Dr. Aoki retained control over the testing and, given the nature of both the industry

5   and the invention, it is logical that extensive testing was prudent.

6          54.     None of the exhibits relied upon by Defendants negate Dr. Aoki's testimony that

7   prior to 1999, he was performing his treatment using RQ to treat diabetic complications on an

8   experimental basis and had not yet reduced to practice the steps for the complications that were

9   ultimately patented.  Dr. Aoki was treating patients and focusing on blood glucose control prior to

10  1999.  He wasn't charging for treatment of complications.

11         Copyright Infringement

12         55.     The Copyright Act grants the copyright owner the exclusive right to reproduce a

13  copyrighted work, to distribute copies of the work, and to authorize reproduction or distribution.

14  *See* 17 U.S.C. §106(1), (3).  To prevail on a claim of copyright infringement, a plaintiff must

15  prove: (1) ownership of a valid copyright and (2) that the defendant violated at least one exclusive

16  right granted to plaintiff under 17 U.S.C. §106.  *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d

17  1004, 1013 (9th Cir. 2001).

18         56.     Defendants argue many — but not all — of Dr. Aoki's slides present factual data

19  that is not properly copyrightable.  They also assert any use falls within the fair use doctrine.

20         57.     "Unlike a patent, a copyright gives no exclusive right to the art disclosed;

21  protection is given only to the expression of the idea — not the idea itself." *Mazer v. Stein*, 347

22  U.S. 201, 217 (1954).

23         58.     "[T]he fair use of a copyrighted work, including such use by reproduction in

24  copies . . . or by any other means specified by that section, for purposes such as criticism,

25  comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or

26  research, is not an infringement of copyright."  17 U.S.C. § 107.

27         59.     In determining whether the use made of a work in any particular case is a fair use,

28  the factors to be considered shall include: (1) the purpose and character of the use, including

35

whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.  17 U.S.C. § 107.  The court is to consider and weigh the factors together, not in isolation, and in light of the purpose of copyright to promote science and the arts. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994).

60.     The proponent of fair use has the burden of demonstrating fair use.  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994).

61.     Defendants concede that, at a minimum, the slides containing photographs of Dr. Aoki's patients are copyrightable.  Additionally, the Court finds Dr. Aoki's body of work as a whole is an expression of his ideas and innovation, he was not simply reproducing facts.

62.     The record establishes that the use of the slides in various contexts, as set forth in the findings of fact, was not fair use.  Indeed, in light of the Court's finding of patent infringement it is clear Mr. Gilbert's use of the slides was not "transformative."  Rather, while he may have added to certain images, the images are nonetheless simply copied and used as if the findings were the result of APT.  The slides themselves represent and reflect Dr. Aoki's life's work, including the results of studies surrounding his MAT treatment.  Mr. Gilbert used those images for the commercial purpose of soliciting and informing potential investors about Trina, Bionica, and APT.  Defendants put forth no evidence concerning the effect of their use on the market for or value of the copyrighted work but based on the evidence the Court concludes that, at best, Mr. Gilbert's use caused confusion in the market by representing the slides were the product of APT and not MAT.

63.     Plaintiffs have sufficiently met their burden of proving Dr. Aoki's ownership of a valid copyright in the MAT slide deck (PX 10A) and have further proved Defendants Gilbert, Bionica, and Trina Health have reproduced the copyrighted work in violation of 17 U.S.C. § 106(1).  Defendants have failed to meet their burden of establishing any use was a fair use and therefore Mr. Gilbert, Bionica, and Trina Health are liable for copyright infringement.

64.     The record is devoid of evidence of copyright infringement on the part of the other

36

Trina Defendants.

### False and Misleading Advertising and Unfair Competition: Lanham Act

65.     The following five elements make up a false advertising claim under § 43(a) of the Lanham Act, 15 U.S.C. §1115(a): (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products. *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1110 (9th Cir. 2012).

66.     To constitute a statement made in a commercial advertisement, the statement must be: (1) commercial speech; (2) by the defendant who is in commercial competition with the plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services; and (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.  The representations need not be made in a "classic advertising campaign," but may consist instead of more informal types of "promotion." *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1054 (9th Cir. 2008).

67.     The Act distinguishes between advertisements that are literally false and those that are literally true, but misleading.  When the advertising is literally false, a court may grant relief without reference to the advertisements' impact on the buying public.  *In re Century 21 RE/MAX Advert. Claims Litig.*, 882 F. Supp. 915, 922 (C.D. Cal. 1994).

68.     Where a statement is not literally false, but is only misleading in context, proof that the advertising actually conveyed the implied message and thereby deceived a significant portion of the consuming public is required.  *William H. Morris Co. v. Group W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995).  The only exception to this proof requirement arises when the plaintiff intentionally deceives consumers.  *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 209 (9th Cir. 1989).

69.     Mr. Gilbert, individually and in his capacity as president, manager, and/or CEO of Bionica, and/or Trina Health made statements about APT that are both literally false and/or misleading in various APT promotional materials.  Where those statements were literally false — as in, most obviously, claiming APT was FDA-cleared, claiming certain patient outcomes were the result of APT when they depicted MAT results, and claiming APT was the only treatment of its kind — the Court need not consider the impact of those statements on the public.  *See In re Century 21 RE/MAX Advert. Claims Litig.*, 882 F. Supp. at 922.

70.     To the extent certain statements by Defendants were not literally false but were misleading — as in, for example, construing the claim that APT was the only treatment to mean that APT was being administered under a purported license agreement to the MAT technology, and APT and MAT are therefore the same (and only) treatment — the Court finds such statements to be intentionally deceptive and therefore within the exception set forth in *Harper House*, 889 F.2d at 209.

71.     The record supports a finding that Mr. Gilbert made the above statements individually and on behalf of Bionica and Trina Health knowing they were false and with the intent to deceive prospective patients and investors.  That deception was material in that FDA clearance, patient outcomes, and exclusivity, for example, are likely to influence both investors' and patients' decisions.

72.     The false or misleading statements have or are likely to injure Dr. Aoki and ADRI by lessening their goodwill and any goodwill associated with MAT.  Indeed, Mr. Gilbert and Trina have infringed on Dr. Aoki's patents and used that technology to set up their own clinics, intentionally muddying the waters concerning who is the inventor and rightful owner of the patented technology.  Mr. Gilbert's scheme to open Trina clinics and mislead patients and investors into believing either (1) that APT is the only FDA cleared treatment which has itself undergone decades of studies, and/or (2) that APT and MAT are the same, certainly has the effect of tarnishing Dr. Aoki's reputation concerning his research and protocol.

73.     There is no evidence in the record indicating any other Trina Defendant made any false or misleading statement.

74.     To the extent such false advertising constitutes unfair competition under the Lanham Act, the same findings of fact apply to the latter, and Mr. Gilbert and Trina are liable for the same.

FAL and UCL: Cal. Bus. & Prof. Code §§ 17500 and 17200

75.     California's False Advertising Law ("FAL") prohibits the dissemination of false or misleading statements in connection with advertising.  Cal. Bus. & Prof. §17500.  "Section 17500 has been broadly construed to proscribe 'not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'"  *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal.App.4th 663, 679 (2006) (citation omitted).

76.     "Actual reliance, or causation, is inferred from the misrepresentation of a material fact."  *Chapman v. Skype, Inc.*, 220 Cal.App.4th 217, 229 (2013) (citing *In re Tobacco II Cases*, 46 Cal.4th 298, 327 (2009).

77.     "A misrepresentation is judged to be 'material' if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question . . . ."  *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 332-333 (2011) (internal citations omitted).

78.     Cal. Bus. & Prof. Code § 17200 defines "unfair competition" to include "any unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising" as well as any act that violates California's FAL.  A violation of the FAL therefore also constitutes a violation of the UCL.  *Kasky v. Nike, Inc.*, 27 Cal.4th 939, 950 (2002).

79.     Additionally, the UCL covers the following theories of liability: (1) unlawful business acts or practices; (2) unfair business acts or practices; (3) fraudulent business acts or practices; and (4) unfair, deceptive, untrue or misleading advertising.  *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 180 (1999).

80.     To prevail on a claim under the FAL and UCL, a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) show that the economic injury was the result of, i.e., caused by, the unfair business

1  practice or false advertising that is the gravamen of the claim." *Kwikset Corp.*, 51 Cal.4th at 322.

2  This is a narrower standing requirement than Article III's actual injury requirement. *Id.*

3      81.    "There are innumerable ways a plaintiff may demonstrate economic injury,

4  including the following: [a] plaintiff may (1) surrender in a transaction more, or acquire in a

5  transaction less, than he or she otherwise would have; (2) have a present or future property

6  interest diminished; (3) be deprived of money or property to which he or she has a cognizable

7  claim; or (4) be required to enter into a transaction, costing money or property, that would

8  otherwise have been unnecessary.  Courts have also found lost sales, revenue, market share, and

9  asset value sufficient to allege an economic injury." *Obesity Research Institute, LLC v. Fiber*

10 *Research Int'l, LLC*, 165 F. Supp. 3d 937, 947–48 (S.D. Cal. 2016).

11     82.    Plaintiffs have not met their burden of establishing an economic injury caused by

12 Defendants' false advertising.  While Plaintiffs may otherwise be entitled to the profits certain

13 Defendants unlawfully garnered, Plaintiffs have proffered no evidence that they lost profits, were

14 unable to open clinics, or otherwise lost money or property as a result of the deceptive statements

15 discussed above, as required under the UCL and FAL.  Although goodwill is a protected property

16 interest and harm to goodwill is a cognizable injury, *see Soranno's Gasco, Inc. v. Morgan*, 874

17 F.2d 1310, 1316 (9th Cir.1989), Plaintiffs presented no evidence of the value of their goodwill or

18 an economic harm stemming from the loss of goodwill.

19     83.    To the extent Plaintiffs' UCL claim is premised not on false advertising but on the

20 underlying patent and/or copyright infringement, such claim is preempted by federal law.

21 *Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*, No. CV 15-769 PSG (SSX), 2015 WL

22 12731929, at *7–8 (C.D. Cal. May 8, 2015) ("[T]he alleged unfair conduct is simply Defendants'

23 [actions] that infringe on Plaintiff's patent. This theory of wrongful conduct is not 'qualitatively

24 different' than a claim for patent infringement based on that conduct; therefore, the unfair

25 competition claims premised on this theory are preempted by the Patent Act.")

26     84.    As a result, the Court finds Plaintiffs have not sufficiently proven their claims

27 arising under the UCL or FAL as asserted against any Defendant.

28 ///

1    Breach of Fiduciary Duty and Confidentiality as to Mr. Gilbert

2        85.    The elements of a claim for breach of fiduciary duty are the existence of a

3    fiduciary relationship, breach of fiduciary duty, and damages.  *Oasis West Realty, LLC v.*

4    *Goldman*, 51 Cal.4th 811, 820 (2011).  Among those fiduciary obligations are the duties of

5    loyalty and confidentiality, which continue in force even after the representation ends.  *Id.*

6        86.    "[A]n attorney is forbidden to do either of two things after severing [the]

7    relationship with a former client.  [The attorney] may not do anything which will injuriously

8    affect [the] former client in any matter in which [the attorney] formerly represented [the client]

9    nor may [the attorney] at any time use against [the] former client knowledge or information

10   acquired by virtue of the previous relationship."  *Id.* at 821 (citations omitted).

11       87.    A confidential relationship exists between two persons "when one has gained the

12   confidence of the other and purports to act or advise with the other's interest in mind" and "may

13   exist although there is no fiduciary relation" and "is particularly likely to exist where there is a

14   family relationship or one of friendship . . . ."  *Davies v. Krasna*, 14 Cal.3d 502, 510 (1975).  A

15   "confidential relationship exists when trust and confidence are reposed by one person in the

16   integrity and fidelity of another."  *Estate of Sanders*, 40 Cal.3d 607 (1985) (citations omitted).  It

17   is not necessary that "there be an extended period of business or accommodation transactions or

18   dealings between persons in order for a confidential relationship to be established between them."

19   *Id.* (citations omitted); *see also Richelle L. v. Roman Catholic Archbishop*, 106 Cal.App.4th 257,

20   271 (2003) (citations omitted) ("Technically, a fiduciary relationship is a recognized legal

21   relationship such as . . . attorney and client, whereas a confidential relationship may be founded

22   on a moral, social, domestic, or merely personal relationship as well as on a legal relationship.")

23       88.    The Court finds Mr. Gilbert breached his fiduciary duty and duty of confidentiality

24   to Dr. Aoki and ADRI.

25       89.    The record establishes the following: Mr. Gilbert was the attorney for ADRI and

26   Dr. Aoki personally for many years.  In that capacity, he worked closely with Dr. Aoki and

27   ADRI, and obtained confidential information regarding Dr. Aoki's technology (which would

28   ultimately be embodied in the RQ patents).  Mr. Gilbert advised on the formation of a number of

1    business entities to commercialize Dr. Aoki's technology and drafted and reviewed documents in

2    connection with that enterprise, spanning multiple business entities.  Mr. Gilbert obtained a copy

3    of Dr. Aoki's MAT slides with instructions not to disseminate.  Put most succinctly, the

4    relationship between Dr. Aoki and Mr. Gilbert deteriorated beginning in or around 2002.

5    Thereafter, Mr. Gilbert began opening clinics using Dr. Aoki's technology.  He used Dr. Aoki's

6    slides to promote his enterprise, both before and after they were copyrighted.  Mr. Gilbert claimed

7    and still claims he was operating under a license agreement from CI that he concealed from Dr.

8    Aoki and which the Court ultimately finds invalid.  Mr. Gilbert also claimed he obtained license

9    rights via the Diabetex settlement, which the Court also finds invalid.  Mr. Gilbert also claims to

10    be operating under a new technology that he himself invented.  The Court finds this to be

11    disingenuous as well.

12         90.    These facts support the conclusion that Mr. Gilbert used information and

13    knowledge gained from his decades-long relationship with ADRI and Aoki to his former clients'

14    detriment, even beyond the scope of Plaintiffs' federal law claims.  This amounts to a breach of

15    both fiduciary duty and confidentiality.

16    **III.    REMEDIES**

17              Patent Infringement Remedies

18         1.    Upon a finding of patent infringement, "the court shall award the claimant

19    damages adequate to compensate for the infringement, but in no event less than a reasonable

20    royalty for the use made of the invention by the infringer, together with interest and costs as fixed

21    by the court."  35 U.S.C. §284.

22         2.    The patentee has the burden of proving damages and must do so by a

23    preponderance of the evidence.  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed.

24    Cir. 2009).  "Two alternative categories of infringement compensation are the patentee's lost

25    profits and the reasonable royalty he would have received through arms-length bargaining."  *Id.*

26         3.    It does not appear Plaintiffs seek lost profits, nor is there evidence in the record to

27    establish such a figure.

28         4.    "A reasonable royalty may be based upon an established royalty, if there is one, or

42

1   if not, upon the supposed result of hypothetical negotiations between the plaintiff and defendant.

2   The hypothetical negotiation requires the court to envision the terms of a licensing agreement

3   reached as the result of a supposed meeting between the patentee and the infringer at the time

4   infringement began." *Minks v. Polaris Industries, Inc.*, 546 F.3d 1364, 1372 (Fed. Cir. 2008).

5        5.     This approach typically includes consideration of the "*Georgia-Pacific* factors," a

6   set of factors set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 116, 1120

7   (S.D.N.Y. 1970).  *See, e.g., Lucent Technologies v. Gateway*, 580 F.3d 1301, 1324 (Fed. Cir.

8   2009).

9        6.     *Georgia-Pacific* outlines fifteen factors that may be considered.  As is relevant

10   here, two of those factors are: (1) the royalties received by the patentee for the licensing of the

11   patent in suit, proving or tending to prove an established royalty; and (2) the rates paid by the

12   licensee for the use of other patents comparable to the patent in suit.  *Georgia-Pacific Corp.*, 318

13   F. Supp. at 1120.

14        7.     Damages awarded for patent infringement "must reflect the value attributable to

15   the infringing features of the product, and no more." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d

16   1201, 1226 (Fed. Cir. 2014).

17        8.     Apportioning patent infringement damages ensures that patentees are compensated

18   only for the value of what they invented.  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292,

19   1318 (Fed. Cir. 2011) (The patentee "must in every case give evidence tending to separate or

20   apportion the defendant's profits and the patentee's damages between the patented feature and the

21   unpatented features, and such evidence must be reliable and tangible, and not conjectural or

22   speculative . . . .").

23        9.     "The entire market value rule allows a patentee to assess damages based on the

24   entire market value of the accused product only where the patented feature creates the 'basis for

25   customer demand' or 'substantially create[s] the value of the component parts.'" *Id.* (citing

26   *Lucent Techs.*, 580 F.3d at 1336.)

27        10.    As a preliminary matter, the Court notes the record as a whole is painfully lacking

28   in terms of concrete evidence of damages.  The parties' respective proposed findings of fact and

43

1    conclusions of law contribute little to the discussion of remedies in general.  Despite a finding of

2    liability, the Court can only award damages that are sufficiently established by Plaintiffs.  The

3    Court is acutely aware, however, that this void is caused largely by Defendants' refusal to

4    produce financial records, even after a protective order was in place and even after the magistrate

5    judge issued sanctions in connection with a failure to produce discovery.

6         11.    Here, the evidence in the record includes two kinds of license agreements that are

7    potentially relevant to determining a reasonable royalty.

8         12.    First, Dr. Aoki licensed the subject technology first to PAT (PX 39) and then to

9    MI (PX 47) in 2001.  Those licenses were intended to commercialize Dr. Aoki's treatment, and

10   specifically cover what at that time were identified as patent applications for the RQ patents.  The

11   royalty rate set forth in those agreements is a running royalty of 5% of all commercial sales.

12        13.    Second, Trina Health (via Mr. Gilbert and Bionica) purported to license the same

13   subject technology to various clinic entities from at least 2013 to 2016 (PX 94, 95, 98, 99, 104,

14   105, 108).  Based on the seven examples before the Court, those license agreements provide for

15   the payment of chair fees, oversight fees, and training fees, in addition to a running royalty of 5%

16   to 13% of gross revenue.  There were 33 clinics in all.

17        14.    In attempting to fashion a reasonable royalty, the Court essentially attempts to

18   construe what a license between Plaintiffs and Defendants Gilbert, Trina Health, and Bionica for

19   the subject technology would have looked like.  While Plaintiffs urge the Court to find

20   Defendants' various clinic licenses are the best evidence of a reasonable royalty, including the

21   start up fees for the right to practice the claimed invention, the Court finds these license

22   agreements are not sufficiently comparable to the hypothetical license between Plaintiffs and

23   Defendants.  To the contrary, and even though those licenses purported to license the same

24   technology, those license agreements were actually sub-licenses, entered as a means of starting

25   treatment clinics.  Had Plaintiffs and Defendants entered into a valid agreement whereby

26   Plaintiffs licensed the subject technology to Defendants, it is more likely such a license would

27   provide Defendants the right to sub-license the technology and open clinics (as they did without

28   such rights), and would provide a more standard royalty to Plaintiffs.  Indeed, Dr. Aoki's license

1   to MI was for the purpose of MI then contracting with ADTC to open clinics.  The Court can

2   conceive of a similar arrangement between Plaintiffs and Defendants here for the ultimate

3   purpose of starting Trina clinics.[13]

4        15.    The best evidence of a reasonably royalty is therefore the established royalty set

5   forth in Dr. Aoki's licenses to PAT and MI, both of which provide commercialization rights to

6   the licensee in exchange for a royalty of 5% of all Commercial Sales [as defined] based on the

7   Net Selling Price or Net Revenues [as defined].  (*See* PX 39, PX 47.)

8        16.    Determining a base for that royalty rate is a difficult task due to the lack of

9   evidence of financials in this matter.  The Plaintiffs have sufficiently proven, however, that

10  Defendants collected $7,936,500 in chair fees, training fees, oversight fees, and pump sales across

11  the 33 clinics.  Mr. Gilbert also testified that the aggregate royalties collected from all clinics —

12  by definition, not including chair fees or other upfront fees — were not more than $5,000 total.

13  The Court finds the entirety of this sum was garnered as a result of the infringement under the

14  entire market rule because the RQ patents substantially create the value of the license agreements.

15       17.    As Defendants proffered no evidence in the way of costs to offset those figures,

16  the Court concludes a total of $7,941,500 is an appropriate base.  Using the reasonable royalty of

17  5%, Plaintiffs are entitled to damages totaling $397,075 for Defendants' infringement of the

18  patents at issue.

19       18.    The Court may increase damages up to three times the amount found.  35 U.S.C. §

20  284.

21       19.    Such an enhancement is "designed as a 'punitive' or 'vindictive' sanction for

22  egregious infringement behavior.  The sort of conduct warranting enhanced damages has been

23  variously described in our cases as willful, wanton, malicious, bad-faith, deliberate, consciously

24  wrongful, flagrant . . . ."  *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016).

25       20.    The Court finds the record supports an enhancement of three times the amount

26  _____

27  [13]    Given the bad blood between the parties, the Court is aware such an agreement would not
    have actually taken place at the time of the infringement.  But that is not relevant to the
    hypothetical negotiations discussed herein, which presume the parties would enter into an arm's
28  length transaction.

45

1    found.  Mr. Gilbert used his position as a fiduciary to garner access to and understanding of Dr.

2    Aoki's technology which ultimately allowed him to infringe the patents, demonstrating bad-faith.

3    Moreover, his conduct in first claiming a purported license right to the technology, withholding

4    the existence of the CI-Bionica license, opening clinics using the patented technology, and

5    claiming the treatment effects of MAT to be those of APT demonstrate willful and consciously

6    wrongful acts.  Treble damages therefore amount to $1,191,225.00.

7         21.    The Court may award reasonable attorney fees to the prevailing party in

8    exceptional cases.  35 U.S.C. § 285.

9         22.    An exceptional case is one that "stands out from others with respect to the

10   substantive strength of a party's litigating position (considering both the governing law and the

11   facts of the case) or the unreasonable manner in which the case was litigated."  *Octane Fitness,*

12   *LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014).   The court should consider the totality

13   of the circumstances and the prevailing party must show entitlement to an award by a

14   preponderance of the evidence.

15        23.    This is an exceptional case meriting an award of attorney's fees.  Defendants

16   admitted to infringing Dr. Aoki's patents early on in this case.  The subsequent downstream

17   licenses even explicitly reference Dr. Aoki's patents and Dr. Aoki's technology as the source of

18   the APT technology.  Defendants' subsequent reversal of position that APT is not MAT is not

19   credible.  And Defendants' refusal to produce any financial documents also support a finding of

20   exceptional circumstances.  Reasonable attorney's fees will be awarded.

21        24.    The Court may grant an injunction "in accordance with the principles of equity to

22   prevent the violation of any right secured by patent, on such terms as the court deems

23   reasonable."  35 U.S.C. § 283.

24        25.    "According to well-established principles of equity, a plaintiff seeking a

25   permanent injunction must satisfy a four-factor test before a court may grant such relief.  A

26   plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies

27   available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that,

28   considering the balance of hardships between the plaintiff and defendant, a remedy in equity is

1   warranted; and (4) that the public interest would not be disserved by a permanent injunction."

2   *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

3         26.    "A plaintiff's past willingness to license its patent is not sufficient per se to

4   establish lack of irreparable harm if a new infringer were licensed.  *See eBay*, 547 U.S. at 393,

5   126 S.Ct. 1837 (rejecting the district court's conclusion that 'a plaintiff's willingness to license its

6   patents and its lack of commercial activity in practicing the patents would be sufficient to

7   establish that the patent holder would not suffer irreparable harm if an injunction did not issue')."

8   *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008).

9         27.    Plaintiffs have demonstrated their entitlement to a permanent injunction.

10   Defendants' use of Dr. Aoki's MAT treatment under the guise of a different name has caused

11   irreparable injury to Dr. Aoki and ADRI for which monetary damages are insufficient.  Dr. Aoki

12   is the inventor of the MAT treatment, for which he spent his entire career developing.  The Court

13   has found there is no substantial distinction between APT and MAT, and that patients and

14   investors were lulled into falsely believing that APT was invented by Mr. Gilbert.  A lack of

15   proper oversight led to clinics modifying the treatment in some instances, creating a "wild west of

16   medicine" and resulting in adverse consequences to patients.  (*See* RT Vol. 16 at 2625:15–21.)

17   Absent an injunction, these practices will likely continue, and Plaintiffs will likely continue to

18   suffer irreparable harm (at a minimum to their name, reputation, and goodwill) for which

19   royalties from a license would not compensate.

20         28.    The balance of hardships inquiry oftentimes compares the relative size of the

21   parties and their revenue sources in assessing the effect of granting or denying an injunction.  *See*

22   *i4i Ltd.*, 598 F.3d at 862.  In this case, the record overall reflects that the subject technology is at

23   the heart of both Dr. Aoki and Mr. Gilbert's enterprises.  An injunction would no doubt largely

24   impact Mr. Gilbert and Trina Health to the extent any active clinics would cease to operate.

25   Nonetheless, the Court finds the hardships tip in favor of Dr. Aoki.  MAT is the result of Dr.

26   Aoki's life's work.  The Trina clinics, by practicing what they purport to be APT, essentially

27   compete with Dr. Aoki's MAT treatment by using that treatment and intentionally conflating it or

28   calling it their own.  While an injunction is not an automatic result of a patent infringement, the

47

1    Court finds Dr. Aoki is entitled to possess the right to exclude others from using his property.

2        29.    The Court has carefully considered the public interest in this matter.  One thing the

3    parties seem to agree on is the fact that the treatment generally benefits patients.  Nonetheless, the

4    evidence reflects that a lack of oversight at the clinics licensed by Trina Health resulted in

5    negative patient outcomes in some cases, indicating the public would be better served by the grant

6    of an injunction to halt operations of illegitimately licensed clinics.

7        Copyright Infringement Remedies

8        30.    The Copyright Act authorizes an award of actual damages plus any profits

9    attributable to the infringement not taken into account in calculating the actual damages to the

10   plaintiff.  17 U.S.C. § 504(b).  Alternatively, the copyright owner may elect to recover an award

11   of statutory damages, as Plaintiffs here have done.  *Id.* at § 504(c)(1).

12       31.    The Act provides for statutory damages of up to $30,000 per infringed work.  *Id.*

13   Where the copyright owner proves infringement was willful, the Act authorizes enhanced

14   statutory damages of up to $150,000 per infringed work.  *Id.* §504(c)(2).  Willfulness may be

15   found where the defendant's infringing actions are undertaken either with knowledge that the

16   conduct constitutes infringement or with reckless disregard for the copyright owner's rights.  *See*

17   *In re Barboza*, 545 F.3d 702, 707–08 (9th Cir. 2008).  The court has broad discretion to determine

18   the amount of statutory damages.  *Peer Intern. Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1336

19   (9th Cir. 1990).

20       32.    The evidence demonstrates that this is not a situation of isolated, innocent

21   instances of infringement, but multiple instances of willful unauthorized uses.  Even after this

22   lawsuit was filed in 2011, Defendants continued to use Dr. Aoki's copyrighted slides in

23   promoting APT.  Most glaringly, they used the foot wound photos of Dr. Aoki's patient whom he

24   treated with MAT and which photos he copyrighted, to claim that the patient was treated with

25   APT rather than MAT.  These facts demonstrate Defendants knew their conduct was unlawful or

26   at minimum engaged in reckless conduct sufficient to support a finding of willfulness.  As such,

27   the maximum statutory damages for willful infringement is appropriate.

28       33.    The Copyright Act authorizes a permanent injunction to prevent future

48

1    infringement where plaintiff has demonstrated: "(1) that it has suffered an irreparable injury; (2)

2    that remedies available at law, such as monetary damages, are inadequate to compensate for that

3    injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a

4    remedy in equity is warranted; and (4) that the public interest would not be disserved by a

5    permanent injunction."  17 U.S.C. § 502(a); *see also*, *eBay Inc.*, 547 U.S. at 391–92.

6         34.    For the same reasons discussed above in the context of patent infringement, the

7    Court finds Plaintiffs have suffered an irreparable injury as a result of infringement of the

8    protected copyright and that monetary damages provide inadequate compensation.  Indeed, the

9    copyright infringement demonstrated by Plaintiffs goes hand-in-hand with the infringement of Dr.

10   Aoki's patents.  Dr. Aoki's copyrighted slide deck represents the results of years of studies

11   concerning MAT, and Defendants use of the slides for promotion of APT deceived investors and

12   patients.  Continued use is likely to have the same result, also indicating the public interest favors

13   an injunction.  The balance of hardships tips in favor of Plaintiffs as there is no potential harm to

14   Defendants if they are forced to cease use of copyrighted materials to which they have no right.

15        35.    The Copyright Act permits the court to award full costs and reasonable attorney's

16   fees.  17 U.S.C. § 505.

17        36.    A court may not award attorney's fees as a matter of course, but rather, must make

18   a more particularized, case-by-case assessment.  *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533

19   (1994).

20        37.    Objective reasonableness is an important but not controlling factor in assessing

21   whether to award fees.  "Although objective reasonableness carries significant weight, courts

22   must view all the circumstances of a case on their own terms, in light of the Copyright Act's

23   essential goals."  *Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 1989 (2016).

24        38.    As stated above, the record demonstrates Mr. Gilbert, Bionica, and Trina Health

25   have willfully infringed the copyright at issue here and continued to do so even after this action

26   was filed.  Moreover, even if Defendants were able to put forth a reasonable defense of fair use of

27   the slides in another (hypothetical) context, Defendants' specific use of the slides as

28   representative of APT is egregious and such repeated infringement should be deterred.  *See id.*

                                                 49

1    Reasonable attorney's fees and full costs are warranted.

2             Lanham Act Remedies

3        39.    A plaintiff who establishes a violation of § 43(a) of the Lanham Act is entitled to

4    recover, "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of

5    the action. . . .  In assessing profits, the plaintiff shall be required to prove defendant's sales only;

6    defendant must prove all elements of cost or deduction claimed."  15 U.S.C. §1117(a) (emphasis

7    added).

8        40.    "In assessing damages the court may enter judgment, according to the

9    circumstances of the case, for any sum above the amount found as actual damages, not exceeding

10   three times such amount.  If the court shall find that the amount of the recovery based on profits is

11   either inadequate or excessive the court may in its discretion enter judgment for such sum as the

12   court shall find to be just, according to the circumstances of the case.  Such sum in either of the

13   above circumstances shall constitute compensation and not a penalty."  *Id.*

14       41.    "The district court assesses any damages sustained by the plaintiff in the same

15   manner as in tort damages: the reasonably foreseeable harms caused by the wrong."  *Skydive*

16   *Arizona, Inc.*, 673 F.3d at 1112.

17       42.    An exact amount of actual damages need not be proven.  In measuring harm to

18   goodwill, a jury may consider a plaintiff's expenditures in building its reputation in order to

19   estimate the harm to its reputation after a defendant's bad acts.  *Id.*

20       43.    As discussed above with respect to FAL liability, Plaintiffs have failed to

21   adequately demonstrate *any* actual damages caused by Defendants' false or misleading

22   advertising.  Indeed, even Plaintiffs' presumed loss of goodwill is not tied to any economic harm.

23   Plaintiffs seem to concede this in their proposed conclusions of law.  (ECF No. 430 at 70.)

24       44.    Nonetheless, and despite Defendants' refusal to produce financial statements,

25   Plaintiffs have demonstrated Defendants Gilbert, Trina Health, and Bionica profited at least

26   $5,626,500 in chair license fees, training fees, and oversight fees and $2,310,000 in pump sales

27   stemming from their false advertising.  No Defendant proffered evidence of cost or other

28   deduction to offset this amount.

45.     Treble damages are not appropriate on Defendants' profits, as distinguished from Plaintiffs' damages.  *See Bowmar Instrument Corp. v. Continental Microsystems, Inc.*, 497 F. Supp. 947, 961 (S.D.N.Y. 1980).  Nor do the circumstances of this case indicate an award in the amount of Defendants' estimated profits is inadequate compensation where, as here, the award is not intended to be punitive.

46.     Plaintiffs are entitled to costs as "one of the routine elements of a prevailing plaintiff's recovery" under the Lanham Act.  *Bowmar Instrument Corp. v. Continental Microsystems, Inc.*, 497 F. Supp. 947, 961 (S.D.N.Y. 1980).

47.     Under 15 U.S.C. § 116, courts may grant injunctions to prevent violations of § 43(a) of the Lanham Act.  For the same reasons set forth above with respect to copyright infringement, Plaintiffs are entitled to a permanent injunction under the Lanham Act as well.

48.     "The court in exceptional cases may award reasonable attorney fees to the prevailing party."  15 U.S.C. § 1117(a).

49.     The court's analysis of the fee shifting provision of the Lanham Act mirrors that of the Patent Act.  *See SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179, 1180 (9th Cir. 2016).  "Therefore, district courts analyzing a request for fees under the Lanham Act should examine the 'totality of the circumstances' to determine if the case was exceptional, *Octane Fitness*, 134 S.Ct. at 1756, exercising equitable discretion in light of the nonexclusive factors identified in *Octane Fitness* and *Fogerty*, and using a preponderance of the evidence standard."  *Id.* at 1181.

50.     For the reasons set forth above, then, Plaintiffs are again entitled to reasonable attorney's fees.

Breach of Fiduciary Duty and Confidentiality Remedies (as to Mr. Gilbert only)

51.     "Recovery for damages based upon breach of fiduciary duty is controlled by Civil Code [§] 3333, the traditional tort recovery."  *Michelson v. Hamada*, 29 Cal. App. 4th 1566, 1582 (1994).

52.     "Where a person profits from transactions conducted by him as a fiduciary, the proper measure of damages is full disgorgement of any secret profit made by the fiduciary

51

1   regardless of whether the principal suffers any damage." *Am. Master Lease LLC v. Idanta*

2   *Partners, Ltd.*, 225 Cal. App. 4th 1451, 1483 (2014) (internal citations omitted).

3       53.    "Where a benefit has been received by the defendant but the plaintiff has not

4   suffered a corresponding loss or, in some cases, any loss, but nevertheless the enrichment of the

5   defendant would be unjust . . . the defendant may be under a duty to give to the plaintiff the

6   amount by which [the defendant] has been enriched." *Id.* at 1482 (internal citations omitted).

7       54.    "In measuring the amount of the defendant's unjust enrichment, the plaintiff may

8   present evidence of the total or gross amount of the benefit, or a reasonable approximation

9   thereof, and then the defendant may present evidence of costs, expenses, and other deductions to

10  show the actual or net benefit the defendant received." *Id.* at 1487.

11      55.    Plaintiffs have not put on evidence of separate damages to which they may be

12  entitled as a result of Mr. Gilbert's breach of confidentiality.

13      56.    Nonetheless, the Court finds Plaintiffs are entitled to disgorgement of Mr.

14  Gilbert's profits, which Plaintiffs have reasonably established to be a total of $7,936,500 from

15  chair fees, oversight fees, training fees, and pump sales for the 33 established Trina clinics.

16  Defendant has proffered no evidence of costs, expenses, or deductions.

17      57.    Punitive damages are appropriate for a breach of fiduciary duty.  *Michelson*, 29

18  Cal.App.4th at 1582.  Under California Civil Code § 3294, punitive damages may be recovered

19  where "oppression, fraud, or malice" is proven by clear and convincing evidence.

20      58.    "The purpose in awarding punitive damages is to punish wrongdoers and thereby

21  deter the commission of wrongful acts.  An award should be no larger than the amount necessary

22  to accomplish this purpose and therefore must be tailored to the defendant's financial status. . . .

23  Factors to be considered include the nature of the acts of the defendant and the wealth of the

24  defendant." *Michelson*, 29 Cal. App. 4th at 1593 (1994) (internal citations omitted).

25      59.    "Three factors guide determination of punitive damages under California law: (1)

26  the nature of the defendants' acts; (2) the amount of compensatory damages awarded; and (3) the

27  wealth of the defendant. . . .  The plaintiff carries the burden of producing evidence of a

28  defendant's financial condition." *Nat'l Integrated Techs., Inc. v. Gustavson*, 76 F. App'x 774, 778

1   (9th Cir. 2003) (internal citation omitted).

2         60.     There is no evidence in the record even hinting at Mr. Gilbert's financial

3   condition. The Court is aware that this void was caused at least in part by Defendant's refusal to

4   comply with discovery requests and court orders, but the fact remains that the Court cannot

5   fashion a punitive damages award based solely on speculation. *See id.* at 779. As a result, the

6   Court awards no punitive damages.

7         <u>Affirmative Defenses</u>

8         61.     To the extent Defendants assert affirmative defenses aside from the patent

9   invalidity addressed above, those defenses were not raised in trial or in post-trial briefing and

10   Defendants have therefore not met their burden concerning any pleaded affirmative defense.

11   **IV.**     **CONCLUSION**

12         Based on the foregoing findings of fact and conclusions of law, the Court concludes

13   Defendants Gregory Ford Gilbert, Bionica Inc., and Trina Health, LLC, are jointly and severally

14   liable for patent infringement, copyright infringement, and false and misleading advertising and

15   unfair competition under federal law. Additionally, Defendant Gilbert is liable for breach of

16   fiduciary duty and breach of confidentiality. Judgement shall be entered in favor of Plaintiffs on

17   those claims. The Court finds the same Defendants are not liable under California's FAL or

18   UCL.

19         Plaintiffs have proven entitlement to damages amounting to $7,936,500, plus statutory

20   damages of $150,000. Plaintiffs are also entitled to reasonable attorney's fees, costs, and

21   injunctive relief.

22         Not later than thirty (30) days from the date of electronic filing of this order, Plaintiffs are

23   ordered to file the following: (1) a proposed order setting forth the terms of permanent injunction,

24   including the scope and effective date of injunctive relief; and (2) a motion for attorney's fees.

25         IT IS SO ORDERED.

26   DATED: November 16, 2020

27

28

                                                Troy L. Nunley
                                                United States District Judge